# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and DR. DANIEL L. SIMMONS, <br><br> Plaintiffs, <br><br> vs. <br><br> PFIZER, INC., et al. <br><br> Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING DEFENDANTS' MOTIONS IN PART** <br><br> Case No. 2:06-CV-890 TS BCW <br><br> Judge Ted Stewart <br><br> Magistrate Judge Brooke Wells |

Before the Court are two discovery motions filed by Defendants Pfizer, Inc., G.D. Searle LLC, and Pharmacia Corporation f/k/a Monsanto Company (collectively Pfizer). First, is Defendants' motion for a protective order regarding marketing practices litigation.[1] And second, is Defendants' motion for a protective order regarding post-2001 documents.[2] In each of these motions, Defendants seek to limit the discovery available to Plaintiffs Brigham Young University and Dr. Daniel Simmons (collectively BYU). As outlined below, the Court GRANTS Defendants' motion for a protective order regarding marketing practices litigation and GRANTS in PART Defendants' motion for a protective order regarding post-2001 documents.[3]

---

[1] Docket no. 342.
[2] Docket no. 344.
[3] After a telephone conference with the parties and after carefully reviewing the written memoranda, the Court has concluded that oral argument is unnecessary and decides the motions on the basis of the written memoranda. *See* DUCivR 7-1(f) (2009).

1

At the current stage in this litigation relevance is broadly construed and relevant information need not be admissible at trial. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."[4] But, discovery is not without limits.[5]

> Indeed, the Advisory Committee's note to the 2000 Amendment of Rule 26(b)(1) states that '[t]he rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.[6]

Thus, if there is "too tenuous a connection between the requested documents and the allegations involved in [a] case"[7] then the court should deny requested discovery.

With these principles in mind the Court now turns to the motions before it.

**I. Defendants' Motion for a Protective Order Regarding Marketing Practices Litigation**

Plaintiffs seek discovery from litigation involving the improper marketing and misuse of sales information pertaining to certain drugs including Bextra, which is a COX-2 inhibitor. Defendants oppose the production of such information because they argue it is not relevant to any claim or defense in this case and is not reasonably calculated to lead to admissible evidence.

In contrast, BYU argues the information is relevant due to its "allegations regarding Pfizer's ongoing scheme to inflate profits from its COX-2 inhibitor drugs."[8] BYU claims the

---

[4] Fed. R. Civ. P. 26(b)(1); *see also United States v. Shaw*, 2005 WL 3418497 (D.Kan. 2005) (stating that relevancy is broadly construed so "as a general proposition, a request for discovery should be considered relevant if there is 'any possibility' that the informations ought may be relevant to the claim or defense of any party") (quoting *Sheldon v. Vermonty*, 203 F.R.D. 679, 689-90 (D.Kan. 2001)).

[5] *See e.g., James v. Frank's Westates Servs., Inc.*, 2008 WL 2714206 (D.Utah 2008) (denying in part a motion to compel because some of the requests were over broad and not reasonably calculated to lead to the discovery of admissible evidence).

[6] Mem. in supp of Def.s' mtn. for protective order regarding marketing practices litigation p. 3 (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2000 Amendment, subdivision (b)(1) (emphasis omitted).

[7] *James*, 2008 WL 2714206 *3.

"crime/fraud litigation is highly relevant to show Defendants' plan and pattern of fraud to conceal its misappropriation and to maximize its profits with regard to COX-2 inhibitors."[9] BYU first argues discovery into the crime/fraud litigation is appropriate under Federal Rules of Evidence 404(b) and 406. Next, BYU cites to the liberal discovery standard and the key fact that "Pfizer placed its integrity directly at issue in an attempt to avoid discovery sanctions from this Court."[10] So, according to BYU, discovery into the crime/fraud litigation is relevant to BYU's motion for dispositive sanctions. Finally, BYU alleges such discovery is likely to "contain documents relevant to this litigation that Pfizer is withholding."[11]

Plaintiffs devote the majority of their opposition memorandum outlining problems Defendants have had with various parties including the Federal Government. For example, BYU points to the fraudulent promotion of Bextra and the fines Pfizer agreed to pay following a government investigation. "Pfizer agreed to pay a $1.195 billion dollar criminal penalty for Pharmacia's illegal activities, and to forfeit another $105 million of profits."[12] Next, BYU notes that Pfizer's conduct became so egregious that the Federal Government required Pfizer to enter into a "Corporate Integrity Agreement." This agreement, which was the second one signed by Pfizer's representatives, extended its scope and coverage and provided that Pfizer's Chief Compliance Officer could not be subordinate to Pfizer's General Counsel or Chief Financial Officer due to concerns with possible fraud. In sum, according to BYU, Pfizer's corporate culture is one that cultivates dishonesty, fraud, and theft, and is full of individuals who engage in

---

[8] Op. p. 20.
[9] *Id.*
[10] Joint Statement Memorandum p. 24.
[11] Op. p. 25.
[12] *Id.* at p. 11.

3

illegal activities even though they know such activities are against the law.[13] BYU points to these numerous instances of "ethical failures" and asserts that Pfizer's conduct toward BYU is exactly the same whether it was with the initial discovery of the COX-2 gene, or with providing requested discovery in the instant matter. Thus, the Court should permit discovery into the crime/fraud litigation.

While it is clear to the Court that the individuals within Pfizer have had many serious lapses in ethical behavior, the Court is not persuaded that discovery into the crime/fraud litigation is appropriate in this case.

First, BYU's arguments regarding the Federal Rules of Evidence fail. Rule 404(b) provides that evidence of other crimes, wrongs or certain actions is not admissible to prove the character of an individual or to show an action is in conformity with prior acts. Such evidence, however, is "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[14]

BYU alleges discovery of the crime/fraud litigation is appropriate to show "Pfizer's motive, intent and plan for misappropriating BYU's Confidential Information and concealing that misappropriation in order to maximize and keep the profits form the COX-2 inhibitors."[15] The Court, however, notes one serious flaw in BYU's reasoning -- Plaintiffs seek discovery relating to subsequent conduct to show intent or motives in conduct that occurred nearly ten years previously. This proposition is not supported by the cases relied upon by BYU. For example, in *Untied States v. Barbieri*,[16] the Tenth Circuit concluded the trial court did not err in

---

[13] *See id.* at p. 11-16.
[14] Fed. R. Evd. 404(b).
[15] Op. p. 21.
[16] 614 F.2d 715 (10th Cir. 1980).

4

admitting evidence regarding the defendant's <u>earlier attempts</u> to organize a prostitution operation. And, in *Campbell v. State Farm*,[17] the Utah Supreme Court did find that evidence of the defendant's "intent, motive, and rationale for its wrong-doing was extremely relevant, and the evidence of its long-established methods of doing business were . . . highly probative."[18] But, in reversing this decision the United States Supreme Court stated:

> the Utah courts erred in relying upon this and other evidence: The courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here.[19]

Upon remand, the Utah Supreme Court noted its error and stated "The Supreme Court chided us for basing our reinstatement of the jury's $145 million punitive damages award on State Farm's 'nationwide policies rather than for the conduct direct [sic] toward the Campbells.'"[20]

Thus, the Court finds that discovery of the crime/fraud litigation is not supported by Rule 404(b). Moreover, such evidence is not relevant to a punitive damages claim or the other current pending claims in this action.

In similar fashion, the Court finds Federal Rule of Evidence 406 also does not support the discoverability of the crime/fraud litigation. Rule 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove

---

[17] 65 P.3d 1134 (Utah 2001).
[18] *Id.* at 1158.
[19] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003) (referred to as *Campbell II*).
[20] *Campbell v. State Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 413 (Utah 2004) (referred to as *Campbell III*) (quoting *Campbell II*, 538 U.S. at 420.

that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.[21]

BYU argues that discovery of the crime/fraud litigation is relevant under Rule 406 to show that Pfizer has "a routine practice, even a 'corporate culture' of committing fraud to protect its COX-2 related profits."[22] The Court disagrees. Habit evidence, which is what Rule 406 evidence is often called, is characterized "as a semi-automatic act . . . that is done reflexively."[23] It involves "'one's 'regular practice of meeting a particular kind of situation with a specific type of conduct.' Examples include going down a particular stairway two stairs at a time, giving the hand signal for a left turn, alighting from railway cars while they are still moving, . . . ."[24] Thus, certain actions are very difficult to characterize as a semi-automatic act. For example, "[e]xtortion or refraining from extortion is not a semi-automatic act and does not constitute habit."[25]

Here, Pfizer's wrongdoings, as detailed by BYU, are not only related to the COX-2 drug Bextra but involve other drugs that were marketed illegally. The fraud BYU alleges is very difficult to characterize as a semi-automatic act. "Lying to obtain gain when faced with financial adversity is neither a particular kind of situation nor a specific type of conduct."[26] Therefore, the Court finds the discovery of the crime/fraud litigation is not habit evidence available under Rule 406.

Next, although there is not a currently pending motion for discovery sanctions, the Court finds even if there was one pending it would not provide a basis for discovery into the

---

[21] Fed. R. Evd. 406.
[22] Op. p. 24.
[23] *U.S. v. Oldbear*, 568 F.3d 814, 822 (10th Cir. 2009) (quotation and citation omitted).
[24] *U.S. v. Morris*, 2002 WL 382859 **4 (10th Cir. 2002) (citation omitted).
[25] *U.S. v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987).
[26] *Morris*, 2002 WL 382859 at **4.

crime/fraud litigation. The company-wide integrity of everyone within Pfizer is not at issue in this case. And, the quotation BYU uses as a basis to try and create an issue from the Joint Statement Memorandum is taken out of context. The statement is from Pfizer's Associate General Counsel, Stephen O'Sullivan, and it refers to the integrity of Pfizer's outside counsel not to that of its employees.[27]

Finally, while the Court notes that there have been some very serious errors committed by Pfizer in providing BYU discovery, there is nothing to indicate discovery into the crime/fraud litigation would somehow provide insight into missing evidence. The crime/fraud litigation involves defendants that are not named in this case, Pharmacia & Upjohn Company.[28] And, the Court is not persuaded that discovery into the illegal marketing for unapproved off the shelf uses for drugs is sufficiently related to the issues in this case to lead to the discovery of admissible evidence.

Accordingly, for the foregoing reasons, the Court GRANTS Defendants' motion for a protective order regarding marketing practices litigation.[29]

**II. Defendants' Motion for a Protective Order Regarding Post-2001 Documents**

Defendants seek a protective order "stating that neither party must produce non-damages related documents dated after May 8, 2001. This order would also not apply to pleadings, depositions, transcripts, or exhibits from prior relevant litigation."[30]

BYU opposes the motion and asserts that the "proposed 8 May 2001 relevance cut-off makes no sense."[31] BYU argues the Court should reject Pfizer's cut-off date because "Pfizer has

---

[27] *See* Joint Statement Memorandum p. 24.
[28] *See* Def.s' reply p. 8.
[29] Docket no. 342.
[30] Def.s' reply to their motion for a protective order regarding post-2001 documents.

7

now made too many discovery misrepresentations to be trusted."[32] For example, Pfizer misrepresented the completion of the documents from the *Rochester* litigation and the incidents surrounding the destruction of biological materials in this case. In essence, BYU alleges that "Pfizer should be required to review and produce the relevant, responsive documents it is still withholding, regardless of the date those documents were created."[33]

Much of BYU's concern appears to center around documents from the "Chesterfield collection." "Pfizer is currently in the process of closing its facilities in Chesterfield, Missouri."[34] As part of this process, Pfizer is conducting interviews of its Chesterfield employees and "collecting all COX related paper and electronic documents in the custody of these employees."[35] BYU wants Pfizer to review everything from the Chesterfield closing and if it is relevant then produce it even if it is a post-May 2001 document.

Both parties agree the scientific research that gave rise to this case occurred "between 1989 and 1995."[36] The heart of this dispute lies within the circumstances surrounding this scientific research and how such research was subsequently used to develop COX-2 drugs. BYU claims that "[t]he date a document was created does not determine whether or not the document contains relevant information."[37] In support of this position, Plaintiffs describe a number of relevant documents "created after 1995 (when the majority of the research at issue had been completed)"[38] and argue that most of these documents were created after May 8, 2001. Some of

---

[31] Op. p. 1.
[32] *Id.* at p. 2.
[33] *Id.*
[34] Mem. in supp. p. 3.
[35] *Id.* at p. 4.
[36] Op. p. 2.
[37] *Id.* at p. 5.
[38] *Id.*

these examples include, *inter alia*,: a post 2001 deposition of Dr. Philip Needleman; a global slide kit created by Pfizer in 2002 to help market Bextra; an August 2001 deposition of Dr. Peter Isakson, Pfizer's Executive Director of COX-2 Technology; press releases promoting the release of Celebrex; portions of the "Queeny Award nomination;"[39] and Dr. Seibert's consulting agreement.

Out of all of BYU's cited examples, Pfizer alleges that only two which were created after May 8, 2001, are not publicly available and are not part of a litigation related document that would not be included in the post-2001 protective order. Thus, BYU's own examples support the notion that there should be a May 2001 cut-off date to prevent the further production of "'literally millions' of 'useless' irrelevant post-2001 documents that Plaintiffs indicate they have received in this litigation."[40]

Pfizer also points to BYU's own responses to certain requests for production of documents where BYU agreed to only search for and produce documents through May 8, 2001. For example, in response to Pfizer's Fifth Request for Production of Documents Plaintiffs state:

> Plaintiffs agree to produce any responsive documents in Brigham Young University's custody and control for the period between January 1991 through 8 May 2001, located after a reasonable search . . . .[41]

So, it appears that Plaintiffs themselves do not want to produce documents after the proposed cut-off date of May 8, 2001. Plaintiffs fail to explain why they find post-May 2001 documents to be irrelevant while still requiring Pfizer to produce such documents.

---

[39] *Id.* at p. 9.
[40] Reply p. 1.
[41] Response to Request Nos. 1, 2, and 6, attached as ex. 2 to Pfizer's mem. in supp.

A party may obtain discovery "that is relevant to any party's claim or defense."[42] Yet, "[o]n motion or on its own, the court must limit the frequency or extent of discovery [if] the discovery sought is unreasonably cumulative or duplicative [or when] the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, . . . ."[43]

Here, like Plaintiffs, the Court is concerned about the history of Pfizer's discovery misrepresentations. Pfizer's own admission about the Chesterfield documents adds to this concern. Pfizer states that some of the documents in the Chesterfield closing "may arguably be 'responsive' to Plaintiffs' requests, even though there is little or no likelihood that documents have any relevance to BYU's claims."[44]

Pfizer argues that where documents from a certain time period are unlikely to be relevant, it is appropriate to limit a party's production of documents to a relevant time period. In support of this argument Pfizer cites to a number of cases.[45] The Court finds the reasoning of these cases persuasive and notes that Plaintiffs themselves sought to impose a post-2001 cut-off in their responses to discovery. Therefore, the Court GRANTS Defendants' motion for a protective order regarding post-2001 documents[46] with the following exceptions. First, as noted by

---

[42] Fed. R. Civ. P. 26(b)(1).
[43] *Id.* 26(b)(2)(C).
[44] Mem. in supp. p. 4.
[45] *See Sundaram v. Brookhaven Nat'l Lab., Associated Univs., Inc.,* No. CV-94-2330, 1996 WL 563829, *3 (E.D.N.Y. March 11, 1996) (limiting discovery to the time period likely to have relevant documents and noting that "[t]he mere possibility that admissible evidence may be uncovered, however, does not entitle a party to unlimited discovery"); *James v. Frank's Westates Servs., Inc.*, No. 2:07-cv-937-DB-PMW, 2008 WL 2714206, *3 (D. Utah July 10, 2008) (holding that time limitation contained in a document request was appropriate); *Chapman v. Carmike Cinemas, Inc*., No. 2:06-cv-00948 TS DN, 2007 WL 1302754, *4 (D. Utah May 2, 2007) (limiting discovery to the relevant time period); *Richards v. Convergys Corp*., Nos. 2:05-cv-00790-DAK, 2:05-cv-00812 DAK, 2007 WL 474012, *5 (D. Utah Feb. 7, 2007) ("The court agrees with Richards that Convergys is not entitled to an open-ended request for Richards' employment records. The court encourages the parties to agree on an appropriate time limit for the discovery requests.")
[46] Docket no. 344.

10

Defendants the protective order does not apply to pleadings, deposition transcripts, exhibits or other materials from other relevant litigation. Many of the documents cited to by BYU as support against a post-2001 protective order fall within this excepted category of items. Second, given the history of discovery misrepresentations by Pfizer in this case, the Court will not exempt from discovery those items collected by Pfizer from the Chesterfield, Missouri facility. Pfizer is ORDERED to search the documents and materials from its Chesterfield, Missouri facility and provide those items that are responsive to BYU's discovery requests within 45 days from the entry of this order. And finally, any relevant responsive documents that Defendants--or entities which Defendants control--are withholding are not exempt from production under the protective order. The Court ORDERS Defendants to produce any such discovery within 45 days from the entry of this order.

Other than these stated exemptions the Court HEREBY ORDERS that neither party must produce non-damages related documents dated after May 8, 2001.

DATED this 23rd day of June, 2010.

BY THE COURT:

_____
Magistrate Judge Brooke Wells