**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH,**

**CENTRAL DIVISION**

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and DR. DANIEL L. SIMMONS, <br><br> Plaintiffs, <br><br> vs. <br><br> PFIZER, INC., et al. <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION TO DISQUALIFY (SEALED)** <br><br> Case No. 2:06-CV-890 TS BCW <br><br> Judge Ted Stewart <br><br> Magistrate Judge Brooke Wells |

Before the Court is Plaintiffs Brigham Young University's and Daniel Simmons' (collectively BYU) sealed motion to disqualify Winston & Strawn LLP.[1]  The Court heard oral argument on Plaintiffs' motion.  Mark Bettilyon, Leo Beus, Richard Williams and Samuel Straight appeared for Plaintiffs.  David Jordan, Brad Brian and Benjamin Maro represented the law firm of Winston & Strawn.  Having heard oral argument, and after considering the parties' memoranda and relevant case law the court renders the following decision.  For the reasons discussed below, the court grants the motion.

**BACKGROUND**

Much of this dispute centers on Mr. Gene Schaerr who is currently a partner at Winston & Strawn.  Mr. Schaerr graduated from BYU in 1981 and Yale Law School in 1985.  Previously Mr. Schaerr was a partner at the law firm of Sidley Austin L.L.P. (Sidley).  In 2001 while Mr.

---

[1] Docket no. 374.

1

Schaerr was at Sidley, BYU's general counsel Thomas Griffith[2] asked Mr. Schaerr to represent

BYU in connection with certain legislative and regulatory proceedings that could impact BYU

and its "religious mission."[3]   In addition to the religious freedom issues Sidley also represented

BYU on a number of other matters.

      Around this same time frame Sidley was asked to represent Pfizer, or its predecessors in

interest Searle and Pharmacia, in relation to a dispute with BYU concerning Celebrex (the

Celebrex matter).   This dual representation created a problem.   Mr. Schaerr's partners at Sidley

asked him to "approach BYU on Sidley's behalf to obtain a conflict waiver to facilitate Sidley's

representing [Pfizer]."[4]   BYU, through its general counsel Mr. Griffith, signed the waiver.[5]

      In February of 2005 Mr. Schaerr left Sidley and joined Winston & Strawn (Winston).[6]   In

order for BYU to continue having Mr. Schaerr represent its interests-something which BYU

desired given the past relationship that existed between Mr. Schaerr and BYU-Winston required

BYU to sign an engagement letter, which at paragraph 7, contains a prospective conflict waiver.

The waiver states:

> <u>Advance Patent Waiver</u>: As you may know, universities frequently hold patents in the
> products and inventions developed at such universities.  Winston & Strawn LLP currently
> represents multiple pharmaceutical and other companies with respect to patent and
> intellectual property matters (collectively, the "Other Clients"), including litigation (the
> "Patent Matters").  Winston & Strawn LLP is not currently representing any Other
> Clients in matters adverse to the University.  Because of the scope of our patent practice,
> however, it is possible that Winston & Strawn LLP will be asked in the future to
> represent one or more Other Clients in matters, including litigation, adverse to the
> University.  Therefore, as a condition to Winston & Strawn LLP's undertaking to

---

[2] Mr. Griffith left his position as General Counsel at BYU in July 2005 and is currently serving as a federal judge on the Untied States Court of Appeals for the District of Columbia Circuit.
[3] Orme Decl. ¶4, attached as exhibit 1 to BYU's mem. in supp. of its motion to disqualify.
[4] Schaerr Decl. ¶30.
[5] Griffith Decl. ¶¶4-5, attached as exhibit C to BYU's reply mem.
[6] In response to the court's questions during oral argument Mr. Schaerr submitted a supplemental declaration noting that he started at Winston & Strawn on February 9, 2005.

represent you in the BYU Matters, you agree that this firm may continue to represent the Other Clients in the Patent Matters, including litigation, directly adverse to the University and hereby waive any conflict of interest relating to such representation of Other Clients.[7]

Mr. Griffith signed the engagement letter that contained the prospective conflict waiver for BYU on March 1, 2005.

Following BYU's consent, Mr. Schaerr and Winston continued to represent BYU on certain matters including work in relation to the Higher Education Opportunity Act (HEOA). "Winston's work on the HEOA matters concluded on about February 28, 2009"[8] and Mr. Schaerr sent BYU the "final bill" on March 20, 2009. Other matters that Winston worked on for BYU ended in approximately June 2008. Michael Orme, BYU's current general counsel, notes that BYU has paid a total amount of $750,455.19 to Mr. Schaerr's firms.[9] "Of this amount, $267,608.57 was paid to Sidley Austin and $462,846.62 was paid to Winston & Strawn."[10]

On October 18, 2006, BYU filed the instant lawsuit against Pfizer regarding the Celebrex matters. It is unclear exactly when Mr. Schaerr became aware of this litigation, but in the Summer of 2008 Mr. Schaerr signed up for a Lexis/Nexis service where he received copies of electronic docket notices from this case. Mr. Schaerr also had many conversations with Mr. Orme about this litigation. Some of those conversations included matters that were "already known to BYU's opponents, or would shortly become known."[11]

Since the inception of this case Sidley has represented Pfizer. In January 2010, however, Mr. Orme received a phone call from Mr. Schaerr informing him that Winston "intended to make

---

[7] Orme Decl. ¶10 (emphasis added). A copy of the entire engagement letter is attached as exhibit B to BYU's mem. in supp. of its motion.
[8] Schaerr Decl. ¶23.
[9] Orme Decl. ¶9(f).
[10] *Id.*
[11] Schaerr Decl. ¶38.

an appearance as counsel in the Pfizer litigation against BYU."[12]  Winston still has a current

relationship with BYU and there is nothing in the record to indicate that either party has

terminated its relationship although certain matters may currently be dormant.

During this same phone conversation Mr. Schaerr told Mr. Orme that Winston would not

play the same "discovery games" that Sidley had thus far and Winston would be much more

cooperative.[13]  Mr. Schaerr offered to help broker a settlement between BYU and Pfizer.  Mr.

Schaerr thought he "might be able to act as a 'go-between' to bring BYU and Pfizer together in

settlement discussions"[14] based upon the friendship he developed with Mr. Orme through

representing BYU.  Mr. Schaerr informed Mr. Orme that Pfizer was interested in settling the case

and asked Mr. Orme to "divulge the specific dollar figures at which the settlement discussions

had broken down during BYU's failed mediation attempts with Pfizer in 2006."[15]  Mr. Schaerr

also indicated his view that "even though he continued to represent BYU on . . . other matters,

his firm did not need a conflict waiver to oppose BYU in this matter because BYU had signed a

prospective waiver when he had joined Winston & Strawn in 2005."[16]

Following this initial phone call, BYU and Winston exchanged multiple emails and

letters.  One such email sent from Mr. Schaerr to Mr. Orme states:

> [L]et me express my regret at the difficult position my communication with you – and my
> firm's potential involvement in the litigation – have put you in.  If I were to consider only
> my personal feelings and preferences, the last thing I would want is any kind of adverse
> relationship between my firm and BYU.  The opportunity to represent BYU on a range of
> important matters, and in the process to develop a friendship with you, has been one of
> the most gratifying experiences of my professional life.  So my natural inclination is a

---

[12] *Id.* at ¶15(g).
[13] Orme Decl. ¶15(g).
[14] Schaerr Supp. Decl. ¶5.
[15] Orme Decl. ¶15(g).
[16] *Id.*

desire to join with you in achieving your objectives, rather than seeing my colleagues working at cross-purposes with you.

Yet I also have a fiduciary duty to my partners, and (especially in turbulent economic times) a moral duty to our employees, not to stand in the way, unnecessarily, of new opportunities that come to other partners. I'm so sorry that my attempt to discharge those duties has created discomfort. My hope is that I can live up to my responsibilities to the firm and its employees in a way that maintains the strong relationship that I have enjoyed with BYU over the past 36 years, and that minimizes any discomfort to you and my other friends in the BYU administration.[17]

BYU objects to Winston entering this case and filed the instant motion to disqualify Winston shortly thereafter.

## DISCUSSION

### I. Legal Standard

"Motions to disqualify are governed by two sources of authority."[18] First, attorneys are bound by the local rules of the court in which they appear. The local rules of this court provide:

All attorneys practicing before this court, whether admitted as members of the bar of this court, admitted pro hac vice, or otherwise as ordered by this court, are governed by and must comply with the rules of practice adopted by this court . . . , with the Utah Rules of Professional Conduct, as revised and amended and as interpreted by this court. The court endorses the Utah Standards of Professionalism and Civility (Appendix XII) to guide the attorney conduct in cases and proceedings in this court.[19]

Second, because motions to disqualify "are substantive motions affecting the rights of the parties, they are decided applying standards developed under federal law."[20] Motions to disqualify, therefore, "are governed by the ethical rules announced by the national profession and considered 'in light of the public interest and the litigants' rights.'"[21] "Utah has adopted, with

---

[17] Gene Schaerr email dated January 28, 2010, attached as exhibit C to BYU's motion.
[18] *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994).
[19] DUCivR 83-1.1(g) (2009) (all citations to the local rules are to the December 2009 edition).
[20] *Cole*, 43 F.3d at 1383.
[21] *Id.* (quoting *In re Dresser In-dus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)).

some variations, the American Bar Association Model Rules of Professional Conduct."[22]  In

*Cole*, the Tenth Circuit stated that the ABA Model Rules of Professional Conduct "reflect the

national standard to be used in ruling on disqualification motions."[23]  The court, therefore, looks

to these two sources of authority in deciding BYU's motion.[24]

BYU contends that "Winston & Strawn, particularly its partners Gene Schaerr and Dan

Webb, have committed egregious violations of Utah Rules of Professional Conduct ("URPC")

1.6, 1.7, and 1.8."[25]  Specifically, BYU alleges that while Winston was representing BYU on

other unrelated matters that Mr. Schaerr "solicited and received confidential information from

BYU about this very litigation . . . while actually representing Pfizer."[26]  Thus, two of Winston's

current clients – BYU and Pfizer – are now in a directly adverse relationship.  In sum, given the

violations of the URPC Winston should, according to BYU, be disqualified.

## II. Rule 1.7

At the outset the court notes that although BYU and Winston's current relationship is

largely dormant, there is nothing before the court to indicate that either party has terminated the

attorney client relationship.  The court finds, therefore, that Rule 1.7 is applicable here because

this matter involves a concurrent conflict of interest.[27]

Rule 1.7 of the URPC governs conflicts of interest involving current clients.  The rule

prohibits a lawyer from representing a client who is directly adverse to another client without

---

[22] *SLC Ltd.V v. Bradford Group West, Inc.*, 999 F.2d 464, 466 (10th Cir. 1993).

[23] *Cole*, 43 F.3d at 1383.

[24] In his rebuttal report, BYU's expert John Morris, alludes to the Utah practice and standards as perhaps some other basis for another source of authority.  The court concludes that while Utah's practice and standards may differ in some respects from the national practices and standards, there are no significant applicable differences that the court need consider in deciding this motion.

[25] Mtn p. 1.

[26] *Id.*

[27] In its opposition, Winston, does not contest that this matter involves a concurrent conflict of interest.  *See* Op. p. 13.

obtaining the written consent of both clients.  The rule provides that "a lawyer shall not represent

a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of

interest exists if: (a)(1) The representation of one client will be directly adverse to another client;

or (a)(2) There is a significant risk that the representation of one or more clients will be

materially limited by the lawyer's responsibilities to another client."[28]  The rule further provides,

in relevant part, that notwithstanding a concurrent conflict of interest, an attorney may still

represent a client if "(b)(1) the lawyer reasonably believes that the lawyer will be able to provide

competent and diligent representation to each affected client; [and] (b)(4) each affected client

gives informed consent, confirmed in writing."[29]

Winston argues that it may represent Pfizer and BYU because "BYU gave its informed

written consent to precisely this sort of representation and Winston reasonably believes that it

will be able to provide competent and diligent representation to Pfizer and BYU in their

respective matters."[30]  BYU disagrees, arguing that it never waived Winston's conflict via the

Advance Patent Waiver.

Comment 22 to Rule 1.7, which addresses consents to future conflicts, is instructive here.

It states:

> Whether a lawyer may properly request a client to waive conflicts that might arise in the
> future is subject to the test in paragraph (b).  The effectiveness of such waivers is
> generally determined by the extent to which the client reasonably understands the
> material risks that the waiver entails.  The more comprehensive the explanation of the
> types of future representations that might arise and the actual and reasonably foreseeable
> adverse consequences of those representations, the greater the likelihood that the client
> will have the requisite understanding.  Thus, if the client agrees to consent to a particular

---

[28] Utah R. Prof'l Conduct 1.7(a).
[29] *Id.* 1.7(b)
[30] Op. p. 13.

type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict.[31]

The comment goes on to describe situations where the consent is general and open-ended rather than specific.  It continues:

> If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved.  On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, such consent is more likely to be effective, particularly if, e.g., the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation.  In any case, advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict nonconsentable under paragraph (b).[32]

The parties dispute the general applicability of advance waivers.  BYU notes that advance waivers are less common in Utah than in other parts of the country and even Comment 22, which deals with advance waivers, was not adopted in Utah until November 1, 2005.  Therefore, according to BYU, Comment 22 was not part of the governing Utah law when BYU executed the engagement letter on March 1, 2005.  In contrast, Winston argues that there is no special Utah law governing advance waivers.  Moreover, Comment 22 is merely an interpretation of Rule 1.7 and not a change to that rule.

Although they may be less common in Utah, the court finds that advance waivers are permissible under Rule 1.7.  In fact, they appear to have increased in importance given the nature of modern law practice which is often both national and international in nature.  The court agrees with Winston's expert Ronald Rotunda who states "As law firms have grown larger, potential conflicts have proliferated, and advance waivers of imputed conflicts have become an

---

[31] Utah R. Prof'l Conduct 1.7 cmt. 22.

[32] *Id.*

increasingly important tool in enabling clients to obtain representation from the lawyer of their choice."[33]   The court is not persuaded by BYU's position that Comment 22 is somehow excludable because it was adopted after the waiver was executed.  As BYU itself notes, "It is the Rules that set standards, not the Comments."[34]   There was no applicable change to Rule 1.7 from the time BYU executed the agreement to the time Comment 22 was adopted.  Therefore, the court now turns to the waiver itself and Rule 1.7 to determine the applicability of the advance waiver.

**(i) The Advance Waiver**

Before considering the advance waiver the court notes the well-settled rule of construction when dealing with waivers such as this.  The document is to be construed against its drafter and read as it would be read by a reasonable client.  The American Bar Association in a formal opinion stated, "The courts, in evaluating a waiver, often look primarily to the language and construction of the waiver to determine its validity.  For a consent to be interpreted as validly waiving the client's right to exclusive representation, '[l]anguage in a contract of release ... would have to be positive, unequivocal and inconsistent with any other interpretation.'  Where the terms of a waiver are not explicit, the client should not be held to the terms of the document."[35]

The advance waiver states:

Advance Patent Waiver: As you may know, universities frequently hold patents in the products and inventions developed at such universities.  Winston & Strawn LLP currently represents multiple pharmaceutical and other companies with respect to patent and intellectual property matters (collectively, the "Other Clients"), including litigation (the "Patent Matters").  Winston & Strawn LLP is not currently representing any Other

---

[33] Rotunda Decl. ¶24.
[34] Morris rebuttal report p. 4 fn. 5.
[35] ABA Formal Op. 93-372 (1993) (quoting *In re Boone*, 83 F. 944, 956 (D.C.N.D.Cal. 1897)).

Clients in matters adverse to the University.  Because of the scope of our patent practice, however, it is possible that Winston & Strawn LLP will be asked in the future to represent one or more Other Clients in matters, including litigation, adverse to the University.  Therefore, as a condition to Winston & Strawn LLP's undertaking to represent you in the BYU Matters, you agree that this firm may continue to represent the Other Clients in the Patent Matters, including litigation, directly adverse to the University and hereby waive any conflict of interest relating to such representation of Other Clients.[36]

BYU argues the "engagement letter, by its explicit terms, applies only where a conflict arises in the future with respect to companies represented by [Winston] on 28 February 2005 with respect to 'intellectual property matters,' which the Advance Patent Waiver defines as 'Other Clients.'"[37]  BYU further notes that the "Advance Patent Waiver does not state that Pfizer or any other Defendant [such as Pfizer's predecessors in interest] was an 'Other Client[].'"[38]

In response to BYU's assertion that there is no specific information that Pfizer was an Other Client under the terms of the waiver agreement Winston cites to the declaration of Thomas Frederick.[39]  Mr. Frederick states "Winston's accounting and administrative records, . . . , show that the firm has represented Pfizer and related entitles (including the predecessor entities Monsanto, Pharmacia, and Searle) since 1985 on matters ranging from labor disputes to general corporate litigation, including intellectual property matters."[40]  Mr. Frederick continues, "Prior to being asked in January 2010 to become counsel to Pfizer in the current matter,

---

[36] Orme Decl. ¶10 (emphasis added).  A copy of the entire engagement letter is attached as exhibit B to BYU's mem. in supp. of its motion.
[37] Reply p. 2.
[38] *Id.*
[39] Thomas Frederick is a partner in the Chicago office of Winston.  Mr. Frederick is Winston's General Counsel and the partner responsible for "overseeing the firm's policies and practices with respect to conflict of interest issues." Frederick decl. ¶1.
[40] *Id.* at ¶7.

Winston's accounting and administrative records show that the firm has never represented Pfizer in a matter adverse to BYU."[41]

The court is persuaded by BYU's argument.  In reviewing the Advance Patent Waiver the court finds that "Other Clients" as used by Winston in the agreement is a term of art.  Other Clients is used throughout the Advance Patent Waiver and is defined in the waiver itself as companies that Winston currently represents "with respect to patents and intellectual property matters."  The last part of the waiver also makes reference to the term "Other Clients."  It states BYU agrees "that [Winston] may continue to represent the Other Clients in the Patent Matters, including litigation, directly adverse to the University and hereby waive any conflict of interest relating to such representation of Other Clients."

Based upon the plain language found in the waiver, and the well-settled rules of construction, the court finds the waiver only applies to clients that Winston was representing with respect to patent and intellectual property matters as of the date of the agreement.  BYU signed the agreement on March 1, 2005.  Therefore, the court concludes that if Pfizer or its predecessors in interest were clients of Winston "with respect to patents and intellectual property matters" on March 1, 2005, then the waiver applies.

The court's own review of Winston's web site reflects that Winston has represented Pfizer,[42] or its predecessors in interest, in various suits involving such issues as race discrimination, negligent supervision, administrative hearings for labor and employment claims, and defense against the mass tort litigation arising from Pfizer's drugs Celebrex and Bextra.[43]

---

[41] *Id.*
[42] *See* http://winston.com/index.cfm?contentID=17 (representative matters last accessed on August 23, 2010).
[43] *See* http://winston.com/index.cfm?contentID=19&itemType=20&itemID=329&pageID=381 (last accessed on August 23, 2010).

After reviewing the materials before it, including the declaration of Thomas Frederick and Winston's web site, the court finds there is no specific evidence that Pfizer or its predecessors in interests were "Other Clients" as defined by the Advance Patent Waiver on March 1, 2005 when it was signed by BYU. Winston has failed to meet its burden in demonstrating to the court that it satisfied the requirements for an exception found in Rule 1.7(b).[44] Accordingly, based upon the circumstances in this case, the court concludes the Advance Patent Waiver fails to waive the conflict created by Winton's dual representation of BYU and Pfizer and therefore, Rule 1.7 has been violated.[45]

## III. Rule 1.10

Rule 1.10 of the URPC deals with the imputation of conflicts of interest within firms. It states that "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm."[46]

Winston's own expert, Ronald Rotunda, acknowledges the common principle of imputation found in Rule 1.10. He states, "Conflicts that preclude an individual lawyer from representing a client's adversary are generally imputed to the entire firm. Therefore, in the

---

[44] *Celgene Corp. v. KV Pharmaceutical Co.*, 2008 WL 2937415 *4 (D.N.J. 2008) (stating that "the key question is whether [the party arguing that the waiver applies] has satisfied the requirements of the exception" allowing for such a waiver); *Bodily v. Intermountain Health Care Corp.*, 649 F.Supp. 468 (D.Utah 1986) (finding that the law firm accused of violating an ethical rule regarding concurrent representation failed to prove by a preponderance of the evidence that there was no violation of the rule).
[45] Having determined that Pfizer is not an Other Client under the Advance Patent Waiver the court does not consider the arguments from the parties concerning whether or not the waiver is sufficient under the Utah Rules.
[46] Utah R. Prof'l Conduct 1.10(a).

absence of an advance waiver that is binding on the client, law firms would often choose to reject prospective clients so as not to foreclose the opportunity to represent long-standing clients in unrelated matters adverse to the prospective client that may arise in the future."

Having determined that the waiver does not apply in this case, and based upon Mr. Schaerr's relationship with BYU, Rule 1.7 would prohibit Mr. Schaerr from representing Pfizer in a matter adverse to BYU.  The court, therefore, finds that this same conflict of interest is imputed to Mr. Schaerr's firm Winston.

## IV. Remedy

Having determined that Rule 1.7 has been violated, the court must now determine whether disqualification is the appropriate remedy.[47]  A court has broad discretion and the inherent authority to disqualify counsel or a law firm.[48]  But, a court should take into consideration the important interest a party in a civil case has in being able to retain counsel of its choice.[49]  Disqualification "is a drastic measure and a court should hesitate to impose it except when necessary."[50]  A motion to disqualify should be viewed with "extreme caution . . . recognizing the possible unfair advantage that may result."[51]  In essence, "[t]he sanction of disqualification of counsel in litigation situations should be measured by the facts of each particular case as they bear upon the impact of counsel's conduct upon the trial."[52]

---

[47] In its motion BYU also asserts that ethical rules 1.6 and 1.8 were violated.  Having already determined that Rule 1.7 was violated, the court believes a determination of whether rules 1.6 and 1.8 were violated would not materially impact its analysis in relation to the appropriate remedy.  The court therefore does not consider those arguments.
[48] *SLC Ltd*, 999 F.2d at 466; *Redd v. Shell Oil Co.*, 518 F.2d 311, 314 (10th Cir. 1975).
[49] *Proctor & Gamble Co. v. Haugen*, 183 F.R.D. 571, 574 (D.Utah 1998).
[50] *Bullock v. Carver*, 910 F.Supp. 551, 559 (D.Utah 1995).
[51] *Parkinson v. Phonex Corp.*, 857 F.Supp. 1474, 1480 (D.Utah 1994).
[52] *Id.* at 1476.

The Supreme Court has stated "[t]he decision whether to disqualify an attorney ordinarily turns on the peculiar factual situation of the case then at hand."[53]  Thus, when considering a motion to disqualify the court must consider the facts of each particular case, the nature of any violations and the impact of the violations on trial proceedings.[54]  Factors to consider include: (1) the egregiousness of the violation, (2) the presence or absence of prejudice to the other side, (3) whether and to what extent there has been a diminution of effectiveness of counsel, (4) hardship to the other side, and (5) the stage of trial proceedings.[55]  "The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit."[56]

This court denied motions for disqualification of counsel in three fairly recent cases considering a conflict of interest arising from a concurrent adverse representation.  In *Parkinson v. Phonex Corp.*,[57] the law firm representing the plaintiffs discovered that one of its attorneys had represented one of the defendants, Mr. Simonson, for approximately one month in an estate-planning matter.[58]  After discovering the conflict, the firm immediately terminated the estate planning representation and dismissed Mr. Simonson as a defendant because of the apparent conflict situation.  Applying the factors set forth above, the court found disqualification of counsel was not appropriate.  The court stated, "the violation of the ethical rules in question did not taint the lawsuit nor diminish counsels' effectiveness.  In addition, the court finds the

---

[53] *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377 (1981); *see also Parkinson*, 857 F.Supp. at 1476; *Bodily*, 649 F.Supp. at 478.
[54] *Bodily*, 649 F.Supp. at 473.
[55] *Parkinson*, 857 F.Supp. at 1476; *Bodily*, 649 F.Supp. at 473.
[56] *Parkinson*, 857 F.Supp. at 1476.
[57] 857 F.Supp. 1474.
[58] *Id.* at 1475.

interests of the parties and the legal profession and the intent of the Rules of Professional

Conduct to be best served by denying defendants' motion to disqualify."[59]

In *Bodily v. Intermountain Health Care*,[60] the law firm of Howard, Lewis & Peterson

represented the plaintiff Mr. Bodily against Intermountain Health Care (IHC).  While

representing Mr. Bodily, Richard Johnson a partner with the Howard firm, agreed to act as local

counsel for a California firm which was representing IHC in a wrongful discharge action (*Wilson*

case).  Mr. Johnson's involvement in the *Wilson* case was nothing more than procedural.  He

moved for admission of members of the California firm to practice in the *Wilson* case and

reviewed documents prepared by the California firm to make sure they complied with the local

rules of practice.  His fee for legal services and costs totaled $195.82.[61]  Mr. Johnson was aware

of the conflict of interest, but he relied on the California firm's representation that IHC had

consented to the dual representation.  There was, however, no written consent from IHC or Mr.

Bodily.  After IHC's local counsel discovered the dual representation, they immediately

contacted Mr. Johnson and terminated his employment.  IHC subsequently filed a motion to

disqualify the Howard firm from representing Mr. Bodily.  The district court found the Howard

firm's simultaneous representation violated the applicable ethical rule,[62] but denied the motion

for disqualification.  In denying the motion, the court cited to the small amount of time spent on

the matter, the very modest fee charged for the representation, and noted that the threat of

tainting the lawsuit did not exist.[63]

---

[59] *Id.* at 1477-78.
[60] 649 F.Supp. 468.
[61] *Id.* at 471.
[62] *Bodily* was decided before the adoption of the Utah Rules of Professional Conduct.
[63] 649 F.Supp. at 478.

Finally, in a 2008 decision from this court, *Flying J Inc. et al. v. TA Operating Corp. et al.*,[64] a non-party to the litigation, Petro Stopping Centers, L.P. (Petro), filed a motion to disqualify Gibson, Dunn, & Crutcher LLP (Gibson Dunn), who was representing the plaintiff Flying J.  The court found that there had been a violation of Rule 1.7, but in applying the factors outlined above, denied a motion to disqualify.  Specifically, the court noted the following reasons for denying the motion: the vague nature of information Petro alleged Gibson Dunn had obtained about its business that was found in public disclosures; the high unlikelihood that such information would be used in the litigation against Petro who was a non-party; the court's continued confidence that Gibson Dunn could vigorously and fairly represent its client; the significant hardship that would be inflicted upon Flying J because Gibson Dunn had represented Flying J "for many years in other litigation that involve[d similar facts];"[65] and finally, that disqualification would result in significant delay.[66]

**(i) The egregiousness of the violation**

In considering the "peculiar factual situation"[67] of this case, the court finds that the violation of Rule 1.7 is more egregious than in any of the aforementioned cases.  In denying the respective motions to disqualify, the *Parkinson* and *Bodily* courts cited to the nature of the relationship the firm had with a client – one month in *Parkinson* and a short procedural representation in *Bodily*.  The legal fees incurred in both those cases were also extremely small.  In contrast, Winston has represented BYU since March 2005 incurring approximately $462,846.62 in legal fees and costs.  And Mr. Schaerr – the attorney at the heart of this matter –

---

[64] [2008 WL 648545](#) (D.Utah).
[65] *Id.*at *8.
[66] *Id.* at *9.
[67] *[Firestone Tire & Rubber Co.](#)*, 449 U.S. at 377.

has represented BYU since 2001.  The large amount of fees paid by BYU for legal work

performed by Winston and Mr. Schaerr appears to be a larger amount than that incurred by

Gibson Dunn who had represented Petro "for at least a year."[68]

Additionally, the conflicted attorney in *Parkinson* was unaware of the conflict.  Here, by

contrast, Mr. Schaerr either knew or should have known about a conflict between BYU and

Pfizer.  While at his prior firm, Sidley, it was Mr. Schaerr who approached BYU on Sidley's

behalf to get the conflict waived between BYU and Pfizer (or its predecessors in interest).  Yet,

after moving to Winston, it appears Mr. Schaerr failed in his duties to monitor potential conflicts

between BYU and Winston's clients.  Mr. Schaerr states that "it was not until well after [this]

litigation was underway that I even learned that Pfizer was a Winston client and that it had

become a party to the litigation, which I had always associated only with Parmacia and Searle."[69]

By at least 2008, however, it is clear that Mr. Schaerr should have been aware of the conflict.

Mr. Schaerr states that "In Summer 2008, I began to use a Lexis/Nexis service that provides

copies of electronic docket notices.  I entered approximately 10 cases into the service so that I

would receive notices when there were new docket entries in those cases."[70]  One of the cases

Mr. Schaerr followed was the instant litigation between BYU and Pfizer "because [Mr. Schaerr]

had on occasion discussed the litigation with Mr. Orme"[71] BYU's general counsel.  The

evidence indicates that some of the conversations about this case between Mr. Schaerr and Mr.

Orme occurred after Mr. Schaerr signed up for the Lexis?Nexis notice service.  In January 2010

Mr. Schaerr told Mr. Orme that Winston intended to appear in this case.  The evidence, however,

---

[68] *Flying J.*, 2008 WL 648545 at *7.
[69] Schaerr Decl. ¶50.
[70] *Id.* at ¶38.
[71] *Id.*

17

suggests that Pfizer was a client of Winston on other matters prior to January 2010.  The court is concerned with the fact that Mr. Schaerr simply failed to provide BYU timely notice that Pfizer was a client of Winston on other matters.  Why Mr. Schaerr failed to do this is unclear from the record.

More troubling to the court, however, is Mr. Schaerr's attitudes about client loyalty as expressed in an email sent to BYU after finding out that Pfizer had asked Winston to join this case.  After expressing some regret about the current situation Mr. Schaerr wrote "Yet I also have a fiduciary duty to my partners, and (especially in turbulent economic times) a moral duty to our employees, not to stand in the way, unnecessarily, of new opportunities that come to other partners."  In essence, it appears Mr. Schaerr is willing to leave his loyalty for a current client behind if a more lucrative offer comes along.

The length, type of relationship between Mr. Schaerr and BYU, fees incurred and Mr. Schaerr's attitudes toward client loyalty all lead this court to find that the violation of Rule 1.7 more egregious in this case.  The court finds this factor weighs in favor of disqualification.

**(ii) The prejudice to BYU**

Next, the court considers prejudice to BYU as a result of the conflicted representation. BYU states that it would be "prejudiced if [Winston] is not disqualified because the University never was given a chance to provide (or not provide) informed consent, [Winston] inappropriately solicited confidential information from BYU about this very case, and now seeks to represent Pfizer."[72]

---

[72] Reply p. 9.

Winston responds that there has not been unfair prejudice to BYU.  The information shared by Mr. Orme with Mr. Schaerr was either publicly available in documents or "generally known."  Winston asserts that it has erected a screen to prevent any of this information from passing from Mr. Schaerr to other members of the firm.  Winston points to *Flying J.* as further support for its position that vague general information that is publicly available cannot form the basis for prejudice.

In the instant case, however, the information does not appear to be as vague or publicly available as Winston suggests.  Moreover, there is no support for a "generally known exception" in the Utah Rules of Professional Conduct or the Model Rules.  Most courts confronted with a purported "generally known exception" have rejected it."[73]

Mr. Schaerr declared that his conversations with Mr. Orme included matters that were "already known to BYU's opponents, or would shortly become known."[74]  Matters that are unknown to an adversary, even if they will become known at some point, are clearly confidential.  Additionally, Mr. Orme testified that he shared ideas and impressions about the Pfizer litigation.  And often it was Mr. Schaerr who would bring up the discussion about the Celebrex claim and the case against Pfizer.  Mr. Orme further recounts a time from the Fall of 2006 where he visited the offices of Utah Senator Orrin Hatch with Mr. Schaerr and another individual, Mr. Joe Cannon an attorney and lobbyist in Washington D.C.  During the visit some of Mr. Hatch's staff inquired about the instant litigation with Pfizer.  After leaving Mr. Orme asked Mr. Schaerr and Mr. Cannon about their thoughts concerning the possibility of Pfizer

[73] *See e.g., Iowa Supreme Court Attorney Disciplinary Bd. v. Marzen*, 779 N.W.2d 757, 766 (Iowa 2010) ("the rule of confidentiality is breached when an attorney discloses information leanred through the attorney-client relationship even if that information is otherwise publicly available.").
[74] Schaerr Decl. ¶38.

seeking to influence BYU's desire to settle this case by the use of political pressure.[75]  While this conversation with Mr. Schaerr and Mr. Cannon may have involved some lobbying talk as suggested by Winston, it would have still added to Mr. Orme's impression that Mr. Schaerr was "part of a small and select group of individuals affiliated with BYU with whom I could share ideas and impressions about the Pfizer litigation and obtain candid advice."[76]

Finally, the court finds this case distinguishable from *Flying J* because as noted above the information in this case was different than that allegedly known in *Flying J*.  Additionally, the motion to disqualify Gibson Dunn in *Flying J* was brought by Petro, a non-party to the suit.  In the court's view, a non-party brining a motion to disqualify should be viewed with even more caution and scrutiny than one brought by a party in the case.

There is no evidence in the record that Mr. Schaerr has shared the information obtained from Mr. Orme with others at Winston that represent Pfizer.  But, given the long standing relationship between Mr. Schaerr and BYU and the information that Mr. Schaerr obtained, the court finds the prejudice to BYU narrowly favors disqualification.

**(iii) The diminution of the effectiveness of counsel**

The next factor is the diminution of the effectiveness of counsel.  The court is not entirely convinced that Winston could effectively represent Pfizer in this matter and BYU in other unrelated matters.  While the screen implemented by Winston would help, it appears that such a screen was already less than 100% effective with respect to Mr. Schaerr.  During the same phone conversation information BYU that Winston intended to represent Pfizer, Mr. Schaerr sought to use his position of trust "to act as a go-between to bring BYU and Pfizer together in settlement

---

[75] Orme Supp. Decl. ¶6.
[76] Orme Decl. ¶14.

discussions."[77]  Mr. Schaerr even inquired about specific dollar figures for settlement.  Such

behavior by Mr. Schaerr while perhaps naïve, still in the court's view casts doubt on the ability

of Winston to effectively represent both BYU and Pfizer in this matter.  The court finds this

factor leans in favor of disqualifying Winston.

**(iv)The hardship to Pfizer**

The court believes the hardship that disqualification would inflict on Pfizer to be at most

very minimal.  Winston has not been involved in this matter for any extended period of time.  In

contrast to the Gibson Dunn firm in *Flying J*, there is nothing to suggest that Winston has for

years represented Pfizer in other cases involving similar facts.  While Mr. Daniel Webb is a

renown experienced trial attorney, the court presumes that there is someone at Sidley, the firm

that has represented Pfizer in this matter even prior to the filing of the instant suit, who is of

similar caliber and experience.  Or, should Pfizer desire, there are many other exceptional firms

that could undertake Pfizer's representation in this matter that would not have a conflict with

BYU.  This factor, therefore weighs in favor of disqualification.

**(v) The stage of trial proceedings**

BYU filed this action in 2006.  Recently, the court entered an amended scheduling order

setting trial for September 2011 with discovery to end in March 2011.  Discovery is well under

way, but Winston has not had involvement in that discovery process.  Trial is also over a year

away.  Given Sidley's prior involvement in this case there would be no significant delay by

disqualifying Winston.  In fact, there may be more delay by allowing Winston into this case due

to its complexity and the need for Winston to take additional time to understand all that has

---

[77] Schaerr Supp. Decl. ¶5.

occurred thus far.  The court therefore concludes that the stage of proceedings weighs in favor of disqualification.

In sum, it appears that for financial reasons Mr. Schaerr and Winston seek to abandon their long history and client relationship with BYU in favor of an increased economic benefit from representing Pfizer.  After considering the factors as set forth in *Parkinson*, *Bodily* and *Flying J*, the court concludes that allowing Winston to represent Pfizer in this matter will taint the lawsuit.  As noted in *Parkinson*, "The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit."[78]  Allowing Winston, who has represented BYU since 2005, and Mr. Schaerr who has represented BYU since 2001, to suddenly shift allegiances for the sake of monetary gain in a troubled economy undermines the interests of the parties, the legal profession, and the intent of the Rules of Professional Conduct.

## ORDER

For the foregoing reasons, BYU's motion to disqualify Winston is GRANTED.


DATED this 23rd day of August, 2010.

BY THE COURT:

_____

Magistrate Judge Brooke C. Wells

---

[78] *Parkinson*, 857 F.Supp. at 1476.