Mark M. Bettilyon (4798)
Rick B. Hoggard (5088)
Arthur B. Berger (6490)
Samuel C. Straight (7638)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
mbettilyon@rqn.com
rhoggard@rqn.com
aberger@rqn.com
sstraight@rqn.com

David B. Thomas – (3228)
Office of the General Counsel
Brigham Young University
A-350 ASB
Provo, Utah 84602
Telephone:  801-422-4722
Facsimile:  801-422-0265
Dave_Thomas@byu.edu

Leo R. Beus (admitted *pro hac vice*)
L. Richard Williams (admitted *pro hac vice*)
Mark C. Dangerfield (admitted *pro hac vice*)
Adam C. Anderson (admitted *pro hac vice*)
Keith C. Ricker (admitted *pro hac vice*)
BEUS GILBERT PLLC
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona  85251
Telephone: 480-429-3000
Facsimile:  480-429-3100
lbeus@beusgilbert.com
rwilliams@beusgilbert.com
mdangerfield@beusgilbert.com
aanderson@beusgilbert.com
kricker@beusgilbert.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, a Utah Non-Profit Education Institution; and Dr. DANIEL L. SIMMONS, an individual,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>PFIZER, INC., a Delaware corporation; G.D. SEARLE & COMPANY, a Delaware corporation; G.D. SEARLE LLC, a Delaware limited liability company; MONSANTO COMPANY, a Delaware corporation; and PHARMACIA CORPORATION, a Delaware corporation,<br><br>                              Defendants. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PORTIONS OF PLAINTIFFS' RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case Number: 2:06CV-890-BTS (BCW)<br><br>Judge Ted Stewart<br><br>Magistrate Judge Brooke C. Wells |

## INTRODUCTION

Pfizer's Motion to Strike fits into the Defendants' well-established pattern of trying to conceal material facts. For example, Pfizer asks the court to strike SOF ¶¶ 56-58, which describe key records from the early 1990s that should exist, but don't: "immunoprecipitation" assays and the related "autoradiograms." Similarly, Pfizer wants the Court to strike SOF ¶¶ 134-152. Those facts set out Monsanto's standards for making and preserving lab notebooks in the 1990s, and point out that, in breach of those standards, Pfizer failed to keep and produce at least ten such lab notebooks from the critical period of 1990 to 1993. All such facts support an inference that Monsanto took deliberate steps to conceal records that would show Monsanto's successful use of BYU and Dr. Simmons's confidential materials.

The absence of such materials also shows the futility of any investigation by BYU, because the Defendants took steps from the very beginning to hide evidence that would support BYU's claims. And Pfizer's conduct in this litigation fits into the same mold. As this Court has observed, there have been "repeated holes" found in Pfizer's production of documents, and the "Court has been forced to intervene on numerous occasions and order the production of further discovery."[1] Indeed, in light of "Pfizer's repeated delays in failing to provide relevant discovery," the Court found that "Pfizer has interfered with the judicial process."[2]

People at Monsanto and Pfizer have taken deliberate steps to make sure that critical documents never survived or were never made available. And the absence of these documents is not just a "discovery dispute." What BYU "knew or could have known" about its claims in the 1990s is directly tied to the Defendants' efforts to conceal such documents. Such evidence also

---

[1] Order and Memorandum Decision, Dkt. 303 at 12-13.

[2] *Id.* at 13.

fits the "futility component" of the fraudulent concealment doctrine, recognized by Utah's Supreme Court in *Colosimo v. Roman Catholic Bishop,* 156 P.3d 806, 818, ¶ 48 (Utah 2006). That doctrine excuses a plaintiff's failure to discover its claims when the plaintiff has inquired and been misled, or when the plaintiff didn't inquire at all due to the defendant's fraudulent concealment.  And if BYU has had great difficulty getting access to important documents in this litigation – where it has the full power of the Court and the rules of discovery – that underscores the futility of any attempt to discover the facts underlying its claims before this suit was filed.

Indeed, Pfizer only two weeks ago produced critical new documents from Dr. Karen Seibert's personnel file that had been withheld in this case for four long years, documents that show that Monsanto falsely reported to the company that Dr. Seibert had cloned mouse COX-1 and COX-2, when in fact she hadn't done so but had received the clones directly from Dr. Simmons.  These documents support BYU's position that Monsanto engaged in a scheme to conceal BYU and Dr. Simmons's role in the development of Celebrex.  But BYU didn't have these documents when Dr. Seibert was deposed last June, or when her supervisor Dr. Currie was deposed last October, or even when BYU filed its Response to the summary judgment motion last December .

The facts in this case – including those the Defendants now ask the Court not just to disregard but to strike – show the Defendants' concerted effort to stonewall every attempt by BYU to learn the true facts underlying their causes of action, from 1992 up through today.  But a fact finder is entitled to consider all of that evidence in deciding whether, in light of the Defendants' conduct, BYU acted reasonably in filing this action when it did.[3]

---

[3] Although it doesn't affect the outcome, Pfizer  errs in arguing that BYU must first prove that it "did not know and could not reasonably have discovered" the facts underlying their cause of action, citing dicta in *Ottens v. McNeil,* 239 p.3d 308, ¶ 57 (Utah App. 2010). Utah's highest

## I.    FACTUAL BACKGROUND.

### A.    Monsanto Concealed Its True Reasons for Terminating the 1991 Research Agreement.

#### 1.    Under the Research Agreement, Monsanto had continuing duties that survived the agreement's termination.

1.    The July 1991 Research Agreement memorialized a two-year collaboration between BYU and Monsanto to do research to try and identify COX-2 selective drugs that might have commercial potential.   SOF ¶¶ 12-18.

2.    Pursuant to the collaboration with Monsanto, Plaintiff Dr. Daniel Simmons gave Monsanto scientists Drs. Karen Seibert and Jaime Masferrer various confidential biological materials, including his "murine" or mouse COX-1 and COX-2 clones and antibodies. SOF ¶ 33.

3.    Although the Research Agreement itself was for only a two-year period, some duties extended past the termination of the agreement.  SOF ¶ 28.  Thus, for a five-year period, with certain exceptions, ¶ 4.1 of the agreement limited the use of BYU's confidential materials to the collaborative "Project" described in the agreement.  SOF ¶¶ 24-25.

4.    In addition, ¶ 3.3 of the Research Agreement obligated Monsanto, if research results from the Project were obtained that Monsanto thought were patentable, to notify BYU of

---

court, which this Court must follow, has only applied that test to the "exceptional circumstances" version of the discovery rule, which BYU has not invoked. In *Colosimo v. Roman Catholic Bishop of Salt Lake City,* 156 P.3d 806, 812, ¶ 19   (Utah 207), the Court said: "For this [exceptional circumstances] exception to apply, 'an initial showing must be made that the plaintiff did not know and could not reasonably have discovered'. . .").  In so stating, *Colosimo* was quoting its earlier decision in *Burkholtz v. Joyce,* 972 P.2d 1235, 1237 (Utah 1998), where the Utah Supreme Court said that, in an "unbroken line of cases dealing with the discovery rule," it had "made it clear" that, before a limitations period could be tolled under the "exceptional circumstances" version of the discovery rule, "an initial showing must be made," etc.  Dicta by the court of appeals in *Ottens* does not modify the Utah Supreme Court's "unbroken line of cases."

such, and according to Monsanto attorney Larry Swaney, who drafted the agreement, there was no time limitation on that duty.  SOF ¶¶ 22, 28-29.

5.      The reason for that provision is because  universities were not typically equipped to do patent work or make inquiries relating to such, so the Research Agreement intended that BYU would "repose trust and confidence" in Monsanto to handle such work for inventions arising out of the agreement.  SOF ¶ 20.

6.      Paragraph 3.4 of the agreement then gave the parties one year after the issuance of a patent to negotiate a royalty agreement for that patent.  *Id.*   And as lawyer Swaney testified, this duty also continued despite the termination of the agreement:

> Q.      So you anticipated at the time you included [Section 3.4] in this agreement that there are some things that could occur outside the two-year period of the research agreement?
>
> A.      Well, the next sentence indicates that you have got one year after issuance of the patent to complete the negotiations.  So obviously that would be beyond a two-year period for that, yes.  SOF ¶¶ 28-29.

**2.      Contrary to the Research Agreement, Monsanto, without telling BYU, began using BYU's confidential materials for Monsanto's own project.**

7.      Unbeknownst to BYU, though, Monsanto began using Dr. Simmons's confidential materials for its own research, without disclosing such to BYU. On 8-11 January 1992, Dr. Seibert along with Monsanto molecular biology group leader, Dr. Gwen Krivi, attended a cyclooxygenase-related meeting in Keystone, Colorado, armed with the knowledge gained from BYU/Simmons's confidential information. SOF ¶¶ 97-98. There they heard a presentation from a DuPont scientist, Dr. Galbraith,  about a pain relieving compound, DuP-697, that did not appear to cause gastric problems. SOF ¶ 99. The first day Dr. Seibert returned from

the conference, she told Dr. Masferrer about DuP-697.[4]  Then on 3 March 1992, Monsanto's Dr. Len Lee synthesized DuP-697 so Monsanto could test it, which took him only about three weeks.[5]

8.      On 6 March 1992, using a cellular assay developed with BYU's confidential information, Monsanto then tested DuP-697 and found that it was COX-2 selective, thus validating DuP-697 as a potential compound that Monsanto could modify to develop its own COX-2 selective inhibitor. (Merck had a patent on DuP-697, so Monsanto could not use that compound itself.)  SOF ¶¶ 85, 101-102.

### 3.      After using Dr. Simmons's material to develop a patentable COX-2 selective drug, Dr. Needleman took steps to terminate the Research Agreement.

9.      Then on 17 March 1992, Dr. Needleman wrote Dr. Simmons. SOF ¶ 103. However, Dr. Needleman did not write to disclose Monsanto's synthesis and successful testing of DuP-697 as a COX-2 selective compound.  Rather, he wrote to advise Dr. Simmons that, because Dr. Simmons allegedly had been "non-communicative," Needleman was giving "serious consideration to ending" the Research Agreement at the end of one year.  *Id.*

10.      The very next day, 18 March 1992, Monsanto's Dr. Lee developed the idea of modifying the chemical structure of DuP-697 so as to make a new, potentially-patentable compound.  SOF ¶ 105.  Dr. Lee later filled out a "Disclosure of Invention" form, describing the new compound, stating he had discovered it on 18 March 1992, and stating that it would "inhibit inducible human fibroblast prostaglandin synthesis," or in other words, the drug would inhibit COX-2.  SOF ¶ 105.

---

[4] J. Masferrer Dep., *Merck v. Monsanto*, 12 Dec 00, Ex. 1 at 33:24-34:4.

[5] L. Lee Dep., 17 Sep 10, 5:19-86:4, Ex. 2 at 85:19-86:4.

11.     On 23 March 1992 – less than one week after Dr. Lee's discovery of a potentially-patentable COX-2 selective drug – Dr. Needleman wrote Dr. Simmons a second letter. SOF ¶ 108. Once again, Dr. Needleman did not disclose Monsanto's use of Dr. Simmons's materials to discover a potentially-patentable COX-2 selective compound.  This time Needleman stated that he "regard[ed] this as an unworkable collaboration which I would like to terminate," and offering five reasons for terminating the collaboration. *Id.* Though Dr. Simmons was upset by Needleman's desire to terminate and felt it was unfair, he believed that a collaboration required at least two willing participants, so that if Monsanto did not want to participate, Dr. Simmons did not think he could force it to do so.  SOF ¶ 116.

> ### 4.     BYU asks for more information about the termination, but Monsanto concealed the true reasons for the termination.

12.     On 27 March 1992, Carol Hardman of BYU thus wrote to Dr. Needleman stating that BYU would agree to the termination, and asking for a "formal notice of termination."  SOF ¶ 117.  Monsanto never responded to that letter.

13.     On 20 May 1992, Dr. Simmons wrote another letter to Dr. Needleman in which he enclosed a summary report describing the research done up to that time under the Research Agreement. SOF ¶ 118. Dr. Simmons told Dr. Needleman that, while he disagreed with Dr. Needleman's stated reasons for terminating the Research Agreement, he believed that Dr. Needleman had been misinformed about the matter.  SOF ¶ 119.  Dr. Simmons agreed, however, that the "arrangement should not be continued unless both parties feel they have a good working relationship and see promise in the interaction." *Id.* Monsanto never responded to Dr. Simmons's letter.

14.     On 21 May 1992, BYU's Carol Hardman wrote another letter to Needleman, stating that, in light of Monsanto's failure to respond to prior correspondence, "we are assuming

that the research agreement referenced has been terminated . . ."[6]   Monsanto never responded to that letter either.   Nevertheless, Dr. Needleman wrote a note on the letter saying: "I am terminating this after one year."[7]

15.   On 2 September 1992, Ms. Hardman wrote yet another letter to Dr. Needleman, referencing the Research Agreement and stating that "[u]nless we hear from you to the contrary, we will assume that our obligations have been met under the terms of the agreement . . ."[8] Monsanto never responded to that letter either.

16.   In July 1992, Dr. Simmons met with Drs. Needleman and Masferrer at a conference in Montreal, and there Dr. Simmons gave Dr. Needleman the results of some testing BYU had done on various NSAIDS.[9]   Dr. Simmons also tried to discuss the allegations in Needleman's letters relating to the termination of the Research Agreement.   SOF ¶ 123.   But Dr. Needleman only responded that it was "nothing personal, just business," and said that his reasons for ending the agreement were accurate because he had "gotten []his information from Karen Seibert" and "she wouldn't lie." SOF ¶ 123.   And at that same Montreal conference in July 1992, Dr. Needleman also told Dr. Simmons that he (Dr. Needleman) "was not a dishonest man . . ."[10]

17.   Not until June of last year (2010) however, did BYU learn during Dr. Seibert's deposition in this case that in fact she did not provide Dr. Needleman with the information he

---

[6] *See* Ex. 7 to Pfizer's Memorandum in Support of Partial Summary Judgment, Dkt. 485.

[7] Ltr. to P. Needleman from C. Hardman, 21 May 92, BYU-PFE 058838, Ex. 3.

[8] Ltr. to P. Needleman from C. Hardman, 2 Sep 92, BYU-01-1418, Ex. 4.

[9] D. Simmons Dep., 20 Apr 09, Ex. 5 at 34 :11-50 :23.

[10] *Id.* at 49:7-50:19.

used as the basis for terminating the Research Agreement, thus showing that Dr. Needleman's statement to Dr. Simmons at the Montreal conference was false.[11]

18.     Dr. Simmons followed up on these inquiries in conversations he later had with Monsanto's Dr. Barry Haymore between 1992 and 1997.[12] According to Dr. Haymore, he and Dr. Simmons had six to eight conversations starting in about 1994, all at BYU when Dr. Haymore would stop by.[13] Per Dr. Haymore, they talked about all kinds of issues in these conversations, but they would typically just "allude to things" regarding Dr. Simmons's experience with Monsanto.[14]

19.     Per Dr. Simmons, in at least one of those conversations, Dr. Simmons informed Dr. Haymore of Dr. Needleman's termination of the research agreement, which Dr. Simmons said "hurt."[15] In that conversation, Dr. Haymore told Dr. Simmons: "Well, you don't know what they had going on in-house before you came there."[16]

B.     **Monsanto Conceals Its Use of Dr. Simmons's Clones and Antibodies By Falsely Telling Monsanto Employees, the World in General, and Dr. Simmons in Particular, that They Had Discovered COX-2 and Created Their Own Clones.**

20.     Although Monsanto received mouse COX-1 and -2 clones from Dr. Simmons, they never created their own clones for either mouse COX-1 or mouse COX-2.  SOF ¶ 197.

21.     However – based on a document just received from Pfizer on 18 January 2011 – Monsanto (falsely) reported to the entire company that Dr. Karen Seibert, in collaboration with

---

[11] K. Seibert Dep., 1-3 Jun 10, Exs. 6A-C at 496:11-24; 498:6- 499:21; 506:21-511:2.

[12] B. Haymore Dep., 25 Sep 10, Ex. 7 at 43:7-17, 48:8-12.

[13] *Id.* at 110:13-112:25.

[14] *Id.* at 112:6-113:7.

[15] D. Simmons Dep., 20 Apr 09, Ex. 5 at 43:7-17, 48:8-12.

[16] *Id.* at 48:10-11.

BGD-#116456-v7-Response.DOC

members of the Molecular Biology department, had both cloned and expressed mouse COX-1 and -2.[17] And based in part on that claim, Monsanto promoted Dr. Seibert to Research Specialist, effective August 1, 1993.[18]

22.     This misrepresentation was made possible because, as set forth in BYU's SOF in its summary judgment Response, Dr. Needleman had taken steps to ensure that Monsanto personnel – including Dr. Mark Currie, the head of Monsanto's Molecular Pharmacology, and Dr. Isakson, the head of the COX-2 project – did not know about Monsanto's collaboration with Dr. Simmons. SOF ¶ 127. Nor did Gwen Krivi, the head of microbiology for Searle, know about Dr. Simmons – she thought that Dr. Seibert's group had cloned a "second from of cyclooxygenase," or COX-2.[19]

23.     As discussed in BYU's SOF, in articles published from 1994 forward, Monsanto scientists also told the world that they were doing research with mouse COX-1 and COX-2 clone of their own making, with no mention of Dr. Simmons. SOF ¶¶ 194-200. Because Dr. Needleman was a member of the National Academy of Science, he was allowed to get papers published in the Academy's journal, PNAS.[20]

24.     The 1990s was a period of rapid advances in knowledge about COX-1 and COX-2, SOF ¶ 171-174, and so by mid-1991 other scientists had published data on dexamethasone's

_____

[17] Monsanto Announcement, 1 Aug 93, BYU-PFE Personnel File 003934, Ex. 8.

[18] *Id.*

[19] G. Krivi Dep., *Univ. of Rochester v. G.D. Searle*, 30 Apr 02, BYU-PFE 118302-367, Ex. 9 at 98:11-15.

[20] P. Needleman Dep., 17-18 Nov 10, Exs. 10A and 10B at 346:21-23.

selective inhibition of COX-2. [21]  *See* SOF ¶ 213. And by 1993, scientists from Michigan State had published an article disclosing their use of "murine" or mouse COX-1 and COX-2, and a type of recombinant enzyme system to determine that a certain compound, "6-MNA," selectively inhibits COX-2.  SOF ¶ 175.[22]

     25.    In September 1994, Monsanto also received its first patent for a COX-2 selective inhibitor, though Monsanto didn't disclose either the application or the patent to BYU.[23] Also unbeknownst to BYU, on 30 November 1993 – only a year and half after terminating the Research Agreement – Monsanto applied for its first patent on Celebrex, SOF ¶ 95, and that patent was issued two years later on 14 November 1995.  SOF Ex. 56.  Monsanto received a second Celebrex-related patent on 8 October 1996.[24]  Then on 27 May 1997, Monsanto received a patent on the drug that became Bextra, another COX-2 selective drug.[25]  Finally, on 2 June 1998, Monsanto received a third Celebrex-related patent.[26] Monsanto did not disclose any of these patents to BYU, nor did Monsanto try and negotiate a royalty agreement for these patents with BYU, as required under ¶¶ 3.3. and 3.4 of the Research Agreement.

     26.    By 1996, also unbeknownst to BYU, Monsanto had already negotiated and entered into a Celebrex license agreement with a Japanese firm, Yamanouchi, authorizing

---

[21] *See also*, M.K. O'Banion, et al., A SERUM – AND GLUCOCORTICOID-REGULATED 4-KILLOBASE MRNA ENCODES A CYCLOOXYGENASE-RELATED PROTEIN, J.Biochem, March 1993, p. 6610, PFC01194743-748, Ex. 11.

[22] *See also,* E. Meade, et al, DIFFERENTIAL INHIBITION OF PROSTAGLANDIN ENDOPEROXIDE SYNTHASE (CYCLOOXYGENASE) ISOZYMES BY ASPIRIN AND OTHER NONSTEROIDAL ANTI-INFLAMMATORY DRUGS, J. Biochem., March 1993, p. 6610, PFC01603523-527, Ex. 12.

[23] U.S. Patent No. 5,344,991, 6 Sep 94, BYU-PFE-ARC 1001608809-838, Ex. 13.

[24] U.S. Patent No. 5,563,165, 8 Oct 96, PFC01567139-167, Ex. 14.

[25] U.S. Patent No. 5,633,272, 27 May 97, BYU-37-6051-078, Ex. 15.

[26] U.S. Patent No. 5,760,068, 2 Jun 98, Ex. 16.

Yamanouchi to market Celebrex in Japan, in return for paying Monsanto $75 million plus a 15% royalty on net sales.[27] Dr. Needleman himself knew of and supported this agreement.[28]  Although the Yamanouchi license agreement is dated 26 March 1996, it had been under negotiation for about a year prior.[29]

27.     By the end of 1996, Monsanto had also successfully completed its Phase II drug trials for Celebrex in the United States, and was starting Phase III.[30]

28.     Then in March 1997, Dr. Needleman encountered Dr. Simmons at a scientific conference in Cannes, France.  SOF ¶ 223.  As Dr. Simmons was eating breakfast in the hotel one morning, Dr. Needleman (uninvited) came and sat down by him, and initiated a brief conversation.[31]  Dr. Needleman simply told Dr. Simmons that he, Dr. Needleman, "had discovered COX-2 before [Dr. Simmons] did anything," and that he (Dr. Needleman) "had the project going before [Dr. Simmons] came on the scene."[32]  Dr. Needleman also said to Dr. Simmons that:

> they had announced it to the scientific world, and – and the last
> part he said, "The scientific world has – was largely, essentially,
> converted," if you will, to his [Dr. Needleman's] discovery of
> COX-2 before I came along.[33]

---

[27] License Agreement between G.D. Searle and Yamanouchi Pharmaceutical, BYU-PFE-K-1000001055-97, Ex. 17.

[28] R. DeSchutter Dep., 14 Dec 10, Ex. 18 at 152:17-153:13.

[29] *Id.* at 150:19-151:15.

[30] Memo to P. Needleman from D. Schamrowski, 11 Nov 96, S00663101-111, Ex. 19.

[31] D. Simmons Dep., 20 Apr 09, Ex. 5 at 41:22-43 :6.

[32] *Id.* at 43:7-9.

[33] *Id.* at 43:10-14.

29.    In February of 1998, Monsanto/Searle signed a co-marketing agreement with Pfizer to market Celebrex.[34] As Searle's CEO, Mr. DeSchutter testified, during those negotiations the company understood that they "had a very valuable asset."[35]

30.    Monsanto also launched a publicity campaign to convince the world that Monsanto and Dr. Needleman were the ones who had discovered and developed the technology underlying COX-2 selective drugs such as Celebrex, to "humanize 'COX-2 science through promotion of Needleman as 'discoverer.'" SOF ¶¶ 227-228. Part of the marketing strategy was to showcase "Dr. Needleman's discovery," to "[o]wn the science," and to position Needleman "as a hero."[36] Monsanto also trained its agents so that, if anyone suggested that "Dan Simmons was the discoverer of COX-2," they were to simply ask, "Who is Dan Simmons?" and then to have the agent give the "Phil Needleman story."  SOF ¶ 228.

C.    **Unbeknownst to BYU, Monsanto's Unpublished Manuscripts, Produced in This Litigation, Acknowledge the Use of Dr. Simmons's Materials.**

31.    As discussed in BYU's SOF, Monsanto has now produced some scientific manuscripts which disclose Monsanto's reliance on Dr. Simmons's clones, but none of those was ever published; rather, someone at Monsanto (presumably either Dr. Needleman or Dr. Seibert) made sure that those references were deleted prior to publication. SOF ¶¶ 185; 187-193. Although BYU's Response to the summary judgment motion mentioned some of those

---

[34] D. DeSchutter Dep., 14 Dec 10, Ex. 18 at 181:24-182:5.

[35] *Id.* at 183:18-21.

[36] *Id.* at 200:4-23.

unpublished manuscripts, another article submitted to the journal *Science* on 2 December 1993, also acknowledged the use of Dr. Simmons's material, but was never published.[37]

32.     As discussed in BYU's SOF, although an article published in 1994 by Monsanto and UCLA scientists did acknowledge the use of Dr. Simmons's COX-1 probe, Dr. Simmons understood that it was Dr. Herschman, one of the UCLA scientists, not Monsanto, who had actually used Dr. Simmons's mCOX-1 probe for the article, with Dr. Simmons's permission. SOF ¶¶ 215-220.  Dr. Simmons had allowed his post-doctoral student, Dr. Xie, to make use of the mCOX-1 clone in Dr. Herschman's lab, under the condition that it be used only for academic research.[38]

33.     Dr. Herschman himself testified that the "northern blot" assay for which Dr. Simmons's COX-1 probe was used was likely done by his lab.[39] And Dr. Herschman's lab made use of the "CHOb" probe, which is referenced in the article.[40] Although no Monsanto article references the use of CHOb, other papers from Dr. Herschman's lab do refer to CHOb.[41]

34.     Monsanto also mentions a 1996 article in which attribution is made to the use of Dr. Simmons's mCOX-1 cDNA.  However, Monsanto has no evidence of when Dr. Simmons

---

[37] Draft Article submitted to Science Magazine by K. Seibert titled MEDIATION OF ACUTE INFLAMMATION BY CYCLOOXYGENASE-2, 2 Dec 03, BYU-PFE 651008-026, Ex. 20.

[38] W. Xie Dep., 27 Mar 09, Ex. 21 at 27:21-28:15; 148:19-149:25.

[39] H. Herschman Dep., 3 Dec 10, Ex. 22 at 46:7-21; 212:9-14.

[40] *Id.* at 36:1-10.

[41] *See, e.g.,* R. Gilbert, et al, REGULATION OF TIS10/PROSTAGLANDIN SYNTHASE-2 PROTEIN AND MESSAGE IN MURINE MACROPHAGE CELL LINES, KUJ 000125-161, Ex. 23A; . D. Kubuju, et al., TIS 10, A PHORBOL ESTER TUMOR PROMOTER-INDUCIBLE mRNA FROM SWISS 3T3 CELLS, ENCODES A NOVEL PROSTAGLANDIN SYNTHASE/CYCLOOXYGENASE HOMOLOGUE, JBC, 1991, Vol 266, No. 20, HERSCH0182-88, Ex. 23B; and J. Masferrer, et al., IN VIVO GLUCOCORTICOIDS REGULATE CYCLOOXYGENASE-2 BUT NOT CYCLOOXYGENASE-1 IN PERIOTENEAL MACROPHAGES, JPET, 1994, Vol. 270, No. 3, BYU-PFE 651957-961, Ex. 23C.

read that article.   As set forth in Dr. Simmons's Declaration, at the time the article was published, Dr. Simmons was on sabbatical in England (which he was from 9/1/95 through 8/31/96[42]), so that he did not have access to his normal publication searches.   SOF Ex. 20, ¶ 6.

### D.   BYU Begins Its Investigation Into the Matter As Monsanto Continues to Conceal the Facts.

35.   As discussed in BYU's SOF, in mid-1998 Merck hired Dr. Simmons to serve as an expert consultant for litigation with Monsanto over its COX-2 patents. SOF ¶ 229 *et seq*. Based on inside knowledge that Merck had, Dr. Simmons came to suspect that Monsanto was not giving appropriate public acknowledgement to his and others' contributions to the development of COX-2 selective drugs. SOF ¶ 234. It was not, however, until much later, when he read a 23 August 1999 witness statement by Monsanto's Dr. Isakson in litigation with Merck pending in Great Britain.  That witness statement "contradicted everything" that Phil Needleman and Searle/Monsanto had been telling him "and the world."  SOF ¶ 237.

36.   In light of the questions raised by Merck, Dr. Simmons spoke with the BYU general counsel's office, which began an investigation. SOF ¶ 239-242. At one point in the spring of 1999, Dr. Astle of BYU spoke with Monsanto attorney Mike Warner.   In that conversation, Mr. Warner was "quite vehement" in "blaming Doctor Simmons for a bad relationship," and saying that it "was all BYU's fault" and not Monsanto's.[43]

37.   On 9 December 1999, BYU general counsel Eugene Bramhall wrote a letter to Monsanto General Counsel William Ide. SOF ¶ 242. On 17 March 2000, Mr. Hoscheit responded on behalf of Monsanto.[44] SOF ¶ 24.  Mr. Hoscheit asserted that "Monsanto records

---

[42] D. Simmons Curriculum Vitae, BYU-38-0028-43, Ex. 24.

[43] L. Astle Dep., 17 Feb 09, Ex. 25 at 174:1-8.

[44] Ltr. to E. Bramhall from D. Hoscheit, 17 Mar 00, BYU-12-0071-74, Ex. 26.

demonstrate" that Monsanto was not successful in getting Dr. Simmons's clones to replicate (though in fact no Monsanto records show this).  *See* SOF ¶¶ 153-166.

38.     On 17 May 2000, Mr. Hoscheit sent a supplementary letter, SOF Ex. 130, to which BYU's David Thomas responded on 18 May 2000. As Mr. Thomas noted in that letter, Monsanto had alternatively "ignored, patronized, and/or dismissed" BYU's "sincere attempts to open a meaningful dialogue . . ."[45]

39.     The parties later signed a tolling agreement dated 8 May 2001.  SOF Ex. 133.

**E.     In This Litigation, Pfizer Has Continued the Attempt to Conceal Key Facts and Documents For As Long As Possible.**

40.     During this litigation, the Court has already entered various orders, and made various findings and observations, relating to the Defendants' failure to produce documents, their misrepresentations to the Court, and their interference with the judicial process.  For example, at a hearing on 19 March 2008, the Court told Defendants' counsel that she was "in the unenviable position of making representations that ultimately could not be substantiated," a point that counsel admitted.  ("I agree with you, your Honor.").[46]

41.     Then on 26 March 2008, the Court granted BYU's motion to compel the production of documents.[47]   Later, on 28 October 2009, the Court granted in part BYU's motion for sanctions, awarding $852,315 in sanctions against the Defendants.[48] In doing so, the Court made the following findings, among others:

a.   "Pfizer has filed one certification and three supplemental certifications regarding its discovery efforts in this case.   In turn, BYU has responded to these

---

[45] Ltr. to D. Hoscheit from D. Thomas, 18 May 00, BYU-01-1441-42, Ex. 27.

[46] Motion to Compel Transcript, 19 Mar 08, Ex. 28 at 46:1-6.

[47] Dkt. 106.

[48] Dkt. 303.

certifications complaining about missing documents or missing materials that allegedly fall within its original discovery requests and this Court's discovery order.  In reviewing these certifications and responses the Court finds a recurring pattern.  After reviewing responses, BYU would complain about certain alleged discoverable items that were missing.  Then, Pfizer would provide those missing items."[49]

b.  "Tellingly, it was during BYU's review of a redacted affidavit from J. Michael Warner, Pfizer's assistant general counsel, that BYU discovered information about a collection of COX-2 related documents that Pfizer had never reviewed for responsiveness to BYU's Requests for Production.  This in turn led BYU to file an expedited motion to preserve and protect evidence, which the Court granted following a hearing held in July of this year [2009]."[50]

c.  "Pfizer continually represents that it has spent thousands of hours and vast resources to comply with BYU's requests and this Court's order.  But, based on the continued need for BYU to file discovery motions, and the repeated holes that are found in Pfizer's production, the Court wonders if Pfizer is counting its efforts and production of documents in other cases as part of its thousands of hours calculus."[51]

d.  "In addition, it is troubling to the Court that there are repeated failures in producing documents such as exhibits and articles that pertain to crucial witnesses.  The Court finds Pfizer's incomplete discovery responses have created delay, mounting attorneys' fees and is prejudicial to Plaintiffs."[52]

e.  "But, over the history of this case thus far, this Court has been forced to intervene on numerous occasions and order the production of further discovery.  Pfizer has continually argued that additional discovery sought by Plaintiffs is irrelevant. Yet, Pfizer has repeatedly failed to convince the Court that such discovery is irrelevant and not discoverable at this stage of the litigation."[53]

f.  "Based upon the large amount of time and resources the Court has been forced to use in this case due to Pfizer's repeated delays in failing to provide relevant discovery, the Court finds Pfizer has interfered with the judicial process."[54]

---

[49] *Id.* at 7.

[50] *Id.* at 8.

[51] *Id.* at 12.

[52] *Id.*

[53] *Id.* at 13.

[54] *Id.*

g. "The Court has given Defendants multiple opportunities to comply with its orders and Pfizer has repeatedly failed to fully comply in a timely manner."[55]

h. "For example, it is inexcusable to find an entire collection of COX-2 related documents after many months of Pfizer's alleged super search efforts.  Moreover, it was BYU that discovered the missing collection and not Pfizer coming forward with the newly discovered documents."[56]

42. These above findings by this Court are consistent with sanctions imposed by other courts, including the following:

a. In 2002, Pfizer, and its subsidiaries Warner Lambert and Parke-Davis, paid $49 million to resolve civil claims that it had failed to report best prices for its drug Lipitor as is required under the Medicaid Drug Rebate Statute.[57]

b. In 2004, Pfizer subsidiary Warner-Lambert pled guilty and paid more than $430 million to resolve criminal charges and civil liability in connection with its fraudulent marketing practices with respect to the drug Neurontin.[58]

c. In 2007, Pfizer subsidiary Pharmacia & Upjohn, Inc. paid $34 million and pled guilty to paying kickbacks for formulary placement of its drugs and entered into a Deferred Prosecution Agreement for off-label distribution of the Drug Genotropin.[59]

d. In 2009, Pfizer agreed to pay $2.3 billion to resolve criminal and civil health care liability relating to fraudulent marketing and payment of kickbacks relating to the promotion of the COX-2 selective drug, Bextra.  The criminal resolution included

---

[55] *Id.* at 14.

[56] *Id.*

[57] Pfizer Fact Sheet – www.stopmedicarefraud.gov/pfizerfactsheet.html, Ex. 29.

[58] *Id.*

[59] *Id.*

a $1.195 billion criminal fine that was the largest ever imposed in a Unitee States criminal prosecution. [60]*Id.*

e.  In March 2010, a jury found Pfizer liable for RICO for unlawfully promoting its epilepsy drug Neurontin for unapproved uses, and imposed a $141 million penalty ($47 million, trebled).[61] In January 2011, the federal district court judge overseeing the matter upheld the verdict.[62]

---

[60] *Id.*

[61] Pfizer Hit With $141 Million RICO Penalty Over Neurontin Promotion, 29 Mar 10, Law.com, Ex. 30.

[62] Pfizer to Pay $142.1 Million Over Neurontin Marketing, 28 Jan 11, Bloomberg.com, Ex. 31.

## II.   THE FACTS PFIZER WANTS TO STRIKE HELP SHOW THE DEFENDANTS' CONTINUING FRUAUDLENT CONCEALMENT.

### A.   The Jury Must Decide Whether BYU Acted Reasonably in Light of the Defendants' Actions to Conceal The Facts Underlying the Claims.

Pfizer's motion for partial summary judgment should be denied because, among other reasons, the Defendants have fraudulently concealed the facts, and they continue to try and do so with this motion. Fraudulent concealment occurs when defendants "with a legal duty or obligation to communicate certain facts remain silent," as well as when they "act to conceal material facts" they know.[63] Thus, a "fiduciary's breach of the 'duty to speak the truth'" is itself "sufficient to establish fraudulent concealment."[64]

Moreover, once Plaintiffs have made a "prima facie" case of fraudulent concealment, then the Defendants must show that, "given the defendant's actions, a reasonable plaintiff would have discovered the claim earlier."[65] And whether BYU was "reasonably diligent in investigating" the facts is "a question of fact normally left for the trier of fact," and first requires a showing that BYU had "information of circumstances sufficient to put a reasonable person on inquiry."[66] Even then, a "duty of inquiry" only requires the party to "make inquiry" and "diligently do that which the answer to the inquiry reasonably prompts."[67] And in general, only when an inquiry that should have been made "**would have developed the truth**," is knowledge

---

[63] *Jensen v. IHC Hospitals, Inc.,* 944 P.2d 327, 333 (Utah 1997).

[64] *Charlesworth v. Reyns,* 113 P.3d 1031, 1037 (Utah App. 2005).

[65] *Berenda v. Langford,*  914 P.2d 45, 51 (Utah 1996).

[66] *Safsten v. LDS Social Services, Inc.,* 942 P.2d 949, 953 (Utah App. 1997).

[67] *Diversified Equities, Inc. v. Amercan Sav. & Loan Ass'n*, 739 P.2d 1133, 1137, n. 5 (Utah App. 1987).

imputed to a party.[68]  Plaintiffs' Response presents numerous facts showing that, in light of the Defendants' acts of concealment, BYU acted reasonably in filing its complaint when it did.

**B.** **The Facts Monsanto Wants to Strike Show that the Defendants Concealed or Failed to Preserve Evidence Showing Their Use of Dr. Simmons's Reagents.**

As described above, Monsanto took concrete steps to falsely persuade everyone Monsanto had developed Celebrex without any contribution from Dr. Simmons.  Those attempts to fraudulently conceal facts are highly relevant to the pending motion for summary judgment.

**1.** **SOF ¶¶ 59-64 illustrate the futility of BYU's pre-complaint investigation .**

These paragraphs show the Defendants' pattern of deliberately withholding documents, including critical personnel files.  Most importantly, the personnel files Pfizer eventually produced show that other documents that should exist, don't – as further discussed in BYU SOF ¶¶ 56-58, which Pfizer also asks the Court to strike.

**2.** **SOF ¶¶ 56-58, 134-152, and 156 Show That Monsanto Has Lost or Destroyed Key Documents.**

Pfizer's requests to strike paragraphs 56-58, 134-152, and paragraph 156, fall into a similar category.  The thrust of SOF ¶¶ 56-58, for example, is that the Defendants failed to keep documentation of key tests or "assays" that were done from 1991 forward, specifically relating to immunoprecipitations or "IPs."   Such spoliation helped ensure that any attempt by BYU to investigate its claims back then would be futile.  Moreover, SOF ¶¶ 134-140 highlight why these documents *should* still exist: namely, because Monsanto's written recordkeeping guidelines at the time required all such records to be preserved.

---

[68] *United Park City Mines Co. v. Greater Park City Co.,* 870 P.2d 880, 888 (Utah 1993) (emphasis added).

Paragraphs ¶¶ 141-152 then discuss specific documents that should exist, but don't, including 10 laboratory notebooks from the critical 1990 to 1993 time frame. As summarized in SOF ¶ 152, these facts "support an inference that Monsanto took deliberate steps to ensure that there would be few if any records showing Monsanto's successful use of Dr. Simmons's clones and antibodies." And paragraph 156 points out one of the biggest holes in Pfizer's documents: Pfizer has not produced even a single lab notebook having an experiment testing whether Dr. Simmons's COX-2 clone did or did not express protein.

### 3. SOF ¶¶ 124-126 and 127-132 show additional Monsanto's efforts to conceal the facts underlying BYU's claims.

Paragraphs 124-126 of BYU's SOF show that Monsanto, while the Research Agreement was still in place, took steps to ensure that few within Monsanto knew about the BYU collaboration, and to further ensure that "little or no evidence would be preserved showing the use of Dr. Simmons's clones and other reagents." SOF ¶ 126. That's fraudulent concealment.

The same applies to SOF ¶¶ 127-132, which simply provide more detailed evidence that the Defendants succeeded in limiting knowledge of the collaboration with BYU. Hence – among many others – neither Dr. Isakson, the head of the COX-2 Project, nor Dr. Currie, Dr. Seibert's direct supervisor, were aware of BYU's involvement. SOF ¶ 127-128.

### C. SOF ¶¶ 157-158, and 159-166 Highlight the Futility of any Pre-Complaint Attempt by BYU to Discover the Facts Underlying Its Claims.

Pfizer also claims that its conduct in this litigation is "irrelevant" to the pending motion, and thus asks the Court to strike SOF ¶¶ 157-166 on that basis. In fact, Pfizer's discovery abuse is highly relevant to underscore the futility of any prior attempt by BYU to investigate its claims.

Paragraphs 157 and 158 of the SOF relate to Pfizer's central defense in this case: that Dr. Simmons's clones didn't work. Paragraphs 159-166 then describe how Pfizer gradually produced documents contradicting Pfizer's position, but did so only sporadically as BYU

identified deficiencies in Pfizer's production.  This is in keeping with what this Court called Pfizer's "recurring pattern": only after BYU complains about certain missing documents does Pfizer eventually provide them.[69] Such facts are relevant to BYU's "futility" defense.

Utah's Supreme Court has specifically recognized a "futility component to the fraudulent concealment doctrine" that comes into play in either of two circumstances.[70]  The first is "where a plaintiff has made inquiry and then been misled"; in which case he "has raised sufficient evidence of the futility of further investigation to survive summary judgment."[71] Second, a "plaintiff's lack of inquiry may be excused" when "the defendant has affirmatively concealed from the plaintiff the facts necessary to put the plaintiff on inquiry notice."[72]

Here, BYU asserts it was never on "inquiry notice" to investigate a claim prior to at least mid-1998 (and even later) due to the Defendants' fraudulent concealment.  In any event, though, the Defendants have misled BYU in every attempt to learn the facts about this case, including after the termination of the Research Agreement, in the mid-1990s when Monsanto published articles falsely claiming to have made its own mouse COX-1 and -2 clones, in 1997 when Dr. Needleman went out of his way to tell Dr. Simmons's that Needleman had discovered COX-2 before Dr. Simmons did, in 2000 when Monsanto's lawyer lied to BYU's general counsel after BYU initiated an investigation, and in this lawsuit after BYU's filed its complaint.

The Defendants' actions to conceal documents in this litigation are relevant because such actions make it more probable that the Defendants would have, and did, engage in the same type of obstructive actions when BYU made inquiries prior to filing a complaint.  In this lawsuit, the

---

[69] Dkt. 303.

[70] *Colosimo v. Roman Catholic Bishop*, 156 P.3d 806, 818, ¶ 48 (Utah 2006).

[71] *Id.*

"Court has been forced to intervene on numerous occasions and order the production of further discovery," because Pfizer has "interfered with the judicial process."[73] Yet after having spent more than four years and millions of dollars, and having made use of the Court's sanctioning power, BYU still doesn't have key documents that should exist, including any documentation showing Monsanto's experiments to cause Dr. Simmons's COX-2 clone to express protein, and the ten lab notebooks for the critical period between 1990 and 1993.

BYU's attempt to investigate its claims in this litigation – when it has access to both the liberal rules of discovery and the sanctioning power of the Court – underscores the futility of any prior, pre-lawsuit, investigation by BYU.  As the Court has previously found, the Defendants have "repeatedly failed to fully comply [with the Court's discovery orders] in a timely manner."[74]

**D.      SOF ¶¶ 225-228 Show the Defendants' Fraudulent Publicity Campaign to Falsely Promote Needleman as the Discoverer of COX-2.**

Pfizer also asks the Court to strike SOF ¶¶ 225-228, which deal with the publicity campaign that the Defendants launched to "promote Needleman as COX-2 discoverer."  Pfizer argues that the Defendants' PR campaign was irrelevant because "[w]hat other people thought or said is irrelevant to Dr. Simmons' and BYU's knowledge," and because the "relevant cutoff date" for the pending motion is 'May 8, 1998.'"  Pfizer errs on both points.

To begin with, although Dr. Simmons knew what materials he had given to Monsanto in 1991, he didn't know what materials Monsanto already had in-house at the time, nor did he have any idea of what research Monsanto had done internally between 1992 and 1999, when Celebrex

---

[72] *Id.* at 156 P.3d 819 at ¶ 49.

[73] Dkt. 303 at 13.

[74] Dkt. 303 at 14.

began to be sold.  The Defendants of course knew that, and their actions to "promote Needleman as COX-2 discoverer," went hand-in-hand with their efforts to sanitize their own records so as to minimize or erase any mention of Dr. Simmons and his contribution.

Indeed, Monsanto played on these same themes whenever Dr. Simmons raised any questions.  For example, as related above, Monsanto's Dr. Haymore told Dr. Simmons that Dr Simmons's simply didn't know what Monsanto had going on in-house before the short-lived collaboration with BYU.  And in March 1997, Dr. Needleman himself told Dr. Simmons that Needleman had discovered COX-2 before he had.

Second, contrary to Pfizer, BYU hasn't alleged that only facts prior to "May 8, 1998" are relevant to the pending motion.   Indeed, a key argument made in BYU's Response is that sales of Celebrex did not begin until early 1999, at which point the Defendants owed BYU a reasonably royalty under ¶ 3.4 of the Research Agreement.   As noted above, under that paragraph, the parties have one year after a patent is issued to negotiate a reasonable royalty. The Celebrex patent was applied for in November 1993, and issued in November 1995, SOF Ex. 56.   Hence, Defendants duty to negotiate a reasonable royalty for the patent was breached in November 1996, and the statute of limitations for that breach wouldn't have run until November 2002 – more than a year after the 8 May 2001 tolling agreement.

This point is underscored in Corbin.  Per Corbin, there are contracts "that have been said to require continuing (or continuous) performance for some specific period of time, a period that may be definite or indefinite when the contract is made."[75]  Such contracts are capable of being partially breached, and a "separate action is maintainable" for each such breach.[76] And "as the

---

[75] *Corbin on Contracts*, § 956.

[76] *Id.*

limitations period runs with each breach," a plaintiff is only precluded from recovering damages occurring prior to the statutory period.  *Paul Holt Drilling, Inc. v. Liberty Mutual Ins. Co.* 664 F.2d 252, 256 (10th Cir. 1981); *cf. Hi-Lite Products Co. v. American Home Products Corp,* 11 F.3d 1402, 1408-09 (7th Cir. 1993) ("Contracts requiring continuous performance are capable of being partially breached on numerous occasions . . . a plaintiff may sue on any breach which occurred within the limitation's period, even if earlier breaches occurred outside the limitation period."); *Cf.* Rest. (2d) of Contracts § 236, cmt. B. ("Although every breach gives rise to a claim for damages, not every claim for damages is one for damages based on all of the injured party's remaining rights to performance under the contract").[77]

Here, the Defendants had a continuing duty under Research Agreement ¶ 3.3 to notify BYU of patentable results arising from the Project, and under ¶ 3.4 to negotiate a reasonable royalty rate within one year of a patent's issuance.  This language was drafted by Monsanto's lawyer, Larry Swaney, who testified about its meaning:

> Q.    Okay.  So you anticipated at the time you included that language in this agreement that there are some things that could occur outside the two-year period of the research agreement?
>
> A.    Well, the next sentence indicates that you have got **one year after issuance of the patent to complete the negotiations**.  So obviously that would be beyond a two-year period for that, yes.
>
> Q.    And in the process of obtaining a patent on an invention would most likely take more than two years?

---

[77] A continuing contract can be totally breached only by "repudiation," but that requires a "voluntary affirmative act" indicating the promisor "will commit a breach" when performance becomes due, facts that don't apply here.  *Franconia Assoc. v. U.S.* 536 U.S. 129, 143 (2002); *cf. Restat. (2d) Contracts*, § 243 (if at time of breach "the only remaining duties of performance are those of the party in breach and are for the payment of money in installments," his breach of less than the whole "does not give rise to a claim for damages for total breach").

> A.    Take more than two years, yes, um-hum.

SOF ¶¶ 256-257, which discuss the commercial success of Celebrex, also relate to this point.

Hence, BYU's claim to recover reasonable royalties on the sale of Celebrex and Bextra are not barred by the statute of limitations.

**E.    The Facts Pfizer Claims Are Unsupported By the Record.**

Pfizer also complains that various paragraphs "lack any citation to the record," and therefore should not be considered by the Court, including ¶¶ 49, 58, 66, 80, 84, 96, 113, 122, 125 , 141, 143, 148, 152, 159, 163, 169, 173, 201, 209-10, 214, 221, and 254.  But Pfizer errs in its analysis.  First, it is Pfizer, not BYU, that has the burden of proving that facts are undisputed.  And Pfizer filed nothing that disputes or controverts any of the facts set forth in our SOF.

But second, and more importantly, that part of the rule **not** quoted by Pfizer specifically allows a party to show facts by negative evidence; that is, by "showing that the materials cited [by the moving party] do not establish the absence or presence of a genuine dispute," or by pointing out that "an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1)(B).  And as the comment to this rule notes, "Subdivsion (c)(1)(B) recognizes that a party need not always point to specific record materials."

For example, ¶ 49 of BYU's SOF states:   "Pfizer has provided no evidence that Monsanto informed BYU of these successful experiments with BYU/Simmons's antibodies." That's a perfectly valid statement of fact under the rule, and if Pfizer disagrees, then it should provide the evidence.  The same may be said of ¶ 58, which states in pertinent part: ". . . in this litigation Pfizer has produced only three autoradiograms from 1991."  Again, if Pfizer disputes, that, it can come forward with the evidence.  The same point applies to SOF ¶¶ 80, 84, 96, 113, 125, 169, 210, each of which merely points out a lack of evidence.

Some of Pfizer complaints also stem from paragraphs that, while lacking an internal citation, refer to other paragraphs for cited authority, or are summarizing statements made in other paragraphs.  For example, SOF ¶ 66 refers to a 1993 employment review that is quoted – and cited – in ¶ 67. Statement of Fact ¶¶ 122, 152, 159, 163, 201, 214, 221 and 254 also generally fit this category.[78]

## III.  <u>PLAINTIFFS' DECLARATIONS (AS MODIFIED) ARE ADMISSIBLE.</u>

Through an oversight, the originally-submitted declarations of Drs. Simmons and Bell neglected to include the required "under penalty of perjury" clause.  That oversight has now been corrected, and replacement declarations are being submitted with this Response, attached as Exhibits 34 and 35.  These declarations are identical to the originals, but with the added clause.

The Defendants' other allegations lack merit.  Contrary to Pfizer, Dr. Bell's opinions are specific and well-supported by his background, experience, and review of documents in this case.  His declaration specifically states his reliance on the depositions and related exhibits taken of the key Monsanto scientists, including Dr. Karen Seibert, Jaime Masferrer, Scott Hauser, Dr. Peter Isakson, and Len Lee, as well as his review of the scientific articles discussed in Pfizer's motion and other articles used in the depositions.[79]  And his credentials are flawless: Dr. Bell is a chemistry Ph.D. who worked on COX-2 issues for Abbott Labs, a Monsanto competitor, throughout the 1990s.

---

[78] There are a few paragraphs in BYU's SOF, however, for which the citation was inadvertently omitted.  Paragraphs 141 and 143, for example, are supported by the attached Ex. 32 (Email to A. Anderson from E. Coates at The Monsanto Company, with attached schedules and memos).  Paragraph 148 is supported by ¶ 151(d).  Paragraph 173, like ¶ 172, is supported by the 17 Dec 10 Decl. of R. Bell, ¶ 16, attached as Ex. 94 to the SOF.   Paragraph 209 is supported by the attached Ex. 33 (Email from J. Masferrer to S. Adams, 9 Mar 92, BYU-PFE-P009297-306).

[79] *See* Appendix A to Bell Amended Declaration, Ex. 35.

Moreover, the Defendants' case law merely finds that, in particular circumstances, an expert's affidavit was insufficient to defeat summary judgment, not that the affidavit was inadmissible.  At most, Defendants' complaints go to the weight to be given the declarations. Indeed, particularly in cases involving technical issues, such as patents, that an affidavit is "conclusory" is "an insufficient reason for rejecting it," indeed, "[e]xpert opinion has this quality."[80] As other courts have observed, "Judges are seldom masters of intricate mechanics or engineering," or for that matter chemistry and molecular biology.[81]  Hence they "must often rely on expert testimony to assist them in understanding" the technical aspects of inventions.[82]  And "as in other fields where expert testimony is of vital significance," the "opinions of patent experts must often be formulated in conclusory terms . . ."[83]

For similar reasons, nor are Defendants' complaints about Dr. Simmons's declaration well taken.   As an experienced scientist who regularly met other scientists at conferences, and who generally kept up on the literature, Dr. Simmons is familiar with methodologies used in different labs.  For example, none of the scientific articles Monsanto wrote ever mentioned Chob, while Dr. Herschman had at least two other articles in the early 1990s, in addition to the 1994 article he co-authored with Monsanto, which referred to the use of Chob.[84]

## CONCLUSION

For the reasons discussed above, the Court should deny Pfizer's motion to strike.

---

[80] *Black, Sivalls & Bryson, Inc. v. National Tank Co.* 445 F.2d 922, 926 (10th Cir. 1971).

[81] *N. V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 590 F.2d 415, 419 (2d Cir. 1978).

[82] *Id.*

[83] *Id.*

[84] *See* Exs. 23A-C.

RESPECTFULLY SUBMITTED this 1st day of February, 2011.

**BEUS GILBERT PLLC**


By_____*s/Mark C. Dangerfield*_____
      Leo R. Beus
      L. Richard Williams
      Mark C. Dangerfield
      Adam C. Anderson
      Keith C. Ricker

RAY QUINNEY & NEBEKER P.C.
      Mark M. Bettilyon
      Rick B. Hoggard
      Arthur B. Berger
      Samuel C. Straight

OFFICE OF THE GENERAL COUNSEL
      David B. Thomas
      BRIGHAM YOUNG UNIVERSITY

BGD-#116456-v7-Response.DOC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of February, 2011, I electronically filed the foregoing

RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PORTIONS OF

PLAINTIFFS' RESPONSE with the Clerk of the United States District, District of Utah Central

Division, using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Richard O'Malley, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL  60603<br>Telephone:  312-853-3577<br>Facsimile:  312-853-7036<br>romalley@sidley.com | John Caleb Dougherty<br>Richard T. Mulloy<br>Kathy J. Owen<br>DLA PIPER<br>6225 Smith Avenue<br>Baltimore, MD  21209<br>Telephone:  410-580-4140<br>Facsimile:  410-580-3140<br>john.dougherty@dlapiper.com<br>richard.mulloy@dlapiper.com<br>kathy.owen@dlapiper.com |
| Brent O. Hatch<br>Hatch, James & Dodge, P.C.<br>10 W. Broadway, Ste. 400<br>Salt Lake City, UT  84101<br>Telephone:  801-363-6363<br>Facsimile:  801-363-6666<br>bhatch@hjdlaw.com | |

*s/ Mark C. Dangerfield*

## OPPOSITION TO PFIZER MOTION TO STRIKE
## EXHIBITS

| TAB NO. | DESCRIPTION | BATES/REFERENCE | DEPO EX. NO. | FILED UNDER SEAL |
|---------|-------------|-----------------|--------------|------------------|
| 1. | J. Masferrer Dep., *Merck v. Monsanto*, 12 Dec 00 | BYU-PFE 106767-819 | 326 | X |
| 2. | L. Lee Dep., 17 Sep 10 | | | X |
| 3. | Ltr. to P. Needleman from C. Hardman, 21 May 92 | BYU-PFE 058838 | 585A | X |
| 4. | Ltr. to Needleman from Hardman, 2 Sep 92 | BYU-01-1418 | 951 | |
| 5. | D. Simmons Dep., 20 Apr 09 | | | X |
| 6.   A | K. Seibert Dep., 1 Jun 10 | | | X |
| 6   B | K. Seibert Dep., 2 Jun 10 | | | X |
| 6   C | K. Seibert Dep., 3 June 10 | | | X |
| 7. | B. Haymore Dep., 25 Sept 10 | | | X |
| 8. | Monsanto Announcement, 1 Aug 93 | BYU-PFE Personnel File 003934 | 971 | X |
| 9. | G. Krivi Dep., 30 Apr 02, *Univ. of Rochester v. G.D. Searle* | BYU-PFE 118302-367 | 969 | X |
| 10. A | P. Needleman Dep., 17 Nov 10 | | | X |
| 10  B | P. Needleman Dep., 18 Nov 10 | | | X |
| 11. | M.K. O'Banion, et al., A Serum – and Glucocorticoid-regulated 4-Killobase mRNA Encodes a Cyclooxygenase-related Protein, J.Biochem, March 1993, p. 6610 | PFC01194743-748 | | |
| 12. | E. Meade, et al, Differential Inhibition of Prostaglandin Endoperoxide Synthase (Cyclooxygenase) Isozymes by Aspirin and Other Nonsteroidal Anti-inflammatory Drugs, J. Biochem., March 1993, p. 6610 | PFC01603523-527 | | |
| 13. | U.S. Patent No. 5,344,991, 6 Sep 94 | BYU-PFE-ARC 1001608809-838 | | |
| 14. | U.S. Patent No. 5,563,165, 8 Oct 96 | PFC01567139-167 | | |
| 15. | U.S. Patent No. 5,633,272, 27 May 97 | BYU-37-6051-078 | 309 | |
| 16. | U.S. Patent No. 5,760,068, 2 Jun 98 | | 849 | |
| 17. | License Agreement between Searle and Yamanouchi | BYU-PFE-K-1000001055-97 | 914 | X |
| 18. | R. DeSchutter Dep., 14 Dec 10 | | | X |
| 19. | Memo to P. Needleman from D. Schamrowski, 11 Nov 96 | S00663101-111 | 913 | X |
| 20. | Draft Article submitted to Science Magazine by K. Seibert titled Mediation of Acute Inflammation by Cyclooxygenase-2, 2 Dec 03 | BYU-PFE 651008-026 | 257 | |

| | | | | |
|---|---|---|---|---|
| 21. | W. Xie Dep., 27 Mar 09 | | | X |
| 22. | H. Herschman Dep., 3 Dec 10 | | | X |
| 23. A | R. Gilbert, et al, REGULATION OF TIS10/PROSTAGLANDIN SYNTHASE-2 PROTEIN AND MESSAGE IN MURINE MACROPHAGE CELL LINES | KUJ 000125-161 | 747 | |
| 23  B | D. Kubuju, et al., TIS 10, A PHORBOL ESTER TUMOR PROMOTER-INDUCIBLE mRNA FROM SWISS 3T3 CELLS, ENCODES A NOVEL PROSTAGLANDIN SYNTHASE/CYCLOOXYGENASE HOMOLOGUE, JBC, 1991, Vol 266, No. 20. | HERSCH0182-88 | 315 | |
| 23  C | J. Masferrer, et al., IN VIVO GLUCOCORTICOIDS REGULATE CYCLOOXYGENASE-2 BUT NOT CYCLOOXYGENASE-1 IN PERIOTONEAL MACROPHAGES, JPET, 1994, Vol. 270, No. 3 | BYU-PFE 651957-961 | 129 | |
| 24. | D. Simmons CV | BYU-38-0028-43 | 167 | |
| 25. | L. Astle Dep., 17 Feb 09 | | | X |
| 26. | Ltr. to E. Bramhall from D. Hoscheit, 17 Mar 00 | BYU-12-0071-74 | 576A | |
| 27. | Ltr. to D. Hoscheit from D. Thomas, 18 May 00 | BYU-01-1441-42 | | |
| 28. | 19 Mar 08 Hearing Transcript | | | X |
| 29. | Pfizer Fact Sheet – www.stopmedicarefraud.gov/pfizerfactsheet.html | | | |
| 30. | Pfizer Hit With $141 Million RICO Penalty Over Neurontin Promotion, 29 Mar 10, Law.com, Ex. 30. | | | |
| 31. | Pfizer to Pay $142.1 Million Over Neurontin Marketing, 28 Jan 11, Bloomberg.com | | | |
| 32. | Email to A. Anderson from E. Coates, 13 Dec 10 | | 873 | |
| 33. | Email from J. Masferrer to S. Adams, 9 Mar 92 | BYU-PFE-P009297-306 | | X |
| 34. | Amended Declaration of Daniel Simmons | | | |
| 35. | Amended Declaration of Randy Bell | | | |

BGD-#116456-v7-Response.DOC