1              IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF UTAH, CENTRAL DIVISION

3

4   BRIGHAM YOUNG UNIVERSITY, a Utah          )

5   Non-Profit Education Institution; and DR. )

6   DANIEL L. SIMMONS, an individual,         )

7            Plaintiffs,                       )

8      vs.                                     )      Case No.

9   PFIZER, INC., a Delaware corporation; G.D.)  2:06-CV-890TS

10  SEARLE & COMPANY, a Delaware              )

11  corporation; G.D. SEARLE LLC, a Delaware  )

12  limited liability company, MONSANTO       )

13  COMPANY, a Delaware corporation; and      )

14  PHARMACIA CORPORATION, a Delaware         )

15  corporation,                              )

16            Defendants.                      )

17  _____)

18

19            BEFORE THE HONORABLE TED STEWART

20            --------------------------------

21                  February 10, 2011

22                   Motion Hearing

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP

25  350 South Main Street, #146, Salt Lake City, Utah  84101

```
1                        A P P E A R A N C E S

2

3    For Plaintiff:          Adam Anderson
                             Leo Beus
4                            Richard Williams
                             BEUS GILBERT
5                            4800 N. Scottsdale, #6000
                             Scottsdale, Arizona  85251
6

7                            Mark Bettilyon
                             RAY QUINNEY & NEBEKER
8                            36 South State Street, #1400
                             Salt Lake City, Utah  84111
9

10                           Robert Blakey
                             UNIVERSITY of NOTRE DAME LAW SCHOOL
11                           P.O. Box 780
                             Notre Dame, Indiana  46556
12

13   For Defendant;          John Dougherty
                             DLA PIPER US
14                           6225 Smith Avenue
                             Baltimore, Maryland  21209
15

16                           Richard Mulloy
                             DLA PIPER US
17                           401 B Street, #1700
                             San Diego, California  92101
18

19                           Brent Hatch
                             HATCH JAMES & DODGE
20                           10 West Broadway, #400
                             Salt Lake City, Utah  84101
21

22

23

24

25
```

```
1    SALT LAKE CITY, UTAH; THURSDAY, FEBRUARY 10, 2011; 3:00 P.M.
2                            PROCEEDINGS
3               THE COURT:  Good afternoon, counsel.  We are here
4    in the case of Brigham Young University, et al., plaintiffs,
5    vs. Pfizer, Inc., et al., defendants, case 06-CV-890.  We
6    have representing the plaintiffs in this case Mr. Adam
7    Anderson, Leo Beus, Robert Blakey, Mark Bettilyon and
8    Richard Williams, on behalf of defendant Pfizer, John
9    Dougherty, Rick Mulloy, and Brent Hatch.
10              Counsel, let me make you aware that we have one
11   hour for this hearing.  This matter has been very thoroughly
12   briefed and the Court believes that it has a fairly good
13   handle on most of your arguments.  I'm therefore going to
14   ask that you focus exclusively in the motion to dismiss on
15   the RICO enterprise issue and on the motion for summary
16   judgment, the fraudulent concealment.
17              And these are your motions, Mr. Hatch.  Who will
18   be arguing them?
19              MR. DOUGHERTY:  Your Honor, John Dougherty.
20              MR. HATCH:  Your Honor, he'll argue --
21              THE COURT:  You'll split them.
22              MR. HATCH:  Yeah, we'll split those two issues.
23              THE COURT:  All right.  Let me tell you what I'm
24   going to do then, counsel.  I will give you 25 minutes, and
25   then you split that however you want.  And then I will give
```

1   the other side a half hour.  Then you will get the last five

2   minutes.  Okay.

3          Be aware that we do have a jury out in a criminal

4   case.  If the Court gets a note that it has reached a

5   verdict, we'll have to take that verdict unless it's close

6   enough to the end that we can just wait for the attorneys to

7   appear before we do it.  But it is a priority, which you can

8   appreciate.

9          MR. HATCH:  How long has the jury been out, Your

10  Honor?

11         THE COURT:  Just a couple of hours, but it's only

12  been a two-day trial.

13         Mr. Dougherty, will you handling the RICO

14  enterprise issue?

15         MR. DOUGHERTY:  I was going to the statute of

16  limitations, if that's okay.

17         THE COURT:  That's fine.

18         MR. DOUGHERTY:  We have some slides, Your Honor,

19  and I see they are now up here.

20         So the Court has indicated an interest in

21  discussing the fraudulent concealment issue.  And, of

22  course, this would be part of the statute of limitations

23  discovery rule jurisprudence.  And I think the Colosimo

24  case, Your Honor, is very helpful for us understanding the

25  burden that the plaintiff bears on the fraudulent

1    concealment.  So there really are two questions under the

2    fraudulent concealment law as it exists in Utah, and the

3    question is did the plaintiff exercise reasonableness and

4    diligence and was the concealment so entire that there is no

5    way that somebody could be put on notice, or did the

6    plaintiff make an inquiry and be misled by the defendant.  I

7    think those are the teachings of both Colosimo and the

8    Russell Packard case.

9         And I think in this case, Your Honor, there are

10   only a few facts that are largely undisputed, in fact, can't

11   really be disputed, that bear directly on the question of

12   whether or not the plaintiffs in this case knew enough to be

13   on inquiry notice because there is no dispute that no

14   inquiry was made.  So I think we're in that prong of

15   fraudulent concealment that asks the question was the cause

16   of action so entirely concealed from the defendants that no

17   inquiry would have been possible or would have been futile.

18        We think both with respect to the wrongful

19   termination allegations, Your Honor, and the

20   misappropriation of the project allegations, the record

21   evidence is undisputed and these plaintiffs knew or should

22   have known and were on notice that if they had a claim, they

23   should have pursued it.  They should have picked up the

24   phone and made a call, wrote a letter, asked a question.

25   They never did it.

1          Between the termination of that agreement in March

2    of 1992 and the time they contacted the defendants in 1999,

3    there was absolutely no inquiry made of the defendants.

4    There were a couple of contacts.  Your Honor, I would like

5    to focus on the facts that I think are relevant to this

6    question.

7          The wrongful termination allegations which form

8    the basis of so many of the causes of action, but we find it

9    here on the screen, Your Honor, in the breach of contract,

10   Count 1, the essential allegation is that the research

11   agreement that the parties executed in March -- or effective

12   August of 1991 was wrongfully terminated in March of 1992.

13         So we're going to take a look at our time line

14   here.  And, quickly, Rick, I would like to go through these.

15         Your Honor, all this is all in the briefs, but

16   basically what happened here was Monsanto -- the lead

17   Monsanto scientists wrote Dr. Simmons in March of 1992 and

18   provided the reasons that he believed that the contract

19   should come to an end.  Remember, Your Honor, this is a

20   two-year contract, $50,000 in grant money per year.  So this

21   would have been a premature termination of the agreement on

22   its own terms.

23         So Dr. Needleman informed the plaintiffs of this.

24   The agreement was terminated.  And Dr. Simmons hotly

25   disputed that termination.  So for the purposes of the

1    statute of limitations, Your Honor, we know that the

2    contract claim has to -- it's six years.  We know that the

3    tolling agreement was executed in May of 2001.  So the

4    question Your Honor has to ask, particularly as focused on

5    the fraudulent concealment, what did the plaintiffs know

6    prior to May of 1995 with respect to the termination of the

7    agreement and whether or not it was wrongful.

8            They knew the agreement was terminated for sure.

9    We also know that Dr. Simmons wrote a letter to

10   Dr. Needleman disputing the ground of the termination.

11           This is from the plaintiffs' complaint.  And here

12   it's very clear, plaintiffs' own words, Your Honor, this is

13   the way they have framed the case.  He is arguing that the

14   termination was in error.  He believes that Dr. Needleman

15   did not have complete or accurate information.  He went to a

16   conference and confronted -- confronted Monsanto in July of

17   1992, according to the complaint, Your Honor.  He engineered

18   a luncheon with the Monsanto scientists to dispute the

19   termination, to try and get the research agreement

20   reinstated.  And he apparently was pretty hot in his

21   description of why he thought it was wrong to terminate the

22   contract.  In fact, the conversation was so hot -- again,

23   this is all from the plaintiffs' complaint -- that

24   Dr. Needleman turned around and said, I'm not dishonest.

25           THE COURT:  Mr. Dougherty, let me ask you this.  I

1  understand you have argued that he felt wronged by it.  The

2  plaintiffs here argue that that feeling of wrongfulness is

3  not enough to have put him on notice that your client, in

4  fact, had a secret, conspiratorial intent in all this.  So

5  you've got to get me from his feeling wronged, feeling like

6  it was a mistake, et cetera, to understanding what they are

7  alleging you, in fact, terminated it for.

8            MR. DOUGHERTY:  Right.  So our reasons for the

9  termination, Your Honor, are completely irrelevant to the

10  statute of limitations question.  The only question that has

11  to be asked is was the contract breached, did the plaintiff

12  know, were the plaintiffs in possession of enough facts for

13  them to file a cause of action, were they in possession of

14  enough facts to make an additional inquiry of the

15  defendants.  They did none of that.  I think these facts

16  show -- it is one thing to say now in the face of this

17  motion, well, he didn't really like the fact it was

18  terminated.

19            But, Your Honor, if I'm sitting in private

20  practice and somebody walks into my office and says I had a

21  two-year agreement and these guys terminated it, and I was

22  depending on that $50,000 next year, and the reasons they

23  gave for the termination, whether or not there is some

24  conspiracy behind it or not, are irrelevant.  The question

25  is what did he believe.  He believed that the termination

1   was wrongful.  He went into exquisite detail as to why he

2   thought the termination was wrongful.

3           If a client walked into my office and laid those

4   facts out in front of me and said I went and confronted

5   these guys in Montreal and they refused to reinstate the

6   contract, and, apparently, according to plaintiffs' own

7   internal memorandum, he was telling other faculty members

8   that the termination was unjust, wrongful, unjust, upset,

9   frustrated, if a client walked into my office and gave me

10  those facts, I don't believe that there is a lawyer in this

11  room that wouldn't say to that client the statute of

12  limitations is running.  You now know enough to either bring

13  a cause of action or to write a letter complaining about it.

14  Plaintiffs did none of that.  After the confrontation in

15  Montreal, it was radio silence from the plaintiffs.

16          What else do they know at the time?  They know

17  that they had a second year of the agreement.  They know

18  they were waiting for another $50,000.  They know that

19  Monsanto has possession of all of this information that

20  plaintiffs now claim is a trade secret and confidential

21  information, and that we were not permitted to use, we were

22  not permitted to do any further research on COX-2 without

23  Dr. Simmons' involvement.

24          All of this is known by May of 1993.  There is no

25  question that the plaintiffs believed the contract had been

1   breached, that they were entitled to have that contract

2   reinstated, that they were entitled to their additional

3   money, they were entitled to whatever rights that they have

4   asserted in that first amended complaint.

5          So when the plaintiffs try and focus the question

6   of accrual not on what they knew and not on the precise

7   question of injury and first harm, which were clearly

8   present right after that termination, and they want to make

9   it about what the defendants' motivations were, what the

10  defendants knew, we've turned the statute of limitations

11  analysis upside down.  The statute of limitations is only

12  concerned about when the plaintiff could have acted.

13         These facts, all undisputed, show that the

14  plaintiffs could have acted and did not.  They waited.  They

15  waited until Celebrex had been launched and had become a

16  billion dollar drug before they did anything.  That delay,

17  Your Honor, has significant consequences not just for their

18  claims but for us as well, because in that period between

19  1992 and 1999, hundreds of Monsanto employees were bringing

20  COX-2 therapies to the markets.  Hundreds of millions of

21  dollars were being spent.  Documents which existed were

22  being recycled.  Witnesses, critical to this case, are

23  dying.  So that delay has consequences not just for the

24  viability of their claims but for our ability to defend this

25  lawsuit.

1          So when it comes to concealment, Your Honor, the

2     concealment of the facts that they want to focus on is not

3     the concealment that the law is asking the Court to look at,

4     which is was the plaintiff denied the ability to know that

5     he had a claim.  We believe these facts show that without

6     any reservation at all.

7          Your Honor, if I could go to the fraudulent

8     concealment as it relates to the other claims and quickly

9     review those facts with you.

10         So the misappropriation argument, Your Honor,

11    allegations that exist throughout the first amended

12    complaint, it's basically the notion that defendants stole

13    the so-called project.  And the project is defined by the

14    plaintiffs.  This is not our definition.  This is theirs.

15    The project itself was a trade secret.  And the project they

16    define as being the search for COX-2 selective inhibitors

17    and further research on the COX-2 enzyme without

18    Dr. Simmons' direction or involvement.

19         So the question is if that is the misappropriation

20    of the project, when did plaintiffs know or when should they

21    have known.  Just to give them the benefit of the discovery

22    rule for a second, when should they have known that that

23    claim existed.  I think we've shown in our brief and we can

24    quickly go through it now, Your Honor, we cited to you some

25    of the articles of Monsanto.  I would note for Your Honor

1   that Drs. Masferrer and Seibert, the two authors on these

2   articles, are the very same people that Dr. Simmons alleges

3   he had the most extensive contact with at Monsanto.

4          So throughout 1994, we, meaning the defendants,

5   are publishing articles that clearly reveal that we are

6   continuing COX-2 research, that we are in the hunt for COX-2

7   selective inhibitors.  We know that the plaintiffs

8   understood that because they are citing those exact same

9   articles in their research grants.

10          Can we pull up the first research grant from 1994?

11          Here is Dr. Simmons applying for a research grant

12   at NIH.  In here he's disclosing the basic hypothesis of

13   COX-2, and he's talking about it eliciting intense interest

14   from the pharmaceutical industry.  He's also going on to say

15   that the finding of these would be of tremendous value,

16   enormous importance to those suffering.  He's citing the

17   Masferrer article in 40.  He is reading what we're

18   publishing.  He knows that we're continuing COX research

19   without him.  He knows that we are looking for and found

20   COX-2 selective inhibitors.  All of this, Your Honor, well

21   before the statute of limitations would be saved by the

22   tolling agreement, well before.

23          So if the question is -- because I understand the

24   plaintiffs are going to come up and they are going to talk

25   about some conspiracy to conceal.  This is exactly the

1    opposite.  This is a pharmaceutical company doing what

2    pharmaceutical companies do.  They publish the results of

3    their research.

4            Rick, let's go to the next slide.

5            Here is an article in December of 1994 -- yes,

6    1994.  This is in a very prestigious journal, Your Honor,

7    Proceedings of the National Academy of Sciences.  In here,

8    Monsanto scientists are again disclosing this notion that

9    COX-2 selective inhibitors could be the breakthrough that

10   would alleviate suffering, people taking NSAIDs, and all

11   those side effects.  In this article we're making specific

12   reference to our own compound, the SC-58125.  This is a

13   COX-2 selective inhibitor.

14           So if the project as defined by the plaintiffs is

15   that we, meaning the plaintiffs, own the right exclusively

16   to pursue COX-2 selective inhibitors and you are not

17   permitted to do that without our involvement, this article

18   and the other article and the other articles that are in

19   this presentation, Your Honor, show again and again and

20   again not only that we're publicly disclosing it, but that

21   plaintiffs know.

22           Rick, let's go to the next slide.

23           Again, Your Honor, we're just kind of going

24   through here, recognizing the limitations on our time.  Here

25   is a chapter from -- a book chapter Dr. Simmons wrote in

1    1996 where here he's talking about extensive drug screening

2    by the pharmaceutical industry has led to the identification

3    of multiple potential COX-2 selective inhibitors, and among

4    the articles that he cites is an article by Monsanto where

5    that very fact is disclosed.

6          The next, please.  Go through these quickly.

7          In fact, Dr. Simmons was reading so carefully the

8    articles that were disclosed in all the work that the

9    defendants were doing in the COX-2 world, that he had one of

10   his colleagues in January of 1996 write us a letter asking

11   us to send him a sample of that very same SC-58125 that was

12   disclosed in that prior article.

13         So as we go through these facts, Your Honor, the

14   question here is did he know or should he have known, did he

15   know enough to write a letter to ask defendants are you

16   using my stuff, why are you continuing the COX-2 research,

17   why are you continuing the project, hold on a second, you're

18   not allowed to do that under my -- nothing, nothing at all

19   until we had a blockbuster drug on our hands.

20         Rick, go to the next slide, please.

21         Dr. Simmons' interest in COX-2 was well known

22   throughout the BYU community.  In May of 1996, Your Honor,

23   Lynn Astle, who was I believe the head of BYU's technology

24   transfer office -- so that's going to be the office that

25   deals with the questions of patents and licenses and all

1    that stuff.  He is sending Dr. Simmons an article that

2    appeared in another journal.  This one, The Wall Street

3    Journal, so a little more widely read.  But here, what does

4    this article reveal?  It reveals that the COX-2s may be the

5    holy grail.  It reveals that Monsanto, along with Merck, are

6    the first ones to specifically design COX-2 selective

7    inhibitors.  It also tells him that we are entering into

8    human clinic trials, the second of the last stage of getting

9    something to the market.  He even knows what the name of the

10   drug is because it's right there in the article.

11              Next, please.

12              In October of that same year, again, Dr. Simmons

13   is, in a grant application, reporting that proprietary COX-2

14   drugs have been discovered by the pharmaceutical industry.

15   Again, he's citing to, this time, two Monsanto articles.

16              Next, Rick.  Keep going.

17              So, Your Honor, all of the misappropriation of the

18   project allegations are contained in nearly every single --

19   I believe every single count in the complaint.  So the

20   question, for purposes of statute of limitations, is when

21   did plaintiffs know that the project had been

22   misappropriated.

23              We believe that they knew the day after

24   termination because there was no reasonable position that

25   Dr. Simmons could take to say he thought we were going to

1    stop.  When the agreement was terminated, there was never a

2    request for return of the materials.  There was never any

3    communication where Dr. Simmons said you can't do COX-2

4    research anymore.  Then July, that conference where he

5    confronted them, that was a conference that related to the

6    very subject he said we weren't allowed to do research on.

7            By the time it hits The Wall Street Journal in May

8    of 1996, there is simply no doubt in the minds of the

9    plaintiffs -- forget about what the defendants knew, no

10   doubt in the minds of the plaintiffs that they had

11   possession of all the information that they needed to pick

12   up the phone and call, or to file a lawsuit, and they didn't

13   do any of it.  Why?  I don't want to speculate about why.

14   But is the timing of this coincident with Celebrex's first

15   blockbuster year?  That's the first time they contacted us,

16   when any harm that occurred to the plaintiffs in 1992 could

17   have been addressed and remedied.  That's what the statute

18   of limitations is all about.  We want you to file this case

19   as soon as you know you've got a claim on your hands because

20   we don't want it to turn into something else.

21           That's exactly what happened here.  So instead of

22   dealing with the simple breach of contract, this case has

23   morphed into now we're talking about RICO allegations.

24   Fraudulent concealment?  Hardly.  Defendants were putting

25   out there in the public domain exactly what they were doing,

1    not everything, but enough for these plaintiffs to know that

2    the project that they claim was misappropriated was well

3    under way at Monsanto and was leading to a successful COX-2

4    selective inhibitor program.  That's not concealment.  If

5    anything, that put them on notice to do something.  I think

6    it gave them actual knowledge.  I believe it gave them

7    enough to pick up the phone, write a letter, make an

8    inquiry.  Never happened.  Never happened.

9              Plaintiff is not allowed to sit and wait until he

10   or she believes they have been harmed enough.  They have to

11   move.  The first injury, the first harm, that's what the law

12   teaches us, and that's not what happened here.

13             THE COURT:  Thank you, Mr. Dougherty.

14             Mr. Hatch, you've had 20 minutes to --

15             MR. HATCH:  Twenty minutes?

16             THE COURT:  No.  You've had 20 minutes -- 25

17   minutes, roughly, to get your thoughts.  Summarize your

18   arguments in about seven minutes, okay.

19             MR. HATCH:  You had me all excited.

20             MR. DOUGHERTY:  Your Honor, before you begin, I'm

21   wondering whether I could hand you up a time line that kind

22   of summarizes the facts that I just --

23             THE COURT:  Sure, that would be helpful.

24             MR. DOUGHERTY:  Maybe mark this as Defendant's

25   Exhibit Hearing 1-A.

1              MR. HATCH:  I did a quick bunch of cut and

2      pasting, Your Honor.

3              You asked me to address the enterprise as part of

4      our RICO argument, and I will do that.  As Your Honor is

5      aware, the cases require that an enterprise must have at

6      least two attributes.  One is a common purpose and the

7      second is relationships among those associated with the

8      alleged enterprise.

9              Now the first question -- if you will go to the

10     next -- that's fine, yeah.

11             The complaint takes an interesting approach here

12     because, as we've argued in our briefs and I would argue

13     again today, if you look at the allegations, particularly

14     when you go to pattern of racketeering activity and the

15     other aspects of this matter, we're in a position now of a

16     case that -- the contract had started in 1991.  It went for

17     a few months.  Terminated in '92.  Tolling agreement in

18     2001.  A lawsuit is not until 2006.  Still, not until last

19     year, late 2010, we finally have an amended complaint

20     asserting RICO claims.

21             And virtually every allegation, if you look at

22     them closely, misapprehends not only all the elements of

23     what is required to establish a RICO claim, but really talk

24     about garden-variety business disputes, business torts,

25     contract disputes, things of that nature.

1          So to be able to fit this kind of square peg in a

2     round hole, as the cases have said, to establish an

3     enterprise, the plaintiffs here have to start with a

4     purpose.  The purpose the plaintiffs chose to start with is

5     paragraph 192, define one of the -- it says, the enterprise

6     was formed for the purpose of developing and marketing a

7     COX-2 selective nonsteroidal anti-inflammatory drug.

8          Well, let's think about that for a minute because

9     if you read the rest of the complaint, and when they talk

10    about the pattern of racketeering activity, when they talk

11    about what is actually at issue here, it really isn't this

12    broad.  What they are asking for, they are saying that what

13    we did, allegedly, was misappropriate the confidential

14    information of the plaintiffs.

15         The problem with that, if you identify the purpose

16    directly, is that gives you, almost by the definition of it

17    in the facts of this case, a single actor, a single target,

18    and a single event, because misappropriation -- as we said

19    in our briefs, misappropriation of a trade secret can only

20    happen once.  Once it's taken, it's taken, including all of

21    its value.  So with that, they have no ability to really

22    establish an enterprise.

23         So then what do you do?  You look and find a way,

24    maybe we can expand this.  They expand the purpose to this,

25    developing and marketing, something that is not even -- is

1   not even an inappropriate in and of itself purpose.  And you

2   can see pretty quickly by expanding the breadth of what this

3   purpose is does, because it literally brings in almost

4   anybody who could possibly ever touch this drug.

5          You've got clinical trial participants.  They are

6   helping develop.  Drug reps, radio stations, TV stations,

7   newspapers, magazines, all part of, theoretically, the

8   marketing.  If you take this broad approach that the

9   plaintiffs have taken here, doctors helping develop and

10  marketing it through samples and other things, it gets

11  really quite absurd.  They didn't bring these in.  They

12  would fit underneath their definition, but they brought in

13  eight particular entities.  And there are problems with each

14  of those as well.

15         You can go to the next slide.

16         Washington University, UCLA, the Proceedings of

17  the National Academy of Sciences, an advertising firm, two

18  law firms.  Now for these people to really create the

19  enterprise, there has to be two things.  There has to be

20  this purpose.  And I think if we look at it as what the

21  actual purpose allegedly is, which is a misappropriation of

22  the confidential information of the plaintiffs here, there

23  is not an allegation anywhere in the complaint that any one

24  of those alleged members of the enterprise had or could have

25  had that as a purpose.  It's not alleged in the complaint.

1    And that's fatal to their RICO claim.

2              I would put to the Court that what we look at too

3    is not trying to conflate things here and look at it through

4    what was potentially Monsanto's purpose, but what was the

5    purpose of each of these purported members of the

6    enterprise.  I think once we look at that, the purpose can't

7    have been the purpose either as they define it or as it

8    would have appropriately been defined.

9              Then the second aspect of that is the relationship

10   with others.  Well, the case law talks about that, and there

11   are no allegations that any of these particular members of

12   the enterprise are related in the way that is implied.  We

13   have cited -- both sides have cited the U.S. v. Feldman case

14   at 853 F.2d 648.  In that case it talks about an

15   organization.  It talks about continuity.  There aren't any

16   allegations in the complaint that talk about how any one of

17   these particular and alleged members of the enterprise are

18   part of any kind an organization, how they have any

19   continuity, as a matter of fact, how they have any

20   relationship between themselves at all.

21             A perfect example, I can just pick one out, is

22   UCLA.  They claim that a professor at UCLA gave Monsanto his

23   COX-2.

24             Well, the interesting thing about that is, as you

25   go down, what's the relationship with Sidley Austin, which

1    is serving as a lawyer.  In our brief it talks about how

2    that's not enough anyway.  Even if it were, 15 years later a

3    lawyer comes in and allegedly has discovery disputes with

4    them.  What's the common purpose, what's the organization,

5    what's the continuity there from this one-time event to a

6    professor at UCLA down to Sidley Austin that's representing

7    the firm in litigation?  That's what is missing here, Your

8    Honor.

9           The kind of thing you would expect to see is the

10   kind of thing we would see like in a case like U.S. v. Jones

11   in the Second Circuit, 482 F.3d 60.  At page 70, it talks

12   about there are two executives.  They were known as LT and

13   Speedy.  It seems like there always ought to be some cute

14   name here.  It ought to be something -- the something ought

15   to be in their name.  They had intent.  They worked

16   eight-hour shifts and were paid $500 for each shift.  The

17   lieutenants supervised four or five sellers and earned

18   20-percent commission on any sales.  The executives packaged

19   and prepared drugs, delivered to the lieutenants, delivered

20   to the sellers, who then fraudulently sold those to

21   individuals on the street.  The sellers took their

22   20 percent.  They gave 80 percent to the lieutenants, who

23   then passed 20 up to the executives.  They used violence to

24   protect the sellers, their product, and their territory.

25           Here was a classic example of an organization

1   where people had a common purpose and were joined together

2   in accomplishing it.  There are no allegations in the

3   complaint.  Now we're only at the summary judgment stage, I

4   understand, but there is an obligation for them to get those

5   elements, and they have not done that here.

6           Yes, Your Honor?

7           THE COURT:  One minute.

8           MR. HATCH:  Oh, one minute.  You don't want to ask

9   a question?

10          THE COURT:  No.

11          MR. HATCH:  Let me just -- I will just quickly end

12  then.

13          Just last year in the Third Circuit, in McCullough

14  v. Zimmer, 382 Fed.Appx. 225, pages 231, 232, it's more like

15  what is happening here, the exact opposite of U.S. v. Jones

16  where it really was an organization and a common purpose.

17  There the court had doctors who were allegedly involved in a

18  scheme --

19          THE COURT:  Is this a case cited in your memo?

20          MR. HATCH:  It is not.

21          THE COURT:  I didn't think so.

22          MR. HATCH:  That's why I gave the cite.  I

23  apologize.  We did do some preparation for the hearing.  We

24  found two things we had missed before.  But I like this case

25  because it was involving doctors who were acting parallel.

1    They were all getting money from a scheme, but they were

2    acting parallel.  They did not create an organization.  They

3    didn't have -- they didn't have a relationship among each

4    other, just kind of like where they don't have here.  And

5    the Court said, nothing plausibly suggests that these

6    parties combined as a unit with any semblance of an

7    organizational framework -- same thing as here -- or a

8    common purpose -- same thing as here -- nor have plaintiffs

9    alleged facts that would support an inference that this

10   alleged enterprise had any structure or existence separate

11   and apart from defendants' alleged criminal conduct.

12           In other words, it's the exact same thing as here.

13   The only thing, when it comes right down to it, that's

14   alleged here is the alleged misappropriation by Monsanto.

15   That didn't involve these folks, they weren't involved in

16   that purpose, and they weren't part of an enterprise to do

17   that.  Thank you, Your Honor.

18           THE COURT:  Thank you, Mr. Hatch.

19           Mr. Blakey, will you be handling all of the

20   argument?

21           MR. BEUS:  I'm Mr. Beus.

22           THE COURT:  I'm sorry, Mr. Beus.  I got these

23   mixed up on my chart.

24           Will you be handling the argument on both issues?

25           MR. BEUS:  I will not.

1          THE COURT:  You will be handling the motion for

2    summary judgment?

3          MR. BEUS:  On the statute of limitations.

4          THE COURT:  Thank you.

5          MR. BEUS:  Your Honor, I have a time line to pass

6    up for you and your clerk, if I may.

7          THE COURT:  Yes, please, that would be helpful.

8          MR. BEUS:  While he's doing that, let me first

9    focus on the --

10         THE COURT:  If you are putting that up for me to

11   see, you are going to have trouble unless -- that's all

12   right.  If you have something that I can be looking at so I

13   don't have to be looking over my shoulder.

14         MR. BETTILYON:  Do you want me to turn this board?

15         THE COURT:  No.  I'm fine, Mr. Bettilyon.

16         Go ahead.

17         MR. BEUS:  In order for defendants to make the

18   argument they make, they have to restructure our entire

19   complaint.  If you look at our board, we don't complain

20   about them doing a COX-2 project.  We don't ask for $50,000

21   on the termination of the second half of the year.  Our

22   complaint is that they didn't tell us that they were using

23   our materials to develop a COX-2 selective inhibitor.  They

24   didn't tell us that they had a completely different project

25   going down the road.  This changed everything, and they

1   didn't tell us, if you look at the time line there in front

2   of you, if you look at the insert there, that they had an

3   invention.  Before they had terminated, they actually had a

4   COX-2 selective inhibitor, that they had used our materials

5   to invent on March 18, 1992, five days before they

6   terminated.

7           Now, Your Honor, the relationship between these

8   two parties is important.  It was a fiduciary relationship.

9   That relationship of a fiduciary character was set up in the

10  contract.  And Phil Needleman, their chief witness, admits

11  that it's a fiduciary relationship.  Let me show you his

12  quote.

13          423, please.

14          The question, is it fair to say that Monsanto

15  would do what you just described -- which means they are

16  going to select the patent, pick the patent lawyer, tell us

17  what is patentable, all spelled out in the contract -- is it

18  fair for you to believe that BYU and Dan Simmons could

19  repose trust and confidence in Monsanto?  Answer:  That's

20  the intent.  The intent of the parties here is to create a

21  fiduciary relationship where they are going to do things and

22  then tell us about them.  Question -- even their head man on

23  this -- and you don't think it would be unreasonable, do

24  you, for Dr. Simmons to repose trust and confidence in that

25  promise, do you?  I don't think it would be unreasonable.

1     That's the relationship.

2              If you start with that relationship, let's go to

3     the law on what that means.

4              Put up 456 for me, please.

5              A fiduciary's breach of the duty to speak the

6     truth is sufficient to establish fraudulent concealment.

7     Undone.  What we have no dispute about as to the facts is

8     that when they terminated this contract that's laid out on

9     our time line, they didn't tell us any of these things.

10             What did they do?  They complained that we didn't

11    give them the best bleed.  They complained that we didn't

12    tell them about dexamethasone, or give them some cells.

13    They didn't once tell us that they had a COX-2 project, that

14    they were using our antibodies, that they were using our

15    clones, and they had in hand a molecule, that they had

16    developed over just a short period of time after using our

17    materials, that was a COX-2 selective inhibitor.  They had a

18    duty to tell us that, and under the contract, that duty was

19    clear and unambiguous.

20             Now let's take a look at the contract itself.

21             419, if you would, please.

22             Here's some of the obligations they have.  By the

23    way, these obligations about a reasonable royalty, we don't

24    need a tolling agreement, we don't need fraudulent

25    concealment, we don't need anything.  Let me show you what

1    the contract says there.  It's on the bottom of the slide,

2    paragraph 3.4.  University agrees to negotiate in good faith

3    with Monsanto the terms and conditions of a royalty-bearing

4    license agreement with a right to sublicense with respect to

5    patented inventions developed in the project.

6           They never told us they had developed anything in

7    the project.  We had no misunderstanding that they were

8    going to go do COX research.  That's why that collaboration

9    started.  What they didn't tell us is it was our materials

10   when they did that, and that's what our complaint is about.

11          Then it says, such negotiations shall be completed

12   within one year after the issuance of a patent.  On the

13   screen, there is no dispute about these facts.  You will see

14   the very first COX-2 inhibitor issues 6 September '95.  You

15   add one year.  That gets you to 6 September '95.  We're

16   tolled on May 8th, 2001.  That's within six years.  I don't

17   need anything on that.

18          403.

19          Their lawyer, their in-house lawyer -- would you

20   take the arrow away, please.

21          THE CLERK:  He can't.

22          MR. BEUS:  Oh, I'm sorry.

23          Thank you.

24          Their lawyer, their in-house lawyer who drafted

25   this document, and it is their document, I asked -- or

1    Mr. Williams asked, you included that language in this

2    agreement that there are some things that could occur

3    outside the two-year period?  He says yes.  And obtaining a

4    patent would be more than two years.

5                Put up 436.

6                Here's some other ongoing obligations that don't

7    cease with the contract and don't cease with the

8    termination.  They have a duty to notify us that research

9    results obtained from the projects are patentable.  They

10   have never once said that, nor have they given us any kind

11   of report.  They have always denied, your stuff doesn't

12   work, your clones don't work, your antibodies don't work.

13   They have an obligation to get a royalty-bearing license

14   agreement, which I showed you before.  They have the right

15   to designate a patent attorney.  They have to bear the cost

16   for that.  We're entitled to know who the patent attorney

17   is.  They never told us that.  They fraudulently concealed

18   that when they had a fiduciary duty to speak.  That ship has

19   sailed.

20               Let me show you a United States Supreme Court

21   case, and I've got a lot more.

22               Put up 435.

23               435, Franconia, the time of accrual depends on

24   whether the injured party chooses to treat the repudiation

25   as a present breach.  The statute of limitations commences

1    to run from the time fixed for performance.  As

2    Professor Corbin explained, it's hornbook law, the plaintiff

3    should not be penalized for leaving to the defendant an

4    opportunity to retract his wrongful repudiation.

5              272.  Actually go to 273.

6              Here's what it says, for each partial breach, each

7    time they didn't tell us they had a patentable product

8    coming out of the project with the use of our intellectual

9    property, they had a duty.  Each of those is a separate

10   breach.  Each of those breaches start yet another statute of

11   limitations under the law.

12             Now let me go directly, a little bit more

13   carefully, into inquiry notice.

14             Put up 420, would you, please.

15             Where the circumstances suggest to a person of

16   ordinary intelligence the probability that he has been

17   defrauded, the duty of inquiry arises.  Dan Simmons didn't

18   believe for a second that he had been defrauded.  He thought

19   he had been pushed around a little bit, and he felt bad.  He

20   didn't even have a suspicion that they had a COX-2 selective

21   inhibitor.  And for counsel to stand at this podium and say

22   we didn't make any inquiry, just take a look at the time

23   line in front of you.  We wrote letters.  We got no

24   response.  We wrote more letters.  We got no response.

25             Dan Simmons cornered him in July of 1992, and it

1   was absolute denial.  You know, you were not a good

2   collaborator.  You didn't give me the cells you needed.  You

3   didn't give me the other things you needed.  We couldn't

4   even get a dialogue going.  But it didn't end there, Your

5   Honor.

6          There were another seven or eight conversations

7   with a man by the name of Barry Haymore who came to BYU -- a

8   BYU alumni who came to BYU and got Dan Simmons to actually

9   go talk to these folks, and that's how the collaboration

10  began.  He kept asking him, and he said, Dan, you don't know

11  what was going on at Monsanto before you came along.  That's

12  fraudulent concealment.  He has no idea.

13         But there are 12 to 14 communications, with

14  stonewall, stonewall, stonewall.  It's laughable to say we

15  could have filed a lawsuit.  There isn't a lawyer in the

16  country with the information Dan Simmons had or could get,

17  and when we did write letters, as you know from the

18  briefings, it was denial, denial, denial.  There is nothing

19  more one could have done.

20         Now 458, if you would put that up.

21         The question of when a plaintiff reasonably would

22  have discovered the facts underlying a cause of action in

23  light of the defendants' affirmative concealment -- which

24  the fiduciary relationship creates.  Without any more

25  argument, I'm going to talk about the articles in a

 1    minute -- is a highly fact-dependent legal question that is

 2    necessarily a matter left to trial courts and finders of

 3    fact.

 4            Would a reasonable person -- would Dan Simmons,

 5    having been confronted by Dr. Needleman saying your stuff

 6    didn't work very well?  This is all new stuff.  This

 7    intellectual property, the clones, the antibodies, they are

 8    just being created.  Once the world knew that happened, the

 9    whole world came after COX.

10            Let me take just two or three minutes on the

11    question of the articles because that's the big thing they

12    make in their brief.  Let me show you their brief.

13            Would you put up 452, please.

14            This is their statement of facts.  Dr. Simmons

15    testified that learning from Merck that Monsanto had used

16    mouse COX-1 and mouse COX-2 raised questions --

17            THE COURT:  Mr. Beus, remember, we have a court

18    reporter.  I know you're in a hurry, but read slowly enough

19    that she can capture what you are saying.

20            MR. BEUS:  I apologize, Your Honor.  I get busted

21    for that every once in a while.  I stand corrected.

22            Here's what they did -- and they left this out --

23    in the way that I have already testified, and that brought

24    up questions.  They argue in their brief that, gosh, Your

25    Honor, when somebody says mouse COX-1 or mouse COX-2, that

1   should tell Dan Simmons, man, they are using our stuff

2   because I delivered you antibodies and clones for mouse

3   COX-1 and mouse COX-2.

4          Then look what they argue.  This is right out of

5   their brief.  Dr. Simmons testified that learning in the

6   summer of '98 -- that's when he got hired by Merck and the

7   truth starts to come out.  That's why there was a delay --

8   that Monsanto had used mouse COX materials immediately

9   raised suspicions.  That's not what he testified to, Your

10   Honor.  That, candidly, is not correctly stated in the

11   statement of facts or the brief, and it's not the testimony,

12   and I want to take a minute to show you.

13          282.

14          This is the testimony.  I had information that

15   Searle/Monsanto had used mouse COX-1 and COX-2 in the way

16   that I have already testified.  That's at page 77 of his

17   deposition.  Now let me go 11 pages earlier where he

18   references the way I have already testified.

19          285.

20          This is the testimony, and they told me -- the

21   they is referring to Merck.  Merck hired Dan Simmons because

22   by now Dan Simmons is a recognized world expert on

23   prostaglandins and selective inhibitors.  And they are

24   hiring him -- this is the summer of '98.  This is what gives

25   Dan Simmons, if one is to argue about inquiry notice, the

```
 1   first inquiry notice that happens.  He doesn't have any

 2   before.  Notwithstanding not having inquiry notice, he kept

 3   after them, 12 to 14, 15 times, face-to-face and in letters.

 4   All denials, denials, denials.

 5              13 minutes is up, so I will do this quickly.

 6              THE COURT:  You will have a total of 35 minutes,

 7   because I gave plaintiffs 30 minutes.  I'm going to give

 8   them five minutes at the end, so I'm being terribly

 9   merciful.

10              MR. BEUS:  Thank you very much, Your Honor.

11              Here's what is shown in the testimony that they

12   leave out of their brief.  The word patents, the drug

13   developments starting with mouse and going to humans.  That

14   raised some questions.  That's the first time he gets an

15   inkling that they did drug development, which is what they

16   were going to do under the project, use Dan Simmons'

17   materials to do drug development.  This, he now says,

18   because when you get into the drug development and the

19   literature, they are using human COX-1 and human COX-2,

20   which he didn't even have at that early point in time.  When

21   he sees now that it goes from mouse to humans, that raises

22   some questions.

23              Now the notion of mouse.  You saw a bunch of

24   articles.  You read a bunch of articles.  Let me just show

25   you 361.  The man here, I've highlighted at the bottom
```

1    there, is DeWitt.  He was then at the time a professor at

2    Michigan State.  He's now at the University of Michigan, for

3    which I'm grateful.  He published in 1993, before all of the

4    articles that deal with mouse COX-1, except the

5    dexamethasone article didn't have anything to put anybody on

6    notice, he published in '93 that murine PGHS-1 -- that's the

7    same as COX, it's just a chemical term for it -- and PGHS-2

8    were expressed individually in cos-1 cells as described

9    previously.  Then it says, which the murine PGHS-1 cDNA was

10   subcloned.

11          This is an independent investigator by 1993 who

12   has the notion that mouse would alert anything to anybody.

13   The whole scientific world pounced on this.  The whole world

14   knew about mouse COX-1 and COX-2.  The notion that mouse

15   COX-1 puts anybody on notice is silly.

16          Now there is an attribution in one of the

17   articles, and I want to deal with that.

18          Would you put up 324.

19          This is a red herring.  Here -- and by the way,

20   there is a promise that if you are going to use any of

21   Dan Simmons' materials, the contract says you've got to tell

22   him in advance that you are going to do that.  They didn't

23   do that.  That's part of their fiduciary duty.  That's

24   fraudulent concealment in and of itself.

25          This article in 1994 does, in fact, thank

1   Dr. Daniel Simmons for the COX-1 probe.  There is a whole

2   story behind that.  Let me tell it briefly.

3            218, please.

4            Weilin Xie, the postdoc in Dr. Simmons' lab, after

5   he finished that postdoc, tried to go to Monsanto, Pfizer.

6   This guy was a world-class postdoc.  They don't want

7   anything to do with him because he would then know -- he

8   would absolutely know that they are using his clones and

9   antibodies.  He can't get a job there.  You heard counsel

10  saying they were spending millions and millions.  All they

11  had to do is get Weilin Xie.  They would have had the second

12  best man in the world, second only to Dan Simmons on this.

13           So he goes to Dr. Harvey Herschman's lab, which is

14  another source later for COX-2.  Never a source for COX-1.

15  And they then called and asked Dan Simmons if they could use

16  one of his probes.  There you see Dr. Xie's testimony, got

17  permission, did it.  That doesn't put anybody on notice.

18           342.

19           I shared this trade secret reagent with

20  restrictions.  Once you share something with anybody, there

21  is no possible way that you would think that would cause you

22  to believe that somebody is using it.  He also knew that the

23  CHOb probe was unique to Harvey Herschman.  And it doesn't

24  matter, but it didn't put anybody on notice.  And it is a

25  question of fact.  But if he is imposed with a duty of

1    inquiry notice, he certainly did it.

2            Your Honor, I have one other hand-up that I wanted

3    to talk about, but I don't want to eat up all of my

4    colleague's time, so let me, if I may, pass up why a

5    fraudulent concealment would be excused because of futility.

6    They have been fraudulently concealing even as we stand here

7    today.  May I do this?

8            THE COURT:  Yes, please.

9            MR. BEUS:  Thank you very much, Your Honor.

10           THE COURT:  Thank you, Mr. Beus.

11           MR. BLAKEY:  May I approach, Your Honor?

12           THE COURT:  You may.

13           MR. BLAKEY:  Your Honor, I understand that you

14   want to spend some time on the concept of enterprise.  I

15   think maybe the best way I can do that is to tell you how it

16   got put together shortly, and then I think you will

17   understand, as many people have not, how it operates within

18   the context of the statute.

19           I was working for Senator John McClellan,

20   democrat, of Arkansas.  He had just had a set of hearings on

21   the mob.  He put in a bill that prohibited membership in the

22   mob or a similar organization.  The ranking minority member

23   on my committee was Senator Hruska, a republican from

24   Arkansas -- I'm sorry, from Nebraska, and he had been

25   worried about criminal groups infiltrating business

1    organizations.  He had a statute that said business

2    enterprise.

3              I was told by them -- and I might say, Your Honor,

4    that the dynamics of the senate at this point are ranking

5    republican and the ranking democrat were close politically,

6    and our opposition was from Senator Kennedy and the ACLU.

7    So a republican here and a democrat here.  They, in fact,

8    were close.  The opposition came from senators on other

9    committees.

10             I was instructed to meld those two bills.  So what

11   I did is I took the business off of enterprise in Senator

12   Hruska's bill and I merged the word organization in the

13   enterprise.  And then it's defined in the statute.  But it's

14   terribly important to read the definition because it says

15   enterprise includes.  It doesn't say means.  And that means

16   what you see there is illustrative but not exhaustive.

17   That's not my spin.  That's exactly what the Supreme Court

18   tells us in Boyle.  In footnote 2 in Boyle, it says this is

19   not exhaustive.  It's any -- any -- and any is broad -- any

20   enterprise.

21             Now what is an enterprise in this context?  You

22   have before you four paragraphs.  Why did Monsanto get into

23   this?  They were down in terms of profits.  There is another

24   word for that.  Sin begins from a vice, and the vice here is

25   greed.  Monsanto organized an informal organization of

1   entities and individuals.  And they were ostensibly

2   organized to develop COX-2 and then market it.

3          Participating in that group was of course BYU.

4   They were central to it.  What BYU didn't know was that

5   Monsanto had two illicit purposes -- an ostensible legal

6   purpose and two illicit purposes.

7          Now what my friend Mr. Hatch has done is conflate

8   those two.  Sometimes he's talking about the common purpose

9   of the subgroup and sometimes he's talking about the common

10  purpose of the full group.

11         The full group -- and we have in the chart, in the

12  complaint, each person who entered into this association,

13  what role he played, and whether he was culpable in any way.

14  What you had here was a business organization, not formal,

15  with a corporation, to develop this, and different people

16  were brought into it to play a role in the sense of

17  implementing the ostensible purpose.

18         Some of the people that were brought into it, and

19  I'm referring now to the lawyers, were brought in to

20  implement it.  Point number two, violating -- and now

21  paragraph 193, violating obstruction of justice to protect

22  its profits from legal challenge.

23         Monsanto, Pfizer had been all through this before.

24  They know that if they put a drug out there, it's not enough

25  to develop it.  They have to protect it.  Now if they

1   protect it with normal litigation -- this is a discovery

2   dispute, they hide documents.

3            I can tell you -- I was an Assistant United States

4   Attorney -- if I had been running a grand jury and the

5   people producing materials to me had done what these lawyers

6   did in this case, they would have been indicted in a minute.

7   And the sanction that was imposed on them could easily have

8   been an obstruction of justice, a crime right then and

9   there.

10           What happens to the pattern?  The pattern begins

11   with fraud and concealment, and then it goes into litigation

12   strategy.  It's all part of the subsidiary purpose of

13   Monsanto, Pfizer while the ostensible legal purpose

14   continues on top.

15           If you will look on the chart that I've given you,

16   and now it does not require -- the second quote from Energy

17   Owners Commission v. United States Energy Management, the

18   statute, that's RICO, does not prohibit plaintiff from

19   including themselves in a legitimate, albeit infiltrated,

20   enterprise.  A legitimate enterprise.  The development of

21   the product, the marketing of the product, that's

22   legitimate.  But what happened is that organization was

23   infiltrated with some of the people who founded it.  Its

24   purpose was ostensibly lawful but, in fact, it was unlawful

25   for those who participated in the subpart.

 1              Let me give you another example.  There is a case

 2    in the Eleventh Circuit called Beasley.  It deals with a

 3    black religion.  And there was a subgroup within -- and the

 4    religion is the enterprise, all the people who participated

 5    in it.  There was a subgroup in it that believed that one of

 6    the functions of the religion was to kill white people, and

 7    they went out and did it.  Not every member of that religion

 8    was part and parcel of the killings.  They were the

 9    subgroup.  No problem with common purpose.  The common

10    purpose was the religion.  Illegal twisting of the

11    enterprise is what the black people, the white killers did.

12              That's what happened here.  It was a legitimate

13    marketing enterprise.  At different points in time they

14    would bring in different people who would perform different

15    services, people who would do public relations, people who

16    put articles out to people, know who we are.

17              Let me have number nine.

18              This is from Boyle in which it explains what's

19    involved.  An association-in-fact enterprise must have at

20    least three structural features:  A purpose, relationships,

21    and longevity.  A group of persons associated together for a

22    common purpose.  It doesn't mean that every person who plays

23    a role in the enterprise has to be part of the common

24    purpose.  They can be innocent agents.

25              THE COURT:  Mr. Hatch argued that your greatest

1    weakness is perhaps the failure to show relationship among

2    those associated, that the only relationship was in common

3    with Monsanto, but they had no relationship with each other.

4    Is that a good argument?

5              MR. BLAKEY:  No.  It would be sufficient if you

6    had central people and they worked in from a wheel.  Imagine

7    a wheel.  Is it necessary for them to have a rim?  The

8    answer is no.  A conspiracy is not -- I'm sorry, an

9    enterprise is not a conspiracy.  It's an association.  If

10   you are associated with a hub, you are associated with each

11   of the spokes through the hub.  That's precisely what

12   happened here.

13             If you say that this is not an enterprise within

14   RICO, you are saying it is not a business structure, a

15   business association.  Business associations are as multiple

16   as the idea of a man's in the head.  It was drafted in this

17   form so it would capture no matter what you thought up as

18   long as it was, in fact, an association.  And if it was a

19   wholly illicit association, everybody would have to have the

20   common illicit objective.  But if it's a licit

21   association -- and we cited in here the Supreme Court's

22   decision in Turkette that says enterprises are both licit

23   and illicit.

24             What you have before you is an illicit

25   organization that was perverted.  It is, in a sense, in the

1   center of what Senator Hruska was worried about.  Criminals

2   take over a legitimate organization, develop this product,

3   market this product, waffle.  Develop this product with

4   stolen property, market this property through fraud, and

5   they have to do it through fraud because the day it comes

6   out that Dr. Simmons really invented this, he gets a

7   modification of the patent, it's not worth anything to them

8   to have it.  It's not gold.  It's only as they can patent it

9   and sell it.

10           Now the other points in here are minor.  They say

11   this is not a pattern on two grounds.  One is they are doing

12   it right now.  They are making about a billion and a half a

13   year.  It's ongoing.  That's as much of a pattern as I can

14   imagine, from 1991 to today.  That's like 20 years.

15           It's also the regular way of doing business,

16   apparently, for these people to market drugs fraudulently.

17   They did it with Celebrex.  They did it with Bextra.  They

18   did it with Neurontin.  Either of those routes gets you a

19   pattern.

20           As to predicate acts, it says mail fraud, wire

21   fraud.  I have given you the definition of mail fraud, wire

22   fraud.  I've given you some of our allegations, but not all.

23   And then the statute puts obstruction of justice in the

24   predicate acts.  We didn't dream this up.  The fact that

25   discovery abuses can be obstruction of justice doesn't deny

1    that they do it.  And what they did in this case was done

2    maliciously, intentionally, and to the tune of a court

3    order.  That's called obstruction of justice.

4            On the last point about injury, the statute says

5    property.  It doesn't say what kind of property.  If you

6    want to understand what kind of property, look down into the

7    predicate offenses.  They are crimes protecting property by

8    criminal sanctions.  Through RICO, it's protected by civil

9    sanctions.  It would be weird, absurd if you would have a

10   scope of the predicate offenses be larger than the remedy

11   granted in RICO when it is pretty liberally construed.

12           I have given you the major definitions for the

13   meaning of property in mail fraud and wire fraud.  And this

14   notion of concrete injury is a discredited notion from the

15   Ninth Circuit that's already been overruled by them.

16           In sum, Your Honor, when I came into this, I was

17   asked to look at it and see what it was.  I am a professor

18   of law.  I spend most of my time teaching and about

19   15 percent of my time consulting.  Of that 15 percent, I

20   spend 90 percent of my time telling people not to bring

21   RICOs.  It gives the statute a bad name.  I come in with a

22   presumption that it's no good.  And the deeper I got into

23   this, the more I saw this was precisely what the statute was

24   developed for.  This is Senator Hruska's promise of

25   protecting legitimate business organizations from being

1   subverted for criminal purposes.

2          Theft, that's classic.  Lying, that's classic.

3   And they are making big bucks out of it.  They didn't go in

4   with a gun or a knife.  They went in with a pen.  And if you

5   remember that line from The Godfather, you can steal more

6   money with a pen than you can with a gun.  That's precisely

7   what they're proving in this case.  Thank you.

8          THE COURT:  Mr. Blakey, I do have to ask you this.

9   Mr. Hatch argued and he used the chart to indicate that if

10  the Court accepts the stated purpose as broadly as your

11  client has, that there is no end to the number of entities

12  or individuals that may be included in that enterprise.  I

13  can't believe that that was something intended by the

14  senators who wrote the RICO statute.  How do you respond to

15  that?  You've got about two more minutes.

16         MR. BLAKEY:  My answer to that is this is on a

17  continuum and he's taking it to the absurd end.  We're not

18  there.  Here's the business purpose, develop this product.

19  Who's necessary for the developer here?  The hub now is

20  going to be Monsanto, ultimately Pfizer, their doctors.  We

21  bring in other people to develop it at various points.  And

22  then finally we start marketing it.  Who do we have to deal

23  with to market?  The FDA, et cetera, et cetera.

24         Now as you bring in other people to do this, every

25  drugstore that sold this, are they part of the association

1    in fact?  I think that's where it goes too far.  The real

2    question is not whether it could go too far.  It's whether

3    we went too far in this framing of it.  And that's what

4    we've pled, and we've pled it in detail.  Look at that

5    chart, it's on page 46 of our complaint, each person, when

6    he came in, what he did, the role he played, and whether he

7    was licit.  That answers their issue about relationship.

8    Who created their relationship?  Monsanto, Pfizer, the hub.

9            THE COURT:  But they would have been the hub of an

10   even larger group as well.

11           MR. BLAKEY:  If you wanted to stretch it out, it

12   is true.  Let me give you another example.

13           Where do you get heroin?  It's not made in this

14   country.  It's made in the mid east.  All the people who

15   farm it, and by this I mean Afghanistan, they sell it

16   forward.  It has to be taken from poppies to heroin.  That's

17   done typically in Marseille.  Then it's brought to the

18   United States, in New York, and from there it fans out all

19   over the United States.  In terms of what they call in

20   criminal law a chain conspiracy, those farmers in

21   Afghanistan and those drug dealers on the streets of Los

22   Angeles are part of the whole distribution chain and they

23   are, in fact, co-conspirators.  That's what the law of

24   conspiracy now says.

25           Do you draft anything that broad?  No.  You can

1  only get about 20 some odd people in the courtroom.  So you

2  limit the size of the conspiracy to about what you can get

3  in the courtroom.  But the theory permits that broader

4  thing.

5          What we've done here is a lot less than that.

6  Everybody in there has a purpose.  They performed a purpose

7  for a period of time.  When the purpose was gone, they fell

8  out.  The core root remains the same.  They do it as a

9  wheel.  You don't need a hub.  We do have -- we don't need a

10  rim.  We do need a hub.  And each of the others go out.

11  Could others be added in here?  With increasingly less --

12  what shall we call it -- sensibility.  The real issue is not

13  how far does it go, it's whether we went far enough

14  appropriately.  That's a question of proof.  This is a

15  motion to dismiss.  It's not a motion for a summary

16  judgment.

17          Your Honor, I would be remiss if I didn't thank

18  you for the opportunity to appear before you.

19          THE COURT:  Thank you.

20          MR. BLAKEY:  Thank you very much.

21          THE COURT:  You've got your time divided up?

22          MR. HATCH:  I'm going to try and take 30 seconds

23  and give the remainder --

24          MR. DOUGHERTY:  When was the last time attorneys

25  stuck to 30 seconds?

1              MR. HATCH:  I've been here too much.  I see you

2    shaking your head.  I am actually going to try.

3              I want to go directly to this hub and spoke

4    concept.  I cited a case that said parallel acts aren't

5    enough.  You can't just go back to the acts, say, in this

6    case, of Monsanto.  The problem is that's just wrong.  I

7    cited to you one case in my main argument.  Third Circuit,

8    In re Insurance Brokerage Antitrust Litigation, 618 F.3d

9    300, specifically says that you have to show the components

10   functioning as a unit, that there has to be something that

11   ties together the various defendants.

12             THE COURT:  Is this another case you didn't cite

13   in your memorandum?

14             MR. HATCH:  Well, but it also cites -- it

15   specifically cites and says --

16             THE COURT:  I'm asking you because I need to know.

17             MR. HATCH:  I don't know.

18             THE COURT:  I don't remember this case.

19             MR. HATCH:  Then it probably was not.

20             THE COURT:  Will you make certain that a copy of

21   the case is given to --

22             MR. HATCH:  I will, absolutely, Your Honor.

23             It states specifically, in citing a --

24             THE COURT:  The case will be read.  You don't need

25   to cite it.

1          MR. HATCH:  Your Honor, I just need to cite this

2    one cite.  The cite states, a rimless hub and spoke -- a

3    rimless hub and spoke configuration would not satisfy the

4    relationships prong of the Supreme Court's Boyle structure

5    requirement.

6          So Mr. Blakey is just wrong.  The problem is --

7    and I have the greatest most respect for Professor Blakey,

8    but he has kind of made a career in going around the country

9    and arguing for -- like he has here.  It's hard to tell

10   where he's arguing and hard to tell where he's testifying

11   what he thinks the act should be.  He's gone around the

12   country doing that.

13         I put together a list of cases that Professor

14   Blakey has been involved in where he's tried to expand RICO,

15   and the courts have routinely rejected it, and sometimes in

16   pretty harsh language.  Your Honor, I would put to you that,

17   you know, his purpose in testifying here to try and get you

18   to broaden RICO really isn't what the law is.

19         MR. BLAKEY:  Could we have a copy?  That might be

20   appropriate.

21         MR. HATCH:  Absolutely.

22         MR. DOUGHERTY:  Your Honor, we'll make sure we get

23   those cases to you.  I saw that Mr. Beus cited some cases

24   that were not included in his brief.

25         MR. BEUS:  That's not true.

1          THE COURT:  I'm not using it to criticize.  I'm

2     just trying to figure out why I'm hearing for the first time

3     something that was not in what I read.

4          MR. DOUGHERTY:  No problem.

5          Your Honor, just a couple of things quickly on the

6     statute of limitations issue.  You know, I understand in the

7     face of a statute of limitations issue that the plaintiffs

8     would try and narrow their claims, but we have up on the

9     screen, on the screen in front of you, how they have defined

10    the project.  It is precisely as I said to you when I stood

11    up here.  This is the case they have been litigating and

12    that we have been defending for almost four years.  So to

13    stand up here and say the project is now something else,

14    it's much narrower, and therefore all the information that

15    Mr. Beus didn't address that we pointed out in our argument

16    is not relevant, is incredibly unfair, and I don't think the

17    law permits them to do it.

18          In an effort to prove futility or to prove

19    inquiry, and it's unclear exactly what the argument was, you

20    saw this board right here.  Mr. Beus said again and again

21    and again, or words to that effect, they attempted to make

22    inquiry again, again and again, letter after letter after

23    letter.  Let's look at it.

24          All of this is the termination correspondence.

25    This is not inquiry.  This is no attempt to make an inquiry.

1    This is the parties agreeing to terminate the agreement.

2    He's not asking anywhere in here what are you up to, what

3    are you using, what are you doing with the project.  This is

4    completely misleading, Your Honor.  This is the termination

5    correspondence.  Watch what happens here.

6         The next thing you have is March '97.  They have

7    something here that kind of -- snuck that in, '92 to '97,

8    face-to-face with Dr. Haymore.  Dr. Haymore wasn't working

9    on the project.  Dr. Haymore wasn't their point of contact

10   at Monsanto.  He's just some employee.  And they are

11   claiming that that's the inquiry and that they were misled

12   as a result of that?  There is no inquiry.  There was no

13   communication.  While this thing is going through marketing

14   and going through all of the development process, they say

15   nothing.

16        Mr. Beus said, well, we didn't know.  We might

17   have known that they were using murine COX, but we didn't

18   know that it was our stuff.  But what has the plaintiff

19   alleged in this case?  They have alleged that the trade

20   secrets were such that we actually can't have a COX-2

21   program without using their stuff.  So when he sees the

22   references to murine COX in all of our publications, did he

23   pick up the phone and say is that mine?  No, not once.

24        The law doesn't require the plaintiff to know

25   every fact, just enough to put them on notice.  But, again,

1  what the plaintiffs are doing here, Your Honor, is they are

2  focusing on the wrong party.  They are trying to focus on us

3  and not what they knew.

4         Rick, go to the last slide, please.

5         Again, Your Honor, we would -- the Colosimo case

6  is I think excellent on the question of fraudulent

7  concealment and I think applied in this case it shows that

8  plaintiffs are not entitled to the benefit and haven't

9  proven it, because it's their burden to prove.

10        The articles, on the left-hand side of the screen,

11 Your Honor, this is what Dr. Simmons said about our articles

12 when he was writing his grants contemporaneously with the

13 unfolding of these events, talking about COX-2 as being

14 reported by pharmaceutical companies, citing one of our

15 articles.  Extensive drug screening has led to the

16 identification of multiple COX-2 selective inhibitors.  Now,

17 in the face of the motion for summary judgment, Dr. Simmons,

18 on the right, says, these articles do not specifically

19 relate to Monsanto's work in searching for a COX-2 selective

20 inhibitor.

21        THE COURT:  All right, Mr. Dougherty.  I have got

22 to cut you off.

23        MR. DOUGHERTY:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        Counsel, I am aware you all had a bunch of slides

1   that you would have loved to have presented to the Court.

2   Just make copies -- or make copies available to the law

3   clerk and we will rely upon them to the extent we think they

4   are relevant.

5          I appreciate your willingness to abide by the

6   Court's restrictions here, but, as I said at the outset,

7   it's not as if you have not briefed this matter.  We have

8   stacks and stacks of memorandum and exhibits.  And so this

9   was very helpful.  I appreciate all of you and your

10  arguments.  The Court will take the issues under advisement

11  and will issue a ruling as soon as it can.

12         MR. DOUGHERTY:  Your Honor, we thank you very much

13  for your time.

14         MR. BEUS:  Thank you, Your Honor.

15         MR. BLAKEY:  Your Honor, may I have a point of

16  personal privilege?

17         I didn't see this before today.  I would like to

18  make a motion to strike it from the record.  I didn't have a

19  chance to see it and I didn't have a chance to comment on

20  it.

21         THE COURT:  My guess is I'm not going to consider

22  it, but I'm not going to make an official ruling.  You are

23  correct that it was submitted to the Court late and,

24  frankly, its relevance is de minimis because it's not your

25  credibility.  You are not being offered as an expert witness

 1   and I'm not making a Daubert determination here.

 2             MR. BLAKEY:  Thank you, Your Honor.

 3             (Whereupon, the proceeding was concluded.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED:
     Official Court Reporter
17   350 South Main Street, #146
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25