[1]

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


BRIGHAM YOUNG UNIVERSITY and
DR. DANIEL L. SIMMONS,

       Plaintiffs,

Vs.                    Case No:  2:06-cv-890 TS BCW

PFIZER, INC., et al.,

       Defendants.



~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

THE HONORABLE BROOKE WELLS

STATUS CONFERENCE

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



TAKEN AT:         Federal Court
                      350 S. Main Street
                      Salt Lake City, Utah

DATE:            October 3, 2011


TIME:            2:30 p.m.


REPORTED BY:     Kellie Peterson, RPR

[2]

1                    A P P E A R A N C E S

2


3    For the Plaintiffs:
                            Mark M. Bettilyon, Esq.
4                           RAY, QUINNEY & NEBERKER
                            36 South State Street
5                           Suite No. 1400
                            Salt Lake City, UT  84111
6                           Telephone: (801) 532-1500

7


8


9    For the Defendant:
                            Brent O. Hatch, Esq.
10                          Phillip J. Russell, Esq.
                            HATCH, JAMES & DODGE
11                          10 West Broadway
                            Suite No. 400
12                          Salt Lake City, UT  84101
                            Telephone: (801) 363-6363

13

14

15

16

17

18

19

20

21

22

23

24

25

Status Conference

10/3/2011

[3]

1                    P R O C E E D I N G S
2              THE COURT:  Good morning.  All right, we are
3    here for a status conference, in Brigham Young
4    University and Dr. Daniel Simmons versus Pfizer, et al.
5              Counsel, if you will, just for the record,
6    make your appearances, please.
7              MR. HATCH:  Absolutely, Brent Hatch and
8    Phill Russell, from Hatch, James and Dodge, on behalf of
9    the Defendant.
10             MR. BETTILYON:  And Mark Bettilyon, on
11   behalf of BYU and Dr. Simmons.
12             THE COURT:  Thank you, Counsel.  Let me
13   indicate the following:  While I was gone last week, a
14   request was made, from Defendants, for a status
15   conference and that request was made orally.  Then
16   today, I've received the Plaintiffs' written response, a
17   written memo; and, therefore, in order to structure this
18   hearing, I've determined that I'll consider Defendants,
19   the movant, for purposes of the questions that we have
20   to resolve today and for the purposes of this hearing.
21   But I intend to proceed as we are, in the order of
22   subjects that were raised in the Plaintiffs' memo.
23             In preparation for this hearing, I've
24   reviewed the written memo of the Plaintiffs and the
25   pertinent exhibits, including the scheduling order,

Status Conference

[4]

1    which refreshes my memory there, as well as the

2    deposition scheduling calendar, which was included and

3    the subpoenas that were included.  I have not had the

4    opportunity to re-review the Hooper letter, although I

5    remember it's existence, but to the extent that you may

6    refer to it, you may, if it's pertinent, refresh my

7    memory as to the content.  I know that we ordered it

8    disclosed.

9              MR. HATCH:  It's here.

10             THE COURT:  All right.

11             MR. BETTILYON:  And, Your Honor, I didn't

12   attach it because I didn't want to mark anything under

13   the seal but I do have a copy for you.

14             THE COURT:  Okay, that is fine.  I don't

15   know to the extent that we will have to go through it.

16   So with that having been said, and following the order

17   that has been setout in the written BYU memo, I want to

18   take each subject as it comes and hear brief argument on

19   it, let me rule on that, and then we will go to the next

20   one.  As indicated in the BYU memo, the first relates to

21   the number of depositions, generally, that can be taken.

22             Mr. Hatch, I'll ask you to address that,

23   and, particularly, I do note that the original

24   scheduling order had a limit of 25.

25             MR. HATCH:  Yes, Your Honor, you are right.

[5]

1    I did call your chambers to see -- we had, I had raised

2    with Mr. Williams, on behalf of BYU, and while we were

3    all in New York, almost two weeks ago, these issues,

4    which we had sent letters and we're recent impasse, so I

5    did call your chambers in order to see how you would

6    like us to raise this, and I think these informal

7    hearings like this are quite useful.

8              THE COURT:  I don't disagree, Mr. Hatch.

9    This is what I had before me.

10             MR. HATCH:  I understand.

11             THE COURT:  So we will address it that way.

12             MR. HATCH:  I understand.  And we treated it

13   informally and that is why you didn't get any kind of

14   filing from us.  I can address that specific question, I

15   think, as to the number of depositions.  I mean, I think

16   a lot of these are arguments as to specific reasons why

17   they don't think we should get specific additional

18   depositions that we have asked for.  So I can address it

19   in each deposition or address it --

20             THE COURT:  We can do it deposition by

21   deposition, as long as we are all of the understanding

22   and agreement that the scheduling order and all previous

23   orders have limited each side to 25 depositions.

24             MR. HATCH:  Well, yes.  And just so we are

25   clear, Your Honor, I believe, obviously, that that

[6]

1    limitation was to fact witnesses.  And my understanding,

2    I didn't count them up today, but I think BYU has used

3    all of their's, or possibly had one left.  I think they

4    used all of their's, and we had like three or four we

5    didn't use, but I think that was regarding fact

6    discovery.  Today, we are talking about expert

7    witnesses.

8                    THE COURT:  Expert witnesses.

9                    MR. HATCH:  Except for the reopening of the

10   depositions regarding your Motion to Compel and the

11   Hooper letter, and those we're asking for a fairly

12   limited -- we are not asking for full-blown depositions.

13   We're asking for a limited --

14                    THE COURT:  Although in that regard, you are

15   asking to re-depose Dr. Bateman, and who else?

16                    MR. HATCH:  Mr. Hooper and anyone else.  I

17   think -- I have a proposal that, you know, when we

18   address that, that I can, but the only other one that

19   has any kind of a fact component to it would be the

20   Simmons' deposition.  They have argued that, and we had

21   raised that issue with them, and as BYU put in their

22   papers, I think, kind of twisted a little bit.  I would

23   like to give you the context of that.

24                    THE COURT:  Okay.  You can do that, but I am

25   going to go back, for purposes of organization, to

[7]

1   address it as setout in the BYU memo.

2           MR. HATCH:  So you want him to address

3   the --

4           THE COURT:  No, I want you to.  We know it's

5   25 depositions of fact witnesses.

6           MR. HATCH:  Fact witnesses.

7           THE COURT:  And that some experts were

8   allowed, or two depositions were allowed to occur over

9   two days?

10          MR. HATCH:  Correct.

11          THE COURT:  All right.

12          MR. HATCH:  And those would be fact

13  witnesses, as well.

14          THE COURT:  All right.  But let's address

15  the general prospect of the depositions that fall in

16  that category and the time constraints.

17          MR. HATCH:  Okay.  So you want to address

18  the depositions required by the Hooper letter being

19  compelled first?

20          THE COURT:  Let's talk about that.

21          MR. HATCH:  Okay, I'll do that.  Your Honor,

22  let's see if I can get -- my papers are a little out of

23  order so I will scramble here for just a second.

24  Mr. Bettilyon's good work caused me to scramble a little

25  this morning and pull some stuff together this morning,

Status Conference

10/3/2011

[8]

1   but I did.

2           Your Honor, I would like to give you

3   portions of two deposition transcripts.  This is just,

4   this is just to give you some context, Your Honor.  I

5   took Dr. Hooper's deposition, and as you can, as you can

6   see, this is involving the letter.

7           Page 26, I asked, "Is there some reason you

8   qualified that answer?  Generally, do you recall asking

9   him to write a letter," talking about Dr. Simmons.

10          He says, "No."

11          "Did you receive a letter from him?"

12          "I believe I did."

13          "And do you recall what the content of that

14   letter was?"

15          "I instruct you not to answer.

16   Attorney-client privilege, work product."

17          Then, of course, I quizzed him on what the

18   privilege was.  Then, Dr. Bateman, similar things; he

19   was not allowed to testify, look at, or even testify

20   about the letter, so he was questioned, starting on page

21   77, "Do you know what the contents are of the letter

22   that he attached there, that was his letter to

23   Mr. Hooper?"

24          "I don't remember the contents."

25          "Did he ever tell you, during the first

[9]

1    meeting, about his interactions with Mr. Hooper?"

2              "No."

3              "Did Mr. Hooper report to you?"

4              "I think he reported to Mr. Wilkinson."

5              "I see, and I think you told me that

6    earlier.  I apologize for that.  Do you have any idea,

7    sir, what the content of Dr. Simmons' letter to

8    Mr. Hooper was?"

9              "At this point, I don't."

10             "Do you have any reason to believe that the

11   content of the letter has anything to do with the claim

12   against Monsanto, or whether Dr. Simmons' complaint

13   simply about the University's lack of support for his

14   work?"

15             "I don't know any of the contents of the

16   letter but it obviously it relates to COX-2."

17             This all involves the Hooper letter, and in

18   BYU'S submission to you for this morning, they have

19   alleged that this isn't a relevant pertaining thing

20   because the letter itself -- and Mr. Bettilyon says he

21   has the letter that we can look at it if you want --

22   refers back to things that happened in 1991.  And that

23   is true, but the reason we were discussing this with

24   Mr. Hooper and with Mr. Bateman at the University is

25   because it goes to the heart of one of their claims and

Status Conference

10/3/2011

[10]

1    their claims for damages in this case, Your Honor.

2              They have made allegations, in this case,

3    and asked for billions of dollars, not millions,

4    indicating that they believe that Pfizer should have

5    told them about patented products, that if they would

6    have -- if we would have told them, they would have made

7    lots of money.  I mean, that is just a generalization,

8    obviously.

9              We have put over the fence, and we've

10   elicited testimony on this from witnesses, that what was

11   really going on at BYU at the time, and what was

12   happening, was that BYU themselves had decided that the

13   Simmons' materials weren't patentable, the Simmons'

14   material themselves were of no value, and that Simmons,

15   himself -- and this would go to statute of limitations,

16   it would go to liability and causation questions, and it

17   would go to damages -- that Simmons, himself, was having

18   an ongoing dialogue with senior people at the

19   University, who were basically giving him short -- who

20   felt that the material had zero value.  That is the

21   heart of this case.

22             So when they refused to -- we had a

23   suspicion, of course, that this Hooper letter was

24   absolutely not privileged, that was sent by Dr. Simmons

25   to Hooper, and then copied to Bateman and sent directly

[11]

1    from Simmons to Bateman, Mr. Bateman, for the purposes

2    of trying to get across his opinion, which is the exact

3    opposite of what happened today, Your Honor.

4                THE COURT:  Mr. Hatch, when was the Hooper

5    letter disclosed by order of the Court?

6                MR. HATCH:  Well that, is something

7    interesting.  In their brief, you know, they talk about

8    timing here.  They said the production was ordered on

9    July 14th and that they disclosed it shortly thereafter.

10   It actually took them a month to give it to us.  I have

11   the email here.

12               THE COURT:  So August sometime?

13               MR. HATCH:  Yes, mid-August.

14               THE COURT:  August of 2010?

15               MR. HATCH:  Correct.

16               THE COURT:  And you deposed him?

17               MR. HATCH:  Oh, no, not 2010.  This was your

18   order.

19               THE COURT:  That is what I am asking.

20               MR. HATCH:  Your order was July 14, 2011.

21               THE COURT:  Okay.

22               MR. HATCH:  So it was this summer.

23               THE COURT:  It was disclosed to you after

24   the deposition was taken?

25               MR. HATCH:  After the depositions were

Status Conference

10/3/2011

[12]

1    taken, and then a month later, after the order, they

2    produced it to us, and then we brought the request to

3    finish those depositions where they refused to let them

4    answer the questions.

5              Now -- well, I guess Mr. Bettilyon can

6    address the rest of that, if he wishes to.  Do you want

7    to break it down that way?

8              THE COURT:  That is fine.

9              MR. HATCH:  Okay.

10             THE COURT:  When was the date of my order?

11             MR. BETTILYON:  July 14th, I believe.

12             THE COURT:  Of '11?

13             MR BETTILYON:  Of '11.

14             THE COURT:  I thought it was sooner than

15   that, but all right.

16             MR. BETTILYON:  That is the date I pulled

17   off the dockets.  I think that is accurate.

18             THE COURT:  Okay, thank you.

19             MR. BETTILYON:  Let me point out, Your

20   Honor, that the Hooper letter, and I have a copy here,

21   and I meant to bring multiple copies, but do you want to

22   verify that is the letter we are talking about.  Right?

23             MR. HATCH:  I believe so.  Is this -- I

24   don't think this has -- what this doesn't have -- I

25   think this doesn't have the cover letter going to

Status Conference

[13]

1     Dr. Bateman, Mr. Bateman.

2               MR. BETTILYON:  Okay.

3               MR. HATCH:  Dr. Bateman.  I think he is a

4     doctor.  Right?

5               MR. BETTILYON:  So there's a cover of the

6     letter that goes with this but the gist of the facts are

7     contained here.

8               MR. HATCH:  No, the gist of the facts that

9     we are complaining about that surround the delivery of

10    the letter to Dr. Bateman, not what facts were contained

11    in there; although those are relevant to understanding

12    the context of the delivery of the letter.

13              And, Your Honor, just so I -- if I am not

14    clear before Mark starts, so I can be fair to him, Your

15    Honor, we are not asking for a full day.  You know, we

16    think, you know, probably to make sure we get through it

17    all is probably, you know, a couple hours.  We are not

18    looking for a full day.

19              THE COURT:  Mr. Bettilyon?

20              MR. BETTILYON:  And, Your Honor, let me say

21    this:  The Hooper letter has been on a privileged log

22    since 2007, and by his own admission, Counsel has

23    acknowledged that they deposed a witness about this

24    Hooper letter, in October of last year.  The witness

25    didn't answer questions about it, and they apparently

Status Conference

10/3/2011

[14]

1    showed him the privileged log entry and asked about it,

2    so they have been on notice that there may be issues in

3    this for some period of time.

4            They did not file the motion the related to

5    the release of the document until right at the

6    conclusion of fact discovery.  So I think it was filed

7    the days, or the day of, the end of fact discovery.  So

8    I think if you just look at all of that, I just don't

9    think there is a basis now, at this late date, to reopen

10   discovery with respect to this document.

11           I have articulated, in the brief I filed, a

12   few of the instances where Pfizer had also produced

13   documents late.  Some of those we believe are very, very

14   serious, and, frankly, far more serious than the

15   production of this letter.  I also think that if you

16   look at the letter that is attached as Exhibit E to the

17   materials that I provided, it's a letter we sent to

18   Mr. Hatch just recently, and in that letter, we

19   articulate where the information that is in the Hooper

20   letter is really found elsewhere in the body of the

21   evidences that were produced in this case.

22           For example, Dr. Simmons gave a deposition,

23   in 2002, and that deposition was taken by Pfizer's

24   counsel.  It was in a different case, but there were

25   actually questions that were asked in that case that

Status Conference

[15]

1    related to the very same issues.  And, in fact, he more

2    or less paraphrases the kinds of things he said in the

3    Hooper letter, about what BYU told him about what was

4    discoverable and what was not.  So they were certainly

5    alerted to the fact that that was issue, or topic, in

6    which they could have addressed and could have talked to

7    Dr. Simmons about that and could have talked to other

8    people, as well.

9              And so I just think that on balance, if we

10   are going to reopen discovery to do this, you are going

11   to have to, in fairness, reopen discovery on all these

12   other issues.  We are a right to re-depose all of the

13   witnesses I have mentioned; Dr. Needleman, Dr. Siegburg,

14   Dr. Hauser and others, and I think at some point you

15   just have to say enough is enough.

16             THE COURT:  Mr. Bettilyon, I don't know, in

17   which litigation was it?  The Rochester litigation --

18             MR. BETTILYON:  Yes.

19             THE COURT:  -- that this was referenced?

20             MR BETTILYON:  That is where it was first

21   referenced.  There are also other letters and other

22   documents that are articulated in this letter, where it

23   was discussed as well.  So I think it's just in

24   fairness, yes, certainly they, perhaps, should have had

25   the letter sooner.  I don't think the Court found that

Status Conference

10/3/2011

[16]

1  we didn't have a good faith basis to make, to put it on

2  the privilege log in the first instance.

3          THE COURT:  I did not -- I just disagreed

4  with you.

5          MR. BETTILYON:  You disagreed with us, and

6  we understand that, and we produced the document.  But I

7  just think that when it's on a privileged log, since

8  2007, and a witness, in 2010, says, "I'm not going to

9  answer questions about that document," you know it may

10  be important, and then you file a motion the very last

11  day of the discovery cutoff period.  And you're also in

12  a situation where you, yourself, have produced documents

13  late.  In fact, just last week, Your Honor, we received

14  audit results for the Kalamazoo facility, and those are

15  very important documents in this case.

16          THE COURT:  And the personnel file.

17          MR. BETTILYON:  And the personnel files we

18  received months after those depositions were taken if we

19  are going to go back to fact discovery, which ended in

20  February, and say we are going to reopen depositions, I

21  just think that opens up a can of worms that we just

22  can't do.  And I mean, on balance, is there isn't enough

23  harm here to allow these depositions to proceed.

24          They are going to have the opportunity,

25  during Dr. Simmons' scheduled deposition, to ask him

Status Conference

10/3/2011

[17]

1    whatever questions they want to ask him about these

2    letters.  We also have the fact that Elder Bateman is 75

3    year's old, is unlikely to remember much of this, and

4    really wasn't involved in the facts.  I mean, his

5    factual involvement would only be:  I received a letter

6    from Dan Simmons that had another letter attached to it

7    and I don't remember a whole lot beyond that.  And I

8    think the same is, frankly, true of Mr. Hooper.  So I

9    just think the balance is not worth it, nor is it

10   appropriate for us to re-open discovery.  We need to do

11   it for all things and I think that is not appropriate.

12             THE COURT:  Mr. Bettilyon, will you show me

13   a copy of the Hooper letter, please?

14             MR. BETTILYON:  Yes, Your Honor.  And what

15   they care about the most is on the second page where

16   they talk about inventions, in that first paragraph, and

17   I didn't have the cover letter.  Actually, I didn't

18   realize there was a cover letter to it.  I got that from

19   one of their experts who has been given a copy.  That is

20   the copy I got from the expert, in his deposition.

21             THE COURT:  All right, thank you.

22             MR. BETTILYON:  The attachment was produced

23   in other -- so the attachment has been produced to them

24   before.

25             THE COURT:  All right.  That refreshes my

Status Conference

10/3/2011

[18]

1    memory as to contents of the letter.

2              MR. BETTILYON:  Okay.  And unless the Court

3    has any other questions, I think I will rest on that

4    issue.

5              THE COURT:  All right.  Mr. Hatch, well, I

6    am trying to pose a question to you; is there any

7    question that, as indicated by Mr. Bettilyon, that

8    Pfizer was not on notice of the existence of this letter

9    early on, through the privileged log and through the

10   Rochester litigation?

11             MR. HATCH:  I don't know what the timing of

12   that is because I am not sure what the relevance of that

13   is.

14             THE COURT:  The relevance of what?

15             MR. HATCH:  What the timing of when we knew

16   about the letter from the privileged log.

17             THE COURT:  Well, he's raised it and said --

18             MR. HATCH:  I know he's raised it.  That is

19   the point I am trying to make, is that really,

20   Mr. Bettilyon is creating, essentially, a strong man

21   that he can knock down here, which is all these things

22   that are outside; oh, you should have known this, you

23   should have known that, you had time to do this.

24             The reality is we brought a timely Motion to

25   Compel on a document that they refused to allow people

Status Conference

[19]

1    to answer questions, allowed us to use it.  They did not

2    give it to us so that we had the opportunity to depose

3    witnesses on one of our -- or the main theory in our

4    case.  And you granted that Motion to Compel, that it

5    had been improperly withheld; regardless of motives, it

6    had been properly withheld and now produced.  And the

7    fact that we could have deposed on topics that were

8    related to this letter, we don't have the letter.  How

9    do we do that?  I mean, I think it's kind of an act of

10   shelving here.

11           THE COURT:  Can't Dr. Simmons authenticate

12   the letter and cross-examine him on that?

13           MR. HATCH:  But, Your Honor, that isn't the

14   issue here.  That is why they have written their brief

15   the way it is.  That is not the issue.  I think

16   Dr. Simmons can authenticate the letter.  The issue is

17   that we are discussing today is not that issue.

18           The issue we are discussing today is, should

19   we have a fair opportunity to depose Dr. -- Mr. Hooper

20   and Dr. Bateman, as to -- Dr. Hooper and Dr. Bateman, I

21   believe, as to the conversations they had regarding this

22   letter, their reaction to this letter, whether BYU was

23   truly -- the things that go into -- I think it's on the

24   second page of that letter -- that go into, why is

25   Dr. Simmons fighting this right now.  Because we contend

[20]

 1    that it was because BYU did not support it, didn't

 2    believe his materials had value, and that, you know, we

 3    are entitled to know what the BYU administration's

 4    reaction was to all this, what they understood, who they

 5    talked to, whether they talked to people in BUY's

 6    technology office.

 7              All of that was denied us because, in the

 8    privileged log, all it would have said was letter from

 9    Dan Simmons to Gary Hooper, and it's privileged.  We

10    didn't get the content of it and we didn't get to fairly

11    inquire about it.  So saying that, you know, we may have

12    covered some of the factual areas that are in this

13    letter, in other depositions, doesn't give us the

14    testimony as to this letter, why it was written.  This

15    is a letter, in 1999, attaching an older letter.

16              THE COURT:  All right.  I guess I am having

17    trouble agreeing with you; although, I understand your

18    arguments that timing doesn't pre-empt it, your opinion,

19    that you were on notice.

20              MR. HATCH:  Okay.  But we couldn't have

21    deposed -- the fact is, you ordered it compelled.

22    Correct?

23              THE COURT:  Right.

24              MR. HATCH:  And we didn't have the letter

25    until a month after your order.  Right?  No one's

Status Conference

10/3/2011

[21]

 1   disputed that.  So how would we have deposed someone on

 2   the contents of that letter?  I gave you the discussion

 3   that was had, just from the privileged log with

 4   Dr. Bateman, and without the letter in front of him, he

 5   wasn't -- he was able to say it was about COX-2, that it

 6   was relevant, but he wasn't able to discuss it, nor

 7   would his attorney allow him to.

 8             THE COURT:  All right.

 9             MR. HATCH:  So when would we have been able

10   to ask those questions?

11             THE COURT:  Why can't you ask those

12   questions and the intent of the letter with Dr. Simmons?

13             MR. HATCH:  Well, I think -- I agree.  I

14   mean, Mr. Bettilyon, to be fair, I think has offered

15   today that we can ask these questions of Dr. Simmons,

16   during his expert deposition that is coming up.  We

17   think to be fair, because this is stuff that we should

18   have been able to inquire about before, we should get

19   additional time for that.

20             But Dr. Bateman and Dr. Hooper are not

21   expert witnesses.  Their depositions aren't -- and

22   Dr. Bateman is the key here because we want to know why

23   BYU administration didn't move forward, in 1999; why

24   didn't they do something when Dr. Simmons came forward;

25   You know, what was their reaction; what was their

[22]

1    inquiry; what did they find out about what the

2    technology transfer, obviously, had done in the past.

3    None of that.  All of that was denied to us.  So a

4    short, a short deposition of Dr. Bateman and Dr. Hooper,

5    would be in order because they refused to let us ask

6    those questions.  That fact has never changed.

7              THE COURT:  Now the entirety of the

8    depositions isn't before me, but I know that they were

9    disclosed, maybe the minutes were disclosed to you.

10   Were there minutes of BYU's meetings and conferences

11   disclosed?  I simply can't remember.

12             MR. HATCH:  I don't think --

13             THE COURT:  In which there was discussions?

14             MR. HATCH:  I don't think that they were

15   relevant to what we are asking about, in this particular

16   letter, which is a key letter.  And the fact that it

17   simply was sent to Dr. Bateman, and what his reaction

18   was, and the internal discussions are important here,

19   and that is why -- we are not trying to overreach here.

20             THE COURT:  All right.  Let's go to the

21   other argument made by Mr. Bettilyon; that if these

22   depositions were to be reopen, for whatever limited

23   purpose and for whatever short period of time, how does

24   that then balance, and shouldn't it balance with the

25   fact that Pfizer has, again, been late in disclosing

Status Conference

10/3/2011

[23]

1    some of it.

2              MR. HATCH:  First of all, I disagree with

3    that.  When he talks about personnel records, if we need

4    to get into that, we will produce it to you.  We did

5    what they did.  So almost everyone of their witnesses

6    was the exact same issue.  The problem is, if I were

7    you, I don't see why are we getting into that.

8              We brought a proper Motion to Compel, we

9    brought it timely, as Mr. Bettilyon said, and the

10   document was compelled, and we should be about to ask

11   questions.  He now is changing the game.  It's a typical

12   thing we get.  If we, if we want something, okay, we've

13   got to have something.  It can never be just because

14   it's right.  Where is -- the fact discovery is over.

15   Where, if those things were important and if those

16   things were really the big issue he is making them

17   today, show me where the Motion to Compel was on those.

18   There is no Motion to Compel on those.  It is not the

19   same situation.

20             If he really truly felt that was essential

21   to his case -- there are all kinds of things that both

22   parties were fighting about, through the entire fact

23   discovery phase, as Your Honor knows, and we brought a

24   Motion to Compel on something that was very important on

25   us, that we were denied testimony.  He can't produce a

Status Conference

[24]

1    single motion before the fact discovery cutoff, or

2    after, frankly, where they asked for these things.  This

3    is simply to draw your attention away from what the

4    issue at hand is and say all these other problems --

5              THE COURT:  Let's assume that it does get my

6    attention.

7              MR. HATCH:  I understand.

8              THE COURT:  Because I am interested in the

9    case moving forward, and I see this as --

10             MR. HATCH:  Wouldn't that be moving

11   backwards, because if you are going to open fact

12   discovery like that, then I will bring up every single

13   instance where they didn't give us the documents they

14   should have beforehand, we got it afterward, and we

15   have, each of us, about ten more depositions.

16             THE COURT:  Then let's look at how the case

17   would move along if none of this were allowed.

18             MR. HATCH:  Well, if none of it is allowed,

19   then none of us will be paying much attention to it,

20   unless we -- you know, the only option at that point is,

21   you know, further motions on that.  But, I mean, we are

22   looking this, in this particular instance, we are

23   looking for a couple-hour deposition.  I think reality

24   is, probably because what we are looking for is the

25   administration's approach to this and response to

Status Conference

10/3/2011

[25]

1    Dr. Simmons, and that --

2                THE COURT:  Okay.  But, Mr. Hatch, hasn't

3    that been --

4                MR. HATCH:  No.

5                THE COURT:  -- a defense theory --

6                MR. HATCH:  Yes.

7                THE COURT:  -- for as long as this case --

8                MR. HATCH:  Yes, yes, and we've approached

9    it and have gotten some documents on it and some support

10   for it, but here was a key document and that is why they

11   kept it from us.  You can't look at that document, and

12   Your Honor didn't, did exactly this analysis, and say

13   that was ever privileged.  It's not to a lawyer.  It's

14   not from a lawyer.  It doesn't copy a lawyer.  It was

15   some kind of concoctive theory that had them put that on

16   the privileged log, knowing that this was a very

17   damaging letter, and knowing that it was sent to the

18   President of BYU, and knowing that at the highest

19   administration level, that is where Dr. Simmons felt he

20   wasn't getting his support.

21              And so, yes, we have gotten some discovery,

22   we have gotten some support for our theorys, in the

23   case, and our defense, but here our key documents.  I

24   have given you the deposition excerpt.  We were denied

25   the opportunity to ask the decision makers about that.

[26]

```
 1   We didn't have it.  We couldn't put it down, in front of
 2   Dr. Bateman, and say, "Do you remember him saying this?
 3   Did you agree with him?  Did you not?"
 4                THE COURT:  Okay.  Well, I think he
 5   acknowledges -- well, one of them acknowledges receiving
 6   a letter.
 7                MR. HATCH:  Correct.
 8                THE COURT:  Or two letters.
 9                MR. HATCH:  So as far as your question about
10   how does this affect discovery, I think very minimally,
11   because we can do that deposition whenever, you know, is
12   within reason, whenever is convenient for Dr. Bateman.
13   And it doesn't have to be a particularly long deposition
14   because it is just one subject area of inquiry.
15                THE COURT:  Wouldn't it make some sense to
16   wait until after your deposition of Dr. Simmons?
17                MR. HATCH:  Like I said, I think the timing
18   is less important than the taking of the deposition.
19   Let me make sure, let me think through my head and make
20   sure -- yes, I mean, I think there are probably orders,
21   an order I would prefer, but I think, ultimately, you
22   know, we want the facts on that, and so whatever we get,
23   it would be appropriate.  I think it would be -- so it
24   could follow the October 31st expert discovery cutoff, I
25   think, if necessary.
```

Status Conference

10/3/2011

[27]

1              THE COURT:  All right.  Anything else,
2      Mr. Hatch?
3              MR. HATCH:  Not at that point.
4              THE COURT:  Mr. Bettilyon?
5              MR. BETTILYON:  If I could just briefly,
6      Your Honor, I want to point out two things; one is, and
7      I don't want to belabor this, but Pfizer has been under
8      a court order to produce its documents.  They didn't
9      produce Karen Siegburg's personnel file until six months
10     after deposition.
11             Now when they did that, what they said to us
12     in letters -- and Mr. Hatch certainly has access to
13     them, although, I think it was before he was on the
14     case -- they said, that same information was found in
15     other documents and they pointed it out.  Now, I was
16     just reading, in this letter that we attached to the
17     Motion, which is Exhibit E, and, in 2002, Mr. Simmons,
18     Dr. Simmons, essentially --
19             THE COURT:  Where are you?  I am looking at
20     the letter.
21             MR. BETTILYON:  It's in the second
22     paragraph.  And if we start with the sentence that is
23     about six lines down, "Dr. Simmons testified..."
24             THE COURT:  Okay.
25             MR. BETTILYON:  "That though he had made an

Status Conference

10/3/2011

[28]

1   enormous discovery, he was told by BYU Vice-President of

2   Research, 'I hear what you are saying.  It sounds

3   interesting but I can't do anything.'"  That is,

4   essentially, the same thing as the Hooper letter.  That

5   is what the Hooper letter says.

6           He testified that he also reported his

7   discovery to the technology transfer office, and that

8   would be to Dr. Hooper, and gave them his view that BYU

9   should patent it.  "I felt that they should get a patent

10  on COX-2 and its uses, uses and expression system."

11  Indeed, Dr. Simmons testified that he approached the TTO

12  many times, trying to get them to patent this.

13          Now they had that testimony, in 2002.  That

14  deposition has been made part of the discovery, in this

15  case; although they did not have the Hooper letter, I

16  think they, essentially, had the gist of it right there.

17  That is the same kind of testimony that is found in the

18  Hooper letter.

19          They are making a big deal about it, Your

20  Honor, but I think that, frankly, that has more to do

21  with the fact they have new lawyers on the case who

22  would like to reopen discovery and ask different

23  questions than were asked the last time around.  But

24  that isn't a basis to open discovery.  And if we are

25  going to have a level playing field, we have to reopen

Status Conference

10/3/2011

[29]

 1    discovery for all of these things.

 2              We made strategic decisions not to raise

 3    issues like Karen Siegburg's deposition, because we have

 4    been to prior hearings with you, and we've heard you

 5    tell us very loudly and clearly that we needed to move

 6    on with this case, and we have.  And we believe that

 7    that same advice applies to Pfizer and that they need to

 8    move on with this case.  There isn't anything that they

 9    didn't already know, that they can't -- you know, and

10    they get to depose Dr. Simmons, anyway, and they can

11    spend that time however they want with him, and we just

12    need to move on.

13              THE COURT:  All right.  I am prepared to

14    rule on this.

15              MR. HATCH:  Your Honor, the only part that I

16    would mention is this action suggests that it went up to

17    the president of the university.

18              THE COURT:  No, I agree with that, but I am

19    going to rule in this case, Mr. Hatch, that you are not

20    going to be allowed to reopen the depositions of

21    Dr. Bateman or Dr. Hooper.  I think that the information

22    you have has been sufficient to allow you to determine

23    who your witnesses will be and also to continue with

24    your deposition of Dr. Simmons.  So I am going to deny

25    the request as to those two depositions.  Now what else

[30]

1   do we need to?  I think we have gone off our chronology

2   a little bit.

3           MR. HATCH:  I am not certain where you want

4   to go next.

5           THE COURT:  All right.  It says Pfizer

6   should not be given an extra day to depose Dr. Simmons.

7           MR. HATCH:  Okay.  I am sure I have

8   everything out of order now.

9           THE COURT:  That is why I decided to follow

10   the written response.

11           MR. HATCH:  I've got in the box, and, you

12   know, I guess probably the least weighty of my arguments

13   is, just the weight of what is Dr. Simmons' work.  He is

14   given -- we are being, we are being somewhat treated

15   here by the other side as though somehow this is some

16   small case, and Dr. Simmons is some small player, and

17   has already been deposed when he was deposed, which I

18   think it was almost three years ago, as a fact witness.

19           Since that time, and I may have gotten the

20   count wrong on parts of this, but he's given three

21   extremely lengthy expert reports, in which, you know,

22   this box represents, not just Dr. Simmons, but I brought

23   all of them over, if we need.  But this portion of the

24   box, everything but the last three binders, this is all

25   Dr. Simmons' expert reports, supplemental reports.

Status Conference

10/3/2011

[31]

1           THE COURT:  I get it.

2           MR. HATCH:  Rebuttal expert reports that he

3     filed in this case, and that is without the exhibits.

4     If I brought the exhibits, I would have had to bring

5     over five or six of these boxes.  He's filed six

6     declarations.  Every single time we filed a motion for

7     summary judgment, we have gotten extensive declarations

8     from Dr. Simmons.  Okay?  And since we've begun the

9     expert discovery, I will just read a couple of these, we

10    are finding out -- where is my pile?  Let me see if I

11    can get these right.  They are out of order.

12          THE COURT:  Mr. Hatch, I will let you make

13    whatever argument you want to, but I am inclined to

14    allow the extra day, based upon my decision, as to the

15    Hooper-Bateman matter.

16          MR. HATCH:  Okay.  Well, I killed a lot of

17    trees.  I was ready to burn up more tape and trees.

18          THE COURT:  I don't doubt you can do that.

19          MR. HATCH:  The only thing I can say, and

20    maybe based on what Mark has to say, I will, but, you

21    know, I was prepared, just for the experts we have gone

22    through, to read from depositions where literally

23    every -- not every, but an enormous number of questions;

24    where did you get this information?  I got it from

25    Dr. Simmons.  And it's from his expert reports, from

Status Conference

10/3/2011

[32]

1    what he called, and in numerous instances, what he told

2    them recently because they couldn't find it in the

3    expert reports, and it wasn't in any of the documents

4    produced.  So, you know, there's a mountains --

5              THE COURT:  All right.  Unless Mr. Bettilyon

6    can convince me, based upon my previous ruling, that

7    that should not be allowed, that is what I am inclined

8    to do.

9              MR. BETTILYON:  Well, I'm hoping I can.

10   Your Honor, I should mention that Trudy Simmons,

11   Dr. Simmons' wife, is in the courtroom.  I think she may

12   start crying if you allow this deposition.

13             THE COURT:  I am sympathetic to that fact.

14   I am not sure that that's a basis on which we can --

15             MR. BETTILYON:  Part of the facts that you

16   have before you are incorrect.  Let me walk through

17   chronology in this case.  In February of this year, the

18   other side asked for another day to depose Dr. Simmons.

19   They weren't entitled to one but we agreed to allow them

20   to depose him again.  And I have a quote from that

21   letter, which we attached, where they say that, you

22   know, they'll depose him for one more day.  He's a

23   so-called expert, so on and so forth.

24             But shortly thereafter, on February 18th, I

25   think that letter came out like the 16th, so a couple

1    days later, they received Dr. Simmons' first expert

2    report.  It was 183 pages long and it's certainly not

3    half of that box.  And they received that right after

4    writing this letter, right after this parties reached an

5    agreement regarding the fact that they can depose him

6    again.

7            On June 10th, we provided a supplemental

8    report which was to replace the original report.  So

9    they count that, in the documentation what they told

10   you, that supplemental report which they received on

11   June 10th, was 196 pages, so slightly bigger than the

12   original report.  But, again, in June, when they

13   received that document, no lawyer calls BYU and says,

14   "We now need more time to respond to these issues.  The

15   agreement we reached in February isn't going to satisfy

16   us.  We need to do more."  And then most recently, on

17   August 26, they received Dr. Simmons' rebuttal report,

18   and it's 50 pages long, so I don't think that additional

19   50 pages can be the basis to depose Dr. Simmons for an

20   extra day.

21           I also want to point out, Your Honor, that

22   there is a little bit of gamesmanship going on here, and

23   that is, BYU made the decision to provide an expert

24   report from Dr. Simmons because we've looked at Rule 26

25   and we are uncertain as to whether he is a fact witness

Status Conference

10/3/2011

[34]

1    and needs to provide an expert report or not. He is

2    going to testify at trial as a fact witness, but his

3    fact testimony clearly will contain a lot of scientific

4    evidence, and we have provided, in all instances with

5    all of our experts, very detailed expert reports.

6           But the reality is we don't really need to

7    provide that, I don't think, under Rule 26. We have

8    done it as a precaution, and I want to point out Pfizer

9    hasn't done that. Pfizer hasn't provided any expert

10   reports from any of its fact witnesses, and, yet, it's

11   going to have five or six players come to the table, and

12   who will testify at trial, and who will give scientific

13   testimony, just as Dr. Simmons. But we are not going to

14   have an opportunity to depose them because they didn't

15   provide expert reports.

16          But the bottom line, Your Honor, is there

17   just really isn't time to conduct this discovery. I

18   mean, you saw the calendar. The days where there are no

19   depositions scheduled right now, in this month, are not

20   scheduled because it didn't work for anybody. Those

21   days would have depositions on them. We're already

22   double booked on deposition days. Dr. Simmons has been

23   attending many of these depositions because he does

24   understand the science and many of these experts are

25   science people. And I think if I have to go back and

[35]

1  tell him he's going to be deposed for a second day, he

2  may have a nervous breakdown, and I am not kidding on

3  that.  I think it's going to be -- it will be very

4  difficult for him to do that, and I just don't see any

5  basis for doing this.

6           We would have loved to spend another day

7  with Dr. Needleman, or Dr. Siegburg, or any scientist on

8  the other side of this case, but we all made an

9  agreement, we all agreed two days with witnesses.  We

10  all agreed we would do that.  Fact discovery is over.

11  We agreed, in February, they could have him for an extra

12  day.  They agreed to that and now come back to you and

13  say they want more time.  They received his initial

14  expert report two days after they reached that

15  agreement.

16           THE COURT:  Okay.  Mr. Bettilyon, here is

17  the problem I wrestle with is, I just denied them the

18  opportunity to re-depose Dr. Bateman and the other

19  doctor, Dr. Hooper, and because, in part, that they

20  would have the opportunity to discuss, with Dr. Simmons,

21  these matters during his deposition.  Now why shouldn't

22  they be entitled some extra time in which to do that?

23  And I understand that you are concerned about health

24  matters, but I notice Dr. Simmons' deposition is on

25  Friday the 7th.

Status Conference

[36]

1          MR. BETTILYON:  Correct.

2          THE COURT:  Isn't there sometime on

3     Saturday, or on Monday, that that testimony couldn't

4     appropriately be done and give Dr. Simmons some time?

5          MR. BETTILYON:  I don't think they need

6     another day to do that, Your Honor.  I think if you say

7     they get one more hour -- they are not possibly going to

8     spend a whole day talking about the Hooper letter, and

9     if that is really what the Court is concerned about, I

10    think we would agree they can have an additional half

11    hour to an hour.

12          I think, quite honestly, if we are making a

13    decision about what would be best, I think we would

14    rather offer them Dr. Hooper and Elder Bateman, to have

15    them re-depose them, rather than spend another day with

16    Dr. Simmons, because it is going to be -- and with all

17    due respect, Your Honor, this case has been very

18    difficult on Dr. Simmons, as I am sure you can imagine,

19    and he is just about near death's door, given everything

20    that he has had to put up with and all the work that he

21    is required to do.  I think the stress of that

22    deposition would be inappropriate, and I don't think

23    there is no way they are not going to ask him -- I will

24    be surprised if they have half an hour of questions to

25    ask about that Hooper letter.

[37]

1          What this is about is they have eight new
2    lawyers from Wilmer and Helm.  They read prior
3    depositions and want to ask him deferent questions than
4    what's been asked for --
5          MR. HATCH:  Can I make an objection?
6          THE COURT:  Yes, you can.
7          MR. HATCH:  I mean, they raised this in
8    their brief.  Where's the Wilmer Helm lawyers?  I mean,
9    this is just a total red herring, and I am kind of
10   getting a little bit offended by it, Mark, because I am
11   standing here, I have argued every hearing, in this
12   case --
13         THE COURT:  Okay, enough.  Mr. Hatch, how
14   much time do you need with Dr. Simmons to address the
15   issues raised in the Hooper letter?
16         MR. HATCH:  In the Hooper letter itself?
17   Well, we were -- as I mentioned earlier, we were asking
18   for a couple of hours with Dr. Bateman, and they had
19   already agreed with -- this is something they had
20   already agreed with on the Simmons thing, so it would at
21   least be that, if not more.
22         But this really begs the issue -- and I kind
23   of take -- I mean, I am sorry if I take a little bit of
24   offense, but I've argued pretty much every motion since
25   I've gotten this case last October.  They -- you know

[38]

1    and they take some liberty with what they put in their

2    briefs, and they've concocted this argument that this is

3    all being done by Wilmer Helm, and they drop this

4    footnote saying, "Well, look at all these lawyers that

5    came in recently."

6           The reason you have done pro hac's recently

7    for lawyers from Wilmer Helm, as in the case because

8    just like them, we are sending people all over the

9    country to cover depositions, prepare witnesses, and do

10   what we can and get everything we can done, in the month

11   of October.  A lot of people, people you will never see

12   probably never in a court in this district, but it had

13   to be pro hac so they can potentially participate in

14   depositions.  No one from Wilmer Helm is asking for any

15   kind of extension or new information and I have been the

16   one standing up in court and arguing these cases in

17   front of Judge Stewart.  And here, periodically, a DLA

18   lawyer will attend with me, but, you know, this is just

19   not a real argument.

20          Now on the second part of this, and, again,

21   you know, he is talking, he is talking -- again, we are

22   playing kind of strongman, kick the strongman down

23   games.  He brings up two people who were not -- who have

24   not issued expert reports, and say, "To be fair, we have

25   to open them, too."  Wait a minute.  We are talking

[39]

1      about since the motion started and since the discovery,

2      the expert discovery phase, I have got three lengthy

3      expert reports from Dr. Simmons.  And what he is,

4      essentially, saying is, I shouldn't have an opportunity,

5      my side, to be able to depose him on that and test them.

6                  THE COURT:  Okay, all right.  Now the extra

7      day was agreed to based upon the existence of those

8      reports, or in anticipation of those reports.  Correct.

9                  MR. HATCH:  Yes, yes.  Well, not the

10     reports.  They were -- the extra day was agreed to in

11     anticipation that he would be giving an expert report.

12     Your Honor, I will be real honest with you; this is a

13     big case.  If I were coming here and asking for what I

14     really want, what I really want, then the two main

15     witnesses that we're about to talk about, Dr. Simmons we

16     are talking about, and Gearing, we are going to talk

17     about, I would -- in this size of a case, I would

18     probably want far more than two days.  I think I am

19     being fairly generous in that.

20                 THE COURT:  Okay.  Mr. Hatch, I am limiting

21     you, and I am retreating from my position that I will

22     give you what time extra that you, in good faith, need

23     to explore what you might go into as it relates to the

24     Hooper letter and Dr. Bateman's review of that.  All

25     right.  So how long would that take?  Mr. Bettilyon has

[40]

1    said an hour.  I will give you up to two.  You can do

2    them that day or you can do them on Saturday, the next

3    morning.

4              MR. HATCH:  Well, we can work that out.

5              THE COURT:  Are you two doing them; the two

6    of you?

7              MR. HATCH:  The Simmons' deposition, well,

8    depending on how things go this week, I will probably be

9    there but not taking that one.

10             THE COURT:  Mr. Bettilyon?

11             MR. BETTILYON:  I won't be down there, but

12   if he wants to work it out; the agreement is they get

13   time to ask questions about the Hooper letter, and that

14   is all they get to ask about, and we will work something

15   out with him a little later on.

16             MR. HATCH:  Not just the letter itself but

17   what the area of focus that that letter covers, too.

18             THE COURT:  All right.

19             MR. HATCH:  Your Honor, if you can belabor

20   me just a minute, here is the problem with this

21   argument; one is on the other half of this, you know, I

22   appreciate him making the argument about Dr. Simmons and

23   his health concern; one is we don't have -- there is no

24   evidence of that with this hearing.  And I make that

25   argument somewhat cautiously because I don't want to

Status Conference

10/3/2011

[41]

1    tread on anybody's feeling, certainly not Mrs. Simmons.

2           MR. BETTILYON:  I can put her on the stand,

3    Your Honor, and she will testify that is not the

4    significant --

5           THE COURT:  I'll take that as a proper,

6    Mr. Hatch, if you want her to testify.

7           MR. HATCH:  I don't know that she would have

8    the foundation to testify.

9           THE COURT:  Okay.  She can testify based

10    upon lay observation.

11           MR. HATCH:  I understand.  I have no doubt

12    he feels stress, but I have been travelling around the

13    country and Dr. Simmons has attending every single

14    deposition.  This is, obviously, a very important matter

15    to him.  I personally haven't noticed any stress, but,

16    you know, it's certainly a case of much interest but

17    I --

18           THE COURT:  Go back to the issue of how much

19    time you realistically need, given the limitations I

20    placed on you.  And remember what the standard here is

21    with my management of this case; you know, the abuse of

22    discretion, and I don't know that that constitutes,

23    putting a limit on you does not constitute an abuse of

24    discretion, so go on.

25           MR. HATCH:  That is why I am arguing

[42]

1    somewhat strenuously here, Your Honor.

2                    THE COURT:  I understand.

3                    MR. HATCH:  If we go through the experts we

4    have looked at, not only do we have all these

5    declarations and expert reports, but I don't think,

6    realistically, we can get through, in an adequate

7    fashion to defend our client, in one day, leaving aside

8    the extra hours for the Hooper issue.

9                    In addition to those, virtually every

10   deposition we have taken of their experts, so far the

11   large, the majority -- I mean, the large part of what

12   they are relying on is Dr. Simmons, during this period

13   of time.  I will give you a couple of examples, if you

14   will allow me.

15                   THE COURT:  Let me ask you, how many times

16   now has Dr. Simmons testified?

17                   MR. HATCH:  His deposition was back in 2008.

18   I think it was -- he had a two-day deposition.  And I

19   would also point out, Your Honor, to the extent it

20   matters, and, Mark, correct me if I'm wrong, we only

21   used one of those two-day depositions that were allowed.

22   In the fact discovery, well, I think they used both.

23                   This is Dr. Lents, and this just -- and let

24   me give you this one, too.  I'm on page 221 of the

25   Lents' deposition, Your Honor, the first one I gave you.

[43]

1    He says, "I want to know, putting aside your deposition,

2    did you have any communications with Dr. Simmons before

3    that deposition where you told -- he told you --" by the

4    way, this is a rough ASCII.  This is reason enough.

5    It's not -- it's a little rough.  "-- Dr. Simmons,

6    before that deposition, where he told you he

7    communicated to anyone at Monsanto that DuP-697 was a

8    lead compound?"

9              "That conversation may have been more recent

10   than that deposition."

11             These are just examples.  And in, for

12   instance, Bell, whose deposition was -- it doesn't even

13   say here -- oh, the 29th, so just a few days ago, page

14   173, "What evidence do you have that Dr. Simmons had

15   conversations with Dr. Siegburg about DuP-697?"

16             "Dan told me that he did, that he did."

17             "When did he tell you that?"

18             "He told me a couple different times."

19             "Is that in any of his expert reports?"

20             "I am not sure."

21             "Is it in any documents that you reviewed in

22   this case?"

23             "Not that I am aware of."

24             "Have you seen any deposition testimony from

25   anyone that Dr. Simmons ever pointed out, to anyone from

[44]

1    Monsanto, that DuP-697 was collected COX-2 him?"

2              "No, but Dan told me that."

3              So in the last period of time, all their

4    expert witnesses are calling up, and sometimes they are

5    talking to him during the break.  That is why he is at a

6    lot of these depositions.  And where they were, they

7    were concerned that there isn't a -- they don't have any

8    facts in the record, he tells them.  And then this was

9    really, I think if I can, Your Honor, this was truly a

10   first for me, in my practice, is when we asked for a

11   30(b)(6) deposition of Brigham Young University, and

12   obviously, I mean, I don't think it's lost --

13              THE COURT:  I remember that.

14              MR. HATCH:  It's not lost on anybody here

15   that the key the person who knows all this stuff is

16   Dr. Simmons, and the BYU lawyers chose to put up, as a

17   Rule 30(b)(6) witness, an associate with the Beus Firm,

18   one of their lawyers, somebody whose livelihood is an

19   associate and is dependent on the partners who are

20   prosecuting this case on a continuance fee.

21              And if you go throughout, almost constantly

22   throughout, you know:  When did you talk to Dr. Simmons.

23   He is talking to him and he is getting the information

24   here.  He took notes but he said he didn't keep all the

25   notes.  And so almost his entire testimony -- he says

Status Conference

10/3/2011

[45]

1    here at the bottom of 11, "Is there anything not in

2    these notes that you believe is important to your

3    testimony here today?"

4            "I'm sure there is."

5            "Can you tell me what it is?"

6            "I can't.  I didn't take down a note of

7    everything."

8            Then he on page 13, he's taking about his

9    conversations with Dr. Simmons.  "You address each one

10   of the topics, in 14 through 28, in your conversations

11   with Dr. Simmons?"

12           "Yes."

13           "Was it just the one conversation you had

14   with Dr. Simmons to prepare for this deposition?"

15           "No, I had a number of conversations with

16   Dr. Simmons to prepare for this deposition."

17           "Do you know how many?"

18           "I don't know how many."

19           Then he goes on, "It may have been 15.  It

20   may have been 20.  I don't know.  A lot of conversation.

21   We spent a lot of time trying to address the issues

22   raised in Pfizer's notes.  We did a lot of work."

23           And these conversations -- and he goes on

24   and on about that.  And he goes even further back, and

25   this was quite a lengthily deposition.  Obviously, a

Status Conference

[46]

1    30(b)(6) of BYU is a pretty important examination.  And

2    so we have a situation where, you know, we are in -- I

3    mean, Your Honor, there are a lot of issues in this case

4    for both parties, admittedly.

5              And since -- certainly since his previous

6    deposition, but certainly since his expert reports and

7    as part of the 30(b)(6), he's transmitted an enormous

8    amount of evidence that we haven't been given in

9    documents, we haven't been given in testimony, and we

10   are hearing it for the first time, translated through

11   experts and through associates of law firms being put on

12   as witnesses, and not really -- and then when asked for

13   details, say, "I don't remember.  I just remember

14   Dr. Simmons told me."  You know, and so we are in a

15   situation --

16             THE COURT:  Couldn't you have the person

17   conducting this deposition asked more insightful or

18   detailed questions?

19             MR. HATCH:  Well, like what, Your Honor?

20             THE COURT:  I am asking you.  If the person

21   who is going to conduct --

22             MR. HATCH:  I think if they won't tell you,

23   or they tell you they don't remember; you say, "You had

24   a conversation, what did he say?"  "I don't remember," I

25   don't know what you do with that, other than we are

Status Conference

10/3/2011

[47]

1   getting this broad, "He is the one that I got all this

2   information from."

3            "Well, point us to a document."

4            "Well, I don't know if there is a document."

5            "Point us to an expert report."

6            "I don't know."

7            "Where did you get it?"

8            "I got it from Dan Simmons."

9            When you have that big of case and you are

10   asking for this much money, it's really, it's really

11   hard for me to defend my client without knowing what I

12   am going to face at trial.

13            THE COURT:  Is the person who is going to

14   conduct the deposition of Dr. Simmons as skilled as you

15   are?

16            MR. HATCH:  I hope so.

17            THE COURT:  Well, then, I think that you can

18   get it done.

19            MR. HATCH:  I guarantee I couldn't get it

20   done in one day, Your Honor.  There is no way you can go

21   through this material, and I think it is unfair.

22            THE COURT:  Don't you have Dr. Simmons,

23   every note that he has, all of the other information

24   that he's provided during the discovery process?

25            MR. HATCH:  Let me give you a perfect

Status Conference

10/3/2011

[48]

1  example, Your Honor, because some of these questions,

2  some of the ones I just gave you, we were asking, "Where

3  did you get that?"  And I think it is in -- it may be in

4  one of the ones I haven't showed you yet.  Let me look

5  real quick here.  No, I've got -- it may have been one

6  of those, but the answer is, Your Honor, in many

7  instances, and I think let's see, I was in -- I believe

8  it was Dr. -- or Mr. Lents' deposition.  Don't hold me

9  to that, but I don't think that it was a very typical

10 one, where we asked, I think, the key questions, Your

11 Honor.

12          He makes, he makes an assumption based on a

13 factual, something factual he was told, and we asked,

14 "Where is that in the documents?  Okay, where is that in

15 the notes that has been turned over."

16          "I don't think there is any."

17          So, finally, what he comes up with is,

18 "Well, it may have been in a phone call that Dr. Simmons

19 made to Monsanto."

20          There is no record of that.  So, Your Honor,

21 you know, other than being able to go through the

22 things, I don't know how you would get to that.  So I

23 admittedly -- I mean, I have seen cases this size where

24 somebody with the importance to the matter as

25 Dr. Simmons would be deposed sometimes for weeks, and we

Status Conference

10/3/2011

[49]

1    are asking for an extra day.

2                    THE COURT:  But you are conducting

3    testimony.  Or you're conducting a cross-examination of

4    Dr. Simmons, and you've asked him about the existence of

5    some note or notes.  Right?

6                    MR. HATCH:  Okay.

7                    THE COURT:  He either says, "Yes, here it

8    is, and you presumably have it," or he says, "No, I

9    can't substantiate that," and you have a good argument

10   to make about his lack of credibility.

11                   MR. HATCH:  I understand that 100 percent,

12   Your Honor.  These are just the expert reports, not the

13   declarations he's filed.  That is just the first one,

14   Your Honor.  There's 842 paragraphs here.  This isn't a

15   fact testimony.  This is an expert report.  I am telling

16   you what's kind of the next to the -- to that is just

17   the first report.  You couldn't -- and you would be

18   lucky to read that in a day.  Okay?

19                   We have to simplify this down, anyway,

20   to -- you know, some of the paragraphs, we are not going

21   to have questions on, undeniably.  Right?  And then,

22   which one was that?  That was supplemental report,

23   sorry.  When he -- you know, when we started filing some

24   things and he wanted the original report.  And the

25   supplemental report was, presumably, it is just that,

Status Conference

[50]

1    and it's additional information.  There is 673 in the

2    original.  So we are up to, well, almost 1,500

3    paragraphs of, apparently according to him, relevant

4    information.  This is 182 pages.  This one was, what?

5    It's 196 pages.  Then we have the rebuttal, which is a

6    little shorter.  These are not the exhibits.  Like I

7    said, Your Honor, there are boxes and boxes of exhibits

8    that have to be absorbed.  This one is a little shorter,

9    it's 146 paragraphs, 50 pages.  I would -- and that is

10   just the expert reports.

11           Then there's, you know, let's see, at least

12   six declarations.  Mostly shorter, I admit, a lot

13   shorter than these, and that doesn't even -- that

14   doesn't even get to the other experts that are -- that

15   he is feeding information and helping them with their

16   testimony.  And so when you think about it, somebody

17   has -- we're getting one day with experts that are just

18   repeating what he is saying, and we are only going to

19   get -- and, you know, as we said --

20           THE COURT:  Okay.  I hold you to the

21   decisions made by your predecessors; why wasn't

22   additional time requested when the scheduling order was

23   entered?  If it was assumed that Dr. Simmons was going

24   to be such import, and of course he is.

25           MR. HATCH:  And of course he is.  Well, Your

[51]

1    Honor, I guess if you are talking about the Judge

2    Kimball scheduling order that was entered into, I don't

3    know when that was, but at least 2000 --

4                    THE COURT:  I have a copy of it here.  It's

5    2009.

6                    MR. HATCH:  So two years ago.

7                    THE COURT:  Excuse me just a minute,

8    Mr. Williams, will you assist Mrs. Simmons with those

9    shades?  It looks like she is about to be blinded by the

10   light.

11                   MR. HATCH:  The original one was 2007.

12                   THE COURT:  Yes.

13                   MR. HATCH:  My answer to that would be, Your

14   Honor, that was, all of that, is before.  You know, even

15   in Judge Kimball's order, if I remember it right, hard

16   to believe I remember this:  Party may file a motion,

17   including information supporting a request for

18   modification of total number of depositions permitted by

19   this order.

20                   So even he, back in '07, realized there

21   would be changed circumstances.  You couldn't be held

22   rationally.  That was a starting point to things that

23   were known in '07, and it's only been part of

24   this -- this only happened during the expert discovery

25   phase.  We are talking about recently filed all these

[52]

1    reports, recently.  We have been finding out what his

2    involvement is with the other experts, recently.  In

3    other words, some of them just this last week during

4    depositions.

5            So I think that is undeniably a part of the

6    reason we are asking for this kind of relief because he

7    is, apparently, you know, and I apologize -- well, I

8    don't really apologize, but I hope it's not too much,

9    but he's, essentially, the hand in the puppet.  And we

10   want to be able to talk to the hand and find out where

11   this information is coming and whether there's a good

12   basis, and I think we are entitled to do that.  And I

13   don't think a case of this size, asking for two days is

14   really that much of a request.

15           So I would ask Your Honor that we, at least,

16   get two days.  I was going to ask for three.  I mean, I

17   didn't have it in a motion, but I actually think even

18   more than that would be appropriate.  But I think two

19   days to be able to synthesize and get through all this

20   would be somewhat more of Herculean task, and I don't

21   have that kind of body.

22                   THE COURT:  Okay.

23                   MR. BETTILYON:  Your Honor, if I can have a

24   brief rejoinder.  First, I would like to note that I am

25   sorry Mr. Hatch is upset that I referred to new counsel.

[53]

1   I should include him as new counsel because Dr. Simmons'
2   deposition was taken before Mr. Hatch came onboard.  And
3   I should also just point out, and I don't know that this
4   matters, but they have also had lawyers testify as
5   30(b)(6) witnesses.  In fact, they did it before we did.
6   So once they had Kathy Owens show up as a 30(b)(6)
7   witness, who is now counsel of record in the case, it
8   just didn't seem like that's fair to point that out as a
9   problem.
10          MR. HATCH:  If I can object, as Mark should
11   know, Kathy was a DLA lawyer, but she had been
12   transferred, for purposes of document discovery, to
13   Pfizer, and I can't remember what they call it, but to
14   Pfizer for that purpose.  So she was not acting as one
15   of the counsel in this case, as Mr. Ricker has.
16          MR. BETTILYON:  I don't know if that makes
17   much difference, Your Honor.  Keith Ricker has now left
18   Beus Gilbert, if that makes any deference, so he is not
19   counsel of record, anymore, either.
20          With respect to the time, we reached an
21   agreement on this issue, in February.  They received his
22   deposition, his expert report, days thereafter.  They
23   got an amended one, in June, and that is the 500 pages,
24   and I am saying that that is really duplicative because
25   it's really just one replaced the other, and it's about

Status Conference

10/3/2011

[54]

1    180 pages.  If they made this motion, in June, Your

2    Honor, this would be a different situation than making

3    it now.

4              But the bottom line is, we have a deadline,

5    in this case, and everybody is killing themselves to get

6    this stuff done.  And I think the Court can probably

7    appreciate that handling literally a deposition a day,

8    and that is what it averages out to, is a Herculean

9    task.  And we've had lawyers flying all over the country

10   and that's why I am here by myself today because people

11   are doing things, that no deposition is scheduled today,

12   but people are getting witnesses prepared and we are

13   doing everything.  There is just not time to get

14   Dr. Simmons prepared for another day.  There is not time

15   to do this.  We can't take more time.

16             We still have three depositions that have to

17   be taken after the discovery cutoff date.  One of those

18   depositions was postponed last week because co-counsel

19   for Pfizer had a medical problem, and so we had to

20   postpone that.  But there just isn't more time to do

21   this, and we can't put these deadlines out any further.

22   Nobody is asking that.  If they need a little more time

23   to talk about the Hooper letter, we are happy to do

24   that, but it should be a very limited amount of time and

25   it should be time only to talk about the Hooper letter.

1          In all honesty, Your Honor, they can do what

2     they need to do with Dr. Simmons in a day.  None of this

3     is news, and this notion that Dr. Simmons is feeding

4     these people things is nonsense.  I have read every

5     expert report in this case.  Ed Lents, his testimony

6     doesn't even relate to anything Dr. Simmons did, nor

7     does it relate to anything here.  Dr. Simmons -- Ed

8     Lents testified that Pfizer should have had a clean room

9     in place.  It has nothing to do with anything that BYU

10    did.

11         THE COURT:  Well, the thing about that that

12    I find unfortunately not that unusual in my experience,

13    but I also note that skilled counsel know how to bring

14    those issues to the forefront and to then argue them to

15    a jury.  And sometimes, and I know that there is

16    criticism of criminal practitioners in some regard, but

17    I will tell you what; I think there is a lot to be said

18    for going forward in trial and making your case;

19    particularly when it relates to credibility issues.  And

20    so I am trying to do here, or to make a decision here,

21    that is fair to both parties.

22         Now I also understand, Mr. Bettilyon, that

23    Dr. Simmons may not need to attend every deposition, and

24    he may have to make some decisions, based upon his own

25    health priorities verses what, you know, health issues

Status Conference

[56]

1    or concerns maybe raised by extended travel.  So, you

2    know, I think that's in the equation, as well.

3              I realize that I have changed my mind, from

4    my initial disclosure.  And I always was appreciative of

5    Judge Winder, who would tell people from the beginning

6    where he thought he was going, and then let you tell him

7    why you shouldn't do that.

8              In this circumstance, I think that it is,

9    potentially -- well, it is appropriate to extend it for

10   a half day, to include the Hooper information, not to

11   exceed two hours, and whatever other additional time

12   there is, and that can go into Saturday.

13             MR. BETTILYON:  Okay.  Thank you, Your

14   Honor.

15             THE COURT:  All right.  Anything else on

16   that issue?

17             MR. BETTILYON:  So two hours is devoted to

18   the Hooper letter and --

19             THE COURT:  No more than two hours devoted

20   to the Hooper letter.

21             MR. HATCH:  We get three and a half, total,

22   however we use it.  Right?

23             MR. BETTILYON:  No, two hours for the Hooper

24   letter and --

25             THE COURT:  No, what I am thinking of is you

Status Conference

10/3/2011

[57]

1    start at 8:30, and you can use up to two hours on the

2    Hooper letter, and you finish by noon.  Okay?

3              MR. HATCH:  So noon on Saturday?

4              THE COURT:  Right.  So you can choose that,

5    but no more than two on the Hooper letter, if you have

6    all this other information --

7              MR. HATCH:  So I think what Mark is saying,

8    we are getting a half day, but we can't use more than

9    two hours on the Hooper letter?

10             THE COURT:  Yes.

11             MR. BETTILYON:  In all honesty, Your Honor,

12   the Hooper letter is a red herring, and they will spend

13   half an hour on the Hooper letter, but if that is your

14   ruling, we'll --

15             THE COURT:  That is the ruling --

16             MR. BETTILYON:  All right.

17             THE COURT:  -- as it relates to that.  Okay.

18   Now we have to deal with the issue of the subpoenas?

19             MR. HATCH:  Or do you want to go to Gering

20   next?  Either one, I will do it however you want to do

21   it, Your Honor.

22             THE COURT:  You are the proponent here.

23             MR. HATCH:  Let me find my notes.

24             THE COURT:  Let me indicate, since we are

25   talking status here, and I have not allowed the

[58]

1    Defendants to reopen depositions, and I will not allow

2    the Plaintiffs to move to opening depositions, or reopen

3    depositions; is that understood?

4              MR. BETTILYON:  Yes, Your Honor.

5              THE COURT:  All right.

6              MR. HATCH:  I think I'll make this one

7    as -- I will try to make it simple, but nothing in this

8    case ever is totally.  And let me do it this way:  Your

9    Honor, undeniably, Dr. Gering has got an extensive

10   report.  He is their key witness.  He is the witness on

11   damages, which they are asking for an enormous number in

12   this case, as I think Your Honor is aware.  Let me --

13             THE COURT:  Here is the schedule for

14   Thursday the 6th.

15             MR. HATCH:  Correct, Your Honor.  And can I

16   point out, Your Honor, that as hotly disputed that this

17   case has been, I actually, frankly, am kind of shocked

18   at how well everything has gone during the expert

19   discovery.  For us to have this be the first time to

20   come with you, and it's really not a particular

21   cantankerous issue.

22             Mr. Bettilyon and his team have been very

23   gracious, and I hope they feel we have, as well, of

24   trying to fit everybody's schedule.  And he is exactly

25   right; both Mr. Malloy and I came back from New York.  I

Status Conference

10/3/2011

[59]

1    came back sick and he regrettably came back with a giant

2    lump on his arm and had to go to the emergency room.  So

3    I would be careful of New York hotels.  But that is why

4    we rescheduled Dr. Robins, and I appreciate the courtesy

5    that they gave us there.  But I think the parties have

6    worked quite well on this and will continue to do so.

7              Your Honor, I am giving you what's a page

8    from Dr. Gering's expert report, and as you can see,

9    Dr. -- this is page 6 from his expert report, where he

10   lists, in general form, the damages or opinions by

11   claim, and this is from his initial report, I believe.

12   And the reason I am giving you this is you can see, on

13   the right-hand side, he lists who the Pfizer expert is

14   that he is -- that coincide with his testimony on the

15   various issues.  And so the damages issue, if you looked

16   at it as one pie, what this is essentially saying is

17   that Dr. Gering, Mr. Gering -- is it doctor or mister?

18              MR. BETTILYON:  It's doctor.

19              MR. HATCH:  Okay.  Dr. Gering, he's got the

20   whole pie, Your Honor, and because of area of expertise,

21   we have actually three experts that are dealing with

22   various aspects of Dr. Gering.  Now whether Dr. Gering

23   really has the ability to testify to everything he

24   purports to, may be the subject of doubter motions

25   coming up, but as of right now, he has taken on the

Status Conference

10/3/2011

[60]

1    whole pie for BYU, where as we are using three

2    witnesses.  It is an extensive damage report.

3              I think Mr. Bettilyon mentioned in his brief

4    that it was full of a lot of details.  He drew a

5    different conclusion than I would from that.  His

6    conclusion was because there is a lot of details, it

7    should be easier for us.  I think that actually gives us

8    a lot more that we need to go into.  But I think the

9    fairness issue here, Your Honor, is because of the way

10   we chose to do it, they are, they are getting three days

11   of depositions for what we are getting one.

12             And, you know, I am quoting here from

13   Mr. Bettilyon's brief that he gave you today, I guess it

14   was.  Right?  "There is simply no reason to afford

15   Pfizer more time to depose BYU damage experts, than that

16   allows for BYU to depose Pfizer damage experts."  Well,

17   they are getting three days and we are getting one day,

18   and I don't think that is fair.  Particularly, you know

19   again, the damages are -- you know, that is kind of

20   where the rubber hits the road here.

21             THE COURT:  On a totally practical

22   standpoint, Mr. Hatch, his deposition is scheduled for

23   Thursday, in Salt Lake City?

24             MR. HATCH:  Right.

25             THE COURT:  How could that be rescheduled or

Status Conference

10/3/2011

[61]

1   extended?

2           MR. HATCH:  I am actually convinced that the

3   parties could work that out.  The other part is he could

4   stay Thursday and Friday, if necessary.

5           MR. BETTILYON:  So we are going to do it

6   while Dr. Simmons' deposition?  It's just not going to

7   work, Your Honor.

8           MR. HATCH:  Well, why not?

9           MR. BETTILYON:  Because the people covering

10  his deposition want to be at Dan Simmons' deposition.

11          MR. HATCH:  Well, I want to be at Dan

12  Simmons, too.

13          MR. BETTILYON:  And, Your Honor, if I can

14  point out as well -- I will wait, I apologize.

15          MR. HATCH:  We all want to be at Dan

16  Simmons' deposition.  I mean, that is the case.  But we

17  can certainly reschedule it.  We can do it at another

18  time.  You know, I mean, there are a number of things we

19  can do.  But the other option is, I mean, Mr. Bettilyon,

20  I don't know if you are backing away, but he said it

21  ought to be even.  If it is, then I would rather have

22  the second day with Dr. Gering, but if it's going to be

23  even, then we should each get an even number of hours.

24          THE COURT:  Isn't that a decision made by

25  the party; you chose to go with one expert and they

Status Conference

[62]

1   choose to go with three?

2            MR. HATCH:  Right, I agree.

3            THE COURT:  So that is Pfizer's choice.

4            MR. HATCH:  I agree.  I agree.  But what I

5   am saying is they are being given 21 hours to cover the

6   same material that we have to cover in seven hours?

7            THE COURT:  But Dr. Gering, and you said it,

8   is relying on the opinions of three people --

9            MR. HATCH:  No, no, he is not relying on

10  them, Your Honor.  Those are our witnesses.

11           THE COURT:  All right.

12           MR. HATCH:  We have got three.  That is why

13  I said we have this pie.  He has got the whole pie and

14  my guys have three of the same pie.  And so if we look

15  at it, that is why I am saying he is getting -- they are

16  getting 21 hours to pound on our damage people and we

17  get seven, and I think there is a lot of stuff there.

18           I want the extra day with Dr. Gering, which

19  gives us 14 to 21, but if that is unacceptable, then we

20  ought to at least be fair, and then they ought to get

21  these same number of hours and divvy them up how they

22  choose.  And I'll let them choose who and how long for

23  the same periods of time.

24           THE COURT:  But it's still within the total,

25  isn't it; the confine of what you agreed to?

Status Conference

10/3/2011

[63]

1              MR. HATCH:  No, Your Honor.  There is no

2    total -- you are thinking back to the fact discovery

3    which is all gone and past.  The experts, we have a

4    right, as do they, to depose every single expert that is

5    put forward in this case.  The reason we have so many

6    depositions is because the parties put together a lot of

7    experts, but there is nothing in the scheduling order

8    that says how many experts or how many -- you are

9    limited to a number of expert opinions.  You have an

10   absolute right, I think, probably a constitutional

11   right, to be able to depose each one of the experts.

12             THE COURT:  All right.  Mr. Hatch, what if I

13   said, what if I only hypothetically said, that you could

14   extend the Gering deposition into Friday; what would

15   your choice be?

16             MR. HATCH:  Well, I've already indicated my

17   choice is to do the extra day of Gering, but it ought to

18   be an even playing field however we do it.  Yeah, sure,

19   I would rather go to Simmons, but I am not going to take

20   that deposition because -- as they're not either.  I

21   think Mr. Beus is taken -- is defending Dr. Gering,

22   where as I think it's Mr. Williams who is taking -- or

23   who is defending Dr. Simmons in Scottsdale.  And, you

24   know, we have been accommodating them.  I mean, they

25   have been doing all of their BYU witnesses in

Status Conference

10/3/2011

[64]

1    Scottsdale.  I haven't raised a single stink about that.

2              THE COURT:  I thought I saw something that

3    said in a deposition, there was a refusal to conduct

4    depositions in Scottsdale.  I read that somewhere.

5              MR. HATCH:  I don't know where because I

6    have been making a lot of trips to Scottsdale for BYU

7    witnesses, and I can travel down there.  It's a little

8    bit of pain, but I want to level playing field on the

9    damages, and I prefer the extra day, but, you know, if

10   it's not going --

11             THE COURT:  When did you receive the report,

12   the expert report?

13             MR. HATCH:  Well, when they were due under

14   the schedule.

15             THE COURT:  Okay.  So why are we waiting

16   until now?

17             MR. HATCH:  Well, it isn't just now.  I

18   mean, we raised this a while ago.  I mean, I don't know

19   where we raised it the first time.  I don't know where

20   we raised it, in the context of the expert reports, but

21   I think I have raised this as a matter of discourse

22   fairly early on.  I can't give you exact dates as I

23   stand here.

24             THE COURT:  All right.  I understand your

25   argument.  Let me hear from Mr. Bettilyon.

Status Conference

10/3/2011

[65]

1          MR. BETTILYON:  First, Your Honor, I do

2     deeply resent the fact that Counsel is saying he's

3     taking a lot of trips to Phoenix.  I mean, we brought Ed

4     Lents, the expert he talked about, to New York so he

5     could be deposed at their convenience there.  I mean,

6     we've done a lot to try to bend over backwards, and I

7     just think that is inappropriate.

8               But more importantly, Your Honor, the expert

9     report of Mr. Gering was provided to them, on February

10    18th of this year.  The parties got together, after all

11    expert reports were exchanged, and we talked about

12    deposition dates.  We agreed to a schedule.  They agreed

13    to that schedule.  They agreed to a schedule that

14    included only one day with Dr. Simmons.  They agreed to

15    a schedule that included one day with Dr. Gering.

16              The truth is, if you look at the expert

17    reports, what this really is, is it's mostly

18    Mr. Hoffman, who is an expert here in town, you have

19    probably seen him before, against Mr. Gering.  And these

20    other two experts, in some instances, they are wearing

21    boots and suspenders and they've decided to have an

22    additional expert provide testimony on a couple of

23    things.  But if you look at this, you know, it's

24    Hoffman's name, you now, about 15, 18 times, and then

25    these other people a few times.

Status Conference

10/3/2011

[66]

1           Now, granted, we are going to take those

2     other depositions.  I doubt we will spend a whole day

3     with any of those people, but that is not the issue.  I

4     mean, we agreed that they could be deposed.  They said

5     we could take the time.  I mean, if they had a problem

6     with this, they should have raised it when we were first

7     talking about these depositions.  I mean, we scheduled

8     these sometime ago and we did it knowing that the

9     schedule was going to be very complicated.

10          I will tell you, Your Honor, that Mr. Gering

11    is in town now.  He is up at my office.  I spoke to him

12    just before I came down.  He is preparing for that

13    deposition and all the experts are scheduled this week

14    that are on financial things so they can all attend.  We

15    brought Mr. Gering into Salt Lake from -- I don't know

16    where he resides but he resides somewhere on the East

17    Coast, because the other experts were here, in Salt

18    Lake.  We did that to accommodate everyone and now

19    you're telling him he is going to have to appear again.

20    It just isn't going to work.  There is no time.

21          And I should also add, Your Honor, that

22    Mr. Gering told me that he has a trial that starts in

23    another matter, and he does not have another day that he

24    can do this, in the month of -- what month are we

25    in? -- in October.  He just does not have another day

1  because he's got this other thing going.  So I just

2  don't think this is appropriate.

3          I mean, they've got his report.  They don't

4  need to ask him, frankly, even a day's worth of

5  questions.  I mean, the truth is, he has four different

6  damage theories and that's it, and they kind of cover

7  the various causes of action.  And his report is

8  detailed but you would expect it to be detailed.  It's

9  footnoted.  They can do this in the time they have

10  allotted, and I honestly don't know why they even think

11  they want more time.

12          THE COURT:  All right.

13          MR. HATCH:  A couple things, Your Honor; one

14  is, let's talk about time.  His rebuttal reports were

15  only about a month ago, and I think within a week or

16  two, I was raising the issue.  I raised it orally -- I

17  mean, by letter, about two weeks ago subsequent to that,

18  and indicated if we couldn't get an agreement, that we

19  were going to need to raise it with you.  I raised it

20  timely.  I didn't get a response to that letter.  In

21  fact, Gering may still haven't actually responded to my

22  letter.  They responded on the letter regarding

23  Dr. Simmons' testimony and the Bateman testimony but not

24  Gering.

25          THE COURT:  Is there any question on behalf

[68]

 1    of your client agreements were made as to these

 2    deposition dates and times?

 3              MR. HATCH:  Yeah, I think -- well, I mean,

 4    it depends on what you mean by agreement.  I don't mean

 5    to be --

 6              THE COURT:  Well, they are scheduled.  They

 7    are all scheduled and scheduled close together.

 8              MR. HATCH:  Well, Your Honor, I mean, I hate

 9    to be -- I hate to get too picky here, but that schedule

10    has been somewhat fluid.  It's changed almost every

11    week, for a variety of reasons.  We offered up -- for

12    instance, we offered up Dr. Mancini, I think, on

13    November 17th.  That was November 10.  Then his schedule

14    filled up and we had to move it again.

15              THE COURT:  November 7th?

16              MR. HATCH:  Was it 7th?  Okay.  No, no, that

17    is the third or fourth try.  If I said November, I meant

18    October.  Your Honor, this has been shifting around and

19    really is unfair because that schedule has changed

20    probably four or five times since I've raised this

21    issue, and I wasn't even done -- and I was not even

22    responded to.

23              I raised it with Mr. Williams, in New York,

24    two weeks ago, and asked when I'd get my response, and

25    he said, "It's going to be a while but, you know, I

Status Conference

10/3/2011

[69]

1    can't give you great hope."

2              And I said, "Well, please get me a response

3    because if it's negative, I need to raise this as soon

4    as I can with the Court."

5              And now because it took two weeks to get

6    back, and they still haven't gotten back to me, I am

7    untimely with it.  I mean, that is just --

8              THE COURT:  That is not the issue,

9    Mr. Hatch.  The question is not one of timeliness.  The

10   question is whether or not, based upon the schedule as

11   it is, whether you're entitled to additional time, based

12   upon a response.

13             MR. HATCH:  What I am saying is, I am saying

14   is these -- sure, it's on that schedule.  No question

15   about it.  But it's on that schedule when there is a

16   dispute about how many days it's going to be.  And so,

17   you know, now because he wrote it down and this is not a

18   schedule that was transmitted.  This was from his own

19   firm.  You can see it has different lawyers' initials on

20   it.  This is something they created for the purpose of

21   putting in this brief, or maybe they use it internally.

22   That isn't something that's circulated.

23             Now because I raise something with them

24   first, instead of coming straight to the Court, they're

25   saying, "Oh, well, it goes against some agreement."

[70]

1    Well, there is no agreement.  The agreement from the

2    beginning was, I have a problem with this.  We need more

3    time.  And if it's not more time, if that is the

4    problem, then as a second position, and I have only, you

5    know -- I didn't put this, well, I didn't put anything

6    in the brief, I guess -- you know, then we ought to all

7    be treated the same.  And that, frankly, Your Honor,

8    wouldn't change anything.

9         I think Mr. Bettilyon said he may not have

10   full questions for Mr. Hoffman and Ms. Bodston (sic)

11   that are over the next couple days, and I assume the

12   same would apply to Mr. Stevens.  But if they want to

13   give equal time and split those up however they want to

14   split them, if they want to spend every minute with Rick

15   Hoffman, they are welcome to do that.  They can make

16   that choice, but I am asking that we be treated equally

17   and fairly on the duty up to the time.

18        THE COURT:  I will give you two additional

19   hours with Mr. Gering to be completed that day.

20        MR. HATCH:  On --

21        THE COURT:  On the schedule for Thursday.

22        MR. BETTILYON:  Can we limit that to an

23   hour?  I mean, these are seven-and-half-hour depositions

24   and we are usually going ten hours to get that done.  If

25   we limit it to one hour -- I mean, I think the thing

Status Conference

[71]

 1    that bothers me the most about this is, the rule says

 2    you get a day with an expert.  If you don't want to

 3    proffer an expert, don't, but if you proffer him, then

 4    you have to make them available for a day of deposition,

 5    and we are doing that.  And, if anything, Pfizer wants

 6    to rewrite the rules and it's just going to get very

 7    complicated.  I mean, that schedule is so tight.  We

 8    will have to have people go back to Phoenix for

 9    depositions, and so if we can just limit it to an hour,

10    that would be much appreciated.

11              THE COURT:  Well, it says that Mr. Beus, and

12    you've indicated, is conducting that deposition?

13              MR. BETTILYON:  Yes.

14              THE COURT:  All right.  And it's at your

15    office.  The Dr. Simmons' deposition will be in

16    Scottsdale.  Correct?

17              MR. BETTILYON:  Yes.

18              THE COURT:  All right.

19              MR. HATCH:  Your Honor --

20              THE COURT:  We are arguing about an hour

21    here.

22              MR. HATCH:  Yes, and I have already checked

23    because I wanted it possible, if it was going to be

24    possible, I wanted to be able to attend Simmons'

25    deposition, and I do know there are flights in the

[72]

```
 1    morning that get you there -- if you are not taking the
 2    deposition, you would be there probably within a half
 3    hour to 45 minutes from the start of the deposition,
 4    which is what I plan to do if this is how this goes.  I
 5    plan to stay here to finish the deposition, if it would
 6    go for another day.  So I think Mr. Beus could be there
 7    to take that same flight, if that is all we will get,
 8    and I am willing to work --
 9              MR. BETTILYON:  They could have raise this a
10    month ago, Your Honor.
11              MR. HATCH:  I did raise it.
12              THE COURT:  All right, stop.  I am going to
13    give you the extra hour, Mr. Hatch, and so that parties
14    can make reasonable travel arrangements, but, you know,
15    if that is an eight- or nine- or ten-hour day, that is
16    just the way it is.  All right?
17              MR. BETTILYON:  All right.
18              MR. HATCH:  Thank you, Your Honor.
19              THE COURT:  Now let's go to the subpoenas.
20              MR. HATCH:  Your Honor, on that issue --
21              THE COURT:  And as I understand it, those
22    subpoenas have been issued to DNA Solutions, I think is
23    the name, in Oklahoma City, and that they are no longer
24    being called by BYU as witnesses; is that correct,
25    Mr. Bettilyon?
```

Status Conference

10/3/2011

[73]

1          MR. BETTILYON:  That is correct, Your Honor.

2          THE COURT:  Have any reports from them been

3    provided at all to Pfizer?

4          MR. BETTILYON:  Yes, they received the

5    initial report and then there was a brief supplemental

6    report.  And truth is, Your Honor, what's happened with

7    them is that there is a financial dispute.  They sent a

8    bill for about $450,000, and, you know, people kind of

9    gulped at that.  So we decided that, you know, we want

10   experts, but some experts, we just can't afford, and

11   that is really the basis for them being withdrawn as an

12   expert.

13         THE COURT:  All right.  Mr. Hatch, were you

14   aware of that information?

15         MR. HATCH:  I was aware that they had

16   withdrawn and there was some dispute, but it was after

17   they filed.  And he is correct; I have three reports

18   that they filed in this case, and the problem with this,

19   too, is that we have got -- if Your Honor will allow me,

20   to save time, I will just give you this one.  And there

21   are others, as well, but I will save time and give you

22   this one.

23         This is the expert report of Steven

24   Prescott.  I think he still hasn't been deposed, I

25   believe.  But if you will notice, on page 116 and 117, I

Status Conference

10/3/2011

[74]

1    have just given you a couple portions from his

2    deposition.  Not only do we have their reports, but

3    their other experts, you know, are relying, he says.

4    You know 3 -- paragraph 316 is described in Simmons'

5    report.  Paragraph 317, in the heading that goes over,

6    indicates that he is talking about Simmons' material.

7              And he said, "I've reviewed the report and

8    supporting material of DNA Solutions."  318, "I also

9    understand from DNA Solutions' report," so these are

10   reports that -- not only they filed three reports, but

11   they've also -- other experts relied on them.

12             MR. BETTILYON:  And just a short circuit,

13   Your Honor, obviously, I mean, if somebody is relying on

14   someone that has been withdrawn, they are not going to

15   be able to rely on that.  We certainly understand that.

16             MR. HATCH:  Well, it's kind of a

17   card-played-card-late situation.  I didn't have a whole

18   lot of time this morning, but we did -- you know, this

19   hasn't been completely briefed.  They said they would

20   bring a motion to quash, and I appreciate the

21   opportunity to do it here.  I pulled one case -- I

22   pulled two cases, actually.

23             If Your Honor, on page 8, and this is

24   Securities and Exchange Commission versus Koenig, which

25   is a Seventh Circuit Court of Appeals decision, in

[75]

1    February, 2009.  It indicates, "A witness identified as

2    a testimonial expert is available to either side.  Such

3    a person can't be transformed after the report has been

4    disclosed and a deposition conducted to the status of a

5    trial preparation expert whose identity and views may be

6    concealed.  Disclosure of the report ends the

7    opportunity to invoke confidentiality."

8            And that is also a position, I think, that

9    has been taken by the district courts, in this

10   jurisdiction, Your Honor.  I will give you Giles -- I

11   think it's Colorado, yes, Giles versus Inflatable Store,

12   also from 2009.  And the relevant part, if you go to

13   page 3, Your Honor, it's under analysis.  It says, "TIS,

14   on the other hand, argues that Rule 26 is discovery

15   rule, and, thus, does not apply where discovery has

16   already occurred and the experts' opinions have already

17   been disclosed.  I agree with TIS."  And that is a

18   district court from this district.

19           I think once they -- they have raised an

20   issue of work product here, Your Honor, obviously,

21   something that's been disclosed pubically and to the

22   other side can't be work product, anymore.  It doesn't

23   magically become that because you become unhappy with

24   their opinion.  Plus, you know, this would work as

25   prejudice to us, as well, because we've, we have been

1    aware for a while of the DNA Solutions' expert report,

2    and many of our experts have relied on -- have reviewed

3    those and intend to potentially rely on them and they

4    are becoming relevant of what they did as part of their

5    testimony, as well.

6              So our DNA Solutions' established facts that

7    our experts ought to be able to cite and rely on.  So I

8    think it's obviously fair game that we're able to, and I

9    think it's the law in, at least, the Seventh Circuit and

10   certainly district courts in this district.  Without the

11   benefit of a more blown-out motion, that is what I could

12   do for this morning.

13             THE COURT:  All right.  Mr. Bettilyon?

14             MR. BETTILYON:  Yes, Your Honor, I did cite

15   a case that says you could withdraw an expert anytime up

16   until the time he is put on an expert -- you know, on a

17   list of witnesses which hasn't yet happened in this

18   case.

19             More to the point, Your Honor, first of all,

20   Mr. Hatch mentions that his experts rely on DNA

21   Solutions.  I don't recall any statement, in any of his

22   expert reports, that call that out.  Maybe he can point

23   specifically what they are relying on.

24             MR. HATCH:  I may have used that word

25   improperly.

Status Conference

[77]

1          MR. BETTILYON:  More importantly, Your

2    Honor, even if they are a testifying expert, the rules

3    that apply to this case and the Federal Rules of Civil

4    Procedure, as amended, don't allow them to get into this

5    discovery.  Now what DNA Solutions did, primarily, Your

6    Honor, if not I think almost exclusively, they did

7    biological tests on the biological samples that were

8    produced by Pfizer, not by BYU.

9          And as the Court will recall, in fact, I

10   came down, you know, several month ago, and said, "Could

11   we maybe get some more of those samples," because we

12   didn't think we received all the samples that we were

13   entitled to.  But now, I have a hard time understanding,

14   and that is one of the things they are asking for, you

15   know, their own biological samples.

16          Well, you know, their own biological

17   samples, they've had those since the beginning of the

18   case and they can test them.  But there are really three

19   reasons why --

20          MR. HATCH:  Can I clarify something?  We are

21   not asking for biological samples.

22          THE COURT:  That's what I thought, as well.

23          MR. BETTILYON:  Well, they want the test

24   results for the biological samples.

25          THE COURT:  Right.

1           MR. BETTILYON:  But the test results, they

2      can get those themselves, and my understanding is they

3      have retained experts that could test biological

4      samples.  I don't know if they've actually issued any

5      reports, but I do recall that they did, on their initial

6      list of experts, have experts that could do testing on

7      biological samples.  They could do that inhouse.  I

8      imagine they tested these inhouse, as well.

9           Here really is the bottom line:  In this

10     case, we have a stipulation that says that the only

11     thing you get are expert reports and what they relied

12     on.  Well, they are not going to testify at trial, so

13     there's nothing they are going to rely on.  There is

14     going to be no testimony at trial.  So I don't see how

15     they can do discovery, given that stipulation that is

16     found in the report, because there isn't anything going

17     to be anything to rely on at trial.  No testimony is

18     going to be proffered at trial.

19           Second, Your Honor, really what they are

20     asking for is what would amount to fact discovery

21     because that would amount to test results that could

22     have been done -- any of that, they could have been done

23     any of that in fact discovery.  They could have obtained

24     samples or results or anything they wanted to and it's

25     really just an effort to try and get around fact

Status Conference

10/3/2011

[79]

1    discovery.

2              And I think most importantly, Your Honor,

3    the samples that we have them test as opposed to samples

4    that we don't have them test, that really is work

5    product.  And even under with the testifying expert, you

6    don't get into work product unless it's part of

7    something that they relied on.  And since they are not

8    testifying at trial, there's nothing for them to rely

9    on.  I just think that this is a nonissue.

10             We have had a financial dispute with this

11   expert, and as a consequence, we have had to withdraw

12   them as experts.  But we are really getting into, again,

13   a great deal of expert discovery.  They've also known

14   for sometime that we withdrew them.  I don't have the

15   exact date, but it's certainly been several months since

16   we withdraw them and we let them know.  I think it was

17   sometime in June, or July, when they were withdraw.

18             And, again, they wait until now at the

19   conclusion of expert discovery and we have so much going

20   on.  And I don't see how they can use this information,

21   or what use it will be, because we have said, with all

22   experts, all you get from any expert is their expert

23   report and the test -- and any documents they've relied

24   on.  And since these experts don't intend to testify at

25   trial, there are no documents they will rely on.

[80]

1    There's nothing that will go into trial so there's
2    really no prejudice at all to them by saying that.  I
3    mean, I just think as an extension of stipulation we
4    have had in place from the beginning, it would be
5    improper to go forward with this discovery.
6                THE COURT:  Mr. Hatch?
7                MR. HATCH:  A couple of things; one is this
8    motion isn't regarding whether or not their testimony
9    will be admissible at trial.  I think that's going to be
10   a decision that Judge Stewart would make, and I think
11   that Mr. Bettilyon's treating that as a forgone
12   conclusion, and I think it's anything but that.
13                I've tried cases in this district where an
14   expert gave testimony that was not acceptable, the party
15   had my client, before I represented them, and that
16   witness became, as a lot of these cases read, became a
17   witness for the other side.  This is a very -- this is
18   an instance where DNA Solutions concurred, apparently,
19   with Dr. Mancini's findings.  It's relevant to the case.
20   It's discoverable.  And I think because they don't like
21   the testimony, they create a financial dispute because
22   they don't like the testimony, but that doesn't get them
23   out of it.
24                THE COURT:  I am not going to go into the
25   reasons.  I accept what Mr. Bettilyon says, in that

Status Conference

10/3/2011

[81]

1   regard, in good faith.  Let's just talk about the law.

2           MR. HATCH:  Okay.  Well, based on the law, I

3   think we are -- I think based on the cases I have shown

4   you, in the fact that they can't claim a work product to

5   something that has already been put out and that they

6   disclosed to us, in three different expert reports.  I

7   think that kind of ends the matter for that decision.

8           At that point, there isn't any

9   confidentiality left.  The work product vanished the

10  second they issued the report.  So I think we are

11  entitled to this.  I think whether it's admissible at

12  trial will probably be a subject to a Motion in Limine,

13  if Mr. Bettilyon wants to bring that and have Judge

14  Stewart decide that before trial.

15          But as of right now, they've fought for, in

16  this court, to be able to see the biologic materials of

17  Monsanto.  They've tested them.  They've issued reports

18  and we have -- since they have been submitted in this

19  case, we have every right to test those and rely -- test

20  their conclusions and rely upon them if we choose to.

21          MR. BETTILYON:  Your Honor, if I can -- I'm

22  sorry if he is not done yet.

23          THE COURT:  Are you finished?

24          MR. HATCH:  I think I am.

25          THE COURT:  Okay.  Mr. Bettilyon?

Status Conference

10/3/2011

[82]

1         MR. BETTILYON:  If I can just walk through

2    this logically, we've withdrawn their expert report.

3    They are not having to show up, in Salt Lake, to testify

4    during the trial.  They don't reside in the State of

5    Utah.  No party can serve a subpoena, a trial subpoena,

6    for them to come testify.  So at trial, unless somebody

7    allows a deposition to occur now, there will be no

8    testimony on which any expert opinions can be formed.

9              Even if there were, under the rules that we

10   have agreed to in this case, the only things that would

11   be produced would be their expert opinions and the

12   documents they relied on in forming their expert

13   opinions.

14             THE COURT:  Which have already been

15   provided?

16             MR. BETTILYON:  We provided their -- expert

17   reports, we provided the documents upon which they

18   relied, yes.  So there isn't really anything that's

19   really discoverable, even if you go back and allow these

20   depositions, and it's just not proper.  The rules talk

21   about how -- I mean, we believe that we can also

22   transfer these people into nontestifying experts.  We

23   have a case that supports that.

24             And the Rules of Civil Procedure say that if

25   it's a nontestifying expert, then you have to show a

Status Conference

10/3/2011

[83]

1   very heightened burden to be able to do that discovery,

2   and they clearly can't meet that heightened burden.  And

3   so I think it's fair to say that we withdraw them long

4   before now, long before the conclusion of expert

5   discovery.  Their depositions haven't been taken.  Even

6   Mr. Hatch's cases, in re, talk about, you know, where an

7   expert's deposition has been taken.  They just haven't

8   been taken.

9            I just don't think, in the context of what

10   we have going on here, it makes any sense to go do this

11   discovery; especially when, again, they were withdrawn

12   many months ago and could have brought this motion up,

13   if they wanted to, you know, in June or July or August,

14   instead of now, when we have 20 depositions scheduled in

15   the next 21 days.

16            So for all of those reasons, we just say,

17   you know, enough is enough.  Let's get done, and let's

18   go try this case, and nothing more should happen.

19            THE COURT:  Mr. Hatch, one more?

20            MR. HATCH:  Just quickly; on the timely

21   issue, this is an issue that came in the very, very

22   beginning of setting up the depositions, so I think,

23   again, that is an over -- and I think Mr. Bettilyon kind

24   of proves my point.

25            Prejudice, I think we are entitled to it by

Status Conference

10/3/2011

[84]

1   the cases.  Once they put themselves out there, they are

2   a witness.  And we -- and I think that is what the

3   Seventh Circuit and the District of Colorado recognized,

4   and I think that he's shown prejudice to us is we have

5   had to do this by a subpoena, and they are outside, you

6   know, the subpoena power for trial.

7           So the only way we get this testimony, I

8   believe is he is right, is by deposition.  And since we

9   are entitled to that, I think we have the ability to go

10  do that.  We can also, presumably, I don't know if

11  anybody has even tried to do this, get them to come

12  voluntarily, but I think we have the right to take that

13  deposition and preserve that testimony for trial.

14          It isn't enough in this, and Mr. Bettilyon

15  points out that the prejudice isn't enough to just show

16  the expert reports and documents they relied on at

17  trial.  We need testimony.  And I think the issue he is

18  arguing on that point is something that should be left

19  for Motion in Limine with Judge Stewart.

20          THE COURT:  I will give this one to you,

21  Mr. Hatch, and allow those to be served, if possible.

22  And, Mr. Bettilyon, you can raise the issue in a Motion

23  in Limine before Judge Stewart.  I don't know that you

24  are going to gain anything.  Is there anything else?

25          MR. HATCH:  I think that addressed it.

Status Conference

10/3/2011

[85]

1          MR. BETTILYON:  That is it, Your Honor.

2          THE COURT:  I want to say this:  I

3    appreciate the very hard work that has been undertaken

4    by both sides, in this very long and somewhat

5    necessarily contentious case, so thank you.

6          MR. HATCH:  I think, Your Honor, if this was

7    it, what we have had after two months of, what was it?

8    About 32 expert depositions or something like that, I

9    think we have done pretty well.  I just hopefully --

10          THE COURT:  You just need to get to trial.

11          MR. HATCH:  We will get there.

12          THE COURT:  All right.  We will be in

13   recess.

14          (The hearing was concluded at 4:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

[86]

1                    REPORTER'S CERTIFICATE

2

3    State of Utah       )
                         )
4    County of Salt Lake)

5

6         I, Kellie Peterson, Certified Shorthand Reporter,

7    Registered Professional Reporter, and Notary Public for

8    the State of Utah, do hereby certify:

9         THAT the foregoing proceedings were taken before

10   me at the time and place set forth herein; that the

11   witness was duly sworn to tell the truth, the whole

12   truth, and nothing but the truth; and that the

13   proceedings were taken down by me in shorthand and

14   thereafter transcribed into typewriting under my

15   direction and supervision;

16        THAT the foregoing pages contain a true and

17   correct transcription of my said shorthand notes so

18   taken.

19        IN WITNESS WHEREOF, I have subscribed my name and

20   affixed my seal this 8th day of October, 2011.

21

22                       _____
                         Kellie Peterson, RPR
23                       Notary Public
     My commission expires:
24   December 29, 2012

25