James S. Jardine (1647)
Mark M. Bettilyon (4798)
Arthur B. Berger (6490)
Samuel C. Straight (7638)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
jjardine@rqn.com
mbettilyon@rqn.com
aberger@rqn.com
sstraight@rqn.com

David B. Thomas (3228)
Office of the General Counsel
Brigham Young University
A-350 ASB
Provo, Utah 84602
Telephone: (801) 422-4722
Facsimile: (801) 422-0265
Dave_Thomas@byu.edu

Leo R. Beus (admitted *pro hac vice*)
L. Richard Williams (admitted *pro hac vice*)
Mark C. Dangerfield (admitted *pro hac vice*)
BEUS GILBERT PLLC
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona  85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
rwilliams@beusgilbert.com
mdangerfield@beusgilbert.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, a Utah Non-Profit Education Institution; and Dr. DANIEL L. SIMMONS, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> PFIZER, INC., a Delaware Corporation, G.D. SEARLE & COMPANY, a Delaware corporation, G.D. SEARLE LLC, a Delaware Limited Liability Company, MONSANTO COMPANY, a Delaware Corporation; and PHARMACIA CORPORATION, a Delaware Corporation, <br><br> Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: OWNERSHIP OF THE COX-2 MATERIALS** <br><br> **(BYU's OPPOSITION TO DEFENDANTS' MOTION NO. 10)** <br><br> Case No. 2:06-CV-890-TS <br><br> Judge Ted Stewart <br><br> Magistrate Judge Brooke Wells |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... iii

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ..................................... iv

ADDITIONAL MATERIAL FACTS ......................................................................... xii

ARGUMENT ............................................................................................................. 1

     I.     Dr. Simmons Has a Valid Claim for Misappropriation of Trade Secrets ............... 1

     II.    Dr. Simmons Has a Valid Claim for Unjust Enrichment ....................................... 4

     III.   Dr. Simmons Has a Valid Claim for Breach of Fiduciary Duty ............................ 7

     IV.   Dr. Simmons Has Valid Fraud and Negligent Misrepresentation Claims ............. 8

CONCLUSION ........................................................................................................ 10

CERTIFICATE OF SERVICE .................................................................................. 11

Plaintiffs Brigham Young University and Dr. Daniel L. Simmons ("Dr. Simmons") (collectively "Plaintiffs" or "BYU") respectfully submit this memorandum in opposition to the Motion for Partial Summary Judgment Re: Ownership of the COX-2 Materials filed by Defendants Pfizer, Inc., G.D. Searle & Company, G.D. Searle LLC, Monsanto Company, and Pharmacia Corporation (collectively "Defendants" or "Pfizer").

## <u>INTRODUCTION</u>

In a new twist in Pfizer's efforts to write Dr. Simmons out of the history of the discovery of COX-2 and despite its failure to raise the defense in its Answer, Pfizer now claims that Dr. Simmons does not have a stake in this case because he did not "own" the intellectual property at issue. These arguments are wrong on the facts, wrong on the law, and spurious given Dr. Simmons's material role in the parties' relationship and the serious damages that he has suffered as a result of Defendants' actions.

While Pfizer may dispute whether the materials at issue in this case were trade secrets, it is beyond dispute that Dr. Simmons developed and possessed those materials. Under the plain language of the Utah Trade Secrets Act and the case law that directly addresses the issue, Dr. Simmons has standing to assert his trade secret claims.

Similarly, Pfizer remarkably claims that Dr. Simmons somehow provided no benefit to Monsanto because he did not "own" the benefits that he did provide. This argument borders on the frivolous as Dr. Simmons provided extensive benefits in the form of documents, biological materials, and services to Monsanto.

Finally, Pfizer's sole basis for claiming that Dr. Simmons cannot assert his breach of fiduciary duty and misrepresentation claims is again that Dr. Simmons did not own the

underlying intellectual property.  Even if Pfizer's premise is accurate, under the very policy that

Pfizer cites, Dr. Simmons stands to receive up to 45% of the net income distributed from the

intellectual property.  In other words, had Pfizer not breached its fiduciary duties to Dr. Simmons

and BYU and had Pfizer not misrepresented facts to Dr. Simmons directly (and to BYU as well),

Dr. Simmons would have received a direct financial benefit from any Pfizer payments related to

the intellectual property.  Because Pfizer breached its duties, Dr. Simmons (and BYU) now

together seek to recover those significant damages.  Both plaintiffs are entitled to do so.  Based

on all of the foregoing, Pfizer's motion must be denied.

<u>**RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**</u>

Plaintiffs set forth Defendants' purportedly undisputed facts in italics and Plaintiffs'

response in plain text.  All exhibits in support of this Opposition have been consolidated with

Plaintiffs' exhibits in support of concurrently filed oppositions.

1.      *"The BYU Intellectual Property and Creative Works Policy" from 1992 declared*

*as follows:*

> *This policy governs the ownership and disposition of intellectual property and creative*
> *works developed by Brigham Young personnel. . . .*
> *Intellectual property or creative works developed by University personnel within their*
> *field of expertise and/or scope of employment at the University . . . are the property of the*
> *University.*

BYU's RESPONSE:  **Disputed in part**.  BYU does not dispute that Pfizer has accurately

quoted one portion of "The BYU Intellectual Property and Creative Works Policy" ("IP Policy")

attached as Exhibit 17 to the Russell Declaration.[1]  However, Pfizer fails to quote other critical

portions of the IP Policy relevant to this motion.  Specifically, the IP Policy states:

> [W]hen scholarship and research activity that is motivated by appropriate
> educational objectives has commercial potential, it is desirable to
> **encourage such appropriate creative activity by providing financial
> incentives to the developers** of the intellectual property which may
> result.[2]

> The University may, at its sole discretion, determine to release its
> ownership rights in the intellectual property or creative works to
> developers upon conditions the University deems beneficial and fair to all
> parties.  The release of rights will be verified in writing to all parties.[3]

> IV.     *Distributions*

> IV.A.   *Income Distribution*
> All revenues derived from the intellectual property or creative works will
> be received and administered by the Technology Transfer Office.  Costs
> incurred in the process of perfecting, transferring, and enforcing
> University rights in the property or works will be paid by the University
> and, together with interest costs, will first be deducted from the net income
> available for distribution.

> * * *

> IV.A.1.  *Academic Developers.*
> Included in this category are professorial and research faculty, research
> associates, post-doctoral fellows and graduate students.  **The net income
> for distribution normally will be allocated as follows:**
>> a.      **Developers – 45%**
>> b.      College of the Developers – 27.5%
>> c.      Technology Transfer Office – 27.5%
>> d.      Academic faculty developers may designate 0-45% from
>>         their net income total toward funding their scholarly work
>>         (including equipment and supplies purchases and student,
>>         post-doctoral, and assistant wages or support).  If this
>>         election is made, the college and the Technology Transfer

---

[1] There are certain typographical errors in some of the quotations in Pfizer's memorandum, but
they are not relevant to the issues in dispute.
[2] IP Policy at BYU-31-3488, Ex. 203 (emphasis added).
[3] *Id.* at BYU-31-3489.

> Office will jointly and equally match from their allocations a transfer of net income up to 17.5% each.  Then the college will equally match from its remaining allocation up to the remaining 10%.[4]

Dr. Simmons is an academic developer pursuant to the policy.[5]

> 2.      *Dr. Simmons testified that he does not have any agreement with BYU that would*

*have given him personal ownership of the intellectual property at issue:*

> Q.      *Do you have any understanding, written or otherwise, with the University that relates to your COX-2 work that would change what is set forth in the policy [(i.e., BYU's 1992 IP Policy)]?*

> A.      *No.*

**BYU's RESPONSE:  Disputed in part**.  Plaintiffs do not dispute that Pfizer accurately

quoted one portion of Dr. Simmons's deposition testimony.  However, it fails to quote other

relevant portions of Dr. Simmons's testimony relevant to the issues in this motion.  Specifically,

Dr. Simmons testified:

> . . . I originally had this idea, with a long ways to go, in October -- in around October of 1989. That's when I had the idea. I conceived of this; meaning, when I say "conceive," I am talking about the colloquial, ordinary meaning of the word -- I had the germ of the idea that this fragment of a clone that I had isolated, ultimately, I could perhaps, after additional experimentation, perhaps I would be able to find a selective COX-2 NSAID; that that was a possibility.
> **Now, I had that idea. In the laboratory, I was the one who had the idea. The others did not have the idea. I had that idea.[6]**

---

[4] *Id.* at BYU-31-3489 (emphasis added).

[5] D. Simmons Dep., 7-8 Oct 11, at 40:12-14, Ex. 4 ("With regard to inventorship, I supervised it all.  I was involved in it at every step of the way in every part, and I am the only person I know of who was.").

[6] *Id.* at 37:14-25 (emphasis added).

With regard to inventorship, I supervised it all.  I was involved in it at every step of the way in every part, and I am the only person I know of who was.[7]

Who owns the trade secrets that are being asserted in this case; you or the University?
MR. WILLIAMS: Objection; calls for a legal conclusion.
THE WITNESS: That, I couldn't tell you.  But, let's look at "Ownership."
Q. BY MR. DOUGHERTY: I'm sorry, let me make sure I understood your answer. You don't know who owns the trade secrets that are being asserted in this case?
A. Trade secrets are a legal issue. I am going to defer to the University and to my counsel on that. I am not a legal expert on that.[8]

Q. Why are you a plaintiff in this case if you don't own anything?
MR. WILLIAMS: Object to the form of the question. Misstates his testimony.
THE WITNESS: Why am I --
MR. WILLIAMS: Calls for a legal conclusion.
THE WITNESS: I am a plaintiff in this case because I was injured in this case, among other things.
Q. BY MR. DOUGHERTY: Okay.
A. And -- but, I am not an attorney. But I was definitely and have been injured by what I believe to be very dishonest behavior.
Q. Well, there is a big dispute about that, Dr. Simmons.
A. That may be your opinion, but it is my opinion that I have been seriously harmed by Monsanto, and that's why I am -- my understanding why I am a co-plaintiff in this case.[9]

3.      *Dr. Simmons further confirmed that when he went to BYU he was informed that*

*the intellectual property would belong to BYU:*

Q.      *"Do you believe that you personally own any of the rights that are being asserted in this litigation?"*

*MR. WILLIAMS: Objection; calls for a legal conclusion.*

---

[7] *Id.* at 40:12-14.
[8] *Id.* at 48:3-15.
[9] *Id.* at 50:8-51:2.

*THE WITNESS: Yeah, that's a legal conclusion. . . .*
*I do know **when I went to the University, they told me that the intellectual property belong to them***.

[*Id.* at p. 49:17-50:1 (emphasis added).]

**BYU's RESPONSE:  Disputed in part**.  Plaintiffs do not dispute that Pfizer accurately quoted one portion of Dr. Simmons' deposition testimony.  However, it fails to quote other relevant portions of Dr. Simmons' testimony relevant to the issues in this motion.  Specifically, Dr. Simmons testified:

> Q.      You do have a financial interest in the outcome of this litigation?
> A.      Yes, I do.  Yes, I do.[10]

*See also* Response to paragraph 2.

4.      *Dr. Simmons further testified as follows:*

> **Q       BYU owns your work; correct?**
> **A.      Yes; my intellectual property.**

[*Id.* at p. 77:14-15 (emphasis added).]

**BYU's RESPONSE:  Disputed in part**.  *See* Responses to paragraphs 1-3.

5.      *Lynn Astle, the director of BYU's Technology Transfer Office during the relevant time period, also confirmed that BYU owns the intellectual property at issue in this case:*

> Q.      Was there a policy when you arrived in January of 1990 as to who owned any inventive concept between a faculty member and the – and the University?
> A.      I believe these earlier policies stated that **the University did own the intellectual property**. And **that was certainly understood by everyone at the University**.

[*Transcript of Deposition of Lynn Astle ("Astle Dep.") at 16:9-14 (emphasis added).*]

---

[10] *Id.* at 27:14-16.

**BYU's RESPONSE:  Disputed in part.**  Plaintiffs do not dispute that Pfizer accurately quotes one portion of Dr. Astle's deposition.  However, Pfizer omits other portions of his testimony relevant to the issues in this motion.  For example:

> Q.   Do you recall whether or not you had any conversations with Doctor Simmons as to what he should do to protect the intellectual property at BYU prior to the adoption of Exhibit 52?
> A.   We discussed how we should go forward.  You know, looking at -- you know, there are many factors that come into when you actually file patent applications.  We, you know, discussed some of those.  And there's also the matter of maintaining confidentiality so you don't publicly disclose **your** materials.  And we -- I'm sure we reviewed that.  The -- you know, how we should work with the students, and that sort of thing, to maintain confidentiality.[11]

> 6.     *On April 29, 1991, Dr. Simmons is alleged to have transmitted certain "aliquots of the murine COX-1 and COX-2" to Monsanto. [See April 29, 1991 Letter from Dr. Simmons at BYU to Karen Seibert and Jaime Masferrer at Washington University].  When asked who owned the specific materials Dr. Simmons allegedly sent to Monsanto, Lynn Astle—BYU's head of technology transfer—testified as follows:*

> Q.      So, again, as we look back to [Dr. Simmons's April 29, 1991 letter], there's no doubt that the material that's described [in that letter] belonged to Brigham Young *University?*
> . . .
> *THE WITNESS: All right. The – I think **there's no ambiguity there that the intellectual property created within their employment belonged to the University**.*
>
> *Q.      And that also would include works that's performed by students under the direction of a faculty member. Correct?*
> *A.      That's correct.*

*[Transcript of Deposition of Lynn Astle ("Astle Dep.") at 62:17 – 63:5 (emphasis added).]*

---

[11] L. Astle Dep., 17 Feb 09, at 28:13-25, Ex. 29 (emphasis added).

**BYU's RESPONSE:  Disputed in part**.  Plaintiffs do not dispute that Pfizer accurately quotes one portion of Dr. Astle's testimony, but omits other portions relevant to the issues in this motion.  Specifically, Dr. Astle testified:

> Q.  All right.  And do you recall what he said or what you said?
> A.  Specifically, no.  However, I'm sure we had discussions about the importance of ***his* intellectual property and maintaining *his* confidentiality**.
> Q.  And by sending a letter like this with biological materials, is that maintaining the protection of the intellectual property?
> A.  Well, as I look at the date on this, this was, I believe, shortly after we had received the proposed contract from Monsanto, and it had confidentiality terms in it.  And we had received assurances, and discussions had gone very well.  And so we were, you know, acting on reliance of what was contained there that this was covered under those confidentiality agreements -- or provisions in the agreement.[12]

7.    *The First Amended Complaint [Dkt. 445] identifies several alleged COX-2 discoveries and/or trade secrets, including "COX-2 mRNA, nucleic acid sequences, mRNA samples containing COX-2 mRNA, complete COX-1 and COX-2 clones, assays for determining COX-2 selectivity" [FAC ¶¶ 447], "COX-2 gene as described by its nucleic acid sequence," "COX-2 enzyme as described by its amino acid sequence," "[a]ntibodies that bind to the COX-2 enzyme, but do not bind to the COX-1 enzyme," "[a] cell line expressing the COX-2 enzyme," "[t]he method for using the COX-2 gene, enzyme, or cell line for the purpose of construing testing system to identify potential COX-2 selective NSAIDs," and "[a] method of treating pain, inflammation, and fever by selectively inhibiting COX-2 activity in a human host." [Id. ¶ 107].*

**BYU's RESPONSE:**  BYU does not dispute that Pfizer has accurately quoted certain portions of the First Amended Complaint concerning some trade secrets that Pfizer

---

[12] *Id.* at 41:25-42:14 (emphasis added).

misappropriated and inventions that it failed to inform BYU were patentable.  However, Plaintiffs dispute that these selective quotations somehow limit or define the entirety of information at issue in the case.  *See, e.g.,* Plaintiffs' Amended Second Supplemental Response to Defendants' Interrogatory No. 8 (identifying trade secrets), Ex. 188; A. Fellmeth Expert Rpt., 18 Feb 11, Ex. 26; D. Simmons Amended and Supplemental Expert Rpt., 10 Jun 11, Ex. 57; K. Ricker Dep., 2-3 Jun 11, Ex. 192; V. Norviel Expert Rpt., 18 Feb 11, Ex. 6 and V. Norviel Rebuttal Expert Rpt., 26 Aug 11, Ex. 241 (identifying patents that should have been filed).

8.    *To the extent either of the Plaintiffs actually possessed the materials described in FAC Paragraph 107, BYU, and not Dr. Simmons, owns the alleged:*

a.    *COX-2 mRNA;*

b.    *nucleic acid sequences;*

c.    *mRNA samples containing COX-2 mRNA;*

d.    *complete COX-1 and COX-2 clones;*

e.    *assays for determining COX-2 selectivity;*

f.    *COX-2 gene as described by its nucleic acid sequence;*

g.    *COX-2 enzyme as described by its amino acid sequence;*

h.    *antibodies that bind to the COX-2 enzyme, but do not bind to the COX-1 enzyme;*

i.    *cell line expressing the COX-2 enzyme;*

j.    *method for using the COX-2 gene, enzyme, or cell line for the purpose of construing testing system to identify potential COX-2 selective NSAIDs; and*

k.    *method of treating pain, inflammation, and fever by selectively inhibiting COX-2 activity in a human host.*

**BYU's RESPONSE:  Disputed.**  Dr. Simmons undisputedly possessed the items listed in paragraph 107 of the First Amended Complaint as he personally participated in and supervised the creation and development of these items.[13]  Moreover, Pfizer's use of the term "owns" is ambiguous in this context as the case law specifically states that "one 'owns' a trade secret when one knows of it, as long as it remains a secret."  *DTM Research, LLC v. AT&T Corp.*[14] *See also* Response to Paragraph 7.

9.      *BYU, and not Dr. Simmons, also owns any other COX-2 materials that allegedly were provided to Monsanto and/or misappropriated by Monsanto in connection with this case. [See, e.g., The BYU Intellectual Property and Creative Works Policy].*

**BYU's RESPONSE:  Disputed.**  *See* Response to Paragraph 8.

## ADDITIONAL MATERIAL FACTS

1.      Whenever Dr. Simmons discovered something in his laboratory during the collaboration, he shared the discovery with Monsanto by facsimile, frequent telephone calls, or physical delivery of confidential information.[15]

2.      Dr. Simmons called Monsanto scientists approximately 60 times during the collaboration, and received a similar number of calls from Monsanto scientists.[16]

3.      During these phone calls, Dr. Simmons disclosed additional trade secrets and Confidential Information to Monsanto, including test data, instruction on how to use Dr. Simmons' COX-2 antibodies for immunoprecipitation, discussion of Dr. Simmons' studies on

---

[13] D. Simmons Dep., 7-8 Oct 11, at 40:12-14, Ex. 4 ("With regard to inventorship, I supervised it all.  I was involved in it at every step of the way in every part, and I am the only person I know of who was.")
[14] 245 F.3d 327, 332 (4th Cir. 2001).
[15] D. Simmons Decl., 17 Jun 11, ¶ 7, Ex. 5.
[16] *Id.* ¶ 15.

mouse COX-2 expression and COX-2 half-life, the fact that dexamethasone blocked COX-2, and

information concerning use of a two-cell assay system.[17]

4.      Karen Siebert testified as follows:

> Q.   Okay.   There's -- have I exhausted your recollection of any
> other **phone calls with Dr. Simmons during the 1991-1992
> period**?
> A.   Well, again, with the caveat, it's in generalities.   We began
> using some of the reagents.   Dr. Simmons, I most particularly
> remember, after I got to Monsanto, started to work with folks who
> were really skilled in the art.   **And we had questions around --
> technical questions around the constructs,** and we had -- we had
> a fair amount of trouble getting some of these reagents to work in
> my hands and in the group, **so we would call for clarification,
> make sure that we were interpreting what we had correctly,
> and whatnot.**   There was also some exchange of information
> about assays that we had provided to Dr. Simmons around, I think
> it was, prostaglandin measurements and how to conduct radio-
> immuno assays, sent some reagents to him in that regard.[18]

5.      On 10 June 1991, Dr. Seibert sent Dr. Simmons a fax which described the value

of the biological tools Dr. Simmons had provided:   "Dan—a quick story I want to finish and **now

we have the tools**; … We always believed we had the wrong clone to see regulation—I hope

**your** COX II sees the change…."[19]

6.      For years, Defendants claimed that the intellectual property that Dr. Simmons

provided Monsanto did not work.[20]

7.      An article Dr. Seibert submitted for publication (but not published) to the

scientific journal, Nature, in January 1994 confirms that Monsanto successfully used Dr.

---

[17] *Id.* ¶¶ 16-21.
[18] K. Seibert Dep., 1-3 Jun 10, at 146:9-147:2, Ex. 3 (emphasis added).
[19] Fax from K. Seibert to D. Simmons, 10 Jun 91, BYU-08-0822, Ex. 30 (emphasis added).
[20] *See, e.g.,* Defendants' Answer to First Am. Compl., Dkt. No. 471 ("Answer") ¶ 167
("Defendants admit that Dr. Simmons and Dr. Seibert had a discussion in which Dr. Seibert
explained that Dr. Simmons's clones had not worked in her experiments.")

Simmons's COX-1 and COX-2 clones to create a recombinant enzyme assay that was used to show that a particular compound (NS-398) selectivity inhibited COX-2 without inhibiting COX-1.[21]

      8.      The article states in part:

> The coding regions of mouse COX-1 and COX-2 (gifts of Dr. Daniel Simmons, Brigham Young University) were subcloned in the baculovirus expression vector PVL1393 (Invitrogen)…[22]

      9.      However, Monsanto's only *published* article referring to the same experiment described in the *Nature* manuscript mentioned above, uses the identical description of the experiment, but deletes the reference to Dr. Simmons as the source of the mouse COX-1 and COX-2 clones.[23]

      10.      Plaintiffs' damages calculations are increased by consideration of factors related to Pfizer's fraudulent claim that Monsanto—not Dr. Simmons—discovered COX-2, including failure to inform Plaintiffs of method/blocking patents that would require all entities selling COX-2 drugs to take a license from Plaintiffs.[24]

      11.      Defendants' Answer to the First Amended Complaint states as follows:  "The evidence will establish, however, that Dr. Simmons provided certain reagents without any expectation of confidentiality, that he published the sequence of cyclooxygenase-2 in chicken for

---

[21] Ltr. to Nature Magazine from K. Seibert w/enclosed manuscript*, 5 Jan 94, PFC01215344-362 at 354, Ex. 173.

[22] *Id.*

[23] K. Seibert, et al., *Pharmacological and Biochemical Demonstration of the Role of Cyclooxygenase 2 in Inflammation*, Proc. Nat'l. Acad. Sci., Vol. 91, pp. 12013-12017 (Dec. 1994), Needle-P 10000004824-828, at 825, Ex. 140.

[24] R. Gering Expert Rpt., 18 Feb 11, at 18-20, 86, Ex. 8.

the world to see, and in any event, that Celebrex was not tested using **his cyclooxygenase-2 reagents.**"[25]

12.  "Defendants admit that at the meeting in Skokie, Illinois, Searle/1933 Monsanto gave BYU limited access to Dr. Seibert's notebooks, which demonstrated that Searle/1933 Monsanto had not used **Dr. Simmons's research and tools** in developing Celebrex."[26]

13.  Defendants' Answer fails to allege that Dr. Simmons cannot assert the claims he has asserted in this case due to his alleged lack of ownership of the intellectual property at issue.[27]

---

[25] Answer at 3.
[26] *Id.* ¶ 165 (emphasis added).
[27] *See generally id.*

## ARGUMENT

### I.    Dr. Simmons Has a Valid Claim for Misappropriation of Trade Secrets[28]

Pfizer argues that Dr. Simmons cannot assert his trade secret claim because "he cannot establish ownership of the materials in question."[29]  Pfizer relies on dubious case law to support its position.[30]  However, Pfizer does not analyze the language of the Utah Uniform Trade Secrets Act ("Trade Secrets Act") itself, and its cases do not analyze the critical issue before the Court. The Trade Secrets Act and case law that addresses the issue presented in the motion make clear that fee simple ownership of a trade secret is not an element of the claim, and that Dr. Simmons has standing to pursue his trade secret claim.

The Utah Supreme Court has clearly explained:

> When interpreting statutes, we determine the statute's meaning by first looking to the statute's plain language, and give effect to the plain language unless the language is ambiguous.  Also, the best evidence of the true intent and purpose of the Legislature in enacting the Act is the plain language of the Act.[31]

Nowhere in the Trade Secrets Act is there any requirement that a party be an "owner" of a trade secret in order to bring a claim for misappropriation.[32]  In fact, the concept of ownership never appears in the statute.  Rather, the statute provides:  "[a]ctual or threatened misappropriation may

---

[28] The first section of Pfizer's memo in support was devoted to arguing that Dr. Simmons does not own the intellectual property at issue in the lawsuit.  As set forth in each of the subsequent sections, Pfizer's assertions do not affect Dr. Simmons' ability to pursue his claims.
[29] Pfizer Mem. Supp. at 2.
[30] For example, Pfizer relies on *Greenberg v. Croydon Plastics Co., Inc.*, 378 F. Supp. 806, 811 (D.C. Pa. 1974), for the argument that ownership is an element of a trade secret claim.  However, *Greenberg* was decided before enactment of the Uniform Trade Secrets Act, and is therefore unpersuasive and unhelpful to the present analysis.
[31] *American Fork City v. Pena-Flores*, 2002 UT 131, ¶ 9 (internal citations and quotations omitted).
[32] *See* Utah Code Ann. § 13-24-1 *et seq*.

be enjoined;" "a **complainant** is entitled to recover damages for misappropriation;" and "the **damages caused by misappropriation may be measured** by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use."[33] Thus, the plain language of the statute does not require or limit relief solely to "owners" of trade secrets.

The Fourth Circuit explains this issue in *DTM Research, LLC v. AT&T Corp.*,[34] a case interpreting the Maryland Uniform Trade Secrets Act, which is materially identical to Utah's Trade Secrets Act.  In *DTM*, the District Court certified two questions to the Circuit pursuant to 28 U.S.C. §1292(b).  The first question was whether the District Court:

> correctly h[e]ld that **fee simple ownership is not an element of** any of the claims set forth in Plaintiff DTM's Complaint against Defendant AT & T for **violation of the Maryland Trade Secrets Act** (Count I), violation of a confidentiality agreement between the parties (Count II), quantum meruit (Count III), and unjust enrichment (Count IV)[35]

The Fourth Circuit upheld this finding that ownership is not an element of a trade secret claim because the "proprietary aspect of a trade secret flows, not from the knowledge itself, but from its secrecy."[36]  The Fourth Circuit further notes:

> As a consequence, **one "owns" a trade secret when one knows of it, as long as it remains a secret.  Thus, one who possesses non-disclosed knowledge may demand remedies as provided by the Act** against those who "misappropriate" the knowledge.[37]

---

[33] *Id.* §§ 13-24-3(1), 13-24-4(1) (emphasis added).
[34] 245 F.3d 327 (4th Cir. 2001).
[35] *Id.* at 330 (emphasis added).
[36] *Id.* at 332.
[37] *Id.* (emphasis added).

Other courts have followed the well-reasoned opinion in *DTM* and determined that non-owners of trade secrets have standing to assert misappropriation claims.[38]

It is beyond dispute that Dr. Simmons possessed and was personally involved in the development of all information that Plaintiffs claim as trade secrets. In fact, the information was developed in Dr. Simmons's laboratory under his direction and supervision.[39] Accordingly, he can state a claim for Pfizer's misappropriation of the trade secrets at issue in this case.

None of the cases that Pfizer cites contain the careful and thorough analysis of the Fourth Circuit. Moreover, many of Pfizer's cited cases are not helpful or relevant at all. For example, Pfizer cites *RMS Software*[40] to argue that ownership of trade secrets is essential to standing. *RMS* interpreted Colorado's version of the Uniform Trade Secrets Act, but that statute is materially different from the Uniform Act and Utah's Trade Secrets Act. Specifically, as quoted by the *RMS* Court, the Colorado Act provides: "To be a 'trade secret' ***the owner*** thereof must have taken measures to prevent the secret from becoming available to persons ***other than those selected by the owner*** to have access thereto for limited purposes."[41] The Court then held that "the plain language of the act contemplates that the 'owner' of a trade secret is responsible for preventing its unauthorized disclosure," and because the plaintiff was not an owner it had no standing.[42] Utah's version of the Trade Secrets Act does not contain these references to owners,

---

[38] *See, e.g., Parking Co. v. R.I. Airport Corp.*, No. Civ. A. P.B.2004-4189, 2005 WL 419827, at *3 (R.I. Super. Ct. 2005) ("the Act does not require ownership of the property in order to have trade secret protection thereof").

[39] BYU Dispute with Pfizer Statement of Fact No. 2, *supra.*

[40] *RMS Software Dev., Inc. v. LCS, Inc.*, No. 01-96-00824-CV, 1998 WL 74245, at *4 (Tex. Ct. App. 1998).

[41] *RMS Software*, 1998 WL 74245, at *4 (quoting Colo Rev. Stat. Ann. § 7-74-102(4) (emphasis in original).

[42] *Id.*

and therefore, the entire basis of the *RMS* opinion cannot apply to the Utah Act or Dr. Simmons's standing.

Similarly, Pfizer cites a line of California cases for the proposition that a prima facie claim for misappropriation of trade secrets requires, among other things, that the plaintiff own a trade secret.  However, these cases simply assume that ownership is an element of a trade secret claim.  They do not analyze the issue in the thorough way that *DRM* case did, do not address the statutory language, and are therefore not helpful to the Court's analysis.[43]  Pfizer also cites a 1974 case from the Eastern District of Pennsylvania to support its argument.[44]  However, the Uniform Trade Secrets Act was not published by the Uniform Law Commission until 1979.[45]  Accordingly, this 1974 case is of little to no value for the Court.

It is beyond dispute that Dr. Simmons possessed the trade secrets at issue as he was intimately involved in their creation and development.  He has also been damaged by their misappropriation.  Accordingly, Dr. Simmons has standing to assert a claim for Pfizer's misappropriation of those trade secrets.

## II.    Dr. Simmons Has a Valid Claim for Unjust Enrichment

---

[43] As set forth in the following parentheticals, these cases also are distinguishable on other grounds.  *See Cytodyn, Inc. v. Amerimmune Pharm.*, 160 Cal. App. 4th 288, 297-98 (2008) ("It is impossible to read CytoDyn's complaint without concluding that the sum and substance of its lawsuit was the alleged misappropriation of its patents and trademarks."); *O'Reilly v. Musk,*, No. H035511, 2011 WL 1044631, at *5 (Cal. Ct. App. 2011) (must not be cited or relied on by a court or a party in any other action pursuant to Rule 8.1115, Cal. Rules of Court); *see also Surgidev Corp. v. Eye Tech., Inc.,* 648 F. Supp. 661 (D. Minn. 1986) (assuming without analysis that ownership is element of claim under California and Minnesota law); *Venango River Corp. v. Nipsco Indus.*, No. 92 C 2412, 1994 WL 702759 (N.D. Ill. 1994) (requiring ownership for standing without analysis language of Trade Secrets Act).
[44] *See Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806 (E.D. Pa. 1974).
[45] *See* http://www.nccusl.org/Act.aspx?title=Trade%20Secrets%20Act.

Pfizer asserts that "[s]ince Dr. Simmons did not own the materials in question, he cannot make a valid claim for unjust enrichment based on transfer of those materials to Monsanto."[46] This argument must be rejected.  Pfizer cites both Missouri and Utah law concerning this issue. While Plaintiffs believe that Utah law should govern this analysis, under either state's law, Dr. Simmons has a valid claim for unjust enrichment.

In Utah, a claim of unjust enrichment requires showing**:**  "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[47]  There is no requirement whatsoever that the person who confers the benefit must have some ownership interest in tangible or intangible property.  In fact, an unjust enrichment claim often centers around the provision of services.  For example, the Utah Court of Appeals found that a plaintiff who "participated in producing the second heater that was accepted," had "clearly conferred" a benefit sufficient to establish the first element of an unjust enrichment claim.[48]

The First Amended Complaint expressly claims that Dr. Simmons and BYU:

> conferred a great benefit upon Monsanto by, among other things, providing Monsanto with **the research, knowledge, and actual biological material** from which Monsanto learned of the existence of COX-2 and the ability to develop a testing system that would lead to the discovery of COX-2 selective NSAIDs.[49]

---

[46]Pfizer Mem. Supp. at 3.

[47] *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998).

[48] *E & M Sales West, Inc. v. Diversified Metal Prods., Inc.*, 221 P.3d 838, 844 (Utah Ct. App. 2009); *see also Bailey-Allen Co., Inc. v. Kurzet*, 945 P.2d 180, 192 (Utah Ct. App. 1997) (comparing value of services provided to determine unjust enrichment damages).

[49] FAC ¶ 419 (emphasis added).  Again, Dr. Simmons is expressly included in the definition of Brigham Young University throughout the FAC.

Monsanto has admitted that it received most of those benefits directly from Dr. Simmons. Specifically, Karen Seibert testified that at Monsanto she had phone discussions with Dr. Simmons because: "**we had** . . . **technical questions around the constructs**, and we had -- we had a fair amount of trouble getting some of these reagents to work in my hands and in the group, **so we would call for clarification, make sure that we were interpreting what we had correctly, and whatnot.**"[50] Even under Pfizer's unsupported theory that Dr. Simmons must have fee simple ownership of all of the materials and trade secrets at issue in the case, Dr. Simmons still has a viable claim for unjust enrichment based on his provision of valuable knowledge, scientific expertise, and biological materials to Pfizer, which Pfizer readily accepted and realized, and which would be unjust to deny Dr. Simmons compensation for those benefits.[51] Under these circumstances, Pfizer's motion for summary judgment against Dr. Simmons unjust enrichment claim must be denied.

Similarly, Dr. Simmons's and BYU's provision of biological materials—regardless of who had fee simple ownership of the materials—unjustly enriched Pfizer at Dr. Simmons expense. Pfizer claims that Dr. Simmons has no claim under Missouri law, which requires "that the enrichment was at the expense of the plaintiff," because Dr. Simmons was not the fee simple owner of the materials, and therefore Pfizer's unjust enrichment could not have been at Dr. Simmons' expense.[52] This facile argument is unsupportable under the very BYU IP Policy upon which Pfizer so heavily relies. The policy provides that Dr. Simmons is entitled to a distribution of "net income" from Pfizer. Specifically, the policy states that "the net income for distribution

---

[50] SOF ¶ 4.

[51] SOF ¶ 1-9.

[52] Pfizer Mem. Supp. at 3-4 (quoting *Homecomings Fin. Network, Inc. v. Bown*, 343 S.W.3d 681, 685 (Mo. Ct. App. 2011)).

normally will be allocated" at 45% to developers like Dr. Simmons.[53]  Thus, Pfizer's unjust

enrichment from the benefits provided by BYU and Dr. Simmons—regardless of who owned

title to the materials—was directly at the expense of Dr. Simmons because he was entitled to

some of the payments that Pfizer should have made for those benefits.

## III.   Dr. Simmons Has a Valid Claim for Breach of Fiduciary Duty[54]

Pfizer argues that because "Dr. Simmons has not alleged and cannot establish that

Monsanto's alleged breaches injured him directly," i.e., "Dr. Simmons cannot base a breach of

fiduciary duty claim on intellectual property owned by BYU."[55]  This analysis is not supported

by the undisputed facts.  Specifically, Dr. Simmons was directly harmed by Pfizer's breach of

fiduciary duty for at least two reasons.  First, Dr. Simmons has a claim to a portion of "[a]ll

revenues derived from the intellectual property" at issue in this case and may receive up to 45%

of net income as described in the BYU IP Policy.[56]  Pfizer's failure to compensate for the

intellectual property at issue in this case directly causes Dr. Simmons harm by depriving him of

his portion of those funds.  Second, Dr. Simmons's reputation was severely damaged by Pfizer's

breaches of fiduciary duty.  Through its breaches of fiduciary duty and other wrongdoing at issue

in the case, Pfizer systematically deprived Dr. Simmons of the recognition and attribution for the

significant discoveries that he made.[57]  As Dr. Simmons aptly summarized:  "But I was

---

[53] BYU Dispute with Pfizer Statement of Fact No. ¶ 1.

[54] Pfizer does not contest, for purposes of this motion, Dr. Simmons's status as an inventor or argue that Dr. Simmons is not owed a fiduciary duty.  Accordingly, Plaintiffs have not addressed those arguments, but believe that it is clear that Dr. Simmons is an inventor and was owed a fiduciary duty.  The case law and arguments concerning the fiduciary duties at issue in the case are set forth in detail in Plaintiffs' prior briefing.  *See* Dkt. Nos. 700, 745.

[55] Pfizer Mem. Supp. at 4-6.

[56] BYU Dispute with Pfizer Statement of Fact No. ¶ 1.

[57] SOF ¶¶ 6-10.

definitely and have been injured by what I believe to be very dishonest behavior."[58]   Based on

these facts, Dr. Simmons has cognizable injury caused by Pfizer's breach of fiduciary duty.

**IV.     Dr. Simmons Has Valid Fraud and Negligent Misrepresentation Claims**

Pfizer again asserts that Dr. Simmons cannot state a fraud claim because "Dr. Simmons

did not own the COX-2 materials allegedly misappropriated and was not entitled to any portion

of the damages," and because "Dr. Simmons was not a party to the Research Agreement and was

not entitled to payment pursuant to that contract," or "to receive ownership of any of the

developments that may have resulted from the Research Agreement."[59]   It is difficult to

understand how Pfizer can assert this argument given the fact that Dr. Simmons stood to benefit

from any and all compensation that Pfizer should have paid, or will pay as damages, under the

Agreement or otherwise.   As set forth in detail above, Dr. Simmons stands to receive up to 45%

of net income from the intellectual property at issue in the case.   Under Pfizer's own analysis,

Dr. Simmons therefore has valid fraud and negligent misrepresentation claims.

Moreover, several of the specific misrepresentations identified in the First Amended

Complaint were made to, or about, Dr. Simmons.   For example, (1) "Monsanto personnel

misrepresented to Dr. Simmons that he should not get a patent on his COX-2 technology;" (2)

"Dr. Needleman, on Monsanto's behalf, misrepresented to Dr. Simmons that Monsanto was

giving Brigham Young University the same agreement Monsanto had given Dr. Needleman;" (3)

"Dr. Needleman misrepresented to Dr. Simmons that everything relating to the Project and the

termination of the Agreement had been done honestly;" (4) "Dr. Needleman misrepresented to

Dr. Simmons that he and his laboratory had discovered COX-2 before Dr. Simmons;" (5)

---

[58] BYU Dispute with Pfizer Statement of Fact No. 2, *supra*.
[59] Pfizer Mem. Supp. at 7.

"Monsanto directly misrepresented, or fraudulently allowed the press to misrepresent, that Dr. Needleman, not Dr. Simmons, discovered COX-2 and conceived the concept of COX-2 selective NSAIDs;" and (6) "Pfizer and its counsel have misrepresented that Dr. Simmons and Brigham Young University's Confidential Information did not work."[60]

These misrepresentations had a significant impact on Dr. Simmons who undisputedly developed the intellectual property at issue in the case—regardless of the fee simple ownership of the property.  For example, Pfizer was able to leverage its fraudulent claim that it had discovered COX-2 into a significant head start and substantial additional revenues from the development and sale of Celebrex without paying any royalties or compensation to Plaintiffs.[61] Pfizer failed to inform Plaintiffs of method/blocking patents that would require all entities selling COX-2 drugs to take a license from Plaintiffs.[62]  That recognition and revenues from such licenses would have directly benefited Dr. Simmons under the BYU I P Policy.  Accordingly, Dr. Simmons has standing to assert his fraud and negligent misrepresentation claims.

---

[60] FAC ¶ 425.

[61] *See* BYU's Opp. to Pfizer's Mot. No. 4, at 11 ("Neither Dr. Galbraith nor anyone at DuPont (or anywhere else) was in a position to demonstrate that DuP-697 selectively inhibited COX-2 and such teachings are not found in the documents Pfizer describes as prior art." (citing SOF ¶¶ 8-21, 62-77)).

[62] SOF ¶ 10.

**CONCLUSION**

Based on all of the foregoing, Pfizer's arguments that Dr. Simmons cannot pursue his claims because he does not "own" the intellectual property at issue in the case should be rejected, and Pfizer's motion denied in its entirety.

RESPECTFULLY SUBMITTED this 22d day of December, 2011.

RAY QUINNEY & NEBEKER P.C.


By____/s/ Samuel C. Straight_____
    James S. Jardine
    Mark M. Bettilyon
    Arthur B. Berger
    Samuel C. Straight

BEUS GILBERT PLLC
    Leo R. Beus
    L. Richard Williams
    Mark C. Dangerfield
    Adam C. Anderson
    Keith C. Ricker


OFFICE OF THE GENERAL COUNSEL
    David B. Thomas
    BRIGHAM YOUNG UNIVERSITY

10

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd of December, 2011, I electronically filed the foregoing **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: OWNERSHIP OF THE COX-2 MATERIALS (BYU's OPPOSITION TO DEFENDANTS' MOTION NO. 10)** using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Richard O'Malley, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL  60603<br>romalley@sidley.com | John Caleb Dougherty<br>Richard T. Mulloy<br>Kathy J. Owen<br>DLA PIPER<br>6225 Smith Avenue<br>Baltimore, MD  21209<br>john.dougherty@dlapiper.com<br>richard.mulloy@dlapiper.com<br>kathy.owen@dlapiper.com |
| Brent O. Hatch<br>Phillip J. Russell<br>Kevin W. Bates<br>Hatch, James & Dodge, P.C.<br>10 W. Broadway, Ste. 400<br>Salt Lake City, UT  84101<br>bhatch@hjdlaw.com<br>prussell@hjdlaw.com<br>kbates@hjdlaw.com | William F. Lee<br>Emily R. Whelan<br>WilmerHale<br>60 State Street<br>Boston, MA 02109<br>william.lee@wilmerhale.com<br>emily.whelan@wilmerhale.com |
| Amy K. Wigmore<br>Amanda L. Major<br>James L. Quarles III<br>Wilmer Cutler Pickering Hale & Dorr LLP<br>1875 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20006<br>amy.wigmore@wilmerhale.com<br>amanda.major@wilmerhale.com<br>james.quarles@wilmerhale.com | Andrea Weiss Jeffries<br>Donald W. Ward<br>Wilmer Cutler Pickering Hale & Dorr LLP<br>350 South Grand Avenue, Suite 2100<br>Los Angeles, CA 90071<br>andrea.jeffries@wilmerhale.com<br>bill.ward@wilmerhale.com |

_/s/ Brandy Sears_

1161761