IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and Dr. DANIEL L. SIMMONS,<br><br>    Plaintiffs,<br><br>vs.<br><br>PFIZER, INC., et al.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER ON PFIZER'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT NOS. 3 AND 11<br><br><br><br>Case No. 2:06-CV-890 TS |

This matter is before the Court on Pfizer's Motions for Partial Summary Judgment Nos. 3 and 11.

I.  BACKGROUND

The present dispute centers around Plaintiffs BYU and Dr. Daniel Simmons (collectively "BYU") and Defendants Pfizer Inc., G.D. Searle & Company, G.D. Searle LLC, Monsanto Company, and Pharmacia Corporation's (collectively "Pfizer") involvement in the discovery and development of COX-2 selective drugs.

COX, or cyclooxygenase, is an enzyme which produces molecules called prostaglandins, which are responsible for inflammation, pain, and fever.  Prostaglandins also have beneficial effects, including promoting protective mucus secretion in the stomach.  Non-steroidal anti-inflammatory drugs, or NSAIDs, operate by binding to COX and blocking it from producing prostaglandins.  Because NSAIDs indiscriminately block the production of all prostaglandins—thereby eliminating not only the negative effects of pain, inflamation, and fever, but also the beneficial effects of mucus secretion in the stomach—use of NSAIDs can lead to the development of potentially harmful NSAID-induced ulcers.  Because of these negative side-effects, drug companies and researchers have searched for NSAID alternatives.

According to BYU's First Amended Complaint (the "Complaint"), prior to BYU's research on COX-2, researchers understood that COX acted differently under varying physiological conditions.  Generally, COX produces a constant level of prostaglandins, but in response to a stimulus like injury or infection, the production of these enzymes spikes.  Although researchers knew that COX behaved this way, researchers had not derived a cogent theory as to why COX responded differently to certain stimulus.

BYU alleges that in late 1989 and into early 1990, Plaintiff Dr. Simmons discovered a novel COX, now known as COX-2, which helped explain COX's varying behavior.  Through Dr. Simmons' research, scientists and the pharmacology community now understand that one COX enzyme (COX-1) produces the constant or "constitutive" level of prostaglandins, while a second COX enzyme (COX-2) produces the "inducible" level or prostaglandins resulting from stimulus.

Plaintiffs allege that this discovery opened the possibility of developing an NSAID that targeted only the COX-2 enzyme, thereby eliminating the negative side-effects associated with COX-1.

BYU alleges that Dr. Simmons understood the significance of this discovery and its value to the pharmacology industry. In hopes of cultivating this value, Dr. Simmons sought out an industrial partner to further research COX-2 and explore the possibility of developing a COX-2 selective NSAID. In the early 1990s, Dr. Simmons met with representatives from Monsanto. After negotiations and extensive discussions concerning the potential of COX-2, Plaintiffs entered into a Collaborative Research Agreement (the "Research Agreement" or "Agreement") with Monsanto to research COX-2 and a COX-2 selective NSAID.

The parties worked together under the Agreement for roughly one year when, according to BYU, Monsanto wrongfully cancelled the Agreement in order to misappropriate Dr. Simmons's research. Plaintiffs allege that with this misappropriated research, Monsanto was able to develop and patent a COX-2 selective NSAID without having to share any of the proceeds with BYU.[1]

In its Complaint, BYU has alleged a breach of various provisions in the Research Agreement. This Order will consider Pfizer's motions for summary judgment on two of those claims.

---

[1] As set forth in BYU's Complaint, Monsanto acquired Searle Co. in 1985, making Searle Co. its pharmaceutical unit. In or around 1998, Monsanto and Pfizer entered into a joint venture to market Celebrex. In April 2000, Monsanto/Searle merged with Pharmacia & Upjohn, Inc. to form Pharmacia. In 2003, Pharmacia merged with Pfizer, leaving Pfizer in control of Pharmacia and Searle. BYU and Monsanto were the original parties to the Research Agreement. However, for clarity's sake the Defendant parties will always be referred to as Pfizer from this point forward, except where the order quotes directly from the Agreement.

## II. STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[2] The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[3] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[4] "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[5]

## III. PFIZER PARTIAL SUMMARY JUDGMENT #3 (PARAGRAPH 3.3)

In this Motion, Pfizer moves the Court to grant summary judgment on BYU's breach of paragraph 3.3 claims. Paragraph 3.3 of the Agreement states: "In the event that MONSANTO determines that research results obtained from the PROJECT are patentable, it shall notify UNIVERSITY and thereafter indicate to UNIVERSITY its interest in a license under such prospective patents."[6] BYU claims that Pfizer breached that paragraph either by (1) failing to review BYU's work for patentability or (2) failing to notify BYU that some of the Project output

---

[2] *See* Fed.R.Civ.P. 56(a).

[3] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[4] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] Docket No. 779 Ex. 10, at 3.

was patentable. Pfizer responds that 3.3 imposes no duty of review and that BYU has not shown that Pfizer ever determined anything from the Project was patentable.

BYU first notes that in its October 4, 2011 Order, this Court stated that "under the paragraphs at issue in this Motion, Pfizer had a duty to notify BYU of patentable research results obtained from the Project."[7] This statement was not based on a detailed analysis of the 3.3 language, and thus does not constrain the Court when directly addressing 3.3. Furthermore, this statement says nothing about a duty to *review*, only a duty to notify. Accordingly, the statement does not resolve the present issue.

The Court thus turns to the language of 3.3. "In the event that" is a common idiom that means, in less terse form, "if"—if the event occurs, then some result must follow. Focusing only on these words, the Court would be hard-pressed to find that "if Monsanto determined" means "Monsanto must determine." However, 3.3 is not to be read in a vacuum.[8] And, when read in conjunction with the entire Agreement, the Court finds that holding that 3.3 does not impose a duty to review Project output for patentability would produce absurd results.

Were the Court to interpret 3.3 to impose no duty to review, the contract would require BYU to send reports to Pfizer, but would not require Pfizer to review them. Section 3.2 of the contract gives Pfizer a paid-up license on any results from the Project that are not patented. Sections 3.4 through 3.6 require that BYU allow Pfizer to negotiate for a license on patented

---

[7]Docket No. 704, at 20.

[8]*See Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003) (per curiam) ("The terms of a contract are read as a whole to determine the intention of the parties.").

inventions.  The combination of these sections presents Pfizer with two options: (1) ignore the reports BYU sends, conduct no patentability review, and wind up with a pre-paid license to everything or (2) do the work required for a patentability review, inform BYU, and then negotiate and pay for a license on patented material.  Under Missouri law,[9] "an absurdity is a result which is contrary to reason or which 'could not be attributed to a man in his right senses.'"[10]  BYU, in its right senses, simply could not have intended to create a structure where the more Pfizer wants, the less it has to do.  This is especially the case in light of the several sections in the Research Agreement that set out the process for patenting and license negotiations, all of which become senseless if Pfizer can take the much easier route of doing nothing to obtain licenses.  The Court therefore finds that Pfizer's interpretation of 3.3 would lead to absurd results.

When interpreting contracts, a court must "attempt to avoid absurd results."[11]  Here, there are only two interpretive options: duty or no duty.  To hold there is no duty would lead to an absurd result.  Accordingly, the Court holds that paragraph 3.3 imposes on Pfizer a duty to

---

[9]As the Court noted in its October 4, 2011 Order, the Research Agreement is to be interpreted under Missouri law.  Docket No. 704, at 9.

[10]*Tumlinson v. Norfolk & W. Ry. Co.*, 775 S.W.2d 251, 253 (Mo. Ct. App. 1989) (quoting *State v. Hayes*, 81 Mo. 574, 585 (Mo. 1884)).

[11]*Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 536 (Mo. Ct. App. 2000).

review Project output for patentability.[12]  In light of this holding, the Court will deny Pfizer's Motion for Summary Judgment on BYU's duty to review arguments.

BYU has also alleged that Pfizer breached 3.3 by failing to notify BYU that it had reached a patentability determination.  Pfizer has moved for summary judgment on this claim because, Pfizer contends, it never determined any Project output was patentable.  The Court must therefore determine whether BYU has shown any facts demonstrating that Pfizer did make a patentability determination.

An inventor can patent a "new and useful process" or "any new and useful improvement thereof" as long as the invention is not found in prior art.[13]  Thus, the question becomes whether, at any point, Pfizer decided that any Project results were (1) "new and useful" or a "new and useful improvement" on an existing invention and (2) not revealed in the prior art.[14]  In addressing this question, the important consideration is not whether the Project output was

---

[12]The Court is aware that upon a finding of ambiguity, the jury and not the court becomes responsible for determining meaning under Missouri law. *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 16 (Mo. Ct. App. 2010) (citations omitted) ("Upon a finding of ambiguity, extrinsic evidence may be used to ascertain the intent of the parties as to the apparent meaning of the contract terms.  However, when ambiguity is found, it becomes the jury's responsibility to ascertain the intent of the parties and summary judgment is inappropriate.").  The court is further aware that "[e]ven an apparently unambiguous contract may be rendered ambiguous and open to construction if its words, taken literally, lead to absurdity or illegality when applied to the facts." *Tumlinson*, 775 S.W.2d at 252 (quoting *Sanders v. Gen. Motors Acceptance Corp.*, 185 S.E. 180, 182 (S.C. 1936)).   Thus, the Court could hold that based on its absurdity, this provision is ambiguous and its meaning must be determined by a jury.  However, here, by ruling out one option, only one interpretation remains possible—that a duty exists.  The Court could not hold that one result is absurd but then allow the jury to choose between the two results.

[13]35 U.S.C. §§ 101-103.

[14]*Id.*

actually patentable, but whether Pfizer "determined" it was. Pfizer has based its Motion on the premise that BYU has failed to show any facts demonstrating that Pfizer made a patentability determination. The Court disagrees.

BYU has put forward expert testimony indicating that those at Pfizer who received information about the project output would have known it was patentable. Vern Norviel, BYU's patent law expert, testified as follows:

> Q: Now, are you aware of whether Monsanto ever made any determination that any of Dr. Simmons' claimed inventions were patentable?
> A: . . . I do believe that any rational scientist like Dr. Needleman—and he's a very sophisticated guy—would read this research report and say, wow, this is the type of thing that you ship off to a patent lawyer.
> Q: So it's your opinion that Dr. Needleman should have understood that, correct?
> A: Yes.
> . . . .
> Q: Are you aware of any evidence, other than your own belief and suspicion, that anyone from Monsanto determined that any of the claimed inventions were patentable?
> A: So I'll kind of say it again, but probably Dr. Needleman wasn't the only one to read this, but I do believe Dr. Needleman or any big pharma company executive or scientist—they do these things fairly routinely, and they would have said, Gosh, this probably pretty darn cool and we should think about getting a patent on this. I do believe that, and my evidence is this: Because any rational big pharma executive would have looked at this and that would have been their reaction.[15]

While it is true, as Pfizer notes, that the question before the Court is whether Pfizer determined something was patentable and not whether they should have, it is also true that Pfizer has a duty to act in good faith, as does any party to a contract.[16] "That duty prevents one party to

---

[15] Docket No. 824 Ex. 46, 308-10.

[16] *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo. Ct. App. 1986) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.") (quoting Restatement (Second) of Contracts § 205 (1981)).

the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract."[17]  If Pfizer held facts in its "mind" that would lead any reasonable entity with similar experience to conclude that something was patentable, then Pfizer would have acted in willful bad faith, or evaded the spirit of the transaction, if it concluded that the output was not patentable.  Nor would it be good faith for Pfizer to be aware of facts that would lead a rational scientist to conclude something should be patented, but endeavor, ostrich-like, to reach no conclusion on those facts so that no duty would be triggered.  The contract in its entirety imposes a duty on Pfizer, when vested with discretion as to which patentability conclusion to make, to conclude reasonably on the facts it knew.  Accordingly, based on the evidence presented, the Court finds that there is a dispute of fact as to whether Pfizer breached 3.3's requirement that it notify BYU of any patentability determinations.

## IV. PFIZER PARTIAL SUMMARY JUDGMENT #11 (PARAGRAPH 1.6)

Pfizer next asks for summary judgment on BYU's claim that Pfizer breached paragraph 1.6.  Paragraph 1.6 states: "MONSANTO shall furnish prostaglandins, NSAIDs and consulting services to the extent provided in Appendix A."[18]  Appendix A contains four pages of description written by Dr. Simmons.  The description, while technical and detailed, does not contain a list of prostaglandins, NSAIDS, or consulting services to be provided by Pfizer.  However, one line of the Appendix states: "we will test as many NSAIDs as we can obtain for their ability to inhibit

---

[17] *Id.* (citation omitted).

[18] Docket No. 757 Ex. 2, at 2.

COX activity in cells transfected with individual COX isoenzymes."[19]  The Appendix does not mention prostaglandins or consulting services at all.

Pfizer argues that because the Appendix does not identify any specific prostaglandins, NSAIDS, or consulting services, Pfizer did not breach 1.6 by failing to provide them.  Pfizer also argues that even if it had breached 1.6, BYU has been aware of that breach all along and thus the statute of limitations bars any action on the claim at this point.  BYU responds that (1) the "as many NSAIDs as we can" language from the Appendix required Pfizer to provide as many NSAIDs as it could get; (2) naming all the specific NSAIDs would be impractical, since BYU wanted to test as many as it could; (3) by failing to provide the materials, Pfizer breached the implied duty of good faith if not the express terms of the contract itself; and (4) that the contract is ambiguous because 1.6 and the Appendix are inconsistent with each other.

"A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of the terms."[20]  The Court finds that 1.6 and Appendix A, when read together, are ambiguous on two levels.

First, the combination of 1.6's "as provided in Appendix A" and Appendix A's "as many NSAIDs as we can" presents at least two logical interpretations. On the one hand, "to the extent" could refer only to the amount of material to be provided and not the breadth of Pfizer's duties. Under this reading, the "Monsanto shall" language of 1.6 would impose, unequivocally, a duty to

---

[19] *Id.* at A-1.

[20] *Helterbrand v. Five Star Mobile Home Sales, Inc.*, 48 S.W.3d 649, 658 (Mo. Ct. App. 2001).

furnish on Pfizer.  The Appendix would then supply content to the duty.  Thus whatever the Appendix stated that BYU wanted, it would be Pfizer's duty to supply, with no further requirement that the Appendix specifically mandate that Pfizer provide it.  On the other hand, "to the extent provided in" could refer to the amount to be provided by *Pfizer*.  Under this reading, 1.6 would only impose a duty on Pfizer to the extent the Appendix specifically stated that *Pfizer* would provide NSAIDs.  Because the language is reasonably susceptible to two interpretations, the Court finds that the language is ambiguous with respect to NSAIDs.

Second, with respect to the provision of prostaglandins and consulting services, the Court finds the disputed language in 1.6 to be ambiguous because reading it according to its plain meaning renders it meaningless.[21]  The contract requires provision of prostaglandins and consulting services, and the volume and style of that provision is left to be defined in the Appendix.  However, the Appendix makes no mention of either.  Accordingly, by their plain language, 1.6 and the Appendix could be read together to say that the contract requires the provision of no prostaglandins or consulting services.  But adopting this reading deprives the words in 1.6 of any meaning, sending the reader on a circuitous scavenger hunt only to complete the loop and discover the items he was sent to find never existed.  One would expect reasonable parties not to take such pains to say nothing.  Under Missouri law, the Court is required to "construe each term of a contract to avoid rendering other terms meaningless" and a "'construction that attributes a reasonable meaning to all the provisions of the agreement is

---

[21]This same analysis would also apply to the provision of NSAIDs, to the extent that Appendix A does not actually list NSAIDs in a way that would require Pfizer to provide them.

preferred to one that leaves some of the provisions without function or sense.'"[22]  Because reading 1.6 and Appendix A to require the provision of no prostaglandins or consulting services would render a portion of 1.6 senseless, the Court finds that the meaning of 1.6 is not apparent on the face of the Agreement.

> Summary judgment is only appropriate in contract cases where there is no ambiguity and the apparent meaning of the terms can be determined within the four corners of the document. Where . . . the contract is ambiguous, "the intent of the parties must be established by extrinsic evidence and so a question of fact arises as to the intent of the parties to its meaning; thus, it is error to grant summary judgment."[23]

Accordingly, the Court will deny summary judgment on 1.6.

Pfizer argues that even if 1.6 did impose a duty to provide NSAIDs, prostaglandins, or consulting services, the statute of limitations has run on that claim.  BYU responds that the Court has already dealt with this issue in a previous Order.  On February 23, 2011, the Court issued a ruling on a motion for summary judgment filed by Pfizer.[24]  In that Motion, Pfizer argued that BYU's breach of contract claims—including the claim that Pfizer breached by not furnishing those things specified in 1.6—were barred by the statute of limitations.[25]  The Court disagreed, noting that a cause of action does not begin to accrue until damages are suffered and that

---

[22]*RLI Ins. Co. v. S. Union Co.*, 341 S.W.3d 821, 831 (Mo. Ct. App. 2011) (quoting *Dunn Indus. Group, Inc.,* 112 S.W.3d at 428).

[23]*Maritz Holdings, Inc. v. Fed. Ins. Co.*, 298 S.W.3d 92, 101 (Mo. Ct. App. 2009) (quoting *Chadwick v. Chadwick*, 260 S.W.3d 421, 425 (Mo. Ct. App. 2008)).

[24]Docket No. 552.

[25]*Id.* at 15 ("Defendants argue that Plaintiffs' claims of breach of contract . . . are time barred because Plaintiffs knew at the time the Agreement was terminated that Defendants failed to provide any NSAIDs for testing.").

damages did not occur in this case until 1999, when Pfizer started selling Celebrex.[26] Thus, the Court denied summary judgment. In trying to circumvent this ruling, Pfizer has cited to portions of the Court's opinion that deal with BYU's fraud and misappropriation claims and do not concern the accrual date for BYU's breach of contract claims. Accordingly, the Court will reject Pfizer's argument that BYU's 1.6 claim is barred by the statute of limitations based on the Court's earlier Order.

## V.  CONCLUSION

In light of the foregoing, it is therefore

ORDERED that Pfizer's Motion for Partial Summary Judgment Regarding Paragraph 3.3 of the Research Agreement (Docket No. 726) is DENIED. It is further

ORDERED that Pfizer's Motion for Partial Summary Judgment Dismissing Plaintiffs' Claim for Breach of Paragraph 1.6 of the Research Agreement (Docket No. 747) is DENIED.

DATED  March 12, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[26]*Id.* at 18.