IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and DR. DANIEL L. SIMMONS,<br><br>Plaintiffs,<br><br>vs.<br><br>PFIZER, INC., et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON BYU'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANTS' BREACH OF PARAGRAPH 4.1 OF THE RESEARCH AGREEMENT<br><br><br><br>Case No. 2:06-CV-890 |

This matter is before the Court on BYU's Motion for Partial Summary Judgment Regarding Defendants' Breach of Paragraph 4.1 of the Research Agreement.[1]

I. BACKGROUND

The facts of this case are fully set out in the Court's Order dated March 13, 2012,[2] and need not be recited here.

---

[1] Docket No. 758.

[2] Docket No. 896.

## II. STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[3] The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[4] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[5] "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[6]

## III. DISCUSSION

BYU has moved for summary judgment on its claim that Pfizer breached paragraph 4.1 of the Research Agreement. Paragraph 4.1 reads:

> In order for the parties to more fully cooperate in this effort, it may be necessary for UNIVERSITY or MONSANTO to disclose to the other party proprietary information, including information relating to transformed cells, genes, transformation vectors, transformation, selection and regeneration procedures, media formulations, chemicals, DNA sequences and probes which information (including MONSANTO INFORMATION) is confidential and proprietary and is hereafter referred to as CONFIDENTIAL INFORMATION. The parties agree that CONFIDENTIAL INFORMATION will be used only as provided for in this Agreement and will:
> 
> (a) hold any and all CONFIDENTIAL INFORMATION received pursuant to the Agreement in confidence and not disclose such

---

[3] *See* Fed.R.Civ.P. 56(a).

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[5] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> information to third parties without the written consent of the other,
> (b) limit the disclosure of CONFIDENTIAL INFORMATION to those personnel who need such access for purposes of this cooperative effort and who have undertaken the obligation to restrict the use and disclosure of CONFIDENTIAL INFORMATION to the extent provided for by this Article 4, and
> (c) not duplicate or use CONFIDENTIAL INFORMATION in any other manner, provided [(going on to list exceptions)].[7]

BYU alleges Pfizer breached this provision by using confidential information in a manner not "provided for" by the Research Agreement.

The last sentence of the opening paragraph of 4.1 is critical in determining what duties the Research Agreement imposed with respect to confidential information. The sentence reads: "The parties agree that CONFIDENTIAL INFORMATION will be used only as provided for in this Agreement *and* will . . . (list of specific duties)." By using the word "and," the sentence imposes a duty distinct from the duties listed in subparagraphs (a)-(c): the parties will both (1) use the confidential information only as provided in the agreement *and* (2) will obey subsections (a)-(c). Furthermore, the exercise of duties in (a)-(c) is also to be conducted "only as provided in the agreement"—meaning that both the specific restrictions of (a)-(c) and the general restrictions imposed by the Agreement apply in an (a)-(c) situation. The only other language—besides that in (a)-(c)—in the Agreement that applies directly to confidential information is found a few lines up in paragraph 4.1, providing that the parties may be required to share information in order to "fully cooperate in this effort." Thus, the Agreement dictates that the confidential information provided to either party will only be used to "more fully cooperate in this effort."

---

[7]Docket No. 757 Ex. 2, at 8 (emphasis added).

3

4.1(a) imposes a duty on either party to hold all confidential information "in confidence, and not to disclose such information to third parties."

4.1(b) requires the parties to limit disclosure of confidential information to "those personnel who need such access for purposes of this cooperative effort." Thus, if any confidential information was communicated to a person at Pfizer that did not need that information in order to participate in the cooperative effort, 4.1(b) has been breached. The document does not further define "cooperative effort."

4.1(c) prohibits the parties from *duplicating* or *using* "confidential information in any other manner." The words "any other manner" necessarily exclude all uses of the information except in the ways specified. Because the first paragraph of 4.1 only contemplates the exchange of confidential information in furtherance of cooperation in the "effort," it follows that confidential information is only to be *used* by the recipients in furtherance of the "cooperative effort," and only *disclosed* to people who need access to it by reason of their participation in the cooperative effort. Thus, if confidential information was used or disclosed by someone at Pfizer for some other purpose than furthering the cooperative effort, 4.1(c) was breached.

In sum, all people who received confidential information at either Pfizer or BYU: (1) must have needed to receive the information in order to further the cooperative effort; (2) can only use the information to further the cooperative effort; and (3) cannot give the information to anyone who does not need it for the cooperative effort. Thus, all obligations with respect to the use and disclosure of confidential information depend on the definition of "cooperative effort" or

"effort." The Court's task then is to establish the boundaries of the cooperative effort, in order to determine whether Pfizer exceeded those boundaries.

The Agreement does not explicitly define the scope of the "cooperative effort." BYU asserted in its memoranda that the "cooperative effort" equates to the Project. However, at the March 9, 2012, hearing, BYU retracted this statement, instead suggesting that the "cooperative effort" includes but is not limited to the Project, and that it also includes work performed by Pfizer at its own labs. Pfizer agreed that work performed at Pfizer was also part of the cooperative effort. There is thus no dispute that the cooperative effort includes the Project, and that the work conducted at Pfizer must comply with 4.1—or, in other words, must have been within the scope of the cooperative effort if it incorporated confidential information.

A cooperative effort is an effort "involving mutual assistance in working toward a common goal."[8] Pfizer suggests that the goal of the cooperative effort should be defined with reference to the recitals at the beginning of the Research Agreement. The Agreement therein states that the parties entered into the Agreement out of a desire to "promote the increase of useful knowledge relating to biological applications."[9] Pfizer thus suggests that the Court should read cooperative effort to mean something like "the parties' shared goal to advance the science concerning COX-1 and COX-2." Tellingly, this definition includes no restraint on *whose* knowledge the parties would advance. Thus, under such a broad definition, either party could convey confidential COX-1 and COX-2 information to a third party drug company as part of the

---

[8] Oxford American Dictionary 382 (3d ed. 2010) (defining "cooperative").

[9] Docket No. 757 Ex. 2, at 1.

cooperative effort, since the conveyance would necessarily increase that company's knowledge of COX-1 and COX-2.

The Court finds that this definition fails, in light of the whole Agreement, to capture the parties' intent. If the goal were truly just to contribute to the collective human knowledge about cyclooxygenase, then confidentiality provisions restricting the use or disclosure of the knowledge would restrict next to nothing—anyone who received the COX-1 and COX-2 information, for whatever purpose, would have their knowledge of science expanded. Thus, the Court will reject Pfizer's suggested interpretation. Instead, the Court finds that, while the parties did have the shared goal of advancing the relevant science, there was a larger goal contemplated by the Agreement towards which an advance of knowledge was just one step—the development of a COX-2 selective NSAID that BYU could patent and Pfizer could license.

This interpretation is compelled by the parties' own agreement that the cooperative effort included the Project. Section 3 of the Agreement, with its detailed instructions on the patenting and licensing procedures for Project inventions, indicates that BYU hoped that any advance of scientific knowledge would culminate in the discovery of a COX-2 selective NSAID. Thus, in order to be "cooperating" with BYU, Pfizer must have been working not just towards increasing scientific knowledge, but also towards a product which BYU could patent and Pfizer could license. It follows that if Pfizer used confidential information for some other goal—for example, to make its own COX-2 selective NSAID—Pfizer used confidential information outside of the cooperative effort and violated 4.1.

This holding is not undermined by the language of paragraph 3.1. That paragraph contemplates that title to an invention developed solely by one party belongs exclusively to that party. Thus, it could be said that 3.1 clearly allows the parties to be doing their own COX-2 work, for their own financial gain. However, 3.1 also recognizes that the parties may contribute jointly to an invention, and thus become joint title holders. The Court finds that the concept of joint contribution as used in 3.1 does not require that the joint inventors be working in the same lab. Rather, if BYU made one piece and Pfizer added a second piece in order to complete the whole, the parties would properly be deemed to be joint title holders. Thus, under 3.1, if either party used the other's confidential information to develop a COX-2 selective NSAID, the parties must share title to that invention. Conversely, if Pfizer had developed a COX-2 NSAID completely independent of any of the materials or knowledge that BYU shared with Pfizer, then Pfizer would not be using confidential information, 4.1 would not apply, and 3.1 would clearly confer title to that invention on Pfizer. It follows that 3.1 does not contradict the Court's interpretation of 4.1.

In light of the Court's defined meaning of 4.1, the Court must determine whether there is any dispute of fact as to whether Pfizer used confidential information in a non-cooperative manner. BYU has put forth extensive evidence—based on expert testimony, deposition testimony from Pfizer scientists, and inter-Pfizer communications—that Pfizer used confidential information provided by BYU in ways not designed to further the cooperative effort.[10] In response, Pfizer does not dispute that it used the information in the way BYU alleges. Rather,

---

[10] *See* Docket No. 773, at 10-21.

Pfizer argues that, even if BYU's interpretation of 4.1 is correct, there is a dispute of fact as to whether any of the paragraph 4.1 exceptions apply. Pfizer notes that 4.1(c) states that neither party is "subject to the use or disclosure" restrictions if it is shown that, among other exceptions, the information (1) "through no fault of the receiving party becomes part of the public knowledge or literature" or (2) "lawfully becomes available without limitation as to its disclosure from an outside source."[11] If such an exception did apply, then the information BYU provided would not be considered confidential, and thus no violation of 4.1 could be found.

Pfizer has offered the following facts in support of its contention: (1) "[t]he DNA sequence of mouse COX-1, the amino acid sequence of mouse COX-1, and a restriction map of mouse COX-l cDNA were published in 1990 by [Dr. David] DeWitt in the Journal of Biological Chemistry"[12]; (2) the amino acid sequences for COX-1 and COX-2 were revealed by Dr. Simmons at a presentation at George Washington University in May of 1991[13]; (3) Dr. Simmons disclosed the complete amino acid sequences of mouse COX-1 and COX-2 in a 1991 paper based on the George Washington University presentation[14]; (4) the 1991 paper also published "the COX-1 and COX-2 RNA expression in mouse tissues, thereby publicizing the tissues in which COX-l and COX-2 can be found—the same information that BYU now claims Pfizer

---

[11] Docket No. 757 Ex. 2, at 8-9.

[12] Docket No. 816, at 19.

[13] *Id.*

[14] *Id.*

utilized to 'characterize' assays used in process of discovering a COX-2 drug"[15]; (5) "Mouse COX-2 became part of the public knowledge and literature for the additional reason that, in a July 15, 1991 paper in the Journal of Biological Chemistry, Dr. Harvey Herschman of UCLA published the DNA sequence for mouse COX-2 cDNA as well as the amino acid sequence for the mouse COX-2 protein"[16]; (6) "Dr. Herschman's July 15, 1991 paper also disclosed techniques for isolating RNA and performing RNA analysis (e.g., Northern blots)"[17]; (7) Dr. Herschman's paper also disclosed the amino acid alignment of mouse COX-l and mouse COX-2, and specifically pointed to a region of COX-2 useful for making COX-2 specific antibodies"[18]; and (8) "BYU's materials became publicly available when BYU made those materials available for sale through an entity known as Oxford Biomedical Research."[19]

Based on this evidence, a reasonable juror could conclude that a paragraph 4.1(c) exception applies to the allegedly confidential information. Accordingly, the Court will deny summary judgment because there are disputed issues of fact as to whether Pfizer breached paragraph 4.1.

Pfizer has made other arguments to defeat summary judgment, which the Court will here reject.

---

[15]*Id.* at 19-20.

[16]*Id.* at 20.

[17]*Id.*

[18]*Id.* at 20-21.

[19]*Id.* at 21.

Pfizer contends that 4.1 does not apply to its use of biological materials because 4.1 only constrains the use of "proprietary information, including information relating to transformed cells, genes, transformation vectors, transformation, selection and regeneration procedures, media formulations, chemicals, DNA sequences and probes."[20] Because BYU is here protesting the use not of information but of materials that BYU gave Pfizer, Pfizer contends that no breach has occurred. In response, BYU has argued extensively that biological material necessarily reveals information about itself. The Court is persuaded that BYU's contention is fully supported by both the common understanding of what the word "information" entails, and common sense, and thus will reject Pfizer's argument on this point. Paragraph 4.1 applies to biological materials.

Pfizer also argues that the course of performance between the parties demonstrates that BYU did not object to Pfizer's use of the information. Pfizer has directed the Court to several instances in the record that show that Dr. Simmons willingly gave materials and assistance to Pfizer scientists in the hopes of helping their research.[21] While the Court agrees that BYU knew that Pfizer was using the information in pursuit of COX-2 progress, this does not end the inquiry. There has been no proof that BYU thought Pfizer was, at that time, using the confidential information to develop its own NSAID without sharing the results with BYU, which is the vital question. In fact, BYU has offered testimony from Dr. Simmons showing the exact opposite—that Simmons had no idea that Pfizer was using the information for any other purpose

---

[20]Docket No. 757 Ex. 2, at 7.

[21]Docket No. 816, at 8-15.

than to further the parties' cooperative effort.[22]  Accordingly, the Court finds that Pfizer's course of performance arguments do not establish that BYU understood 4.1 to allow Pfizer to use confidential information for its own purposes.

Finally, the Court will reject Pfizer's statute of limitations arguments.  As the Court noted in its October Order, a cause of action does not begin to accrue until damages are suffered and damages did not occur in this case until 1999, when Pfizer started selling Celebrex.[23]

## VIII.  CONCLUSION

In light of the foregoing, the Court will deny summary judgment based on the dispute of fact as to whether a 4.1(c) exception applies, while rejecting Pfizer's arguments that (1) materials, as opposed to information, are not covered by 4.1; (2) that the parties' course of performance demonstrates that 4.1 allowed Pfizer to use confidential information for its independent COX-2 project; and (3) that the statute of limitations bars this claim.  It is therefore

ORDERED that  BYU's Motion for Partial Summary Judgment Regarding Defendants' Breach of Paragraph 4.1 of the Research Agreement (Docket No. 758) is DENIED.

---

[22] Dr. Simmons testified that Pfizer "used [his] materials to [create Celebrex], and they didn't tell [him]" and that he had "no idea that they were using [his] materials the way they did." Docket No. 773, at xxxix.

[23] Docket No. 552 at 18; *see also* Docket No. 896, at 12-13 (rejecting Pfizer's argument that BYU's breach of paragraph 1.6 claim is barred by the statute of limitations).

DATED   March 15, 2012.

                                    BY THE COURT:

                                    _____

                                    TED STEWART
                                    United States District Judge