IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and DR. DANIEL L. SIMMONS,<br><br>    Plaintiffs,<br><br><br><br>            vs.<br><br><br>PFIZER, INC., et al.,<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER ON FIDUCIARY DUTY CLAIMS<br><br><br><br><br><br>Case No. 2:06-CV-890 TS |

This matter is before the Court on the parties' cross motions for summary judgment on BYU's fiduciary duty claims.

## I.  BACKGROUND

The facts of this case are fully set out in the Court's Order dated March 13, 2012,[1] and need not be recited here.

---

[1]Docket No. 896.

## II.  STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[2]  The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[3]  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[4]  "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[5]

## III.  DISCUSSION

In its Complaint, BYU asserted: (1) Pfizer had a special relationship with BYU which imposed fiduciary responsibilities on Pfizer; (2) Pfizer entered into an attorney-client relationship with BYU via the Research Agreement; and (3) BYU and Pfizer were engaged in a joint venture. The parties have filed cross-motions for summary judgment on these issues.

A.  CHOICE OF LAW

The parties dispute whether Utah or Missouri law law should apply to these claims.  The Court has already held that the choice of law provision in the Research Agreement—which states that Missouri law will govern the interpretation of the contract—is enforceable as to the contract.

---

[2]*See* Fed.R.Civ.P. 56(a).

[3]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[4]*Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[5]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

However, BYU argues that its fiduciary claims require a separate analysis because they are not based on interpretation of the contract.

The choice of law provision in the Research Agreement states: "The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri."[6]  Pfizer argues that the "any dispute connected herewith" language encompasses claims such as BYU's fiduciary duty claims.

BYU responds that the "court must employ Utah choice-of-law rules to decide [the] question, so the contract's choice of law is not determinative.  Rather, when the tort law of two states differs, Utah uses the Restatement's four-factor, 'most significant relationship test' to decide what law governs."[7]  However, this Court has recognized that while Utah law governs the choice of law analysis, "[i]t is only when the parties have failed to make a valid choice of law that courts apply traditional conflict of laws rules or apply the 'most significant contacts' analysis of the Restatement."[8]  Thus, to the extent that the parties' agreement has specified a choice of law for claims such as BYU's, the contract and not the "most significant contacts" analysis governs.

In *Unibase Systems, Inc. v. Professional Key Punch*, this Court considered whether tort claims related to a contract were subject to a choice of law provision that read: "This agreement

---

[6]Docket No. 757 Ex. 2, at 11.

[7]Docket No. 700, at 15.

[8]*Unibase Sys., Inc. v. Prof'l Key Punch,* 1987 WL 41873, at *3 (D. Utah July 15, 1987).

and any controversy between the parties relating to the subject matter of this agreement shall be governed by the laws of the State of Utah."[9]  The Court found that a tort claim for fraud based on an allegation that a party used misrepresentation to induce the other into signing a contract was sufficiently related to "the subject matter of [the contract]" to apply the choice of law provision.[10] The Court also reached the more generalized conclusion that "when a tort or other claim is closely related to a contract with an express choice of law clause, in the absence of compelling reasons to the contrary, those closely related claims ought to be governed by the same law."[11]

In similar fashion, BYU's fiduciary, attorney client, and joint venture claims rest heavily on the duties allegedly imposed by the Research Agreement.  Therefore, the Court finds that the choice of law provision in the contract covers these claims.

This holding does not conflict, as BYU suggests, with this Court's prior rulings in *Hercules, Inc. v. Martin Marietta Corporation*[12] and *Wolfe Tory Medical, Inc. v. C.R. Bard, Inc.*[13] *Hercules* examined a choice of law provision's applicability to a discovery dispute arising out of litigation over a contract.  One party claimed the work-product privilege in response to a

---

[9]*Id.* at *2.

[10]*Id.* at *5.

[11]*Id.*  BYU seeks to discredit *Unibase* by noting that the case was decided before Utah adopted the Most Substantial Relationship test found in Restatement § 187.  However, Utah's adoption of Section 187, which explicitly states that the Most Substantial Relationship test is not to be used if the parties have included a choice of law provision, merely confirms the validity of *Unibase*, which applied Section 187 in reaching its conclusion.

[12]143 F.R.D. 266 (D. Utah 1992).

[13]2008 WL 541346 (D. Utah Feb. 25, 2008).

discovery request, and the parties then debated which state's law would govern the work-product question. The clause in question stated that "[t]he Contract shall be governed by, subject to, and construed according to the laws of the State of Colorado."[14] The court noted that this language explicitly pertained only to the "contract," that it did "not purport to govern all relationships between the parties," and that applying it to a work-product privilege claim would be an "unwarranted extension of the language of the contract provision and beyond the obvious intention of the parties."[15] In *Wolfe*, the Court held that a choice of law provision in a contract did not apply to a party's tort claims, based entirely on the language of the provision. The provision was "narrowly drawn" to apply only to the contract itself, and the parties agreed that it did not extend to the tort claims.[16] The Court therefore did not see fit to hold otherwise. Thus, applied to the instant case, *Hercules* and *Wolfe* are clearly distinguishable.

Based on the reasoning of *Unibase*, the Court finds that the choice of law provision in the Research Agreement covers BYU's fiduciary, attorney-client, and joint inventorship claims because they are closely connected to the Research Agreement itself. Accordingly, Missouri law applies.

B.    SPECIAL RELATIONSHIP

In Missouri, five elements must be present to establish a fiduciary relationship:

(1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or

---

[14]143 F.R.D. at 268.

[15]*Id.*

[16]2008 WL 541346, at *2.

ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.[17]

Where the party claiming a fiduciary relationship has failed to show a dispute of fact on one element, the Court need not consider the others.[18] Accepting the facts of this case as proffered by BYU, the Court finds that BYU has failed to make an adequate showing on the issue of subservience and will therefore deny summary judgment for BYU and grant it to Pfizer.

The Court notes that the record clearly indicates that there was a degree of inequality between the parties. However, inequality does not necessarily create subservience, and it did not in this situation. In every partnership, one party will have more money, resources, or experience

---

[17]*BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1106 (10th Cir. 1999) (applying Missouri law) (quoting *Emirick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 526-27 (Mo. 1988)). BYU has attempted to skirt the mandatory nature of the *Emerick* factors by citing to cases that suggest that a fiduciary relationship can exist even absent the presence of the five elements. However, these cases seem to contemplate only those situations where parties enter into legal relationships that, by their nature, impose fiduciary duties. *E.g.*, *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 394 (Mo. Ct. App. 1998) ("A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former. For example, one type of legal relationship in which a fiduciary duty of confidentiality may exist absent the above elements is the physician-client relationship. A fiduciary relationship may also exist in the attorney-client setting absent the listed elements.") (quotation marks and citations omitted). Accordingly, the Court is not persuaded that the *Emerick* factors are not mandatory.

[18]*Gilbreath v. First State Bank of Joplin*, 859 S.W.2d 237, 239 (Mo. Ct. App. 1993) (holding that "whether other elements were shown need not be decided" because "[t]here was no evidence from which a jury could find the first element" and affirming judgment notwithstanding the verdict).

than the other.  This imbalance is often what motivates the formation of a contract—parties enter

into arms-length, contractual relationships in order to take advantage of each other's superiority

in a given area.  Here, BYU bargained for and obtained access to an amount of guidance from

Pfizer on patentability, while Pfizer bargained for and obtained access to BYU's research.  The

relationship between the two parties is thus properly described as a business relationship, and, by

itself, "the existence of a business relationship does not give rise to a fiduciary relationship, nor a

presumption of such a relationship."[19]

Much of BYU's fiduciary duty argument relies on two cases wherein courts outside of

Missouri found that a fiduciary relationship existed between a university and a professor

employee of the university.  These cases are neither controlling nor determinative here.

In *St. John's University, New York v. Bolton*,[20] a university professor—Dr. Bolton—and

his assistant were given "resources and the autonomy and discretion to use those resources,

because they possessed the special knowledge and expertise required to exploit those resources

through useful research that might result in patentable discoveries charged with the responsibility

to determine whether their research was producing any patentable results."[21]  The court held that

this trust created a fiduciary duty on the part of Dr. Bolton.  This was due in large part to the fact

---

[19]*Chmieleski v. City Prods. Corp.*, 660 S.W.2d 275, 294 (Mo. Ct. App. 1983).  The
*Chmieleski* court also noted that "in most instances where a fiduciary relationship has been held
to have existed from business relations, such findings have been in conformity with statutory
requirements, or in furtherance of public policy." *Id.* at 294-95.  The instant case involves neither
category.

[20]757 F. Supp. 2d 144 (E.D.N.Y 2010).

[21]*Id.* at 168.

7

that Dr. Bolton and his assistant maintained physical control over the experiment, part of which took place off campus.  As a consequence it was "difficult, if not impossible, for St. John's to independently obtain information about the progress of the research from sources other than [Defendant]."[22]  Furthermore, Dr. Bolton did not disclose the material information he discovered. It was therefore "difficult to imagine how St. John's would have been able to independently determine the patentability and value of Bolton's . . . research without [his] affirmative disclosure of material information relating to it."[23]

In *Fenn v. Yale University*,[24] a Connecticut court considered roughly the same situation and also found a fiduciary duty.  In *Fenn*, defendant Dr. Fenn had developed an invention in the field of mass spectrometry while employed at Yale University.  The court found that Yale was dependent on Dr. Fenn because he "knew more about the value and patentability of inventions *he developed* than anyone else, and Yale necessarily sought out and reasonably relied on his expertise in evaluating such inventions."[25]  The court also noted that Yale was "was entirely dependent on Dr. Fenn . . . to provide truthful and forthright information regarding the progress and outcome of his federally funded research so that Yale could fulfill its reporting obligations."[26]  Thus, again, much of the University's need to trust its employee was based on the

---

[22]*Id.* at 167.

[23]*Id.* at 168.

[24]283 F. Supp. 2d 615 (D. Conn. 2003).

[25]*Id.* at 632 (emphasis added).

[26]*Id.* The Court also finds it significant that under Connecticut law, which the *Fenn* court was applying, the requirements for establishing a fiduciary duty are significantly more relaxed

fact that the employee was the inventor, and thus had more access to and knowledge about his invention than administrative staff at the University.

This Court takes both *Bolton* and *Fenn* to mean that where a university employee is entrusted with free reign over research subject matter, such that the university will not know what has happened unless the employee discloses his or her progress, the employee may be a fiduciary for the university.  Though there is certainly language in both cases about the respective doctor's superior ability to estimate the value of their inventions, these cases do not focus on the issue of subservience.  Rather, they are premised on the fact that the doctors were the inventors and were, as a result, much more familiar with the inventions than anyone else.  Accordingly, the Court finds that neither *Fenn* nor *Bolton* would require a different conclusion than the Court has reached.

In sum, while the parties to the Research Agreement brought different strengths and weaknesses to their business relationship, the degree of inequality between the parties is not so great as to amount to subservience.  Though the degree and nature of each party's sophistication differs, the "interactions between the parties seems like nothing more than a business relationship between two sophisticated parties."[27]  Accordingly, the Court will grant Pfizer's motion for

---

than in Missouri.  The Supreme Court of Connecticut has "specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Id.*

[27]*CCA Global Partners, Inc. v. Yates Carpet, inc.*, 2006 WL 2883376, at *8 (E.D. Mo. Oct. 5, 2006); *see also Chmieleski*, 660 S.W.2d at 294 ("The evidence on this record does not support the finding of any of the above required elements to establish a fiduciary relationship. What the evidence does reveal is an arms-length bargained-for contract reduced to writing within

summary judgment on the existence of a fiduciary relationship because BYU has not shown

subservience.

C.      ATTORNEY CLIENT RELATIONSHIP

As the Court noted in its March 13, 2012 Order, Pfizer took upon itself an obligation to

review BYU's Project output for patentability.  Because advice about whether something is

patentable is legal advice, BYU maintains that Monsanto entered into a contract to provide legal

advice to BYU.

It is not clear by what logic Monsanto the company could be an attorney for BYU.  To

support the proposition, BYU cites to *In re Allstate Insurance Co.*,[28] without any explanation of

how it applies.  Strangely enough, the case appears to hold the opposite of what BYU suggests

and BYU's pinpoint cite directs the Court to the dissent.  The *Allstate* court considered whether

an insurance company's practice of employing attorneys as staff and then using those attorneys to

provide representation for the insurance company's clients amounted to practicing law.  The

court concluded that "an insurance company which defends cases through its [attorney] employee

does not engage in the practice of law."[29]  By the same token, it would follow that a

pharmaceutical company that employs attorneys who determine whether third party work product

is patentable is not practicing law.

_____

which each party was to perform certain duties in exchange for performance by the other party.").

[28]722 S.W.2d 947 (Mo. 1987).

[29]*Id.* at 950.

Regardless, the Research Agreement does not actually require Monsanto to give legal advice to BYU.  Instead, the agreement imposes an obligation on Pfizer to notify BYU if Pfizer "determines" that something from the Project is patentable.  After notice is given, the contract sets out the procedure for engaging counsel to assist in the patent process.  In other words, Pfizer was not required to advise BYU that something *was patentable*, just whether Pfizer *had made an internal decision* that something was patentable.

For these reasons, the Court will grant Pfizer's motion for summary judgment insofar as it applies to BYU's attorney client relationship claim.

D.      JOINT VENTURE

BYU's next theory is that it was engaged in a joint venture with Pfizer, which would impose fiduciary duties on both parties.  Under Missouri law

> [a] joint venture is essentially an association of two or more persons to carry out a single business enterprise for profit.  The elements of a joint venture are as follows: (1) an express or implied agreement among members of the association; (2) a common purpose to be carried out by the members; (3) a community of pecuniary interest in that purpose; and, (4) each member has an equal voice or an equal right in determining the direction of the enterprise.  The parties must intend to, and in fact do, create a contract of joint venture. Indications of a joint venture include: actively participating and sharing in the profits, all parties having joint and several control, and having a duty to share the losses.[30]

In deciphering the parties' intent, the Court may look to an express agreement (if applicable) between the parties, as well as the parties' behavior.[31]

---

[30]*Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 387 (Mo. Ct. App. 1999) (internal quotations marks and citations omitted).

[31]48A C.J.S. *Joint Ventures* § 9 ("The intent of the parties to create a joint venture is determined by the application of ordinary rules concerning the interpretation and construction of

Though there is a dispute over whether it created a joint venture, there is no dispute that an agreement existed between BYU and Pfizer. The Court has also held that the parties shared a common purpose, which was to engage in research as a means of developing a COX-2 selective NSAID that BYU could patent and Pfizer could license.[32]

The Court finds that, under the terms of the Research Agreement, a reasonable juror could find that the parties had a community of pecuniary interest. "The mere fact that both parties have an economic interest in the activity does not make them joint venturers. The community of pecuniary interest requires that the parties have a right to share in the profits and a duty to share in the losses."[33] Thus, the question before the Court is whether the parties shared profits and losses with respect to the "cooperative effort." The Court notes that, were the cooperative effort to culminate in a patentable discovery, both parties intended to benefit economically. Even though BYU could obtain an exclusive patent on inventions arising out of the Project, BYU was obligated to negotiate with Pfizer for a license so that Pfizer could "share in the profits" of the cooperative effort. In this way, the parties intended to share the gains associated with any success in the alleged venture. "An agreement to share losses can be inferred from an agreement to share profits."[34] Thus, based on the Agreement, the Court finds that a reasonable juror could find a community of pecuniary interest between the parties.

_____

contracts as well as consideration of the actions and conduct of the parties.").

[32]Docket No. 899, at 6.

[33]*Hatch v. V.P. Fair Found., Inc.*, 990 S.W.2d 126, 138 (Mo. Ct. App. 1999).

[34]*Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 737 S.W.2d 206, 217 (Mo. Ct. App. 1987).

The Research Agreement also provides grounds for finding that the parties had equal control over the cooperative effort. The element of control cannot be shown without a demonstration that the parties had "the right to control . . . the operations of the other."[35] Of course, this does not mean that to find a joint venture, a court must find that every aspect of the parties' operations were subject to the other's control. Rather, the Court must simply find that each had control over the other with respect to the operations contemplated by the pursuit of the parties' common purpose.[36]

The Court finds that a reasonable juror could find that the parties had a mutual right to control each other's operations with respect to their cooperative effort to find a COX-2 selective NSAID. Under paragraph 4.1 of the Research Agreement, the parties agreed to use each other's confidential information only in furtherance of the cooperative effort. This essentially gives both parties the right to control the operations of the other's labs—each party is required to only operate in ways that further the effort, and can be prevented, under the contract, from operating in ways that do not. Furthermore, under the Research Agreement, Pfizer had the right to force BYU to negotiate for a license. Similarly, the Agreement explicitly states that Pfizer will have "control

---

[35] *Dillard v. Rowland*, 520 S.W.2d 81, 91 (Mo. Ct. App. 1974).

[36]*See Ritter*, 987 S.W.2d at 388 ("Ritter must establish that BJC and Christian Hospital have equal right to control health care delivery, the business venture or undertaking in which Christian Hospital is engaged. She must show that BJC participated in making decisions regarding delivery of health care and, in particular, Mr. Ritter's surgery."); *Firestone v. VanHolt*, 186 S.W.3d 319, 326 (Mo. Ct. App. 2005) (noting that the fact that two parties "exercised some degree of control over various aspects of the job" was "indicative of the requisite control necessary to find a joint venture").

of [patent] filings, prosecutions, issuances and maintenance of patents."[37]  Thus, Pfizer could

prevent BYU from, for example, acting with respect to the maintenance of a patent that issued

from the cooperative effort.  In short, it appears that, based on the terms of the Research

Agreement, a jury could find that the parties each intended to have a degree of control over the

other within the scope of the cooperative effort.

　　　Having determined that a reasonable juror could find a community of pecuniary interest

and , the Court will deny Pfizer's motion.  With respect to BYU's motion, the Court notes that,

while the Agreement suggests that the parties may have intended to enter into a joint venture, it

does not unequivocally establish the relationship.  Accordingly, the behavior of the parties under

the Agreement is highly relevant to a determination of whether a joint venture was intended.

What the parties did and what they intended it to mean during the period governed by the

Research Agreement, however, is hotly disputed.  Pfizer's behavior, for instance, may well

indicate that it had no intention of performing work in its own labs as part of the cooperative

effort, which could in turn support an argument that Pfizer had no intent to enter into a joint

venture.  While Pfizer's subjective intentions cannot be used to contradict the plain language of

the Agreement when considering breach claims, they may shed light on whether Pfizer intended

the contract to form a joint venture between the parties.  Because there are disputes of fact as to

---

[37]Docket No. 757 Ex. 2, at 5.

what the parties intended, the Court cannot rule as a matter of law that the relationship was or was not a joint venture.[38]  Accordingly the Court will deny summary judgment to both parties.

## IV.  CONCLUSION

It is therefore

ORDERED that Pfizer's Motion for Partial Summary Judgment Regarding Count III (Breach of Fiduciary Duty) of Plaintiffs' First Amended Complaint (Docket No. 682) is GRANTED IN PART AND DENIED IN PART and BYU's Cross Motion (Docket No. 701) is DENIED.

DATED   March 16, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[38]*See* 48A C.J.S. *Joint Ventures* § 11 ("Both elements of the joint enterprise test, community of interest and equality of right to control, require factual determinations, but the state of the evidence may render the joint enterprise issue a question of law."); *accord Labor Disc. Ctr., Inc. v. State Bank & Trust Co.*, 526 S.W.2d 407, 423 (Mo. Ct. App. 1975) ("The existence of an agency relationship is a question of fact for the trier of facts . . . . These rules are no less applicable to the question of a joint-venture.").