IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and DR. DANIEL L. SIMMONS,<br><br>    Plaintiffs,<br><br><br><br><br><br>    vs.<br><br><br>PFIZER, INC., et al.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT NOS. 7 AND 8<br><br><br><br>Case No. 2:06-CV-890 TS |

    This matter is before the Court on  Pfizer's Motion For Partial Summary Judgment Regarding Plaintiffs' COX-1 Trade Secret Claims[1] and Pfizer's Motion for Partial Summary Judgment that Plaintiffs' Alleged "Two-Cell Assay" Trade Secret Has Been Licensed to Defendants.[2]

---

[1]Docket No. 738.

[2]Docket No. 742.

## I.  BACKGROUND

The facts of this case are fully set out in the Court's Order dated March 13, 2012,[3] and need not be recited here.

## II.  STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[4]  The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[5]  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[6]  "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[7]

## III.  DISCUSSION

In this Order, the Court will consider two of Pfizer's Motions, both of which seek summary judgment on one of BYU's alleged trade secrets—Simmons's COX-1 materials and his two-cell assay.

---

[3]Docket No. 896.

[4]*See* Fed.R.Civ.P. 56(a).

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6]*Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[7]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Utah has adopted the Uniform Trade Secrets Act ("UTSA").[8]  Under the UTSA, a trade secret is

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[9]

A.      COX-1

In this Motion, Pfizer contends that the COX-1 information and material provided by BYU to Pfizer was not a trade secret because it was "readily ascertainable by other means."

The "generally known or readily ascertainable" standard "cannot be viewed as whether the information is generally known and readily ascertainable to the general public, but, based on the defendant['s] knowledge and experience, whether the information was known or ascertainable to [the defendant]."[10]  The proper question is thus whether the COX-1 information provided by BYU was known or readily ascertainable to Pfizer at the time it was provided.

In its Complaint, BYU claims that the following were trade secrets at the time they were given to Pfizer: "(1) the mouse COX-l DNA and amino acid sequences; (2) a restriction map for that mouse COX-l DNA sequence; and (3) a mouse COX-l cDNA clone."[11]  Pfizer contends that

---

[8]Utah Code Ann. § 13-24-9.

[9]Utah Code. Ann. § 13-24-2.

[10]*USA Power, LLC v. PacifiCorp*, 235 P.3d 749, 760 (Utah 2010).

[11]Docket No. 778, at i.

3

at the time it received it from BYU, this information had already been published in the Journal of

Biological Chemistry by David DeWitt, a Michigan State University Professor.

At the March 9, 2012 hearing, the parties were asked to respond to the following

question: "Using Dr. DeWitt's sequence, regardless of how difficult or how long the process of

cloning may have been, would Pfizer have been able to produce COX-1 clones identical to those

BYU gave Pfizer?"  BYU conceded at the hearing that DeWitt's sequence would, with

substantial effort, produce the same clones as Simmons's sequence.[12]  The Court takes this to

mean that the two sequences are functionally identical and will therefore hold that the DNA and

amino acid sequences underlying Dr. Simmons's COX-1 clones are not trade secrets.

Pfizer also contends that the restriction map provided by Simmons was fully disclosed by

the DeWitt paper.

> A restriction enzyme is a type of enzyme that is used to cut a strand of DNA in a
> particular location. Many restriction enzymes operate by recognizing a particular
> sequence of DNA (called a "restriction site") and then cutting the DNA at a
> particular spot.  Restriction enzymes are a useful tool for scientists because they
> allow for consistent cutting and manipulation of DNA. . . .  Because most
> restriction enzymes will only cut DNA at a sequence unique to that restriction
> enzyme, a "restriction map" can be created for a particular gene or clone that
> identifies the position of various restriction enzyme cut sites for various restriction
> enzymes based on the DNA sequence.[13]

BYU's contention that Simmons's restriction map is different from the DeWitt restriction map is

based on the claim that Simmons's sequence is different.  Because a restriction map is derivative

of a DNA sequence and the Court has found the sequences here to be functionally identical, the

---

[12]March 9, 2012 Hearing Tr. 106-07.

[13]Docket No. 778, at vi.

Court finds that the restriction map is functionally identical as well.  The restriction map was therefore not a trade secret.

Because the method by which to make a COX-1 clone—the sequence and restriction map—was made public by Dr. DeWitt—Pfizer suggests that Simmons's clones are also, necessarily, readily ascertainable by other means.  BYU claims that the clones that Simmons provided were trade secrets irrespective of the availability of the DeWitt information, because cloning requires substantial time and expense.  Accordingly, BYU argues, an actual clone, regardless of whether the sequence was published, derives economic value from not being "*readily* ascertained" or made.

In making this argument, BYU relies heavily on *Amoco Production Co. v. Laird*,[14] a case from the Indiana Supreme Court.[15]  In that case, Amoco, an oil company, engaged in extensive research to determine the viability of a certain area for oil development.  In doing so, Amoco employed Mr. Clendenning to conduct microwave radar tests that would aid in the process.  Oil was detected.  Mr. Clendenning then sent to a rival oil company—Laird—a map with circles indicating the oil reserves Clendenning had detected.  When Amoco discovered Mr. Clendenning's doings, it brought suit for trade secret misappropriation.

---

[14]622 N.E.2d 912 (Ind. 1993).

[15]The UTSA expressly provides that it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the chapter among the states enacting it." Utah Code Ann. § 13-24-9.  Case law from other UTSA jurisdictions is therefore of heightened relevance when analyzing UTSA claims.

Clendenning and Laird argued that the information that Clendenning had supplied was not secret because anyone could have discovered the oil using processes that were not secret. Accordingly, they argued, the information Clendenning passed on was "readily ascertainable by other means." Amoco responded that its discovery of oil had required a considerable expense of both time and money, and therefore was not "*readily* ascertainable."

The court noted that other UTSA jurisdictions have "frequently looked to the degree of time, effort, and expense required of a defendant to acquire or reproduce the alleged trade secret information by other proper means" in determining whether the information is "readily ascertainable."[16] The court went on to find that "where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection."[17] Accordingly, the court held that the trial court's original finding that Amoco's methods were not "simple or easy to accomplish, and are expensive to develop" was enough to allow for trade secret protection.[18]

In reaching its conclusion, the court was not persuaded by defendants' argument that there was no trade secret because "the alleged trade secret information is readily ascertainable because the discovery of the Indiana reserve sites was facilitated by an already-known process

---

[16]*Amoco Prod. Co.*, 622 N.E.2d at 918. The court noted that Illinois, Alabama, and New York, as well as commentators, had all recognized the significance of the amount of time and money a duplication of an achievement would cost in considering whether the achievement was protectable. *Id.* at 918-19.

[17]*Id.* at 919.

[18]*Id.*

rather than by a procedure exclusively developed, owned, or controlled by Amoco."[19]  The court

noted that the methods were clearly not secret, but cited to compilation trade secret law for the

proposition that "'a trade secret can exist in a combination of characteristics and components,

each of which, by itself, is in the public domain, but the unified process and operation of which,

in unique combination, affords a competitive advantage and is a protectable secret.'"[20]  The

compilation afforded a competitive advantage, even though the process could be duplicated by an

interested party, because of the expense of time and money entailed in duplication.

      The Court recognizes that there is some dissonance between *Amoco* and the instant case.

For example, an oil company seeking to duplicate Amoco's methods would not have access to a

publication disclosing Amoco's step-by-step process for finding oil.  Rather, another oil company

would simply have to use whatever methods it hoped would work.[21]  As such, a competitor with

Amoco would have to start quite a ways back on the race track in order to arrive at Amoco's

place.  In the instant case, a would-be maker of COX-1 in possession of the DeWitt material

would, arguably, start the race much closer to the finish line.  Nonetheless, the Court is

persuaded that *Amoco's* reasoning is applicable here.  The *Amoco* court's ultimate holding was

---

[19]*Id.* at 919-20 (quoting *Trandes Corp. v. Guy F. Atkinson Co.*, 798 F. Supp. 284, 288 (D. Md. 1992)).

[20]*Id.* at 919-20.

[21]Pfizer makes essentially this argument when it tries to distinguish *Amoco*:  "[T]hat case involved trade secret protection for information regarding the location of oil fields where there were no public maps to locate the oil fields where the drilling would take place. But this case involves a much different situation akin to where the location of the oil fields was already publicly known.  In those circumstances, the law is clear that trade secret protection does not apply."  Docket No. 841, at 8 (citation omitted).

that if significant time and expense were required to duplicate an achievement, then the "cost" of achievement is a significant factor in determining whether the achievement deserved trade secret protection.  Though, based on what was publicly available, cloning COX-1 may have been "easier" for a scientist than finding oil was for an oilman, the distance between the starting point and the goal, in both situations, can still be expensive enough to warrant trade secret status.[22]

This rule is clearly accepted in Utah.  The Utah Supreme Court has set out factors from the Restatement as guidelines to follow in the "generally known" analysis, two of which are "the amount of effort or money expended by the business in developing the information" and "the ease or difficulty with which the information could be properly acquired or duplicated by others."[23]  Accordingly, if BYU has shown a dispute of fact as to the expense of creating a COX-1 clone, summary judgment is inappropriate here.

BYU has presented evidence that other laboratories struggled to make COX-2 clones, and suggests that the manufacture of a COX-1 clone would be equally difficult.  Pfizer responds that

---

[22]Pfizer has argued that just because a product took time and effort to make does not mean the product is a trade secret.  For example, suggests Pfizer, a barstool takes money and skill to create, but a barstool is not a trade secret.  Of course, if a barstool is being sold publicly, then the barstool itself is "generally known."  But if one bar stool manufacturer were to give another its barstool as part of a collaboration, before the barstool went on the market, and then the recipient were to use that barstool for its own purposes, it would not be a complete defense for the recipient to claim that it could have made the barstool itself by known processes.  Rather, the recipient would have to show that it could have made the barstool with ease.  Furthermore, were the recipient to move for summary judgment, if the creator of the barstool could show that its barstool took such skill and time to make that the recipient simply could not have made one without significant effort, a dispute of fact would be created as to whether the barstool deserved trade secret protection.

[23]*PacifiCorp*, 235 P.3d at 760.

the labs making COX-2 did not have the DNA sequence, and therefore the time expenditure would differ from COX-1, for which the sequence was available.  Pfizer further cites to scientific manuals from the period that indicate that DNA cloning was routine at the time.  However, the Court finds that BYU has put forward sufficient evidence to show a dispute of fact as to whether cloning COX-1 was expensive enough—in time, money, and effort—to justify classification as a trade secret.  In so holding, the Court notes that determining whether a process would generally be expensive and time consuming is an intensely factual issue—one that is better suited to a jury.

The Court is not persuaded by Pfizer's argument that the COX-1 clones cannot be a compilation trade secret because "all the information needed to create a COX-1 clone—the DNA sequence and known molecular biology cloning techniques—was within the public knowledge and readily available in 1991."  As the Court discussed extensively in a previous order, a compilation of known elements can be a trade secret if it is uniquely valuable.[24]  Here, the COX-1 clone is said to derive a unique value from the alleged difficulty entailed in making one.  Whether a COX-1 clone is actually difficult to make is disputed, and the Court does not here make any finding that it is or is not.  Rather, a dispute of fact being identified as to whether the clone is a valuable integration of known components, the question is one for the jury.

In light of the foregoing, the Court will grant Pfizer's Motion as to the COX-1 DNA sequence and the restriction map, but will deny the Motion as to the COX-1 clone.

---

[24]*See* Docket No. 908, 7-10.

B.      TWO-CELL ASSAY (PFIZER PSJ #8)

In this Motion, Pfizer requests that the Court grant summary judgment on BYU's claim

that Pfizer's use of BYU's two-cell assay was a trade secret violation.  Pfizer contends that there

was no violation because BYU claims that the two-cell assay was developed in the Project,

remained unpatented, and thus was irrevocably licensed to Pfizer under paragraph 3.2.

This issue cannot be resolved without a determination of whether paragraph 3.3 was

violated.  As the Court has previously noted, "[i]f Pfizer did breach paragraph 3.3, then Pfizer

should not be rewarded for its breach with an irrevocable license.  However, if no breach

occurred, then Pfizer is correct that it had a license on the materials and cannot be held liable for

their use."[25]  Because there are disputed issues of fact as to whether 3.3 was violated, the Court

cannot now resolve whether Pfizer's use of the two-cell assay system was a trade secret violation.

Accordingly, the Court will deny summary judgment.

## IV.  CONCLUSION

In light of the foregoing, it is therefore

ORDERED that Pfizer's Motion For Partial Summary Judgment Regarding Plaintiffs'

COX-1 Trade Secret Claims (Docket No. 738) is GRANTED IN PART AND DENIED IN

PART.  It is further

ORDERED that Pfizer's Motion for Partial Summary Judgment that Plaintiffs' Alleged

"Two-Cell Assay" Trade Secret Has Been Licensed to Defendants (Docket No. 742) is DENIED.

---

[25]Docket No. 908, at 12.

DATED   March 26, 2012

BY THE COURT:

_____

TED STEWART
United States District Judge