IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, and DR. DANIEL L. SIMMONS,<br><br>Plaintiffs,<br><br><br><br>vs.<br><br><br><br>PFIZER, INC., et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON BYU'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE MITIGATION OF DAMAGES AND FAILURE TO PATENT AS DESCRIBED IN SPECIAL DEFENSES NUMBERED 24 AND 25 IN THE AMENDED ANSWER<br><br><br><br>Case No. 2:06-CV-890 TS |

This matter is before the Court on BYU's Motion for Partial Summary Judgment Re Mitigation of Damages and Failure to Patent as Described in Special Defenses Numbered 24 and 25 in the Amended Answer.[1]

---

[1] Docket No. 753.

## I. BACKGROUND

The facts of this case are fully set out in the Court's Order dated March 13, 2012,[2] and need not be recited here.

## II. STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[3] The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[4] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[5] "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[6]

## III. DISCUSSION

BYU moves the Court to find that two of Pfizer's defenses are invalid as a matter of law as applied to certain of BYU's contract claims. Pfizer has alleged that (1) BYU should have mitigated any damages stemming from Pfizer's alleged breach of paragraphs 3.3 and 4.1 and (2) BYU should have patented Project output. Each defense will be dealt with in turn.

---

[2] Docket No. 896.

[3] *See* Fed.R.Civ.P. 56(a).

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[5] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.     MITIGATION

Under Missouri law, "one damaged by breach of contract must make reasonable efforts to minimize his damages. The duty to mitigate damages, however, does not arise until the promisee learns that the contract has been breached."[7] BYU contends that it had no duty to mitigate damages at the time alleged by Pfizer because it did not then know that Pfizer had breached either 3.3 or 4.1. Pfizer contends that BYU knew about the basis for both of its breach claims at the relevant time.

1. BREACH OF 3.3

BYU claims it could not mitigate damages accruing under paragraph 3.3 at the time Pfizer identifies because it was not aware that Pfizer had breached. To be aware of a breach of 3.3, BYU must have known (1) that Pfizer had determined certain Project output was patentable without telling BYU and/or (2) that BYU was not reviewing Project output. Pfizer argues that BYU was aware of a breach, and submits the following facts as support:

> 35. Lynn Astle, director of BYU's Technology Transfer Office from January 1, 1990 to April 1, 2006, testified in his deposition that BYU knew in or before 1991 that Simmons' alleged discovery was patentable but that BYU elected not to patent it.
> 36. Dr. Simmons had advised BYU's Technology Transfer Office of his discovery and sought the assistance of that office to seek patent protection for the discovery.
> 37. Prior to April 1991, Dr. Simmons had several discussions with Lynn Astle about patentability. A decision was made by BYU that the "timing wasn't yet right."
> 38. It was the duty of BYU's Technology Transfer Office to protect BYU's interests in intellectual property.

---

[7] *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 391 (Mo. Ct. App. 1998) (citations omitted).

39. The BYU Technology Transfer Office had, prior to 1991, engaged outside patent firms to file patents on behalf of BYU.[8]

The Court notes that these facts establish that BYU, at some point, might have thought that some parts of Simmons's inventions were patentable. However, this does not equate to BYU knowing that Pfizer had (1) come to a conclusion something was patentable and then (2) failed to inform BYU about its determination. Nor does it demonstrate that BYU would know, by virtue of thinking it had patentable discoveries, that Pfizer was breaching its alleged duty to review BYU's materials. BYU has consistently claimed to have been unsophisticated in patent matters and that its reason for entering into the Research Agreement was to secure Pfizer's assistance in making exactly these kinds of determinations. Thus, BYU may well have suspected the COX-2 discoveries were potentially patentable, and then construed Pfizer's silence on the topic to mean they were not. In any event, BYU was entitled to rely on Pfizer's silence. It follows that, even construing all facts in a light most favorable to Pfizer, Pfizer has not shown a dispute of fact as to whether BYU was aware that Pfizer had breached 3.3. Accordingly, the Court will reject Pfizer's failure to mitigate claim with respect to 3.3.

2.      BREACH OF 4.1

In order to show that BYU was aware of the breach of paragraph 4.1, Pfizer cites to evidence that (1) Dr. Simmons gave what he considered to be confidential information to Pfizer; (2) that he expected Pfizer to use it; (3) that he was aware of statements made by Pfizer employees indicating the information was being used; and (4) that Pfizer employees later

---

[8]Docket No. 815, at xxiii.

published articles, some of which Simmons himself went on to cite, that clearly incorporated the confidential information Simmons had provided.[9]

As to Simmons's provision of materials to Pfizer and his knowledge that Pfizer was using them, the Court has previously stated that although it

> agrees that BYU knew that Pfizer was using the information in pursuit of COX-2 progress, this does not end the inquiry. There has been no proof that BYU thought Pfizer was, at that time, using the confidential information to develop its own NSAID without sharing the results with BYU, which is the vital question. In fact, BYU has offered testimony from Dr. Simmons showing the exact opposite—that Simmons had no idea that Pfizer was using the information for any other purpose than to further the parties' cooperative effort.[10]

Thus, the only alleged fact that could support a claim that BYU was aware that Pfizer was in breach of 4.1—i.e. using confidential information for its own COX-2 drug program—is the existence of articles written by Pfizer personnel on COX-2 science that supposedly incorporate Simmons's confidential information.

In an Order dated February 23, 2011,[11] (the "February Order") the Court considered whether these articles put Dr. Simmons on notice that Pfizer was using his confidential information for its own purposes. The argument was then raised by Pfizer as support for its

---

[9]*Id.* at xxv (incorporating by reference Docket No. 816, at lxxviii-lxxxiii, and Docket No. 485, at xix-xxvi).

[10]Docket No. 899, 10-11. The Court would note that this statement was made in response to Pfizer's argument that the course of performance between the parties during the Research Agreement period demonstrated that the parties intended the Research Agreement to allow Pfizer to use confidential information for its own purposes. The language is thus necessarily restricted to the Research Agreement time period and does not foreclose the possibility that BYU became aware of Pfizer's misuse after that time.

[11]Docket No. 552.

claim that the statute of limitations had run on various of BYU's claims.  BYU argued that none of the articles actually revealed that Pfizer was using Simmons's work, and offered other evidence to establish a dispute of fact as to whether BYU had notice.  The Court saw the articles as Pfizer's "strongest argument" that BYU's claims were time barred,[12] but nevertheless concluded that BYU had offered sufficient evidence to demonstrate a dispute as to whether Simmons knew of the breach and therefore denied summary judgment to Pfizer.

On this Motion, the roles are reversed—BYU now seeks to demonstrate that the articles do not create a dispute of fact as to whether Simmons knew that Pfizer was misusing confidential information.  However, if the articles were a strong argument for granting summary judgment on BYU's awareness of a breach in the February Order, they are a strong argument for denying it here.  The Court therefore finds that the articles create a dispute of material fact as to whether BYU was aware of Pfizer's use of confidential information and will deny BYU's motion on this point.[13]

BYU seeks to avoid this result by arguing that, even if the articles put BYU on notice, Pfizer had not shown any evidence that a reasonable course of mitigation was open to BYU.  The

---

[12]*Id.* at 20.

[13]The Court notes that Pfizer has implied, to some degree, that BYU could have drafted the Agreement differently to require Pfizer to return confidential materials at the conclusion of the parties' research relationship.  Pfizer argues that because BYU did not do so, it would have been prudent for BYU to request that Pfizer return all confidential materials.  The Court will here note that an argument that a contract should have been written differently is not a mitigation argument.  Mitigation requires reasonable steps from an injured party after a breach becomes apparent.  BYU certainly could not have rewritten the contract once it learned of Pfizer's alleged breach.  Accordingly, the course Pfizer suggests is not one that has any bearing on the issue of mitigation.

Court is not persuaded that this is the case.  Pfizer has suggested that BYU should have informed Pfizer that 4.1 was being breached, and in that way damages would have been mitigated.  BYU responds that it had no obligation to do so.  The Court agrees that BYU was not required to ensure that Pfizer complied with the Research Agreement.  But the Court cannot find that BYU was permitted to knowingly allow the misuse of confidential information to continue for several years without trying to stop it merely because, as BYU now asserts, there is no evidence that Pfizer would have stopped.  The Court will not engage here in a hypothetical contemplation of what, based on assumptions about both parties' characteristics, either party might have done in order to determine whether BYU had any reasonable mitigation opportunities.  Rather, the Court simply notes that there is a dispute of fact as to (1) whether BYU was aware of the breach and (2) if applicable, whether BYU had any reasonable options for mitigation at the time it became aware.

BYU has also argued that the doctrine of mitigation applies only to special, and not general, damages.  BYU relies on *John Call Engineering, Inc. v. Manti City Corp.*[14] in support of this proposition.  *John Call* held that

> "[i]n the context of general damages for breach of contract, which damages ordinarily will be the amount plaintiff would have received had the contract been completed less the expenses plaintiff saved by not having to perform, the mitigation doctrine rarely applies.  In limited circumstances, however, general damages may be reduced by the amount of gains received by performing another contract which could not have been entered into but for defendant's breach of the

---

[14] 795 P.2d 678 (Utah Ct. App. 1990).

prior contract and plaintiff's being thereby left free to perform the second contract."[15]

In response, Pfizer notes that *John Call* is a Utah case, that the case recognizes some exceptions to the rule that mitigation does not apply to general damages,[16] and that its is not clear which of BYU's damages are general and which are special. In its reply, BYU does not respond to any of Pfizer's contentions.

The Court first notes that Missouri law applies to the interpretation of the Research Agreement,[17] and the Court has discovered no such categorical rule in Missouri.[18] However, even if it were the case that mitigation does not apply to general damages, the Court finds there is significant uncertainty over what portion of BYU's damages should be classified as either special or general. "General damages are those which the law would impute as the natural, necessary and logical consequences of defendant's wrongful act. Special damages are the natural but not necessary result of the wrongful act."[19] Some of BYU's damage claim relies on hypothetical patents BYU may have obtained if 4.1 had not been breached. BYU's loss of those patents may

---

[15]*Id.* at 681.

[16]The Court notes, however, that it is indisputable that the limited exception envisioned by *John Call* in which mitigation might apply to general damages does not apply to the instant case.

[17]Docket No. 704, at 9.

[18]BYU cites to *J.H. Barnett v. Elwood Grain Co.*, a Missouri case, for the same proposition. 153 S.W. 856 (Mo. Ct. App. 1911). The Court finds that this case announces no such general rule. Furthermore, the case involves facts entirely distinct from the instant case and the Court will not stretch them to make the case applicable. Furthermore, as discussed above, even if Missouri did follow such a rule, that would not end the inquiry.

[19]*Parsons Const. Co. v. Mo. Pub. Serv. Co.*, 425 S.W.2d 166, 173 (Mo. 1968).

be a natural result of the breach of 4.1, but it does not appear that such damage would be a *necessary* result. At any rate, it is BYU's burden to establish that no dispute of fact exists on mitigation, and a prerequisite to such a demonstration—under a no-general-damages theory of mitigation—would be a showing that all the damages associated with breach of 4.1 are properly described as "general." Because BYU has not engaged in a classification of its damages, the Court will not find that mitigation is barred based on this argument.

In light of the foregoing, the Court will therefore deny summary judgment on the 4.1 mitigation claim.[20]

B.     FAILURE TO PATENT

Pfizer's twenty-fifth defense is that BYU failed to patent its materials. In what context and to what effect Pfizer intends to argue this defense is unclear. To the extent Pfizer is alleging that BYU should have patented its materials as a defense to BYU's breach of 3.3 claim, the Court finds that this is simply a failure to mitigate argument couched in other terms. The Court will reject the argument to the extent Pfizer intends to rely on it to reduce BYU's calculation of damages stemming from Pfizer's alleged breach of 3.3 because, as noted above, BYU was

---

[20]The Court notes that BYU has cited to *Alexander v. Brown* for the proposition that "[w]here the party having the primary duty for performance has the same opportunity to perform and the same knowledge of the consequences of nonperformance as the party to whom the duty is owed, he cannot complain about the failure of the latter to perform this duty for him." 646 P.2d 692, 695 (Utah 1982). First, the Court notes that this is a Utah case. As has been firmly established in previous Orders, Missouri law applies to the interpretation of this contract. Second, even if *Alexander* was controlling authority, the Court finds its facts so divergent from the instant case that its reasoning would not apply here.

entitled to rely on Pfizer's silence and assume that Simmons's discoveries were not patentable. The Court will therefore grant BYU's motion with respect to this issue.

However, where relevant, Pfizer may still offer statements from Dr. Astle or others regarding BYU's position on the patentability of Dr. Simmons's materials. As BYU notes, granting summary judgment on the failure to patent defense does not equate to a motion in limine preventing all future evidence on what BYU knew or did know about the patentability, as long as such evidence is relevant to other claims besides the failure to mitigate damages.

## IV.  CONCLUSION

In light of the foregoing, it is therefore

ORDERED that BYU's Motion for Partial Summary Judgment Re Mitigation of Damages and Failure to Patent as Described in Special Defenses Numbered 24 and 25 in the Amended Answer (Docket No. 753) is GRANTED IN PART AND DENIED IN PART.

DATED   March 26, 2012

BY THE COURT:

_____
TED STEWART
United States District Judge