James S. Jardine (1647)
Mark M. Bettilyon (4798)
Rick B. Hoggard (5088)
Arthur B. Berger (6490)
Samuel C. Straight (7638)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
jjardine@rqn.com
mbettilyon@rqn.com
rhoggard@rqn.com
aberger@rqn.com
sstraight@rqn.com

Leo R. Beus (admitted *pro hac vice*)
L. Richard Williams (admitted *pro hac vice*)
Mark C. Dangerfield (admitted *pro hac vice*)
BEUS GILBERT PLLC
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona 85251
Telephone: 480-429-3000
Facsimile: 480-429-3100
lbeus@beusgilbert.com
rwilliams@beusgilbert.com
mdangerfield@beusgilbert.com

David B. Thomas – (3228)
Office of the General Counsel
Brigham Young University
A-350 ASB
Provo, Utah 84602
Telephone: 801-422-4722
Facsimile: 801-422-0265
Dave_Thomas@byu.edu

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| BRIGHAM YOUNG UNIVERSITY, a Utah Non-Profit Education Institution; and Dr. DANIEL L. SIMMONS, an individual,<br><br>Plaintiffs,<br>vs.<br><br>PFIZER, INC., a Delaware corporation; G.D. SEARLE & COMPANY, a Delaware corporation; G.D. SEARLE LLC, a Delaware limited liability company; MONSANTO COMPANY, a Delaware corporation; and PHARMACIA CORPORATION, a Delaware corporation,<br><br>Defendants. | Case Number: 2:06-CV-890-TS (BCW)<br><br>**BYU'S MEMORANDUM IN RESPONSE TO PFIZER'S MOTION TO EXCLUDE THE TESTIMONY OF VERN NORVIEL**<br><br>Judge Ted Stewart<br><br>Magistrate Judge Brooke C. Wells |

# INTRODUCTION

Under Section 3.3 of the Research Agreement, Monsanto assumed the responsibility to advise BYU whether it had any "research results obtained from the PROJECT" which were patentable. It is undisputed that Monsanto did not undertake such an analysis and did not advise BYU that it had any patentable inventions. BYU therefore alleges in this litigation that Monsanto breached Paragraph 3.3 of the Research Agreement and that BYU is entitled to damages for that breach, based on the patents Monsanto should have advised BYU to obtain.

To support this claim, BYU hired attorney Vern Norviel, a partner with Wilson Sonsini Goodrich & Rosati. Mr. Norviel was tasked with reviewing Dr. Simmons's possible inventions in the 1991/1992 time frame and determining what patents a reasonable patent attorney would have advised BYU to file. To do so, Mr. Norviel attempted to put himself "in the place of a reasonably competent patent attorney at the time" and "opin[e] on the advice it would have been appropriate to give Dr. Simmons and BYU[.]"[1] In other words, Mr. Norviel's role was to undertake the analysis BYU alleges Monsanto should have taken, and advise on what patents would have been obtainable.[2]

Mr. Norviel approached this assignment as he would if a client came to him requesting help determining if inventions were patentable. He spoke with the inventor, Dr. Dan Simmons. He assigned certain tasks, such as drafting the patent application, to young lawyers in his office. At all times, however, Mr. Norviel has demonstrated a complete understanding of the science

---

[1] V. Norviel Expert Rpt., 18 Feb 11, attached hereto as Exhibit 1, at p. 1.

[2] Mr. Norviel's opinions concerning the patents that would have been obtainable are also relevant to BYU's other claims. *See, e.g.*, Dkt. No. 909, at 6-7.

and patent issues relevant to his testimony. In fact, using the criteria established by Mr. Killworth, who is Pfizer's patent expert, Mr. Norviel is a person of ordinary skill in the art. Those who assisted Mr. Norviel are also persons of ordinary skill in the art.

These facts clearly establish the *bona fides* of Mr. Norviel and of the testimony BYU intends to proffer in this matter.

## FACTUAL RESPONSE

### I. MR. NORVIEL IS EMINENTLY QUALIFIED TO TESTIFY IN THIS CASE.

Mr. Norviel is eminently well qualified to testify in this matter. In addition to a law degree, which he obtained in 1985, Mr. Norviel also has a chemical engineering background.[3] For most of the nearly thirty years that Mr. Norviel has been practicing law, he has been engaged to provide patent advice to companies engaged in biotechnology, chemistry, process and life sciences.[4] At the time Mr. Norviel first started practicing law, the word "biotechnology" was not yet in the common lexicon, as invention in this area of the life sciences was just coming into the marketplace.[5] At that time, he was employed by Chevron and commenced his biotechnology career by assisting Chevron in filing patent applications relating to bacteria which had been bioengineered to assist in cleaning up oil spills and performing other functions in the oil industry.[6] Since that time, Mr. Norviel has written or overseen the drafting of thousands of biotechnology patent applications. These patent applications cover the same type of patent

---

[3] V. Norviel Decl., Dkt. No. 1024, at ¶ 2. It should be noted that, if issued today, Mr. Norviel's degree would be a degree in Chemical and Biological Engineering.

[4] *Id*. at ¶ 4.

[5] *Id*. at ¶ 6.

[6] *Id*. ¶¶ 5-8.

claims at issue in this dispute, including patents on genes, clones, antibodies, and methods of using pharmacological compounds.[7]

Mr. Norviel's expertise has also been widely acknowledged. For example, in 2002 MIT evaluated the patent portfolio of one of Mr. Norviel's clients, a company called Affymetrix.[8] MIT determined that the Affymetrix patent portfolio had the highest technological strength in the area of "biotechnology/pharmaceuticals."[9] In contrast, Pfizer's patent portfolio was ranked third – even though Affymetrix was a small start-up company and Pfizer is a multi-national corporation.[10] This award clearly demonstrates that Mr. Norviel has at least the same level of expertise as would the patent attorneys working for Pfizer who should have undertaken to provide Dr. Simmons with patent advice and filed patent applications on his behalf.[11]

Finally, Pfizer's patent law expert, Richard Killworth, has determined that the level of ordinary skill in the art applicable to Mr. Norviel's hypothetical patent applications is a person with a bachelor's or master's degree in chemistry or a related science and several years of

---

[7] *Id.* at ¶¶ 16-18

[8] *Id.* at ¶ 46.

[9] *Id.*

[10] *Id.*

[11] In addition, in 2003 an IP consulting firm named IPCURA provided a list of the twenty most valuable patents. Mr. Norviel wrote four of those applications which cover biotechnology inventions. *Id.* at ¶ 47. And most recently, in April of 2012, Mr. Norviel was recognized by a legal news provider as one of the top twenty five intellectual property portfolio managers. *Id.* at ¶ 48.

experience working in the relevant field.[12] Mr. Norviel meets these criteria and thus is also qualified as a person of ordinary skill in the art.[13]

## II. MR. NORVIEL'S OPINIONS ARE RELIABLE AND ADMISSIBLE.

Mr. Norviel approached this assignment as he would if a client came to him requesting help determining if inventions were patentable and filing patent applications. Therefore, Mr. Norviel's opinion is from the standpoint of a "reasonably competent patent attorney at the time … opining on the advice it would have been appropriate to give to Dr. Simmons and BYU[.]"[14]

Mr. Norviel clearly has the expertise to render this advice. As noted above, Mr. Norviel has, over the course of his career, written or overseen the drafting of thousands of biotechnology patent applications. In performing these functions, Mr. Norviel routinely analyzes prior art inventions for their potential impact on proposed patent claims.[15] Mr. Norviel has also frequently advised venture capitalists interested in investing in start-up companies regarding the probability that various types of biotechnology patent claims will issue.[16]

In making these determinations, Mr. Norviel must, as he did here, evaluate the prior art, evaluate information he has received from inventors and then make determinations regarding the

---

[12] V. Norviel Decl., Dkt. No. 1024, at ¶¶ 13-14; R. Killworth Expert Rpt., 25 July 11, attached hereto as Exhibit 2, at p. 31, ¶¶ 166-67.

[13] *Id*. ¶ 15.

[14] V. Norviel Expert Rpt. (Ex. 1) at p. 1; V. Norviel Dep., 26 Oct 11, attached hereto as Exhibit 3, at 22:10-14, 26:1-11.

[15] V. Norviel Decl., Dkt. No. 1024, at ¶¶ 16-23.

[16] *Id.* at ¶ 27.

scope of patent claims which could issue, both in the United States and in various countries around the world.[17] Mr. Norviel has this expertise.

In his deposition, Mr. Norviel was asked a series of questions regarding whether he considered himself to be a "technical expert." Mr. Norviel now explains that when he answered those questions he had in mind the various categories of witnesses who often provided testimony in patent trials.[18] He notes that he is "acting as a patent expert in this field. I was never asked if I lacked technical expertise. In fact, I do have this technical expertise. The very narrow question I was asked was whether I was acting as a technical expert in this case. In effect I was never asked the question that is relevant to the motion that has been filed by Pfizer."[19]

Mr. Norviel makes clear that he understands the mechanism by which the COX-2 gene functions. He understands the prior art and he understands the inventions covered by the patent claims he has drafted.[20] As such he clearly has the technical expertise needed to opine in this matter.

### III. MR. NORVIEL ALSO RELIES ON TECHNICAL EXPERTS

In addition to his own expertise, Mr. Norviel has also relied on several technical experts – something he is entitled to do under the rules applicable to expert testimony. Pfizer in fact ignores the primary technical expert relevant to Mr. Norviel's testimony: Dr. Dan Simmons. By

---

[17] *Id*. at ¶ 28-30.

[18] *Id*. at ¶¶ 10-11.

[19] *Id.* at ¶ 11.

[20] *Id.* at ¶ 44.

definition, the inventor on a patent is a person of extraordinary skill in the art. Mr. Norviel has had extensive discussions with Dr. Dan Simmons.[21]

In addition to Dr. Simmons, Mr. Norviel has also made clear that he has relied on others with technical expertise. As Mr. Norviel noted in his report, he "would typically assign such application for preparation within [Wilson Sonsini], review and revise drafts, and communicate with Dr. Simmons about the drafts."[22] Mr. Norviel similarly testified that he did not actually draft the hypothetical patent applications himself – rather, he approached this "very much along the lines of the way I would do it if I had been hired by someone at that time."[23] To that end, Mr. Norviel relied on the assistance of various attorneys and staff at Wilson Sonsini to draft the hypothetical patent claims and to conduct research on various issues of patentability.[24] An attorney in Mr. Norviel's position would typically rely on the work of associates and patent agents with technical expertise to assist in drafting patent claims and forming opinions regarding patentability, and Mr. Norviel was entitled to do so here.[25]

Mr. Norviel testified that Dr. Lucian Orbai at Wilson Sonsini, was the main person involved in drafting the hypothetical patent applications. Dr. Orbai is a patent attorney. He also has a Ph.D. in organic chemistry from Stanford University and qualifies as a person of ordinary

---

[21] *Id.* at ¶ 37.

[22] V. Norviel Expert Rpt. (Ex. 1) at pp. 1-2.

[23] V. Norviel Dep. (Ex. 3) at 27:7-22; 33:16-34:11.

[24] *Id.* at 27:7-28:15.

[25] F.R.E. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.")

skill in the art.[26] Pfizer was fully aware of Dr. Orbai's involvement in drafting the patent applications, both through Mr. Norviel's testimony and through the invoices Mr. Norviel provided at his deposition.[27] As Mr. Norviel testified, after speaking to Dr. Simmons and learning about his potentially patentable inventions, Mr. Norviel "conveyed to Lucian, just as I would normally, [t]hese are the kind of claims I think we should probably have to kind of get here, and this is the kind of material we would want in the specification to support it, and then he sits down and does the typing on the keyboard."[28]

Dr. Orbai then drafted the claims, using simple structural variations on compounds to determine what compounds to claim in the third hypothetical patent application.[29] As Mr. Norviel testified, "[i]t's my belief that the patent lawyer is given a lead, and he or she patents a broader group around the lead molecule, not just the lead molecule. That's what lawyers in this business do."[30] As part of this initial process of drafting the hypothetical claims, Mr. Norviel and his assistants analyzed the question of obviousness as they would with any patent application they filed.[31]

In his rebuttal report, Mr. Norviel addressed patentability issues raised by Pfizer's experts. For example, Pfizer's experts Joseph Mancini and Richard Killworth argued that a 1990

---

[26] V. Norviel Decl., Dkt. No. 1024, at ¶¶ 38-39.

[27] V. Norviel Dep. (Ex. 3) at 27:7-28:18; Wilson Sonsini Goodrich & Rosati invoices ("Invoices"), attached hereto as Exhibit 4. Pfizer has never requested to depose Dr. Orbai.

[28] V. Norviel Dep. (Ex. 3) at 33:16-34:11.

[29] V. Norviel Dep. (Ex. 3) at 108:21-116:10.

[30] *Id.* at 112:19-113:3.

[31] *Id.* at 140:7-141:8.

progress report Harvey Herschman filed relating to his NIH grant was prior art; Mr. Norviel reviewed this and determined there was no evidence that it was public or otherwise qualified as prior art.[32]

Attorney Tao Huang worked with Mr. Norviel to draft his rebuttal expert report.[33] Dr. Huang has a Ph.D. in biochemistry from the Chinese Academy of Medical Sciences and Peking Union Medical College, and worked as a post-doctoral scientist at Princeton University.[34] He has an extensive background in molecular biology and biochemistry. Dr. Huang also qualifies as a person of ordinary skill in the art. Again, Pfizer was fully aware of Dr. Huang's involvement in drafting the rebuttal report both through the invoices Mr. Norviel produced and through Mr. Norviel's testimony.

---

[32] J. Mancini Expert Rpt., 25 July 11, attached hereto as Exhibit 5, at pp. 98-99, ¶¶ 229-31; R. Killworth Expert Rpt. (Ex. 2) at pp. 31-33, ¶¶ 168-72; V. Norviel Expert Rebuttal Rpt., 26 Aug 11, attached hereto as Exhibit 6, at p. 9, ¶30; V. Norviel Dep. (Ex. 3) at 290:15-292:20.

[33] Invoices (Ex. 4) at p. 1; V. Norviel Dep. (Ex. 3) at 398:9-14.

[34] V. Norviel Decl., Dkt. No. 1024, at ¶ 40.

# ARGUMENT

## I. MR. NORVIEL'S OPINIONS MEET THE CRITERIA OF RULE 702

The Supreme Court has determined that Rule 702 requires the Court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."[35] The district court's gatekeeping requirement exists "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[36] Reliability is determined "in light of the particular facts and circumstances of the particular case."[37]

Mr. Norviel's testimony clearly meets these criteria. Mr. Norviel has been tasked to provide expert testimony concerning patents which would have been issued pursuant to paragraph 3.3 of the Research Agreement but for Pfizer's failure to provide appropriate advice. He further offers opinions regarding chemical compounds and processes which infringe these patent claims. As noted above, Mr. Norviel's level of expertise is similar to that of patent attorneys that Pfizer could have retained to fulfill its contractual duties.

In an effort to create controversy where none exists, Pfizer argues that Mr. Norviel must be a person of ordinary skill in the art to provide the testimony he provides. While BYU disagrees with this proposition, the issue is also moot. As noted above, using the test and

---

[35] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1120 (10th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589); *North v. Ford Motor Co.*, 505 F.Supp.2d 1113, 1117-18 (D. Utah 2007) ("Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes on the district court a gatekeeper function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

[36] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

[37] *Id.* at 157.

standard Pfizer's patent law expert believes is applicable, Mr. Norviel qualifies as a person of ordinary skill in the art.

Thus, the cases cited by Pfizer, including *Sundance*,[38] are inapposite. *Sundance* concerned a patent attorney who, by his own admission "has no experience whatsoever in 'the field of tarps or covers.'"[39] The court further found that the attorney's "experience with engines and the like" was not sufficiently related to covers and tarps so as to provide the attorney with the appropriate expertise.[40] In contrast, Mr. Norviel has wide ranging prior experiences dealing with patenting genes, clones, antibodies, assay systems and patent claims covering pharmacological compounds.[41] These experiences provide Mr. Norviel with the appropriate level of expertise. In discussing *Daubert*, the Tenth Circuit has noted that "expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation.'"[42] The Tenth Circuit cautions, however, that "absolute certainty is not required" and instead the litigant "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[43]

---

[38] *Sundance, Inc. v. Merlot Tarpaulin and Sidekit*, 550 F.3d 1356 (Fed. Cir. 2008).

[39] *Id*. at 1362.

[40] *Id*.

[41] V. Norviel Decl., Dkt. No. 1024, at ¶ 18.

[42] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[43] *Id*.

Pfizer's other case law is similarly inapplicable. In *Nexmed Holdings, Inc. v. Beta Technologies, Inc.*,[44] the court did not consider the expert's legal expertise sufficient to qualify him as an expert, especially where he was the former litigation counsel for the defendants; however, the court noted that his "engineering background may be helpful" and did not exclude his technical testimony. Similarly, in *Proveris Scientific Corp. v. Innovasystems, Inc.*,[45] the court allowed the testimony of the patent attorney expert within the area of his technical expertise, satellite design, and only partially excluded his testimony. Mr. Norviel is qualified to discuss the technical aspects of the hypothetical patents due to his background and experience, and these cases illustrate that he should be allowed to testify.[46]

Mr. Norviel's opinions clearly meet this criteria. Mr. Norviel followed the same process he would have followed in 1992 had Dr. Simmons come to him seeking advice regarding patentability. The processes employed by Mr. Norviel included the use of highly skilled

---

[44] 2009 WL 2207180 at *2, No. 2:06CV01014 TC DN (D. Utah July 21, 2009).

[45] 536 F.3d 1256, 1267-68 (Fed. Cir. 2008). Furthermore, "as long as an expert stays within the reasonable confines of his subject area, [Tenth Circuit] case law establishes a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston v. Smith & Nephew Records, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)).

[46] Pfizer also cites to *Medtronic v. Intermedics, Inc.*, 799 F.2d 734, 741 (Fed. Cir. 1986). It is not clear how this case is relevant, because it dealt with the exclusion of an expert that "did not personally have knowledge of the prosecution of the patents in suit but would testify generally about patent law…." There was no discussion of his technical expertise. Pfizer's citation to *Byrne v. Wood, Herron & Evans, LLP*, 450 Fed. Appx. 956, 2011 U.S. App. LEXIS 23127 (Fed. Cir. 2011), is also not on point – the proposed expert in that case did not have any technical expertise in the relevant art. *See also Byrne v. Wood, Herron & Evans, LLP*, 2010 U.S. Dist. LEXIS 88497 *18-20 (E.D. Ky. Aug. 26, 2010).

technical experts and Mr. Norviel's own past experiences to render his opinions.[47] He more than satisfies the appropriate standards.

## II. BYU ALSO RELIES ON PERSONS OF EXTRAORDINARY SKILL IN THE ART

Beyond the expertise of Mr. Norviel, BYU also relies on the expertise of Dr. Dan Simmons, who is identified as the inventor of the patent claims which Mr. Norviel testifies would have issued had Dr. Simmons received appropriate legal advice. As a general rule, an inventor qualifies as persons of ordinary skill in the relevant art.[48] Case law also makes clear that "[i]nventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of *ordinary* skill ...."[49]

It is beyond dispute that patent attorneys drafting patent applications rely on inventors for information concerning the inventions disclosed. Case law also makes clear that "[a]n expert may rely on the testimony of others, to the extent it is reliable, in forming his opinions."[50] And

---

[47] V. Norviel Decl., Dkt. No. 1024, at ¶¶ 43-44.

[48] *See, e.g., Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc) (referring to the "well-settled understanding that inventors are typically persons skilled in the field of the invention"); *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1368 (Fed.Cir.2002) (explaining that the inventor is "presumably also an artisan of ordinary skill in the art" for purposes of comparing expert testimony)

[49] *Byrne v. Wood, Herron & Evans, LLP*, 450 Fed.Appx. 956, 2011 U.S. App. LEXIS 23127 (Fed. Cir. 2011) (emphasis in original) (citing *Standard Oil Co. v. Am. Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985)).

[50] *Apeldyn v. AU Optronics Corp*., 2011 WL 5547779 at 3 (Del. 2011).

the Tenth Circuit emphasizes that "district courts should focus on an expert's methodology rather than the conclusions it generates."[51]

In keeping with that mandate, Mr. Norviel made clear in his deposition that he was also relying on two young patent attorneys in his office.[52] The first, Dr. Orbai, has a Ph.D. in organic chemistry from Stanford University.[53] The second, Dr. Tao Huang, has a Ph.D. in biochemistry from the Chinese Academy of Medical Sciences.[54] It is simply beyond dispute that Mr. Norviel alone or in concert with Drs. Simmons, Orbai and Huang provide the necessary expertise to allow this testimony to be heard by the jury.

## III. MR. NORVIEL'S OPINION ON PATENTABILITY IS ACCEPTABLE UNDER FEDERAL CIRCUIT PRECEDENT.

Pfizer points to case law from the infringement context to argue that Mr. Norviel's opinion is inadmissible. However, the case law cited contains the wrong legal standard. This case is more akin to the "case-within-a-case" standard used in legal malpractice cases. BYU is alleging that Pfizer breached its duty to advise BYU that it had patentable inventions, and that had it properly advised BYU under Section 3.3 of the Research Agreement, BYU would have obtained patents on its inventions.

---

[51] *Dodge*, 328 F.3d at 1222.

[52] *See, e.g.*, V. Norviel Dep. (Ex. 3) at 27:7-28:18, 33:16-34:11, 108:21-116:10, 112:19-113:3, 140:7-141:8, 398:9-14.

[53] V. Norviel Decl., Dkt. No. 1024, at ¶ 39.

[54] V. Norviel Decl., Dkt. No. 1024, at ¶ 40.

In *Davis v. Brouse McDowell, LPA*,[55] the Federal Circuit rejected the suggestion that BYU must, for its hypothetical patent claims, "perform a patentability analysis similar to that required in an invalidity trial."[56] To the contrary, the Federal Circuit has made clear that BYU must prove, by a preponderance of the evidence, that Dr. Simmons would have received patents on his inventions but for Pfizer's negligence or breach of contract.[57] The Federal Circuit has also made clear that in cases such as this one, where a hypothetical patent claim is an element of a state law damages calculation, BYU's "ultimate burden" requires BYU to establish that Dr. Simmons' "inventions would have been held patentable on examination in the PTO or any applicable national patent office in accordance with the criteria of patentability applied during examination."[58] This standard is lower than what would be required in an invalidity trial, where the standard of proof would be higher, and issues such as anticipation, obviousness and enablement would be the subject of detailed argument and testimony.[59]

At no point in this discussion did the *Davis* court suggest that a patent attorney was unqualified to offer this analysis of prior art and patentability or that the plaintiff was required to use additional experts to meet her burden. The *Davis* court ultimately agreed with the district

---

[55] 596 F.3d 1355 (Fed. Cir. 2010).

[56] *Davis v. Brouse McDowell*, 596 F.3d 1355, 1364 (Fed. Cir. 2010)

[57] *Id.* at 1363 (in a legal malpractice claim an inventor "must prove by a preponderance of the evidence, that she would have received patents on her inventions but for [her attorney's] alleged negligence in preparing and filing the applications.").

[58] *Id*. at 1364.

[59] The *Davis* court also notes that the Federal Circuit looks "to regional circuit law for the applicable standard controlling the factual foundation necessary to support an expert's opinion, which is not a matter peculiar to patent law." *Davis* at 1363-64, citing *Novartis Corp. v. Ben Venue Labs Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001).

court that the expert should have been excluded, but that was based on the finding that the attorney's opinion lacked adequate foundation because he had not performed a prior art search or patentability analysis.[60] Without such an analysis, the expert's conclusory statement that "but for the legal malpractice of Brouse McDowell identified throughout this report, Ms. Davis would have been awarded [U.S.] patents on her inventions" was inadmissible.[61]

Mr. Norviel has taken the extra steps of analyzing patentability and responding to Pfizer's experts' attacks on patentability. Mr. Norviel performed this analysis with the assistance of Dr. Simmons and other individuals at Wilson Sonsini who all possess the relevant expertise and on whom he routinely relies. He is entitled to rely on this type of assistance under Rule 703.[62]

## IV. MR. NORVIEL CAN OPINE REGARDING INFRINGEMENT

Mr. Norviel has also offered opinions regarding infringement. These opinions are not controversial as Mr. Killworth has also admitted that Celebrex and Bextra infringe the claims of Mr. Norviel's hypothetical patent applications.[63] It is also undisputed, and subject to much expert testimony that Celebrex, Bextra and Vioxx are all analogs of DuP 697, and thus related compounds. Moreover, Mr. Norviel has a degree in chemical engineering and clearly has

---

[60] *Id.* at 1363-64.

[61] 596 F.3d at 1363.

[62] Pfizer also argues that Mr. Norviel is not qualified to offer opinions regarding the meaning of the terms of the Research Agreement. Dkt. 932 at p. 6. However, Mr. Norviel is merely offering testimony on custom and practice in the field, as an individual in the industry who deals with similar agreements on a regular basis. He is opining from the standpoint of what a reasonable person in the industry would have done under the circumstances, and his testimony is therefore admissible.

[63] R. Killworth Expert Rpt. (Ex. 2) at ¶ 160.

sufficient background and skill to compare the chemical structure of patent claims he has assisted in writing to chemical formulas of well known drugs.[64]

V.  **MR. NORVIEL HAS OVERSEEN PROSECUTION OF THOUSANDS OF INTERNATIONAL PATENTS.**

Mr. Norviel has also opined that BYU would have been able to obtain international patents like the hypothetical patents he drafted. Pfizer challenges Mr. Norviel's qualifications to opine on foreign patent applications since Mr. Norviel does not file these applications himself. However, this ignores the fact that Mr. Norviel oversees the filing of international patents on a regular basis.

Mr. Norviel testified:

> Q.  And is that based on any expertise you have in filing foreign patents?
>
> A.  Almost all of the patents that I pursue for my companies end up being filed in Europe and elsewhere.
>
> *        *        *
>
> Q.  Well, you don't prosecute European patents for a living, correct?
>
> A.  Yes, I oversee the prosecution of the European patents all the time.[65]

---

[64] V. Norviel Decl., Dkt. No. 1024, at ¶ 2. Pfizer points to *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011) for the proposition that "a plaintiff must prove the presence of each and every element or its equivalent in the accused method or device." Dkt 932 at p. 8. That case dealt with tobacco curing methods, which involved numerous elements and claim limitations. Here, the parties are dealing with a claim of variations on a compound. Determining whether a compound infringes is relatively simple and Mr. Norviel is more than qualified to offer that opinion.

[65] V. Norviel Dep. (Ex. 3) at 144:5-145:15.

To the extent Pfizer criticizes Mr. Norviel for testifying that the patents would have issued exactly the same as the US patents, Mr. Norviel later testified that foreign patent counsel "make minor modifications" to the patents and that the international patents "would have been different in a very minor way, if at all."[66] Regardless, minor variations in the patent claims that would have issued abroad are not relevant. In *Davis*, the Federal Circuit "reject[ed] the suggestion that Ms. Davis would have had to identify claims for her inventions."[67] In other words, she merely had to prove that *a* patent would have issued, not that specific claims would have issued. Likewise, BYU does not have to prove that international patents issued based on the hypothetical inventions would be identical to the ones in Mr. Norviel's report.

## CONCLUSION

Mr. Vern Norviel is eminently well qualified to testify in this case and Pfizer's motion should be denied.

RESPECTFULLY SUBMITTED this 24th day of April, 2012.

                RAY QUINNEY & NEBEKER P.C.

                By /s/ Mark M. Bettilyon
                    James S. Jardine
                    Mark M. Bettilyon
                    Arthur B. Berger
                    Samuel C. Straight

---

[66] V. Norviel Dep. (Ex. 3) at 144:19-145:9.

[67] 596 F.3d at 1364.

**BEUS GILBERT PLLC**
    Leo R. Beus
    L. Richard Williams
    Mark C. Dangerfield

OFFICE OF THE GENERAL COUNSEL
    David B. Thomas
    BRIGHAM YOUNG UNIVERSITY

# CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of April, 2012, I electronically filed the foregoing **BYU'S MEMORANDUM IN RESPONSE TO PFIZER'S MOTION TO EXCLUDE THE TESTIMONY OF VERN NORVIEL** with the Clerk of the United States District, District of Utah Central Division, using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Richard O'Malley, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: 312-853-3577<br>Facsimile: 312-853-7036<br>romalley@sidley.com | John Caleb Dougherty<br>Richard T. Mulloy<br>Kathy J. Owen<br>DLA PIPER<br>6225 Smith Avenue<br>Baltimore, MD 21209<br>Telephone: 410-580-4140<br>Facsimile: 410-580-3140<br>john.dougherty@dlapiper.com<br>richard.mulloy@dlapiper.com<br>kathy.owen@dlapiper.com |
| Brent O. Hatch<br>Phillip J. Russell<br>Hatch, James & Dodge, P.C.<br>10 W. Broadway, Ste. 400<br>Salt Lake City, UT 84101<br>Telephone: 801-363-6363<br>Facsimile: 801-363-6666<br>bhatch@hjdlaw.com<br>prussell@hjdlaw.com | William F. Lee<br>Amy K. Wigmore<br>WilmerHale<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>Facsimile: (617) 526-5000<br>william.lee@wilmerhale.com<br>amy.wigmore@wilmerhale.com |

/s/ Lori M. McGee

1180850